**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 10–CV–01546–REB–CBS

The Direct Marketing Association,

       Plaintiff,

       v.

Roxy Huber, in her capacity as Executive
   Director, Colorado Department of Revenue,

       Defendant.

_____

<u>**PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION
AND INCORPORATED MEMORANDUM OF LAW**</u>
_____

      The Plaintiff, the Direct Marketing Association ("the DMA"), moves pursuant to

Fed. R. Civ. P. 65 for the entry of a preliminary injunction enjoining the Defendant, Roxy

Huber, the Executive Director of the Colorado Department of Revenue ("Department"),

from enforcing the notice and reporting obligations imposed on out-of-state retailers

under a new Colorado law, House Bill 10-1193, [2010 Colo. Sess. Laws 54 (codified at

COLO. REV. STAT. ANN. § 39-21-112(3.5) (2010)) ("the Act")] and under the regulations

promulgated by the Department to implement the Act, [1 COLO. CODE REGS. § 201-1:

39-21-112.3.5 (2010) (appearing at 33 Colo. Reg. 14 (July 10, 2010)) ("the

Regulations")].   This Court should enjoin enforcement of the Act and Regulations

because the DMA has a strong likelihood of success on its claims that such obligations,

on their face, violate the Commerce Clause of the United States Constitution, art. III, § 8, cl. 3.  Furthermore, absent an injunction, affected DMA members will suffer irreparable harm to their businesses resulting from the forced disclosure to the Department of the private purchasing information of their Colorado customers, in addition to impermissible violations of their constitutional rights.[1]

In support of its motion, the DMA submits the accompanying declarations of Jerry Cerasale, Jeana M. Petillo, Professor Kevin Lane Keller, and Thomas J. Adler, PhD.[2]

## I.    Introduction

This case concerns an attempt by the State of Colorado to compel businesses and non-profit organizations located outside of Colorado that do not collect Colorado sales and use tax to report to the Department the identities and purchasing behavior of their Colorado customers.  In February 2010, the General Assembly enacted, and the Governor signed into law, H.B. 10-1193, "*An Act Concerning The Collection Of Sales And Use Taxes On Sales Made By Out-Of-State Retailers, And Making An Appropriation Therefor*," prescribing new notice and reporting obligations imposed on "each retailer that does not collect Colorado sales tax." [COLO. REV. STAT. ANN. § 39-21-112(3.5)(c), (d).]  The Act was passed in an effort to circumvent the well-established and undisputed Commerce Clause limitation upon the authority of a state to require a

---

[1]  In accordance with D.C.COLO.LCivR 7.1A and as detailed in the relevant certification, *infra*, counsel for the DMA made extensive, good faith efforts, prior to filing this motion, to determine if the parties could prevent such imminent harm by agreeing upon a stipulation for a suspension of the Act's notice and reporting requirements, or equivalent preliminary relief, pending full judicial review of the Act's constitutionality.  Counsel for the parties, however, were not able to reach an agreement, thereby, necessitating this motion.

[2] Citation to the declarations submitted in support of the DMA's motion are provided according to the following convention: "[(Declarant's last name) Dec. ]"

remote seller that has no physical presence in the state to collect that state's sales or use tax. [*See Quill Corp. v. North Dakota*, 504 U.S. 298, 311-19 (1992).] The Act seeks to impose upon out-of-state direct marketers a set of alternative notice and reporting requirements that are, in purpose and effect, even more onerous than the prohibited sales/use tax collection obligation.  Indeed, the avowed purpose of the law, as conceded by the Department's Director of Tax Policy, is to force burdens upon non-collecting Internet and catalog retailers that are so unpleasant that such retailers will choose to surrender their constitutional protection under *Quill* and agree to collect Colorado sales tax.   [Petillo Dec., Ex. C.]

The Act and Regulations (copies of which are attached hereto for the Court's convenience as Exhibits 1 and 2, respectively) establish three separate obligations for affected out-of-state retailers: (1) in connection with each sale transaction, the retailer must notify its Colorado customers that although it does not collect Colorado sales tax, the purchaser is obligated to self-report use tax to the Department ("Transactional Notice");  (2) the retailer must provide Colorado customers annually, by First Class Mail, a detailed listing of their purchases and also inform the customer that s/he is obligated to report use tax on such purchases, and that the retailer is required by law to report the customer's name and total amount of purchases to the Department ("Annual Purchase Summary"); and, most significantly, (3) the retailer must turn over to the Department annually the name, billing address, all shipping addresses, and the total amount of purchases of each of its Colorado customers. ("Customer Information Report").  [*See* COLO. REV. STAT. ANN. § 39-21-112(3.5)(c)(I), (d)(I)(A), (d)(I)(B), (d)(II)(A); COLO. CODE

REGS. § 201-1:39-21-112.3.5(2), (3), & (4).]  The Act and Regulations impose

substantial penalties on retailers who fail to comply with these requirements with

respect to each affected transaction and customer which, as the Regulations make

clear, could amount to tens or even hundreds of thousands of dollars.   [*See* COLO. REV.

STAT. ANN. § 39-21-112(3.5)(c)(II), (d)(III); COLO. CODE REGS. § 201-1:39-21-

112.3.5(2)(f) (including provision for $50,000 first year cap); (3)(d) (including provision

for $100,000 first-year cap); (4)(f) (including provision for $100,000 first-year cap)].

These new requirements are unprecedented, as no other state in the country

requires that individual customer transaction information be turned over to its

department of revenue.  The Act will inflict significant, and irreparable, harm upon

catalog and Internet sellers located outside of Colorado.  As demonstrated by the

survey evidence presented with this motion [*see* Adler Dec., Ex. B], out-of-state retailers

that are subject to the Act will lose substantial sales to consumers who consider the

disclosure of their personal purchasing history information to the Department to be an

invasion of privacy.  Indeed, many of the Colorado residents surveyed reported that

they will stop purchasing from out-of-state retailers who are required to report their

purchasing information to the Department.[3]

The threat to out-of-state retailers is real and immediate, as the Act and

Regulations are currently in effect.  Affected retailers are now required to give the

Transactional Notice to Colorado purchasers in connection with each sale (or be subject

---

[3]  The survey evidence offered by the Plaintiff shows that a substantial majority of
Colorado consumers view the annual disclosure to the Department as an invasion of privacy
(69%) and will decrease their purchases from out-of-state retailers as a result (67%).  [Adler
Dec., ¶ 5 and Ex. B at 2, 5-6.]

to penalties).  Moreover, these remote sellers face the imminent harm of additional

costs and lost business that will be associated with the Annual Purchase Summaries

and Customer Disclosure Reports that must be provided in a matter of months (and for

which retailers must begin implementing computer processes and systems now), long

before this court will have the opportunity to make a final determination of the

constitutionality of the Act and Regulations through dispositive motions or trial.  The

DMA therefore seeks a preliminary injunction against enforcement of the notice and

reporting requirements, pending full adjudication of its claims by the Court.

