**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 10–CV–01546–REB–CBS

The Direct Marketing Association,

      Plaintiff,

      v.

Roxy Huber, in her capacity as Executive
   Director, Colorado Department of Revenue,

      Defendant.

_____

### DECLARATION OF JERRY CERASALE
_____

I, Jerry Cerasale, pursuant to 28 U.S.C. § 1746, do depose and state as follows:

1. I am the Senior Vice President, Government Affairs for the Direct Marketing Association ("DMA"), the plaintiff in this action. In connection with my responsibilities for the DMA, I have been directly involved in the DMA's work monitoring and responding to a new Colorado law, House Bill 10-1193, "*An Act Concerning The Collection Of Sales And Use Taxes On Sales Made By Out-Of-State Retailers, And Making An Appropriation Therefor*," which imposes new notice and reporting obligations on "each retailer that does not collect Colorado sales tax" ("H.B. 1193"). I have discussed H.B. 10-1193 with representatives of dozens of DMA member companies and organizations. I am also the senior officer at the DMA with direct responsibility for managing the DMA's efforts as the plaintiff in this litigation challenging the constitutionality of the new

1

Colorado law.   I make this declaration upon my personal knowledge or, as referenced, upon information received from third-parties upon which I have a reasonable basis to rely, and do rely, in the ordinary course of my work for the DMA.  I make this declaration in support of the DMA's motion for a preliminary injunction.

2.  The DMA is a not-for-profit corporation with headquarters in New York, New York and offices in Washington, D.C.  Founded in 1917, the DMA is the leading trade association of businesses and nonprofit organizations using and supporting multichannel marketing methods, with more than 3,000 members from all fifty states and numerous foreign countries, including nearly half of the companies in the Fortune 100.  Members of the DMA market their products directly to consumers via catalogs, magazine and newspaper advertisements, broadcast media, and the Internet.

3.  Among the primary missions of the DMA is to provide political representation and issue advocacy on behalf of the entire direct marketing community.   To that end, a central goal of the DMA is to advance the interests of direct marketers in securing fair and non-discriminatory treatment under both federal and state laws and regulations.  The DMA represents and promotes its members' interests in each of the 50 states as well as on Capitol Hill and before federal agencies.  Each year the DMA tracks hundreds of proposed laws and regulations in Washington, DC and across the nation.  The DMA addresses key federal and state policy issues that affect the direct marketing community including, among other issues, taxes, data security, privacy, and consumer protection.

4. H.B. 10-1193's new notice and reporting requirements apply to retailers that are not located in Colorado and do not collect Colorado sales tax. This classification describes hundreds of DMA members, the great majority of which are based outside of Colorado. DMA members located outside of Colorado enter into remote sales transactions with thousands of Colorado consumers and businesses each day. Many such DMA members lack any facilities, employees or other "physical presence" in Colorado and, as a result, do not collect Colorado sales or use tax on their sales to residents in the state, consistent with the well-established limitation on state authority to impose tax collection obligations under the Commerce Clause and *Quill Corp v. North Dakota*, 504 U.S. 298 (1992).

5. I am aware that the Colorado Department of Revenue ("Department") has adopted regulations implementing the notice and reporting requirements of H.B. 10-1193. The DMA closely monitored the rulemaking process and submitted certain comments to the Department on proposed versions of the regulations. One of the primary activities of the DMA with regard to H.B. 10-1193 has been to explain to members the requirements imposed upon direct marketers under the Department's regulations.

6. The final version of the regulations, as published in the Colorado Register, is designated "Regulation 39-21-112.3.5" and became effective August 1, 2010. The regulations, in section 1(a), define the term "retailer that does not collect tax in Colorado" for purposes of H.B. 10-1193 to mean "a retailer that makes sales to Colorado purchasers but does not collect Colorado sales or use tax." The regulation

also has a "de minimis" exclusion. A retailer is deemed to be de minimis if the retailer "makes less than $100,000 in total gross sales in Colorado in the prior calendar year and reasonably expects total gross sales in the current calendar year will be less than $100,000." Regulation 39-21-112.3.5(1)(a)(iii). However, it is worth noting that the regulations define "total gross sales" to include, in any particular company's "total gross sales," all sales of goods by a group of affiliated companies. Regulation 39-21-112.3.5(1)(e).

7. There are numerous DMA members with no physical presence in Colorado that do not collect Colorado sales tax who have annual gross sales of goods in Colorado, and reasonably expect future annual gross sales of goods in Colorado, that exceed $100,000. Indeed, there are many such DMA members whose annual gross sales of goods in Colorado are many millions of dollars.

8. Although the de minimis exception excludes smaller sellers, gross sales of $100,000 annually is a fairly modest level of sales for a national direct marketer. As a frame of reference, consider that, according to the United States Census Bureau, Colorado's population is approximately 5 million, or 1.6% of the total United States population of approximately 300 million. Assuming an even distribution of sales by population, a company with only $6.25 million in annual sales would meet the sales threshold. Larger catalog and Internet sellers, including many DMA members, have annual sales that are tens or even hundreds of times that amount.

9. The regulations also include a concept of a "de minimis" purchaser, in connection with the requirement of H.B. 10-1193 that affected retailers provide an annual statement

to their Colorado customers listing all of the customer's purchasers from the retailer during the prior calendar year.  In particular, the regulations provide that out-of-state retailers may, but are not required to, provide the annual statement to any Colorado purchaser whose taxable purchases from the retailer are less than $500.  Regulation 39-21-112.3.5(3)(c).  Affected retailers, however, must provide annual statements to each Colorado purchaser who purchases more than $500 of goods from the retailer.  Most affected retailers have many such customers, whether as a result of repeat business or a single large transaction.  Indeed, many affected retailers sell multiple items that alone cost more than $500, such as computers, consumer electronics, furniture, and other items.

10. Any retailer that is required to provide at least one Colorado purchaser an annual statement is required to file an annual report with the Department reporting the names, billing addresses, shipping addresses, and total purchase amount of <u>all</u> of its Colorado purchasers.  Regulation 39-21-112.3.5(4)(e).

11. In connection with my work related to H.B. 10-1193 and the Department's regulations, I have personally spoken to representatives of dozens of DMA members who have informed me that their company or organization will be affected by the requirements set forth in the final regulations, notwithstanding the "de minimis" gross sales amount of $100,000 and the "de minimis" purchaser amount of $500.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 13th day of August, 2010.

/s/ Jerry Cerasale  
Jerry Cerasale

5