## II.      Summary of Argument

As summarized below and discussed more fully in Section IV, *infra*, the DMA's

motion should be granted because it satisfies each of the requirements for a preliminary

injunction with regard to Counts I and II of its First Amended Complaint ("Complaint")

alleging facial violations of the Commerce Clause.[4]  The DMA also demonstrates in

section IV that it has the necessary associational standing to bring such claims.

---

[4]  It is important to note that the requirement of the new law that out-of-state retailers must annually report the purchase information of their Colorado customers to the Department, *see* COLO. REV. STAT. ANN. § 39-21-112(3.5)(d)(II)(A), implicates, in addition to discriminatory and impermissible regulation under the Commerce Clause, a host of other constitutional protections, as well.  The DMA in its Complaint contends that the Act and Regulations chill the exercise of free speech of both consumers and retailers, trample the right to privacy of consumers, and deprive retailers of proprietary, trade secret information without due process or fair compensation.  Such claims are *not*, however, before the Court on this motion. These claims present important issues of constitutional law, some of which are matters of first impression, regarding the extent to which customer purchase information is protected by the Constitution and whether the government may compel disclosure of such information from businesses without any procedures that allow either the customer or the retailer to raise objections before the disclosure is made or penalties attach.  Although irreparable harm to consumers and retailers may ensue from violations of these constitutional rights, as well, they depend upon a more developed record and do not lend themselves to determination upon a motion for preliminary injunction.

In order to obtain a preliminary injunction, the DMA must show: (1) a likelihood of success on the merits of its claims; (2) a likelihood that DMA members will suffer irreparable harm in the absence of a preliminary injunction; (3) that the balance of equities tips in favor of the DMA; and (4) that the injunction is in the public interest. [*Chamber of Commerce of the United States v. Edmondson*, 594 F.3d 742, 764 (10th Cir. 2010).]

The DMA has a strong likelihood of success on the merits with regard to both Count I and Count II of its Complaint alleging violation of the Commerce Clause.   The Act and Regulations discriminate, on their face, against interstate commerce.  Rather than regulating even-handedly, the Act and Regulations are specifically targeted at retailers with no physical presence in Colorado that "do[] not collect Colorado sales tax," but the Act and Regulations do not apply to in-state retailers, who are required by law to collect Colorado sales tax.  Indeed, the title of the Act makes clear its application solely to out-of-state companies:  "*An Act Concerning The Collection of Sales and Use Taxes On Sales Made By Out-of-State Retailers* . . ." (emphasis added).

Such facially discriminatory laws are virtually *per se* invalid under the Commerce Clause.  [*Dorrance v. McCarthy,* 957 F.2d 761, 765 (10th Cir. 1992) (*citing City of Philadelphia v. New Jersey*, 437 U.S. 617,624 (1978)).]   As a result, the burden falls on the Defendant to prove, under the strictest scrutiny, that the Act and supporting Regulations serve a legitimate local interest that cannot be achieved through reasonable nondiscriminatory alternatives.  [*Id.* (*citing Hughes v. Oklahoma*, 441 U.S. 422, 336-37 (1979)).]  In fact, a non-discriminatory alternative for promoting self-

reporting of use tax by Colorado consumers is readily available: adding a line for such reporting to the Colorado individual income tax return, as is the practice in over 20 other states.  [Petillo Dec., ¶ 4 & Ex. D.][5]  Thus, the DMA is likely to prevail on Count I of its Complaint.

In addition, the out-of-state companies and organizations subject to the Act lack the minimum connection to Colorado necessary under the Commerce Clause for the state to impose upon them notice and reporting obligations of the kind set forth in the Act and Regulations.  The "physical presence" requirement of *Quill* represents the application of a fundamental limitation on state authority under the dormant Commerce Clause, prohibiting a state from unduly burdening interstate commerce.  [*See Quill*, 504 U.S. at 311-13.]  In response to such limitations, Colorado cannot devise alternative, and even greater, burdens on interstate commerce that apply only to remote sellers who are otherwise protected from state tax collection obligations under *Quill,* and then condition relief from such alternative burdens on the waiver of the affected retailers' constitutional rights.  [*See, e.g., Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 893 (1988) (state may not condition the availability of other important rights on the waiver of a foreign corporation's constitutional rights).]  The DMA thus has a likelihood of success on Count II of its Complaint, as well.

---

[5]  Colorado purchasers are required to self-report the use tax due on their purchases on which no sales tax is collected by the retailer. [*See* COLO. REV. STAT. ANN. § 39-26-204(1)(b).] The State relies upon consumers to comply voluntarily with this obligation by filing a Colorado Consumer Use Tax Return, Form DR 0252W.  Colorado's Individual Income Tax Return, Form 104, does not include a section enabling Colorado taxpayers to report their use tax when reporting their state income tax. (Colorado tax forms are available on the Department's website at http://www.colorado.gov/cs/Satellite/Revenue/REVX/1177017542056.)

If not enjoined, the notice and reporting requirements of the Act and Regulations will cause irreparable harm to affected out-of-state retailers.  First, the violation of the rights of affected out-of-state retailers under the Commerce Clause is itself irreparable injury sufficient to support a preliminary injunction.  [*American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999) (*citing American Libraries Ass'n v. Pataki,* 969 F. Supp. 160, 168 (S.D.N.Y. 1997)).]  Next, affected catalog and Internet sellers face significant pecuniary harm, whether they comply, or do not comply, with the Act and Regulations.  Compliance subjects out-of-state retailers to the time and expense associated with satisfying each of the notice and reporting requirements of the law.  What is worse, the mandated disclosure of customer information to the Department will adversely impact sales and cause affected retailers to lose permanently many of their Colorado customers.  [Keller Dec., ¶¶ 6-13.]  Electing not to comply with the law, however, subjects out-of-state retailers to substantial penalties.

Next, the balance of equities clearly favors the DMA.  Colorado "does not have an interest in enforcing a law that is likely constitutionally infirm."  [*Edmondson*, 594 F.3d at 771.]  Furthermore, enjoining the law simply maintains the status quo, and in no way interferes with the state's administration of its tax system.  The state will suffer no injury from preliminary relief and, should the law ultimately be upheld, the Department will be able to obtain subsequently from retailers the sensitive customer information that the Act and Regulations demand.

Finally, "'the public interest will perforce be served by enjoining the enforcement of invalid provisions of state law.'"  [*Edmondson*, 594 F.3d at 771 (*citing Bank One v.*

8

*Guttau*, 190 F.3d 844, 848 (8ᵗʰ Cir. 1999)).]  The public interest will also be served by preventing, until the Court can fully consider the case, the disclosure to the Department of the private purchasing information of thousands of Colorado citizens.  An overwhelming majority of Colorado consumers object to such disclosure [*see* Adler Dec., Ex. B at 2, 5], and there is no countervailing governmental interest which demands such sensitive purchasing information be provided before an adjudication on the merits.

In sum, because the DMA's motion satisfies all the criteria for a preliminary injunction, its request for the entry of an order enjoining enforcement of the notice and reporting obligations set forth in COLO. REV. STAT. ANN. § 39-21-112(3.5) (2010) and 1 COLO. CODE REGS. § 201-1:39-21-112.3.5 (2010) should be granted.

### III.    Specific Facts Relevant to the DMA's Motion

<u>The DMA's Members are Affected by the Act and Regulations</u>

The DMA is the nation's leading trade association of companies and organizations engaged in or supporting the sale of products directly to consumers via mail order, telephone orders, and the Internet, with more than 3,000 members. [Cerasale Dec.,¶ 2.]  A central purpose of the DMA is to advance the interests of direct marketers in securing fair and non-discriminatory treatment under both federal and state laws and regulations.  [*Id.,* ¶ 3.]

Numerous DMA members are affected by Act.  Many of the DMA's members lack any physical presence in Colorado and do not collect Colorado sales or use tax on their sales to residents of the state. [*Id.,* ¶ 4.]  Moreover, although the Regulations adopted

by the Department exclude small retailers from the Act's requirements, and limit the

obligation of affected retailers to provide the Annual Purchase Summary to those

Colorado consumers whose taxable purchases exceeded $500, these thresholds do not

exclude many of the DMA's out-of-state members, who are, therefore, subject to the

onerous notice and reporting requirements of the Act and Regulations.  [*Id.,* ¶¶ 7, 9, 11.]

<u>The Act and Regulations Do Not Apply to In-State, Colorado Retailers</u>

   The Act and Regulations do not, however, apply to in-state, Colorado retailers.

Indeed, the title of the Act explicitly states that it applies solely to out-of-state

companies:  "*An Act Concerning The Collection of Sales and Use Taxes <u>On Sales</u>*

<u>*Made By Out-of-State Retailers*</u> . . ." [2010 Colo. Sess. Laws 54; COLO. REV. STAT. ANN.

§ 39-21-112(3.5) (emphasis added).]  The legislative history of the Act also makes clear

that its intent is to impose new requirements with respect to out-of-state retailers that

are not obligated to report Colorado sales and use tax because of the protections

afforded them under the Commerce Clause and the *Quill* decision.  [Petillo Dec., Ex. A

(the bill "relates to current law requiring a retailer to collect sales tax from a person

residing in this state only if the retailer has sufficient connections with this state"), Ex. B

("In 1992, the U.S. Supreme Court clarified that states can only make companies collect

sales tax if they have a physical presence in the state.") (citing *Quill*).]

   Furthermore, the Act and Regulations impose these notice and reporting

requirements only on retailers that do "not collect Colorado sales or use tax."  [COLO.

CODE REGS. § 201-1:39-21-112.3.5(1)(a)(i).]  This segment of "non-collecting" retailers

necessarily excludes in-state Colorado retailers, because retailers doing business in

Colorado are required, under Colorado law, to obtain a sales tax license from the Department and to collect the sales tax from the purchaser at the time of the sale.  [*See* COLO. REV. STAT. ANN. §§ 39-26-103(1)(a),  39-26-106(2)(a), 39-26-204(2).][6]  Indeed, it is unlawful, and a class 3 misdemeanor, for a retailer subject to the Colorado sales tax law to make sales at retail in Colorado without a license. [*Id.* §§ 39-26-103(1)(a), (4).]  In addition, a retailer that is obligated to collect Colorado sales tax but willfully fails to do so is guilty of a felony. [*Id.* §§ 39-21-118(2).]

Since in-state retailers must, under threat of criminal sanction, collect and remit Colorado sales tax, each retailer that does <u>not</u> collect Colorado sales tax is, by definition, located outside the state.  Thus, the Act and Regulations, both in purpose and effect, impose differential treatment on a specific segment of out-of-state retailers.

<u>The Notice and Reporting Requirements of the Act and Regulations Impose Significant Burdens and Substantial Harm on Out-of-State Retailers</u>

As previously stated, out-of-state retailers subject to the Act and Regulations must satisfy three different sets of obligations.  Each imposes different burdens.

*Transactional Notice*

Affected out-of-state retailers are required, in connection with each sale to a Colorado purchaser, to provide a Transactional Notice regarding the purchaser's obligation to self-report use tax on the purchase.  [*See* COLO. CODE REGS. § 201-1:39-

---

[6] Colorado law imposes sales tax on all non-exempt, retail sales in the state. [*See* COLO. REV. STAT. ANN. §§ 39-26-104, 39-26-106(1)(a)(II).] Colorado law also imposes, as a companion to the sales tax, a use tax on the cost of taxable goods or services purchased at retail.  COLO. REV. STAT. ANN. § 39-26-202(1)(b).  The use tax applies to purchases made by consumers outside the state when the product is delivered or brought into Colorado for use in the state.  [*See* COLO. REV. STAT. ANN. § 39-26-204(1)(b).] The use tax is clearly a tax on the consumer, not on the retailer. [*Id.*]

21-112.3.5(2).]  The Regulations set forth a detailed and convoluted set of requirements regarding the content and placement of the Transactional Notice that must be displayed "in close proximity to the total price." [*See id.* § 201-1:39-21-112.3.5(2)(a)–(e).]  As a practical matter, many affected direct marketers who sell products to consumers throughout the United States will have to provide the Colorado statutory notice on every transaction to every customer, whether the customer resides in Colorado or not, since online "check-out" screens and printed invoice or shipping documents are typically uniform for customers across the United States.  Moreover, retailers must incur substantial compliance costs to modify their computer systems and printed forms.  Of greater concern, however, with regard to the Transactional Notice, is the possibility that other states and local jurisdictions (in Colorado alone, there are dozens of "home-rule" localities) around the United States may impose additional, different and conflicting notice requirements on remote sellers, necessitating costly, cumbersome, and never-ending modifications to basic sales documentation.[7]

*Annual Purchase Summary*

Affected retailers are also required to send, via First Class Mail by January 31 of each year, an Annual Purchase Summary to each Colorado purchaser who purchases $500 or more of taxable products from the retailer, informing the purchaser of the total amount of his or her purchases and listing the date, amount and category of each

---

[7] The Regulations implicitly acknowledge as much, by providing that a retailer that is required to provide a similar notice for another state may provide a more generalized notice if it "contains substantially the information required" by Colorado.  [*See id.* § 201-1:39-21-112.3.5(2)(e).]  But this "accommodation" does little to remedy the problem of multiple states and localities demanding different, additional or conflicting content for the Transactional Notice that are not "substantially" the same as the Colorado requirements.

12

individual purchase. [COLO. REV. STAT. ANN. § 39-21-112(3.5)(d)(I)(A), (B); COLO. CODE REGS. § 201-1:39-21-112.3.5(3)(a), (c).]  The Regulations define the term "Colorado purchaser" to include any customer of the retailer located outside the state who requests that goods be shipped into Colorado.  [COLO. CODE REGS. § 201-1:39-21-112.3.5(1)(b)(i).]  Thus, affected retailers are required by the Regulations to send Annual Purchase Summaries to persons in states other than Colorado, such as individuals who send holiday gifts to family and friends in Colorado.

The aggregate cost of such additional, required mailings is not insignificant.  Out-of-state retailers must alter their systems and practices in order to generate and send such detailed summaries, which will be numerous for larger retailers. [Cerasale Dec., ¶ 9.]  Moreover, retailers will incur both internal costs associated with computer programming and out-of-pocket expenses for printing, processing and distributing the Annual Purchase Summaries.[8]

In addition, the Annual Purchase Summary must inform the customer that the retailer is required by law to report to the Department the customer's name and total dollar amount of purchases made by the customer.  [COLO. REV. STAT. ANN. § 39-21-112(3.5)(d)(I)(A); COLO. CODE REGS. § 201-1:39-21-112.3.5(3)(a).]  This aspect of the Annual Purchase Summary has particular significance, because, as discussed below, the requirement that out-of-state retailers must report their customers' purchase information to the Department is considered by most Colorado consumers to be an

---

[8] The postage charges alone to send the summaries via First Class Mail are $0.44 per piece.  *See* http://www.usps.com/send/waystosendmail/senditwithintheus/firstclassmail.htm.

invasion of privacy. [Adler Dec., ¶ 5.] As a result, a substantial majority of Colorado consumers, when informed of the disclosure requirement, will choose not to make purchases from out-of-state retailers subject to the Act.  [*Id.*; Keller Dec., ¶¶ 8, 13.]

### Customer Information Report

The requirement imposed on affected out-of-state retailers that threatens the most significant harm, both to retailers and their customers, is the annual Customer Information Report.  Each retailer that does not collect Colorado sales tax is required to file with the Department, on or before March 1 of each year, a Customer Information Report which must include, in regard to each Colorado purchaser: the name of the customer; the billing address of the customer; all shipping addresses used by the customer; and the total dollar amount of purchases for the customer. [COLO. REV. STAT. ANN.  § 39-21-112(3.5)(d)(II)(A); COLO. CODE REGS. § 201-1:39-21-112.3.5(4)(a), (b).]

Moreover, if a retailer provides even a single customer with an Annual Purchase Summary, it is then required to include in the Customer Information Report filed with the Department the purchase history information of <u>all</u> of the retailer's Colorado purchasers, even those customers whose purchases are deemed "de minimis" (less than $500). [COLO. CODE REGS. § 201-1:39-21-112.3.5(4)(e).]  Because affected out-of-state retailers are not required to provide an Annual Purchase Summary to "de minimis" Colorado purchasers but, nonetheless, are required to include the name, address, "ship to" information, and purchase amount for such "de minimis" purchasers in the Customer Information Report submitted to the Department, many Colorado purchasers will receive no prior notice that their purchasing information is being provided to the Department.  In

addition, because the Regulations define "Colorado purchaser" to include purchasers located in other states who ask to have goods shipped into Colorado, the Regulations require affected out-of-state retailers to include in their Customer Information Report to the Department the purchase history information of non-residents, as well.

### Penalties Imposed on Affected Retailers for Non-Compliance

The Act and Regulations impose substantial per-violation penalties against affected retailers that fail to comply, as follows: (a) five dollars for each failure to provide the Transactional Notice to Colorado purchasers in connection with each sale; (b) ten dollars for each failure to send an Annual Purchase Summary to a Colorado purchaser; and (c) ten dollars for each failure to include a purchaser in the Customer Information Report filed with the Department.  [COLO. REV. STAT. ANN. § 39-21-112(3.5)(c)(II), (d)(III)(A), (d)(III)(B); COLO. CODE REGS. § 201-1:39-21-112.3.5(2)(f), (3)(d), (4)(f).] Thus, out-of-state retailers face potential penalties for non-compliance of $25 per customer (or more, for customers who did not receive the Transactional Notice on multiple purchases) which for a large retailer can amount to hundreds of thousands of dollars.[9]

### Colorado Consumers Believe the Disclosure of Their Purchasing Information to the Department is a Violation of Their Privacy

In connection with this litigation, the DMA commissioned a survey of Colorado Internet and catalog shoppers.  [Adler Dec., ¶ 3 and Ex. B.]   The survey results

---

[9] The Regulations cap the total penalties for the first calendar year at $250,000 (*i.e.,* $50,000 for the Transactional Notice, $100,000 for the Annual Purchase Summary, and $100,000 for the Customer Information Report), but there is no such cap for subsequent years. [*See* COLO. CODE REGS. § 201-1:39-21-112.3.5(2)(f)(ii)(2), (3)(d)(ii)(3), (4)(f)(ii)(3).]

demonstrate that more than two-thirds (69%) of Colorado Internet and catalog shoppers either "agree" or "strongly agree" that turning over personally identifiable purchase information to the Department constitutes an invasion of their privacy.  [*Id.,* Ex. B. at 2, 5.][10]  Furthermore, the results show two-thirds of Colorado Internet and catalog shoppers (67%) will decrease their purchases from retailers subject to such reporting obligations in the coming year, while sixty-three percent (63%) would most likely not make a similar purchase again from the affected out-of-state retailer from whom they most recently purchased.  [*Id.* at 2, 6.]  Moreover, forty-three percent (43%) of catalog/online purchasers would instead buy from a Colorado retailer that is not required to disclose such information to the Department. [*Id.* at 6.]

In other words, the effect of the law passed by the Colorado General Assembly is to redirect business away from out-of-state merchants to the benefit of in-state retailers. Out-of-state retailers are left in a three-way quandary: either surrender their constitutional protection under Q*uill* to avoid application of the new law; or comply with the Customer Disclosure Report obligations and face the certainty of losing sales and alienating customers; or not comply with the Act's requirements and be subject to substantial monetary penalties of tens or even hundreds of thousands of dollars.

---

[10] Consumers have a reasonable expectation of privacy in their purchasing information, even without disclosure of the items they purchased.  Many vendors have specialized product lines regarding such materials as healthcare products for specific (and embarrassing) conditions, intimate apparel, religious items, etc.  Moreover, the identity of the selling organization itself may reveal the buyer's political beliefs, religious convictions, cultural preferences, investment interests, and whether the consumer is homosexual or heterosexual. The reality is that the entity from whom a person makes purchases (as well as to whom such purchases are sent) reflects personal details about that individual, such as his or her health, politics, religion, sexual orientation, and financial circumstances, among other things.

## IV.    Argument

**A.    THE DMA HAS ASSOCIATIONAL STANDING.**

To put to rest a threshold matter contested by the Defendant in her motion to dismiss, the DMA plainly has standing to challenge the constitutionality of the Act and Regulations on behalf of its members.  An association has standing if: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor relief requested require the participation of individual members in the lawsuit." [*See, e.g., Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).] Putting aside the oddity of the Defendant asserting that a law specifically targeted at direct marketers does not affect the members of the nation's leading trade association representing direct marketers, the DMA submits ample evidence in support of this motion that it meets each of the requirements for associational standing.

With regard to the first prong of the test, the DMA must show that "its members, or any one of them, are suffering immediate or threatened injury" as a result of the challenged law.  [*Hunt,* 432 U.S. at 342 (*citing Warth v. Seldin*, 422 U.S. 490, 511 (1975).]   As attested by the DMA's Senior Vice President for Government Affairs, there are numerous DMA members with annual sales in Colorado in excess of the Regulations' "de minimis" threshold of $100,000 that do not collect Colorado sales tax on sales to consumers in Colorado.  [Cerasale Dec., ¶¶ 4, 7, 9, 11.]   These members of the DMA would have standing in their own right to seek a prospective injunction against the requirements of the Act provided that: (1) the members face the threat of an

imminent, concrete injury that is real, immediate, and direct; (2) the challenged

provisions are the cause of the injuries; and (3) the requested relief is likely to redress

such injuries. [*Edmondson*, 594 F.3d at 756.]

The notice and reporting requirements threaten real and imminent injuries to

affected DMA members in multiple ways, including significant costs of compliance with

each of the notice and reporting obligations, substantial monetary penalties for non-

compliance, lost sales to customers in Colorado and other states as a result of the turn-

over of sensitive customer purchasing information to the Department.  The

Transactional Notice requirements are now in effect, requiring retailers to either comply

or face substantial penalties.  In addition, retailers must begin preparing now to provide

the Annual Purchase Summaries to customers and Customer Disclosure Reports to the

Department in a matter of months, before the case will be ready for resolution on

dispositive motions or at trial.  Thus, as in *Edmondson*, the association's members face

real, immediate and direct threats of injury through both compliance and non-

compliance with the law.  [*Edmondson*, 594 F.3d at 756-57.]  Each of these injuries are,

of course, directly caused by the notice and reporting provisions of the Act and

Regulations and will be redressed by the relief the DMA seeks: a declaration that the

requirements are unconstitutional and an injunction against their enforcement.

The DMA clearly satisfies the remaining two prongs of associational standing, as

well.  Advocating fair and non-discriminatory treatment under both federal and state

laws and regulations is a central purpose of the DMA.  [Cerasale Dec. ¶ 3.]  Indeed, the

DMA has previously brought suit in federal court on behalf of its members to challenge

a state law on the grounds that it violated the Commerce Clause. [*See Direct Marketing Ass'n, Inc. v. Bennett*, 1991 WL 317021 (E.D. Cal. July 12, 1991) (summary judgment that California Board of Equalization could not require DMA member-retailers to collect California use tax).]  In addition, because the notice and reporting obligations are targeted at an entire segment of interstate commerce (remote sellers that do not collect Colorado sales tax) and facially discriminate against all affected out-of-state retailers, no individual member's participation is required for the Court to rule upon the constitutionality of the Act and Regulations.  In sum, the DMA has standing to challenge the new law, and the Court has jurisdiction to enter a preliminary injunction against its enforcement.

**B.      THE DMA SATISFIES THE REQUIREMENTS FOR ENTRY OF A PRELIMINARY INJUNCTION.**

Under the familiar requirements for entry of a preliminary injunction set forth in Section II, above, the DMA's right to an injunction in this case is "clear and unequivocal."  [*E.g., Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1066 (10th Cir. 2001) (citation omitted).]

**1.  The DMA is Likely to Succeed On Each of Its Claims Alleging Violation of the Commerce Clause.**

The DMA has a substantial likelihood of success of the merits of its claims alleging facial violation of the Commerce Clause.  In Count I of its Complaint, the DMA alleges that the Act and Regulations discriminate against interstate commerce. [Complaint,¶ 56.]  It has long been understood that the Commerce Clause "directly limits the power of the States to discriminate against interstate commerce."  [*New Energy Co.*

*v. Limbach*, 486 U.S 269, 273 (1988).]  The Supreme Court has stated that "[f]or over 150 years, our cases have rightly concluded that the imposition of a differential burden placed on any part of the stream of commerce–from wholesaler to retailer to consumer– is invalid, because a burden placed at any point will result in a disadvantage to the out-of-state producer."  [*West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 202 (1994); *see also Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 99 (1994) ("discrimination" for purpose of the Commerce Clause means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.").]  Indeed, "[t]his rule is essential to the foundations of the Union." [*Granholm v. Heald*, 544 U.S. 460, 472 (2005).]

The first step in analyzing any state law under established Commerce Clause principles is to determine whether it "regulates even-handedly, with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce." [*Hughes*, 441 U.S. at 336.]  A state law violates the Commerce Clause if it discriminates against interstate commerce in either purpose, or effect.  [*Id.; Limbach*, 486 U.S. at 280 (striking down law that discriminated against out-of-state companies on its face); *Hunt*, 432 U.S at 350, 354 (striking down law that had the practical effect of discriminating against out-of-state producers; *Best & Co. v. Maxwell*, 311 U.S. 454, 455 (1940) ("[t]he Commerce Clause forbids discrimination, whether forthright or ingenious").]

The Act and Regulations place such differential burdens on out-of-state retailers. As noted above, the very title of the law demonstrates its intent to mandate requirements with respect to sales "by out-of-state retailers."  [*See* 2010 Colo. Sess.

Laws 54.]  Furthermore, by imposing notice and reporting obligations solely upon retailers that do "not collect Colorado sales or use tax," the Act and Regulations are expressly targeted at remote sellers who are constitutionally protected from the obligation to collect such Colorado taxes under *Quill.*  Any claim to the contrary by the Defendant would be not only specious and contradicted by the Act's legislative history [Petillo Dec., Exs. A, B], but also at odds with the actual effect of the law which imposes no requirements upon in-state Colorado retailers who are required, by law, to collect Colorado sales and use taxes. [*See* COLO. REV. STAT. ANN. §§ 39-26-103(1)(a),  39-26-106(2)(a), 39-26-204(2).]

It is evident that the notice and reporting requirements of the Act and Regulations burden remote sellers that do not collect Colorado sales tax, to the benefit of in-state, Colorado retailers.  Such differential burdens inherently disadvantage out-of-state companies in competition with in-state businesses.  [*West Lynn Creamery,* 512 U.S. at 202.]   Moreover, the survey evidence offered by the DMA shows that many Colorado consumers (43% of respondents) who object to the requirement that out-of-state retailers must disclose customer identity and purchase information to the Department will instead make similar purchases from a retailer in Colorado that is not required to submit such information. [Adler Dec., ¶ 5; Keller Dec. ¶ 8.]

Discriminatory laws such as the Act and Regulations are virtually *per se* invalid under the Commerce Clause.  [*Dorrance,* 957 F.2d at 765 (*citing City of Philadelphia,* 437 U.S. at 624).]  As a result, the burden falls on the Defendant to justify the Act and Regulations, under the strictest scrutiny, as: (1) having a legitimate local purpose; that

(2) cannot be achieved through reasonable nondiscriminatory alternatives.  [*Id.* (*citing Hughes*, 441 U.S. at 336-37.]   Indeed, the Defendant's burden of justification is so heavy that "facial discrimination by itself may be a fatal defect" [*Hughes*, 441 U.S at 337], that would, by itself, satisfy the DMA's likelihood of success on Count I.

The Defendant will be unable to carry her burden.  First, the Act was included as part of a package to balance the State's budget, with an express annual revenue projection. [Petillo Dec., Ex. B at 3.] Mere revenue generation, however, by itself is "not a local interest that can justify discrimination against interstate commerce."  [*C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 393 (1994).]  Furthermore, to the extent the law is intended to raise revenue through increased self-reporting of use tax by, and collection from, Colorado consumers, there are demonstrable, non-discriminatory alternatives.  Most obviously, Colorado could adopt the approach taken by more than 20 other states and include a line for reporting use tax on its individual income tax return, Form 104.  As an example, New York facilitates the self-reporting of use tax by its citizens in this manner, and it has realized substantial use tax revenue as a result (approximately $40 million per year) [Petillo Dec., Ex. G] — considerably more per capita than the $4.7 million annual revenue that Colorado has projected the Act will generate. [*See id.*, Ex. B at 3.]   The State might also undertake its own consumer-awareness campaign, through notices and public service announcements, rather than subjecting out-of-state companies to burdensome and onerous notice and reporting obligations that force the disclosure to the Department of the personal purchasing information of thousands of Colorado residents and non-residents.  Since there are

evident, and likely insurmountable, obstacles to the Defendant in justifying the facially

discriminatory requirements of the law, the DMA is likely to prevail on Count I.[11]

The DMA is also likely to prevail on Count II of its Complaint, asserting that the

State lacks the power under the Commerce Clause to require retailers with no physical

presence in the state to comply with notice and reporting obligations of the Act and

Regulations. [*See* Complaint, ¶¶ 67-69.]  It is well-established that the Commerce

Clause, in addition to prohibiting state laws that discriminate against interstate

commerce, also restricts the authority of a state to impose undue burdens on interstate

commerce.  [*Oregon Waste Sys.*, 511 U.S. at 98.]  This inherent limitation upon the

power of a state to regulate interstate commerce further requires that "some aspects of

trade generally must remain free from interference by the States."  [*Kassel v.*

*Consolidated Freightways Corp.*, 450 U.S. 662, 669 (1981); *see also Quill*, 504 U.S at

314-15 (undue burdens on interstate commerce may be avoided in appropriate

situations by the "demarcation of a discrete realm of commercial activity" that is free

from interstate taxation or regulation).]

In *Quill*, the Supreme Court applied these fundamental principles of Commerce

Clause jurisprudence to reaffirm that a state may not require an out-of-state company

---

[11] Nor can the Act and Regulations be justified on the grounds that they impermissibly discriminate against only some, but not all, out-of-state retailers.  Designing the law so that remote sellers that voluntarily collect Colorado sales tax, or that have annual Colorado sales under the $100,000 de minimis threshold, are not subject to the notice and reporting obligations of the Act and Regulations, cannot cure its constitutional defects. The Commerce Clause does not permit a state to pick-and-choose which participants in interstate commerce it will select for discriminatory treatment.  [*E.g., Limbach,* 486 U.S. at 276 (1988) (Ohio statute which offered tax credit to out-of-state companies from states with reciprocal tax credit for Ohio companies and, as a result, burdened only one out-of-state producer, nevertheless facially violated the Commerce Clause); *see also Faulkner Corp. v. Fulton*, 516 U.S. 325, 333 n.3 (1996) (there is no "*de minimis*" defense to discrimination under the Commerce Clause.)]

that lacks a "substantial nexus" with the state to collect that state's sales and use taxes. [*Quill*, 504 U.S. at 311-19.]  As the Court explained, the requirement that an out-of-state retailer must have a physical presence in the state to be subject to a tax collection obligation serves as "a means for limiting state burdens on interstate commerce."  [*Id.* at 313.]   Indeed, the nexus requirement derives from the core objectives of the dormant Commerce Clause and is informed "by structural concerns about the effects of state regulation on the national economy," rather than concerns about fairness to any individual retailer. [*Id.* at 312.]

The same principles relied upon by the Court in *Quill* prohibit the State of Colorado from subjecting remote sellers to the notice and reporting obligations of the Act and Regulations.  By the Act's plain terms, the law is directed at the same kinds of direct marketers, engaged in the same kinds of sales transactions, as are the sales and use tax laws that the Supreme Court struck down and/or limited under *Quill*. Furthermore, the very same "structural concerns" that support the nexus requirement of *Quill* [*see* 504 U.S. at 313-15 and n.6 (*citing National Bellas Hess v. Department of Revenue*, 386 U.S. 753, 759-60 (1967))], apply with equal force to the notice and reporting requirements of the Act and Regulations. There are still thousands of different state and local taxing jurisdictions in the United States (indeed, Colorado itself has numerous "home rule " municipalities and local taxing districts) that can, if the Act is upheld, subject remote sellers that do not collect sales tax to a myriad of disparate notice and/or reporting laws, requiring them to provide customer notices or statements with varying levels of detail about tax obligations and purchase histories, and to file

extensive reports with tax officials concerning what or how much their customers purchased, whether it is taxable, where it was sent, and so on.  Indeed, if Colorado is free to impose such notice and reporting obligations on remote sellers, then "so can every other State, and so, indeed, can every municipality, every school district, and every other political subdivision throughout the Nation with power to impose sales and use taxes," resulting in the precisely the kinds of "local entanglements" and burdens on interstate commerce that the Commerce Clause is designed to prevent. [*National Bellas Hess*, 386 U.S. at 759-60.]

Nor can the Defendant, consistent with the Commerce Clause, dismiss such concerns on the grounds that affected out-of-state retailers have the "option" of avoiding the notice and reporting obligations of the Act and Regulations by simply agreeing to collect Colorado sales tax. In fact, the poorly-disguised objective of the Act and Regulations, as Department's Tax Policy Director has acknowledged [Petillo Dec., Ex. C], is to coerce out-of-state retailers that are protected by *Quill* from the obligation of collecting Colorado sales/use tax to surrender such protection voluntarily, rather than confront the more onerous choice of either complying with the Act's burdensome requirements, or incurring substantial monetary penalties for non-compliance.  The Commerce Clause, however, prohibits Colorado from devising such alternative burdens for out-of-state sellers*,* and then conditioning relief from such burdens on the waiver of the affected retailers' constitutional rights.  [*See Bendix Autolite Corp.*, 486 U.S. at 893 (a state may not condition the availability of other important rights on the relinquishment of a party's constitutional rights under the Commerce Clause).]  Moreover, the

Commerce Clause clearly forbids a state from requiring an out-of-state company to accept additional regulatory burdens as if it were a resident, in order to stand on equal footing with in-state companies. [*Granholm*, 544 U.S. at 474-75 (*citing Halliburton Oil Well Cementing Co. v. Reilly*, 373 U.S. 64, 72 (1963)).]  Such laws promote the very "economic Balkanization" the Commerce Clause is designed to prevent and are routinely stuck down.  [*Id.* at 472; *Fulton Corp.*, 516 U.S. at 333 n.3.]

Moreover, the need to safeguard the national economic interests secured by the Commerce Clause and inherent to remote sales transactions has only increased in the 18 years since *Quill* was decided, due to the advent and growth of electronic commerce conducted over the Internet. The nexus requirement of *Bellas Hess and Quill* was based in part on the Supreme Court's conclusion that "it is difficult to conceive of commercial transactions more exclusively interstate in character than the mail order transactions here involved."   [*National Bellas Hess*, 386 U.S. at 759.]  Today, the majority of remote sales are conducted online, an even more intensely interstate environment.  As the Tenth Circuit has found, the nature of the Internet as an inherently borderless medium raises a host of additional and enhanced Commerce Clause concerns that weigh heavily in favor of enjoining state laws that seek state to regulate commercial activity transacted over the Internet.  [*See ACLU v. Johnson,* 194 F.3d at 1160-63.]  Echoing and amplifying the kinds of "structural concerns" that supported the Court's decision in *Quill*, the Tenth Circuit has concluded that the Internet "requires a cohesive scheme of national regulation" and cannot be subjected to the risk of inconsistent state regulations

under the Commerce Clause.  [*Id.* at 1163 (*citing Pataki*, 969 F.Supp. at 182).][12] The

State of Colorado thus lacks the authority under the Commerce Clause to subject

catalog and online merchants with no physical presence in the state to the kinds of

notice and reporting obligations required under the Act and Regulations.  The DMA has

a substantial likelihood of success on Count II, as well.

### 2.  DMA Members Will Suffer Irreparable Harm Absent an Injunction.

Affected DMA members will suffer irreparable harm if the discriminatory

requirements of the new law are not enjoined, as discussed above.  Violation of the

rights of DMA members under the Commerce Clause is alone sufficient harm to warrant

an injunction. [*ACLU v. Johnson*, 194 F.3d at 1163; *Pataki,* 969 F. Supp. at 168;

*Midwest Title Loans, Inc. v. Ripley*, 616 F.Supp.2d 897, 908 (S.D. Ind. 2009).]

Furthermore, each of the different notice and reporting obligations requires

affected remote sellers to incur compliance costs or, if they do not comply, to face

substantial monetary penalties that can amount to hundreds of thousands of dollars.

Perhaps most seriously, as emphasized above and by the survey and expert evidence

submitted by the Plaintiff, the requirement that out-of-state retailers subject to the Act

must turn over their customers' purchase history information will cause DMA members

to lose sales and the business of many Colorado customers permanently. [Adler Dec.,

Ex. B. at 2, 5-6; Keller Dec., ¶¶ 6-13.]  Placing affected out-of-state sellers between the

---

[12] To the extent that the Regulations purport to include within the definition of "Colorado purchaser" those customers of a retailer located outside Colorado who request that goods be shipped into the state [1 COLO. CODE REGS. § 201-1:39-21-112.3.5(1)(b)(i)], the Regulations extend the Act to  transactions occurring wholly outside the state (*i.e.*, neither party is in Colorado), further violating the Commerce Clause. [*ACLU v. Johnson*, 194 F.3d at 1161.]

Scylla and Charybdis of such alternative injuries subjects them to irreparable harm sufficient to justify an injunction. [*Edmondson,* 594 F.3d at 770-71.]

### 3. The Balance of Equities Favors the DMA.

The balance of equities also weighs in favor of entering an injunction. Colorado "has no interest in enforcing a law that is likely constitutionally infirm." [*Edmondson*, 594 F.3d at 771.] Furthermore, while enjoining the law protects the constitutional rights of affected out-of-state retailers (and their customers), the state will suffer no injury from preliminary relief. Indeed, the DMA's request is entirely consistent with the primary function of a preliminary injunction, as it will simply preserve the status quo pending a final determination of the constitutionality of the Act and Regulations and of the parties' rights. [*Otero Savings & Loan Ass'n v. Federal Reserve Bank*, 665 F.2d 275, 277 (1981).] An injunction will not interfere with the State's tax system or the Defendant's administration of it. Although the obligation of retailers to produce Annual Purchase Summaries and Customer Disclosure Reports is imminent, no such reports have yet been filed. Indeed, the Department has not yet issued necessary guidance to retailers on the format of the Customer Information Reports and how they are to be submitted. [*See* COLO. CODE REGS. § 201-1:39-21-112.3.5(4)(c).] Nor did H.B. 10-1193 include any appropriation to the Department for the implementation of systems or security measures to handle such reports [*see* Petillo Dec., Ex. B at 3-4], which will include the personal information of tens of thousands of Colorado consumers. In any event, if the Court ultimately upholds the law, such statements and reports can subsequently be prepared and submitted to the Department. Moreover, nothing in the relief sought in

this motion would prevent Colorado consumers from self-reporting use tax as is required under Colorado law, or bar the Department from undertaking consumer education initiatives to promote self-reporting by consumers.

**4.     The Entry of an Injunction Serves the Public Interest.**

Finally, the public interest is served by enjoining a law that likely violates the Commerce Clause.  [*Edmondson*, 594 F.3d at 771; *Midwest Title Loans*, 616 F.Supp.2d at 908.]  In addition, the public interest will be served by permitting the Court to consider fully the constitutionality of the Act and Regulations before disclosure of the personal purchasing information of thousands of Colorado citizens, as well as citizens of other states who send goods into the Colorado, is disclosed to the Department.[13]

**V.     Conclusion**

For the foregoing reasons, because the DMA clearly and unequivocally satisfies all the requirements for a preliminary injunction, the DMA's motion for entry of an injunction enjoining the Defendant from enforcing each of the notice and reporting provisions of the Act and the Regulations should be granted, and such provisions of the Act and Regulations suspended, pending final adjudication by the Court of their constitutionality.

---

[13] The submission to the Department of Customer Information Reports from hundreds of retailers will result in the aggregation in the hands of the Department of an enormous amount of personal purchasing information regarding Colorado consumers.  The Department will become the repository of individual purchasing profiles of thousands of Colorado citizens.  There is a substantial question as to whether creating such a data repository serves the public interest, or instead compromises fundamental rights, which itself supports the entry of an injunction.

## Certification Pursuant to D.C.COLO.LCivR 7.1A Regarding Duty to Confer

I hereby certify that, in accordance with D.C.COLO.LCivR. 7.1A., counsel for the DMA conferred on multiple occasions with counsel for the Defendant regarding the DMA's intention to seek a preliminary injunction enjoining the Act and Regulations in an effort to determine if the parties could agree upon an order for temporary relief or suspension of the law's notice and reporting requirements pending full judicial review of their constitutionality.  Counsel for the DMA first raised the issue with the Defendant's counsel in a telephone conference on June 18, 2010, prior to the filing of the complaint. Upon the filing of the initial complaint, counsel for the DMA by letter to Defendant's counsel dated July 1, 2010 set forth a written proposal for preliminary relief and a possible procedure for submitting the case to the court for judicial determination. Counsel for the parties conferred regarding the DMA's proposal, and possible variations to the proposal, on July 7, July 15 and July 16, 2010.  Despite their good faith efforts, counsel for the parties were not able to reach agreement regarding preliminary injunctive relief.

Respectfully submitted,

Dated:  August 13, 2010

/s/ George S. Isaacson
George S. Isaacson
Matthew P. Schaefer
BRANN & ISAACSON
184 Main Street, P. O. Box 3070
Lewiston, ME 04243−3070
Tel. (207) 786−3566
gisaacson@brannlaw.com
mschaefer@brannlaw.com
*Attorneys for The Direct Marketing Association*

30

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2010, I electronically filed the foregoing, Plaintiff's Motion for a Preliminary Injunction and Incorporated Memorandum of Law, using the CM/ECF system, which will send notification of such filing to counsel of record:

> Stephanie Lindquist Scoville
> Senior Assistant Attorney General
> State of Colorado
> 1525 Sherman Street, 7th Floor
> Denver, CO 80203
> stephanie.scoville@state.co.us
>
> Robert H. Dodd, Jr.
> Senior Assistant Attorney General
> State of Colorado
> 1525 Sherman Street, 7th Floor
> Denver, CO 80203
> robert.dodd@state.co.us
>
> Attorneys for Defendant

/s/ George S. Isaacson

George S. Isaacson