**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 10–CV–01546–REB–CBS

The Direct Marketing Association,

       Plaintiff,

       v.

Roxy Huber, in her capacity as Executive
    Director, Colorado Department of Revenue,

       Defendant.

_____

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S JULY 30, 2010,
MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT [DOC. NO. 14]**
_____

The Plaintiff, the Direct Marketing Association ("the DMA") submits this

memorandum in opposition to the Defendant's Motion to Dismiss Plaintiff's First

Amended Complaint, filed with the Court on July 30, 2010 [Doc. No. 14] ("Motion to

Dismiss" or "Motion").  Because the DMA has properly pleaded facts that (1) establish

its standing to sue on behalf of affected DMA–members and their customers and (2)

allege the elements necessary to state each of its claims for violation of the United

States Constitution, the Defendant's Motion to Dismiss such claims should be denied.[1]

_____

[1] As set forth herein in Section III.D., *infra*, after conferring with the Defendant's counsel,
the DMA has agreed to the voluntary dismissal without prejudice (for lack of subject matter
jurisdiction) of its claims against the Defendant brought under relevant provisions of the
Colorado Constitution.  Although the DMA proposed to the Defendant that she consent to the
supplemental jurisdiction of the Court over such claims in order to allow complete adjudication
of all federal and state constitutional issues presented by the Act and Regulations in a single

## I.     INTRODUCTION

The DMA filed this action for declaratory and injunctive relief on behalf of its

affected members and their customers in response to the notice and reporting

requirements imposed on out–of–state retailers under a new Colorado law, H.B. 10–

1193, "*An Act Concerning The Collection Of Sales And Use Taxes On Sales Made By*

*Out–Of–State Retailers, And Making An Appropriation Therefor*" [2010 Colo. Sess.

Laws 54, COLO. REV. STAT. ANN. § 39–21–112(3.5) (2010)) ("the Act")] and the

regulations promulgated by the Department of Revenue ("Department") to implement

them [1 COLO. CODE REGS. § 201–1:39–21–112.3.5 (2010) ("the Regulations")].  The

Act and Regulations represent a sweeping and unprecedented attempt by the State to

compel thousands of businesses and non–profit organizations located outside of

Colorado that do not collect Colorado sales and use tax to report to the Department the

private purchasing information of tens of thousands of consumers residing both within

Colorado and outside the state.  Despite the Defendant's efforts in her Motion to

downplay and minimize the broad scope and effect of the new law, the notice and

reporting provisions of the Act and Regulations, both on their face and in their

application to various types of specialized retailers, infringe upon multiple constitutional

protections of both retailers and their customers, in ways that cannot be justified by any

legitimate state interest.  As the DMA asserts in its First Amended Complaint [Doc. No.

10] ("Complaint"), the Act and Regulations: (a) violate the Commerce Clause rights of

out–of–state retailers (Counts I and II); (b) invade the privacy rights of their customers

---

action, the Defendant has declined to waive her immunity from suit under the Eleventh
Amendment, necessitating dismissal of such claims.

(Count III); (c) chill the free speech rights of affected remote sellers and consumers (Count V); and (d) deprive retailers subject to the law of valuable property rights in their customer lists, without due process of law or fair compensation (Counts VII and VIII).

Seeking to short–circuit appropriate constitutional scrutiny of the new law, the Defendant has moved to dismiss the entire Complaint for lack of subject matter jurisdiction pursuant to Fed. R. Civ. P. 12(b)(1) based on the implausible assertion that the DMA – the leading trade association in the nation representing retailers subject to the law [Complaint, ¶ 2] – purportedly lacks standing to assert the constitutional rights of its affected members.  The Defendant also erroneously challenges the DMA's third–party standing to assert the privacy and free speech rights of its member's customers (an aspect of Counts III and V, respectively), and incorrectly asserts that each of the non–Commerce Clause claims (Counts III, V, VII and VIII) fails to state a claim upon which relief can be granted.  The Defendant, however, can point to no element of either standing or the DMA's constitutional claims that the DMA has not properly alleged, but instead unconvincingly contends that the DMA's detailed, 37–page Complaint is too general, and that the Act and Regulations cannot conceivably violate the constitutional rights of retailers and their customers.  The Defendant is wrong as a matter of both basic pleading requirements and constitutional law.

On August 13, 2010, the DMA filed a Motion For Preliminary Injunction and Incorporated Memorandum of Law [Doc. No. 15] ("Motion for Preliminary Injunction") seeking to enjoin enforcement of the notice and reporting obligations on the grounds that the Act and Regulations violate the Commerce Clause on their face.  As

– 3 –

demonstrated in the DMA's Motion for Preliminary Injunction and supporting declarations, not only does the DMA clearly have standing to bring suit challenging the new law, but the likelihood that the DMA will ultimately prevail on the merits of its Commerce Clause claims warrants entry of a preliminary injunction pending final adjudication of the DMA's claims by the Court.[2]

For purposes of countering the Defendant's Motion to Dismiss, however, the DMA need only demonstrate that its Complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." [*Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009).]  The DMA's Complaint clears that bar with room to spare.

## II.    THE CHALLENGED LAW

It is important at the outset to clarify certain misstatements about the Act and Regulations made by the Defendant, in order to understand the constitutional infirmities endemic to the law.  The Act and Regulations impose three separate obligations on affected out–of–state retailers: (1) in connection with each sale transaction, the retailer must notify its Colorado customers that although it does not collect Colorado sales tax, the purchaser is obligated to self–report use tax to the Department ("Transactional Notice");  (2) the retailer must provide each "Colorado purchaser" who buys at least $500 in taxable goods from the retailer in a calendar year a statement listing their

---

[2] In support of its Motion for Preliminary Injunction, the DMA submitted the sworn Declaration of Jerry Cerasale, its Vice President of Government Affairs, which further substantiates that the DMA satisfies each of the required elements for associational standing. [*See generally,* Doc. No. 16.]  Since the Defendant's unfounded challenge to the DMA's standing is the only grounds on which it seeks dismissal of Counts I and II of the Complaint for violation of the Commerce Clause, the Defendant's Motion to Dismiss presents no obstacle whatsoever to the Court's entry of an order enjoining the Defendant from enforcing the facially unconstitutional notice and reporting provisions of the Act and Regulations.

purchases, informing the customer that s/he is obligated to self–report use tax on such purchases, and notifying the customer that the retailer is required by law to report the customer's name and total amount of purchases to the Department ("Annual Purchase Summary"); and, most significantly, (3) the retailer must turn over to the Department annually the name, billing address, all shipping addresses, and the total amount of purchases of each of its Colorado purchasers. ("Customer Information Report").  [*See* COLO. REV. STAT. ANN. § 39–21–112(3.5)(c)(I), (d)(I)(A), (d)(I)(B), (d)(II)(A); COLO. CODE REGS. § 201–1:39–21–112.3.5(2), (3), & (4).]  Affected retailers who fail to comply with these requirements are subject to substantial penalties.  [*See* COLO. CODE REGS. § 201–1:39–21–112.3.5(2)(f), (3)(d), (4)(f).]

**The Act and Regulations do not apply to all retailers, but rather apply only to out–of–state retailers that do not collect Colorado sales/use tax.**

The Defendant in her Motion asserts that the Act applies to "*all retailers* who sell goods to Colorado retailers and whose gross sales meet or exceed $100,000 annually" [Motion at 2 (italics supplied)].  That statement is both inaccurate and misleading.  The title of the Act makes clear that the law is targeted at out–of–state retailers: "*An Act Concerning The Collection Of Sales And Use Taxes On Sales Made By Out–Of–State Retailers…*" (emphasis added).[3]  Indeed, as demonstrated in the DMA's Motion for Preliminary Injunction [Doc No. 15 at pp. 2–3, 9–11], the notice and reporting requirements of the Act and Regulations do not apply to in–state retailers, but rather apply solely to out–of–state retailers that cannot be compelled to collect Colorado use

---

[3] The Regulations exempt from the target group of out–of–state retailers so–called "de minimis" sellers whose annual gross Colorado sales fall below $100,000, but, significantly, no in–state, Colorado retailers are subject to the notice and reporting obligations imposed under the Act. [*See* COLO. CODE REGS. § 201–1:39–21–112.3.5(1)(a).]

tax because of the protections afforded them under the Commerce Clause. [*See Quill Corp. v. North Dakota*, 504 U.S. 298, 311–19 (1992)].  This differential treatment of in–state and out–of–state retailers constitutes impermissible discrimination under the Commerce Clause.  [*See Motion for Preliminary Injunction,* Doc. No. 15, at 19–23.]

> **Retailers who are required to file a Customer Information Report with the Department must include information concerning <u>all</u> of their Colorado customers, regardless of how much the customer purchased, or whether the customer self–reports tax.**

The Defendant also asserts in her Motion that the annual Customer Information Report that an affected out–of–state retailer must file with the Department "covers only those customers who purchased at least $500 of goods in the prior calendar year." [Motion at 2.]  That statement is blatantly incorrect.  The Regulations provide that if a retailer that does not collect Colorado sale and use tax has *at least one* customer whose Colorado purchases exceed $500 of taxable goods during the calendar year, then the retailer is required to file a Customer Information Report with the Department concerning *all of the retailer's Colorado purchasers*, regardless of their annual purchase amounts.[4]  Furthermore, the Customer Information Report required from each affected out–of–state retailer must broadly include the private purchasing information of <u>all</u> of the

---

[4] The provisions of the Regulations concerning the annual Customer Information Report to the Department provide, in pertinent part: "If a non–collecting retailer is required to provide any [Annual Purchase Statement] notices pursuant to paragraph 3) of this rule, then such non–collecting retailer must include all the purchases made by all Colorado purchasers in its report, *including any purchases made by de minimis Colorado purchasers.*"   [COLO. CODE REGS. § 201–1:39–21–112.3.5(4)(e) (emphasis supplied).]

An accurate understanding of the excessive breadth of the requirements of the Act and Regulations regarding the disclosure of customer purchasing information to the Department is important when evaluating the DMA's claims.  Whereas the number of an affected retailer's customers who purchase over $500 in taxable goods for delivery into Colorado in a calendar year may number in the dozens or hundreds, the total number of Colorado purchasers of a medium– or large–volume retailer each year will often number in the tens, or even hundreds, of thousands.

retailer's Colorado purchasers, including those customers who comply with Colorado law and self–report use tax.

### Retailers are required to disclose to the Department the identities and purchasing information of individuals who reside outside of Colorado.

The Defendant further comments that the Customer Information Report must include "*Colorado residents'* names, addresses, and the total amount of goods they purchased." [Motion at 2 (italics supplied).]  The Defendant fails to explain, however, that the report to the Department must include information regarding all "Colorado purchasers" of the retailer, and that the Regulations define "Colorado purchaser" to include customers located outside of Colorado who request that goods be shipped into the state. [COLO. CODE REGS. § 201–1:39–21–112.3.5(1)(b)(i).]  As a result, a retailer is required to disclose the identity and purchasing information of individuals in other states who merely ship goods to Colorado residents, for example, as holiday or birthday gifts.

### The Act and Regulations contain no provision guaranteeing the confidentiality of customer information submitted to the Department.

Finally, the Defendant fails to note that the Act and Regulations contain no provision either designating the Customer Information Reports confidential or expressly bringing them within the scope of the taxpayer confidentiality statute [COLO. REV. STAT. ANN. § 39–21–113(4)(a)], and contain no procedures for either retailers or consumers to object to the disclosure of sensitive customer information to the Department before it is turned over.  Although the Defendant blithely asserts that "[t]he Department is under a statutory mandate to keep all information collected pursuant to Article 21 of Title 39 of the Colorado Revised Statutes strictly confidential" [Motion at 3], that contention is far

from clear as a matter of Colorado law.   In fact, the terms of the taxpayer confidentiality statute read differently.  According to the law, the Department "shall not divulge or make known in any way any information . . . disclosed in any document, report, or return *filed in connection with any of the taxes covered by this article.*"  [COLO. REV. STAT. ANN. § 39–21–113(4)(a).]  It is undisputed that the Act applies to out–of–state companies that have no obligation to report or pay sales/use tax in Colorado.  No court has determined whether the Customer Information Reports filed by such retailers, which contain no tax information and are related to no tax filing, are submitted "in connection with any tax" covered by Article 21.  Indeed, the purchase amounts reported to the Department will reflect non–taxable purchases by Colorado purchasers, since a retailer is not required under the Regulations to determine whether a particular customer's purchases are subject to tax when compiling and submitting the Customer Information Report to the Department.  [*See* COLO. CODE REGS. § 201–1:39–21–112.3.5(1)(c)(i), (3)(a)(v), 4(a)(iv).]  Furthermore, even if the general taxpayer confidentiality statute extends to the Customer Information Reports filed with the Department, the Act imposes no requirements, and makes no appropriation to the Department, for security measures or systems to safeguard the sensitive data.  [Complaint, ¶¶ 28–32.]

In sum, the law creates an over–reaching, discriminatory, regulatory scheme, pursuant to which the Department will become the repository of the private purchasing information of *all* Colorado purchasers of *every* out–of–state retailer required to file a Customer Information Report with the Department, without regard to: the personal or expressive nature of the items purchased; whether or not the customer lives in

Colorado; whether the customer self–reports Colorado use tax; or whether or not the items purchased are even subject to Colorado sales/use tax; and with no provision ensuring the confidentiality of the data, no prior procedures for retailers or consumers to contest the disclosure, and substantial penalties against retailers that fail to comply.

### III.    ARGUMENT

**A.    Standard Applied to the Defendant's Motion.**

Brought under Fed R. Civ. P. 12(b)(1) and 12(b)(6), the Defendant's Motion argues both that the Court lacks subject matter jurisdiction over the DMA's claims and that certain of those claims are inadequately pled. While the DMA ultimately bears the burden of proof of subject matter jurisdiction [*see Merida Delgado v. Gonzales*, 428 F.3d 916, 919 (10th Cir. 2001) (cited in Motion at 4)], the DMA does not have to carry that burden in its Complaint any more than it need prove the other well–pleaded facts. [*See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[E]ach [jurisdictional] element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of litigation.") (brackets added).]  Whatever its burden of proof at later stages of the litigation, the DMA's only burden at the present stage is to make a short plain statement of the grounds for the court's jurisdiction, the DMA's affirmative claims, and its demand for relief.  [Fed. R. Civ. P. 8(a); *see Iqbal*, 129 S.Ct. at 1949 (detailed factual allegations not required); *Lujan*, 504 U.S. at 561 (general allegations presumed to embrace the specific facts that are necessary to support the claim.)]

The Defendant's jurisdictional challenge is a facial, not a factual one, aimed at the adequacy of the pleadings.  [*See Muscogee (Creek) Nation v. Okla. Tax Comm'n*, __ F.3d __, 2010 WL 2700535, *2 n.1 (10th Cir. July 9, 2010).]  Thus, that challenge is judged under the same standard as the remainder of the Defendant's motion under Fed. R. Civ. P. 12(b)(6).  [*Id.*]  The Court assumes the truth of all well–pleaded factual allegations, and draws all reasonable inferences in the light most favorable to the plaintiff.  [*Dias v. City & County of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (failure to state a claim); *Muscogee (Creek)* Nation, 2010 WL 2700535 at *2 n.1 (lack of jurisdiction); *see also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (dismissal improper if the factual allegations raise a right to relief above a speculative level.)]

The DMA's Complaint clearly satisfies these basic pleading requirements. The Defendant's contrary arguments blur clear lines of demarcation between what must be pled initially and what must be proved later, and between proof of standing and proof of liability. [*See Iqbal*, 129 S.Ct. at 1949 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (quotation omitted); *Warth v. Seldin*, 422 U.S. 490, 500 (1975) ("[S]tanding in no way depends on the merits of the plaintiff's contention that particular conduct is illegal.") (brackets added).]  The DMA has sufficiently pled standing, and has stated valid constitutional claims; those claims may not be dismissed, regardless of which party ultimately bears the burden of proof on any particular aspect of them.

**B.      The DMA Has Properly Alleged Standing.**

The basic elements of standing are not in dispute: (1) an injury in fact to the plaintiff; (2) a causal connection between the injury and the complained–of conduct; and (3) a likelihood that the injury will be redressed by a favorable decision. [*Lujan*, 504 U.S. at 560–61.]  At the pleading stage, general factual allegations covering these three elements suffice. [*Id.*; *see Utah v. Babbitt*, 137 F.3d 1193, 1204 (10th Cir. 1998); *Warth,* 422 U.S. at 501 ("For purposes of ruling on a motion to dismiss for want of standing, [] the trial [] court[] must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party.") (brackets added and citation omitted).]  The DMA has properly asserted standing on behalf of its member–retailers that will be directly affected by the Act and Regulations (associational standing), and on behalf of their customers whose personal information those retailers will be required to disclose to the Department (*jus tertii* standing).

**1.      The DMA Has Standing To Represent Its Affected Members.**

To plead associational standing, an organization must allege that its members would have standing to sue in their own right, the interests at stake in the litigation are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members of the organization.  [*Am. Civil Liberties Union of N.M. v. Santillanes*, 546 F.3d 1313, 1318 (10th Cir. 2008) (quoting *Friends of the Earth, Inc. v. Laidlaw Envt'l Servs., (TOC), Inc.*, 528 U.S. 167, 181 (2000); *see also Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).]  The DMA has done so.

*First*, the DMA has alleged that a large number of its members will be directly affected by the requirements imposed by the Act and Regulations on out–of–state retailers that sell goods directly to Colorado consumers, but do not collect Colorado sales/use tax. Unlike *California Bankers Association v. Shultz*, cited by the Defendant [*see* Motion at 8], the DMA has made detailed allegations that, taken as true, establish its associational standing. [416 U.S. 21, 44 (1974) ("While the District Court found that the Association sued on behalf of its member banks, the Association's complaint contains no such allegation.").] The majority of DMA's over 3,000 members operate outside of Colorado. [*Id.* ¶ 2 (over 3,000 members), ¶ 11 (majority outside Colorado).] DMA members enter into hundreds of sales transactions with Colorado consumers daily. [*Id.* ¶¶ 12–13.] Many DMA members do not have a physical presence in Colorado, and therefore do not have to collect Colorado sales tax. [*Id.* ¶ 17.] These DMA member–retailers are precisely the target of the Act and Regulations. [*Id.* ¶ 21.] In sum, hundreds of DMA members that have no physical presence in Colorado would have standing in their own right to bring this suit. [*Id.* ¶ 7.]

These allegations more than satisfy the DMA's initial pleading obligation, as the Defendant's own case law demonstrates. Assuming that it is true that hundreds of DMA's members are the legislative targets of the Act and Regulations, it is not only plausible, but inescapably true, that at least one DMA would have standing to file suit in its own right. [*See Warth*, 422 U.S. at 511 ("The association must allege that its members, *or any one of them*, are suffering immediate or threatened injury as a result of the challenged action.") (emphasis added); *Nat'l Collegiate Athletic Ass'n v. Califano*,

622 F.2d 1382, 1391 (10th Cir. 1980) ("The NCAA must prove facts conferring standing with respect to *at least one* of its members, but otherwise the case presents issues of law common to all members.") (emphasis added and citation omitted).][5]

*Second*, the Defendant does not dispute that this litigation fits the DMA's organizational mission. Indeed, the DMA, as the leading trade association of businesses and nonprofit organizations using and supporting multichannel marketing methods, is uniquely positioned to litigate this case, because its membership consists of business and nonprofits engaged in direct marketing sales—*e.g.*, catalog, Internet, and telephone sales—which are precisely the kinds of businesses targeted by the Act and Regulations. A central purpose of the DMA is to advance the interest of direct marketers in securing fair and non–discriminatory treatment under both federal and state laws and regulations. [*Id.* ¶ 7.]  This is not the first time that the DMA has filed suit on behalf of its members seeking redress against the unlawful regulation of certain of its members by a state revenue department.  [Complaint ¶ 2; *see DMA v. Bennett*, 1991 WL 317021 (E.D. Cal. July 12, 1991) (summary judgment for DMA that California State Board of Equalization could not require DMA member–retailers with no physical presence in California to collect and remit California use tax).]

---

[5] It is remarkable, to say the least, that the Defendant has chosen to contest the standing of the leading trade association in the nation of retailers subject to the Act and Regulations.  To suggest, as the Defendant's challenge to the DMA's associational standing does, that the law does not apply to *any* member of the DMA, is not only bizarre, it is directly at odds with the purpose of the Act (and the charge of the General Assembly to the Defendant to enforce it), *i.e.*, to compel out–of–state retailers to notify their customers of their use tax obligations and to disclose those customers' purchasing information to the Department.  All concerned parties – out–of–state retailers, the Defendant, and Colorado consumers – will benefit from a determination of whether the law is constitutional. The DMA submits that there is no organization better suited to bring this action than the leading association dedicated to the interests of the very direct marketing firms the Act and Regulations target.

*Third*, the participation of individual affected retailers is not required, a point the Defendant does not seriously contest. The Defendant asserts that the DMA does not have standing "[w]ithout the participation of members with at least $100,000 in Colorado sales." [Motion at 8–9 (brackets added).]  That is simply incorrect as a matter of law – so long as one DMA member is subject to the Act, the DMA has associational standing. [*Warth*, 422 U.S. at 511.]  The DMA acknowledges that the Department has created a regulatory carve–out from the statute for retailers with less than $100,000 in predicted annual sales. [*See* Complaint ¶ 49.]  Taking account of this requirement, the DMA has properly alleged that many of its members are subject to the requirements of the Act and Regulations, including the $100,000 anticipated sales threshold. [*See*, *e.g.*, *id.* ¶¶ 7, 24, 47; *see also* ¶ 37 (many DMA members have customers with purchases in excess of the individual *de minimis* purchase threshold of the Regulations).][6]

Further, the individual participation of particular retailers is not required because the declaratory and injunctive relief sought by the DMA does not require the development of any facts or the imposition of any remedy singular to any individual retailer. [*See* Complaint, Prayer for Relief; *see also Warth*, 422 U.S. at 515 ("If in a proper case the association seeks a declaration, injunction, or some other form of prospective relief, it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."); *Hunt*, 432 U.S. at 344 ("[N]either the interstate commerce claim nor the request for declaratory and injunctive relief requires individualized proof and both are thus properly resolved in a

---

[6] As noted, the DMA has, moreover, substantiated these allegations through the Declaration of Jerry Cerasale [Doc. No. 16], on file with the Court.

group context.") (brackets added).]  The Defendant's motion to dismiss under Rule 12(b)(1) on the grounds that the DMA lacks associational standing should be denied.

## 2.      The DMA Has Standing To Represent Affected Colorado Customers.

The Court should also reject, out–of–hand, the Defendant's fallacious argument that the DMA cannot represent the interests of its members' Colorado customers because those customers do not have a pre–existing relationship with the DMA, but only with the members of the DMA.  [Motion at 12–14.]  As set forth above, the DMA has associational standing to represent its affected members, *i.e.*, out–of–state retailers subject to the requirements of the Act and Regulations that would have standing in their own right.  In that respect, the DMA, by definition, has the same standing that any of its affected members would to represent their injured customers.  At least three different federal courts of appeal have confirmed that an association has *jus tertii* standing to bring claims on behalf of third–parties whose interests the association's members could properly represent.  [*Pennsylvania Psychiatric Soc. v. Green Spring Health Servs., Inc.,* 280 F.3d 278, 291–93 (3d Cir. 2002); *Fraternal Order of Police v. U.S.*, 152 F.3d 998, 1002 (D.C. Cir. 1998); *Ohio Assoc. of Indep. Schools v. Goff*, 92 F.3d 419, 421–22 (6th Cir. 1996).]  Thus, because the DMA stands in the shoes of its members, it can advance the rights of its members' customers to the extent authorized by the law of third party standing, to which we now turn.

The Defendant errs in her assessment that DMA members have no standing to assert the privacy or First Amendment rights of their customers.  Since at least *Craig v. Boren*, 429 U.S. 190 (1976), federal courts have recognized the standing of retailers to

challenge the constitutionality of laws on behalf of their customers whose rights are directly affected by them. Considerations of third party (or *jus tertii*) standing "are not constitutionally mandated, but rather stem from a salutary 'rule of self–restraint' designed to minimize unwarranted intervention into controversies where the applicable constitutional questions are ill–defined and too speculative." [*Id.* at 193 (citations omitted).]  Where a statute, such as the Act, is "addressed directly to vendors," such as DMA members, and those vendors are "obliged either to heed the statutory discrimination, thereby incurring direct economic injury through the constriction of [their] buyers' market, or to disobey the statutory command and suffer [state law penalties]," then those vendors are "entitled to assert those concomitant rights of third parties that would be 'diluted or adversely affected' should [their] constitutional challenge fail and the statutes remain in force." [*Id.* at 194–95 (brackets added and citations omitted).]  In sum, "vendors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or function." [*Id.* at 195.]

Thus, in *Craig*, the Supreme Court held that a beer vendor had third party standing to bring an equal protection challenge to a gender–based state statute that authorized the sale of 3.2% beer to 18 to 20–year old women, but not 18 to 20–year old men. As the Court recognized in *Craig*, a vendor is in the best position to bring a challenge against a statute targeting vendor activity.  [*Id.* at 197 ("[T]he law challenged here explicitly regulates the sale rather than use of 3.2% beer, thus leaving a vendor as the obvious claimant."); *see also Eisenstadt v. Baird*, 405 U.S. 438, 446 (1972)

(contraceptives vendor had third party standing to assert privacy interests of consumers in challenge to law prohibiting distribution, not use, of contraceptives).]

Under this rule, the Tenth Circuit has held that a vendor of drug paraphernalia had standing to assert the due process claims of its customers under a statute penalizing the sale of drug paraphernalia. [*Hejira Corp. v. MacFarlane*, 660 F.2d 1356, 1360 (10th Cir. 1981).] As the Court noted,

> [U]nder the *Craig* rationale, plaintiffs should be allowed to assert the due process claims of prospective purchasers and possessors of drug paraphernalia, since, if plaintiffs' claims were to fail, the rights of prospective purchasers of drug paraphernalia would be diluted or directly affected. Hence, the interests of potential purchasers and potential sellers in this statute are directly interrelated.

[*Id.*] Similarly, the Tenth Circuit found that a vendor of sexually oriented merchandise "has standing to assert the privacy rights of its customers" in challenging a city ordinance regulating "sexually oriented businesses" more restrictively than other businesses. [*Doctor John's, Inc. v. City of Roy*, 465 F.3d 1150, 1173 n.32 (10th Cir. 2006).] Although the appellate panel ultimately ruled against the plaintiff on its privacy claims, the plaintiff's *standing* to bring those claims on behalf of its customers was clear as the plaintiff–vendor was a direct target of the ordinance aimed at vendors of sexually oriented materials, and thus, "the obvious claimant." [*Craig*, 429 U.S. at 197.]

These cases establish vendor standing to assert third party claims that a state or local law violates the due process, equal protection, or privacy rights of customers where the vendor is the target of regulation with the effect of diluting or directly affecting the constitutional rights of its customers. In the case of First Amendment claims, the threshold is, if anything, even lower. [*See, e.g.*, *Essence, Inc. v. City of Federal*

*Heights*, 285 F.3d 1272, 1288 n.13 (10th Cir. 2002) ("Because this case presents a facial challenge on First Amendment grounds, the prudential standing rules are relaxed.") (citation omitted).] The Defendant's motion to dismiss Count III (right of privacy) and the relevant allegations of Count V (consumer's right to free speech) on the grounds that the DMA lacks *jus tertii* standing should be denied.

**C.    The DMA's Complaint Properly States Claims For Violation Of The Constitutional Rights Of Affected Retailers and Their Customers.**

Separate from its challenges to the DMA's standing, the Defendant moves pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss each of the DMA's federal constitutional claims not asserted under the Commerce Clause, on a variety of different, but equally unavailing, grounds. The DMA will respond to the Defendant's claims in the order they were raised, in a manner that complies with REB Civ. Practice Standard V.I.3.a.2.

**1.    Count III (Right to Privacy)**

Defendant's Contention: *"The annual reporting requirements of the Act . . . do not implicate any recognized privacy rights protected by the Fourteenth Amendment."* [Motion at 20.] — **DISPUTED.**

Contrary to the Defendant's contention, Count III of the DMA's Complaint is clearly based on recognized privacy rights protected by the Constitution. As the Defendant concedes, it is well–established that the right to privacy encompasses a right to avoid disclosure of information concerning sensitive, personal matters both to the government and, in turn, by the government to the public at large. [*Douglas v. Dobbs*, 419 F.3d 1097, 1101–02 (10th Cir. 2005); *Eastwood v. Dep't of Corrections*, 846 F.2d 627, 631 (10th Cir. 1988).] While the scope of the right of privacy has never been fully defined, courts have recognized that it covers various categories, including, for

example, matters relating to "marriage, procreation, contraception, family relationships, and child rearing and education." [*Douglas,* 419 F.3d at 1101–02; *Walls v. City of Petersburg*, 895 F.2d 188, 192 (4th Cir. 1990) (collecting cases).]  In addition, courts have found that the right of privacy extends to other sensitive matters, including an individual's health [*Herring*, 218 F.3d at 1173], medical and prescription records [*Dodd*, 419 F.3d at 1102], sexual orientation [*Sterling v. Borough of Minersville*, 232 F.3d 190, 196 n.4 (3rd Cir. 2000)], sexual activities [*Eastwood*, 846 F.2d at 631], and financial information [*Walls*, 895 F.2d at 194].  Other intimate, personal matters in which an individual has a reasonable expectation of privacy may also be protected. [*Walls*, 895 F.2d at 192; *see Livsey v. Salt Lake County*, 275 F.3d 952, 956 (10th Cir.2001) (legitimate expectation of privacy in "highly personal or intimate" information).]  Indeed, "the right to keep one's belief and thoughts and emotions and sensations secure, as against the government is fundamental to 'the right to be let alone – the most comprehensive of rights and the right most valued by civilized man.'" [*Walls*, 895 F.2d at 192 (*citing Olmstead v. U.S.*, 277 U.S. 438, 478 (1928) (Brandeis, J., dissenting)).]

The DMA plausibly alleges that the annual reporting requirement will, with respect to a wide swath of retailers subject to the Act, require disclosure to the Department of information about consumers that is protected under several such recognized zones of privacy, including specifically a customer's "medical conditions, financial situation, family issues, or sexual orientation" [*see* Complaint, ¶10 (p.5), ¶ 80 (p.22), ¶ 83 (p.23)], as well as information concerning other intimate matters in which individuals have a reasonable expectation of privacy, such as the customer's "religious

beliefs" and "political opinions."  [*Id.; see also* ¶ 52 (p. 17) (alleging that a substantial majority of consumers consider the disclosure of their purchasing information to the Department to be an invasion of privacy).]   The DMA further alleges that these privacy rights outweigh any governmental interest in obtaining purchasing information about such consumers.  [*Id.* ¶ 84 (p. 23).] These facts, taken as true, clearly state a cognizable claim for relief and require denial of the Defendant's Motion as to Count III.[7]

The DMA's allegations are, moreover, demonstrably valid.  While the Defendant argues that no right of privacy exists in "basic information" such as the name of a customer or taxpayer or the amount of goods purchased from a particular retailer [Motion at 22], the combination of the retailer's name and the customer's identity may expose intimate, personal information about the consumer.  The fact that an individual is a customer of certain retailers will, of itself, reveal such private information about the consumer.  This is evident from even a narrow sampling of online retailers:

> www.theincontinencestore.com
> www.theviagrastore.com
> www.lingerie.com
> www.overtherainbowshop.com    (gay and lesbian themed products)
> www.teapartypatriotsstore.org    (politically–oriented site)
> www.jewishstore.com
> www.bridgepub.com/catalog/index.html  (Dianetics/Scientology)

---

[7] The Defendant incorrectly asserts that no privacy right exists except in matters "in which the government does not have a legitimate and proper interest."  [Motion at 21.]  The government's relative interest, if any, in obtaining disclosure of information about an individual does not determine whether a subject is sufficiently intimate and personal to merit privacy protection, but rather is part of the balancing test that determines whether a particular governmental demand for information is sufficient to *overcome* an individual's right to privacy. The government has the burden to show that a compelling governmental interest in disclosure outweighs the individual's privacy interest.  [*See Flanagan v. Munger*, 890 F.2d 1557, 1570 (10th Cir. 1989).] Such balancing of interests plainly cannot be resolved through a motion to dismiss.

Moreover, the addition of other information, such as the purchase amount, or the address to which such purchases were shipped, will in many cases dramatically increase the sensitivity of such information.

Indeed, the requirement that a retailer disclose the identity, billing, shipping and purchase amount information of its customers is, in countless instances, the equivalent of asking the individual purchaser directly to reveal personal information.  Requiring an intimate apparel retailer to disclose that Mr. Smith of Denver purchased $500 in lingerie for shipment to Ms. Jones in Boulder is essentially no different from demanding of Mr. Smith: "Isn't it true that you spent $500 on lingerie for Ms. Jones last year?"  Courts routinely scrutinize and invalidate such direct questioning of individuals by government officials regarding private subject matters.  [*See, e.g., Eastwood*, 836 F.2d at 631.]  The fact that the Act and Regulations require the disclosure of such information regardless of whether the items purchased are taxable or exempt, and regardless of whether the customer voluntarily self–reports use tax on such private and personal purchases, further demonstrates the unreasonable and excessive invasions of personal privacy the law entails.  The Defendant's assertion that the annual reporting requirements of the Act "do not implicate any recognized privacy rights" is, therefore, simply wrong.

### 2.    Count V (Freedom of Speech)

Defendant's Contention: "*The First Amendment rights asserted by DMA, however, have not been recognized by courts, and Plaintiff additionally fails to plead facts sufficient to demonstrate any First Amendment violation.*" [Motion at 23.] — **DISPUTED**.

The Defendants' contention that the First Amendment rights asserted by the DMA have not been recognized by Courts is plainly wrong as a matter of law.  The DMA

alleges in Count V that the First Amendment protects both the rights of retailers to sell and distribute, and the right of consumers to buy and receive, expressive content. [Complaint, ¶ 104 (p.27), ¶¶ 110–11 (p.29).]  That such rights are protected by the First Amendment cannot be contested.  [*E.g., Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council*, 425 U.S 748, 756 (1976) (First Amendment protection applies to both source and recipients of speech) (collecting cases); *Smith v. California*, 361 U.S. 147, 150 (1960) ("It is of course no matter that the dissemination takes place under commercial auspices . . . Certainly a retail bookseller plays a most significant role in the process of the distribution of books.") (citations omitted).]

In fact, the Defendant's Motion to Dismiss the DMA's First Amendment claims is based on a fundamental misunderstanding and mischaracterization of the DMA's Complaint.  The Defendant argues for dismissal of Count V on the grounds that courts have not recognized *the act of purchasing* goods to be expressive conduct. [Motion at 23–25.]  Whether or not that is an accurate characterization of the law,[8] it is beside the point.   The DMA's claim that that the Act and Regulations violate the First Amendment is not based on the contention that the act of purchasing is expressive conduct.  Rather, the DMA alleges that the requirement under the Act and Regulations that affected out–of–state retailers, including DMA members, disclose the identity of their customers to

---

[8] Even the authorities cited by the Defendant suggest that conduct that is "inextricably intertwined" with conveying an expressive message is entitled to First Amendment protection. [*See, e.g., Al–Amin v. City of New York*, 979 F.Supp. 168, 172–73 (S.D.N.Y. 1997) (collecting cases).]  It is not difficult to conceive of an instance where the act of purchasing, for example, the work of a particularly controversial artist or vendor, itself might be intended to convey support for the expression contained in the item(s) purchased.  In any case, the Court need not determine whether the Defendant's argument that purchasing can never, as a matter of law, be protected "speech," because the DMA's claims are not based on the that theory.

the Department burdens and chills their exercise of freedom of speech by dissuading customers from purchasing, and affected businesses and non–profit organizations from selling, products that contain expressive content.  [Complaint ¶¶ 10–12 (pp.5–6), ¶¶ 105–111 (pp. 27–29, ¶ 114 (p.29).]  The DMA further asserts that no governmental interest justifies interfering with the rights of retailers and purchasers in this manner.  [*Id.* ¶¶ 112 (p.29).]

These allegations not only state a plausible claim for relief, they present familiar issues at the very core of First Amendment jurisprudence.  The Act and Regulations represent content–neutral regulations which plainly impose potential burdens on the exercise free speech and are therefore subject to intermediate scrutiny under established precedent.  [*See, e.g., Turner Broadcasting Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).]  The DMA's allegations that the required disclosure of a customer's purchasing information to the Department will chill the purchase and sale of products containing expressive content [Complaint ¶¶ 110–11 (p.29)] not only must be accepted as true at this stage of the proceedings, but are consistent with bedrock principles of the freedom of speech recognized for decades.  As Justice Douglas wrote in concurrence more than 50 years ago in a case invalidating a demand by a Congressional Committee for "the name and address of each person from whom a total of $1,000 or more" was received by a targeted retailer:

> Once the government can demand of a publisher the names of the purchasers of his publications, the free press as we know it disappears.  Then the spectre of a government agent will look over the shoulder of everyone who reads.  The purchase of a book or pamphlet today may result in a subpoena tomorrow. Fear of criticism goes with every person into the bookstall.

[*United States v. Rumley*, 345 U.S. 41, 57 (1953) (Douglas, J., concurring).]  Rather than demanding the names of purchasers from a single retailer, the Act and Regulations require every out–of–state seller of expressive content to disclose their customers' names (and purchase histories) to the Department. [Complaint ¶¶ 107–11 (pp.28–29)] That the sweeping law burdens far more speech than is required is made plain by the fact, discussed in Section II, above, that retailers must disclose their customers' information even if certain of their purchases are exempt from tax, and without regard to whether the taxpayer self–reports use tax, as required by Colorado law.

Moreover, while more generalized allegations of an adverse effect on the exercise of the freedom of speech would be sufficient, given the sweeping nature of the Act and Regulations, to state a claim for violation of the First Amendment, the DMA's Complaint goes farther.  Rather than simply alleging that the disclosure of customer identities and purchase volumes to the Department by any out–of–state retailer will impermissibly burden speech, the DMA further alleges that purchases from specialized retailers (both business and non–profit organizations, who are also affected by the Act in their capacity as retailers[9]) whose products primarily and even exclusively contain or reflect expressive content will be negatively affected  by the Act and Regulations. [Complaint, ¶ 10 (p.5), ¶¶ 105–108 (pp.27–28).]   While it is inherently plausible that purchases of expressive content even from those retailers with a broad product line may

---

[9] It is important to recognize that that the definition of "retailer" under Colorado law extends to any organization, including non–profit organizations, that makes sales at retail of taxable products or services.  [*See* Colorado Department of Revenue, Taxpayer Services Division, FYI Sales 2 (Feb. 2010); *see also* COLO. REV. STAT. ANN. § 39–26–718 (exemption for charitable organizations limited to certain fund–raising activities).]

be adversely affected by the reporting requirements of the Act and Regulations, it is not merely plausible, but likely, that disclosure to the Department will chill the purchase of products from more specialized retailers (and the more specialized or controversial, the greater the chilling effect) whose products concern belief systems (religious or otherwise), political causes or issues, lifestyles, doctrines, theories, ideas and opinions.

In response to these detailed, specific allegations, the only argument the Defendant makes in support of her Motion is that the DMA has not given one or more examples in its Complaint of this segment of specialized retailers whose sales of expressive content are most likely to be affected by the Act. [Motion at 25.]  Of course, specific examples of such retailers are not required in the Complaint, at the pleading stage, to state a claim for relief.  [*See, e.g., Christensen v. Park City Municipal Corp.*, 554 F.3d 1271, 1276 (10th Cir. 2009) (reversing dismissal on "vagueness" grounds of Complaint by visual artist challenging ordinance forbidding sale of goods on city property)].  Indeed, given the diversity of online and catalog retailers, the DMA's claim is inherently plausible.  Even a series of simple Internet searches on topics such as "religious stores," "gay weddings," and "home schooling," quickly demonstrates the multiplicity of specialized vendors whose products embody expressive content.[10]  In

---

[10] Furthermore, the Defendant's reliance [Motion at 25] on the "de minimis" gross sales threshold as insulating the Act and Regulations from a First Amendment challenge is misplaced. Purchasers will not know whether any particular online seller is exempt from the requirement to file a Customer Information Report with the Department under the "de minimis" exception, and will be deterred from buying from any retailer that may be subject to the Act.  Moreover, the de minimis threshold creates the risk that distributors of expressive content, who are aware of their sales levels, will limit their own sales to Colorado purchasers in order to avoid triggering a reporting obligation that exposes the organization and its customers to Department scrutiny.

short, the DMA has more than adequately alleged that the Act and Regulations unjustifiably burden both the sale and the purchase of expressive content.

3.   **Count VII (Deprivation of Property Without Due Process) and Count VIII (Unconstitutional Taking)**

> Defendant's Contention: "*Plaintiff Fails To Plead Facts Sufficient to Establish a Property Right.*"  [Motion at 27.] — **DISPUTED.**

Counts VII and VIII of the DMA's Complaint address related, but distinct, constitutional infirmities of the Act and Regulations, based on the unlawful deprivation of its members' property rights in their valuable customer lists, in violation of both the Fifth and Fourteenth Amendments to the Constitution.  The due process claim (Count VII) targets the complete absence of a *pre*–deprivation remedy in the Act or Regulations against the forced disclosure by affected out–of–state retailers of highly confidential, trade secret information, *i.e.*, their customer lists. [Complaint, ¶ 14 (p.6), ¶¶ 133–36 (p.33).]  The takings claim (Count VIII) hones in on the irreparable harm to the value of those customer lists caused by the enactment of the Act and Regulations.  [Complaint, ¶ 14 (p.6), ¶¶ 145–48 (p.35).]   The DMA states a claim for each violation.

The DMA's assertion that its retailer–members have constitutionally protected property interests in their customer lists is inherently credible.  The Department concedes, as it must, that customer lists may be trade secrets, and that trade secrets are protectable property rights. [Motion at 27 (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003–04 (1984)).]   Indeed, numerous courts, in this jurisdiction and elsewhere, have held that customer lists may be trade secrets.  [*E.g., Hertz v. Luzenac Group,* 576 F.3d 1103, 113–115 (10th Cir. 2009) (reversing grant of summary judgment

based on lower court's finding that customer list was not a trade secret, and remanding for trial); *Network Telecomms., Inc. v. Boor–Crepeau*, 709 P.2d 901, 902–03 (Colo. App. 1990) (reversing denial of preliminary injunction on grounds that customer list was not trade secret, and remanding); *National City Bank, N.A. v. Prime Lending, Inc.*, 2010 WL 2854247 (E.D. Wash. July 19, 2010) ("Generally, a confidential customer list is a trade secret.") (Washington law).]  Indeed, customer lists are expressly included within the statutory definition of a protected "trade secret" in Colorado, as well as other states. [COLO. REV. STAT. ANN. § 7–74–102(4) ("'Trade secret means the whole or any portion or phase of any . . . listing of names, addresses, or telephone numbers"); *e.g.,* 12 PA. CONS. STAT. ANN. 5302 ("Trade secret" includes "a customer list") (Pennsylvania law).]

Furthermore, far from making "threadbare" allegations that its members' customer lists are trade secrets [Motion at 28], the DMA specifically alleges that: (a) such customer lists have considerable value; (b) are directly related to its members' retail businesses, and (c) DMA members invest substantial resources in compiling, maintaining, and protecting from disclosure to competitors and other unauthorized third parties.  [*Id.* ¶¶ 13–14 (p.6), ¶ 135 (p.33), ¶ 147 (p.35).]  These allegations more than adequately allege a protected property right that is the subject of the DMA's due process and takings claims.

The Defendant's argument that the DMA is required to allege even more facts is unfounded.  The DMA does not have to prove its claim to state it, although evidence of the trade secret character of its members' customer lists may be required at a later stage.  [*See Hertz*, 576 F.3d at 1114–15 (reversing summary judgment on trade secret

issue); *see also Colo. Supply Co., Inc. v. Stewart*, 797 P.2d 1303, 1306–07 (Colo. App. 1991) (record evidence supported trial court's determination that customer list not trade secret).]  As required at the pleading stage, the DMA's Complaint more than "provides sufficient factual material that the defendant[] must know the actual grounds of the complaint against [her]" with regard to the property right asserted by the DMA in connection with Counts VII and VIII.  [*Christensen*, 554 F.3d at 1276 (citing *Twombly*, 550 U.S. at 555).]

### 4.    Count VII (Due Process) and Count VIII (Takings)

Defendant's Contention: "*Even Assuming a Property Right Exists, Plaintiff Fails to Plead Facts Sufficient to Establish a Deprivation of Property*" [Motion at 28] — **DISPUTED**

The critical point missed by the is that the DMA's Complaint is predicated on harms suffered by its affected members directly as a result of the enactment of the Act and promulgation of the Regulations, and not on a hypothetical future harm they may suffer at some later time.  [*See* Complaint ¶ 43 (p.14), ¶ 52 (p.17), ¶¶ 134–36 (p.33),  ¶¶ 146–48 (p35).]  The statutory requirement that affected out–of–state retailers turn over their confidential, customer purchasing information to the Department has an immediate and irreparable effect on the value of direct marketers' lists of Colorado purchasers.

The value of a customer list derives from the opportunity to make future sales to the individuals identified on the list.  As a consequence, retailers invest substantial resources in developing, maintaining and protecting from disclosure a list of both their existing customers and "prospects" in hopes of securing a return on that investment in the form of future sales.  (The value is enhanced, but not entirely dependent upon,

preventing disclosure of such customer names to competitors.)  The investment expense includes costs of data processing and data security in capturing and safeguarding customer names, as well as the expense of sending solicitations (*e.g.*, catalogs, direct mail, e–mails) to prospective customers.  If, as the result of a new regulatory requirement, individuals on a retailer's customer list will NOT make future purchases from the retailer, the value of the investment made in the customer list is lost.

As alleged by the DMA, the loss of customer list value is precisely the effect the enactment of a requirement that out–of–state retailers must file Customer Information Reports with the Department.  [*See id.* ¶¶ 43 (p.14), 52 (p.17).]   The DMA contends that "Colorado purchasers" (both consumers residing within Colorado and individuals from outside Colorado who ship goods into the state) object to the disclosure of their name and purchasing information to the Department, and will discontinue or decrease their purchases from retailers subject to the disclosure requirement as a result. [*Id.*]  In other words, by enacting H.B. 10–1193 (and promulgating the supporting Regulations), Colorado has decimated the value of the Colorado purchaser lists of thousands of direct marketers.[11]  This allegation is sufficient alone to establish a deprivation of property sufficient to state a claim for violations of the Due Process and Takings Clauses.

There are additional factors, also properly pleaded by the DMA, that make the extent of the injury to remote sellers' property rights even worse.   The Act itself does

---

[11] Indeed, although not required to do so to state a valid claim for relief, the DMA has submitted evidence in support of its pending Motion for a Preliminary Injunction that the existence of a requirement that retailers turn over customer information to the Department has compromised the value of affected retailers' customer lists, because many Colorado consumers will not buy from retailers subject to the Act. [*See* Declaration of Thomas J. Adler, PhD (Doc. No. 19) ¶ 5 & Exhibit B; Declaration of Professor Kevin Lane Keller (Doc. No. 18) ¶¶ 7–8.]

not provide any provision for the security or confidentiality of the customer lists submitted to the Department.  [Complaint, ¶¶ 28–32 (pp10–11).]  Nor, as discussed above in Section II, is it clear that the general taxpayer confidentiality statute applies to the Customer Information Reports submitted to the Department.  "Property rights in a trade secret are extinguished when a company discloses its trade secret to persons not obligated to protect the confidentiality of such information." [*Eli Lilly & Co. v. Envt'l Prot. Agency*, 615 F. Supp. 811, 820 (S.D. Ind. 1985) (citing *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 584 (1985).]  Thus, a private company that submits trade secret data to a government agency that has an unclear or limited statutory duty to maintain the data in confidence, may be later barred from mounting a legal challenge to that requirement based on the loss of trade secret value that occurs with the transfer of such information to the government. [*E.g., Eli Lilly*, 615 F. Supp. at 820 (pesticide manufacturer submitting confidential data to the government "can claim no property interest under state law in such data").]  A business that discloses a trade secret to a government agency without a statutory guarantee specific to the disclosed information or an "express promise" from the agency may be held not to have a "'reasonable, investment–backed expectation' that its information would remain inviolate in the hands of the [relevant agency]." [*Monsanto*, 467 U.S. at 1008.]  Indeed, because the loss of value in a trade secret is immediate and irrecoverable, disclosures of trade secret information, and even non–trade secret, highly confidential information, "are not readily addressed through the payment of economic damages." [*Saini v. Int'l Game Tech.*, 434

F. Supp. 2d 913, 919 (D. Nev. 2006).]  The DMA has properly pleaded a clear deprivation of the property rights of affected retailers.

### 5.    Count VII (Due Process)

Defendant's Contention: "Due Process Violations Must Be Based on an Intentional Deprivation, Which DMA Does Not Plausibly Allege."  [Motion at 30] — **DISPUTED**

The Department cannot seriously dispute that the intent of the Act and Regulations is, among other things, to force out–of–state retailers to disclose their customer purchasing information to the Department, *i.e.*, to require them to turn over their trade secret information or face monetary penalties. To make their "no intent" argument, the Department simply misstates the DMA's claimed due process violation in order to argue that the DMA has pled at most that it anticipates that the Department will negligently publicize the confidential trade secret information of its members. [*See* Motion at 30–31 (citing *Daniels v. Williams*, 474 U.S. 327, 337 (1986) (Stevens, J., concurring)).]  As set forth in the Complaint, the deprivation results because the disclosure requirements "compromise[] the value of the Customer List and deprive[] the disclosing retailer of its protected property right in the list, without due process of law." [Complaint ¶ 134 (p.33) (brackets added).]  The violation occurs not at some future moment of negligence on the part of a Department employee, but at the moment the Act imposes disclosure requirements on affected out–of–state retailers.

### 6.    Count VII (Due Process)

Defendant's Contention: "Plaintiff Has Not Plausibly Asserted a Procedural Due Process Violation." [Motion at 31] — **DISPUTED**.

This part of the Department's Motion is predicated on the same mistaken understanding that the DMA's due process claim is based on some future, public disclosure by the Department of the customer information submitted by retailers subject to the Act and Regulations.  It is not; the DMA rather complains of the lack of any procedure available to retailers to object to the required submissions of their customer lists to the Department *before* a retailer is obligated to file a Customer Information Report.  Indeed, the Act and Regulations require the disclosure of customer information without any front–end process available to protect trade secret information, or back–end guarantee that affected retailers' trade secret information, once turned over, will be treated with the same level of care by the Department as by the retailers. [*E.g.*, Complaint ¶¶ 28-32 (pp.10–11); ¶ 137 (p.33).] Far from "unanticipated" [Motion at 31], the deprivation of the retailers' property interests in this manner is expressly mandated by the Act and Regulations.

"Procedural due process requires that a governmental body follow fundamentally fair procedures when it threatens an individual with deprivation of liberty or property." [*Copley v. Robinson*, 224 P.3d 431, 435 (Colo. App. 2009) (citing U.S. CONST., amend. XIV; COLO. CONST. art. II, § 25) (additional citations omitted).] Thus, "[t]he General Assembly may not constitutionally authorize the deprivation of a property interest, once conferred, without appropriate procedural safeguards." [*Weston v. Cassata*, 37 P.3d 469, 477 (Colo. 2001) (brackets added and citations omitted).] The Department's own cited case law establishes that "[u]nder the Fourteenth Amendment, procedural due process requires notice and a *pre*–deprivation hearing before *property* interests are

negatively affected by governmental actors." [*Becker v. Kroll*, 494 F.3d 904, 922 (10th Cir. 2007) (quoting *Marcus v. McCollum*, 394 F.3d 813, 818 (10th Cir. 2004) (brackets in opinion) (emphasis added).]  "The Supreme Court has described 'the root requirement' of the Due Process Clause as being 'that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest.'" [*Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009) (quoting *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985)) (emphasis in opinion).]  Thus, the Department's argument that *post*–deprivation remedies are adequate is doomed from the start.  The Defendant's Motion to Dismiss Count VII for failure to state a claim should be denied.[12]

### 7.    Count VIII  (Takings)

Defendant's Contention: "*Plaintiff fails to assert that the provisions of the Act have or will deprive members of a property interest, and that just compensation has been denied.*"  — **DISPUTED.**

The Department rightly concedes that the requirement that a business submit trade secret information to a government agency may constitute a taking. [*See* Motion at 33; *see also Am. Express Travel Related Servs. v. Kentucky*, 597 F. Supp. 2d 717, 727 (E.D.Ky. 2009) ("[T]he Supreme Court has clearly stated that economic regulations appropriating assets from private parties may be considered takings.") (brackets added and citations omitted).]  As noted, the DMA has alleged that the Act and Regulations have already deprived affected retailers of a property interest in their trade secret information, because the requirements of the Act and Regulations—without any pre–

---

[12] The Defendant also argues that the "Plaintiff's Substantive Due Process Claim Is Subsumed by Its More Specific Takings Claim." [Motion at 32.]  This argument is inapposite, because the DMA did not intend to state a separate substantive due process violation. Since the DMA has stated a valid procedural due process claim, however, this argument affords no basis for dismissing Count VII or any portion thereof.

deprivation hearing rights or post–deprivation confidentiality guarantees—have already devalued affected retailers' customer list information.

In circumstances in which the enactment of a statute or the promulgation of a regulation effects a taking, the usual ripeness requirement that a claimant must exhaust its administrative/state law remedies before bringing its claim does not apply. A facial challenge is generally ripe at the moment of enactment of the challenged statute. [*See Asociación de Subscripción conjunta del Seguro de Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1, 14 (1st Cir. 2007) (collecting cases); *Guggenheim v. City of Goleta*, 582 F.3d 996, 1006 (9th Cir. 2009); *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 736 n.10 (1997) ("Such 'facial' challenges to regulation are generally ripe the moment the challenged regulation or ordinance is passed.") *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992) (facial challenge that "does not depend on the extent to which petitioners are deprived of the economic use of their particular pieces of property or the extent to which these particular petitioners are compensated" may go forward although just compensation has not been sought).] The DMA surmounted the hurdle of pleading its claim that the enactment of the Act, as implemented by the Regulations, effected a taking of trade secret information by imposing a requirement on affected out–of–state retailers that they turn over trade secret information to the Department, thereby extinguishing some or all of its value without compensation. Indeed, the Act and Regulations give the Department *no* authority to excuse any retailer (other than a retailer below the *de minimis* sales threshold) from the requirement that it hand over its confidential customer list information, *no* opportunity to request such an

exclusion, and *no* guarantee that the information disclosed will be adequately safeguarded to preserve its trade secret value.

Adjudicating whether the enactment of the Act and/or the promulgation of the Regulations by the Department effected such a taking does not depend on the extent to which affected out–of–state retailers are deprived of the use of their specific pieces of property, further demonstrating that the DMA's claim is ripe. [*San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 340, n.23 (2005) (quoting *Yee*, 503 U.S. at 534).]  In order to determine whether the declaratory and equitable relief sought is appropriate, the Court need not draw upon facts specific to individual retailers. [*See Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 386 (1926) ("Assuming the premises, the existence and maintenance of the ordinance in effect constitutes a present invasion of appellee's property rights and a threat to continue it. Under these circumstances, the equitable jurisdiction is clear.") (citation omitted).]  Indeed, the disclosure requirement of the Act and Regulations results in the uniform seizure, from every affected out-of-state retailer, of valuable (non–tax) customer information — maintained by retailers who, it is undisputed, have no obligation to collect or pay Colorado taxes — for use by the Department, for its own purposes, in collecting tax revenue from third parties.  Equitable relief from such widespread harm is appropriate.

**D.    The DMA Agrees To The Dismissal, Without Prejudice, of Its State Constitutional Claims [Count IV (Right of Privacy), Count VI (Free Speech), and Relevant State Law Portions of Count VII (Due Process) and Count VIII (Taking)], In Accordance With The Eleventh Amendment.**

The DMA does not contest the dismissal, without prejudice, of its claims under the Colorado Constitution for lack of subject matter jurisdiction.  The DMA brought this

action in order to seek the prompt and dispositive adjudication of all of its legal challenges to the Act and Department Regulations, including state constitutional claims, in a single action. The Defendant, however, has asserted her immunity from suit under the Eleventh Amendment, and has declined to consent to the supplemental jurisdiction of the Court over the DMA's state constitutional claims.  Although piecemeal litigation was not, and is not, the DMA's preference, the DMA agrees to the dismissal without prejudice of its claims under the Colorado Constitution (Counts IV, VI, and the relevant state law portions of Counts VII and VIII).

## IV.    CONCLUSION

Based on the foregoing, the DMA respectfully requests that the Court deny the Department's motion to dismiss the DMA's claims under the United States Constitution.

### Certificate of Compliance with REB Civ. Practice Standard V.I.1.

I hereby certify, in accordance with REB Civ. Practice Standard V.I.1, that I have read and complied with the Practice Standards of this court governing the formatting and marshalling of motions and responses filed under Rule 12(b).

Respectfully submitted,

Dated:  August 27, 2010

/s/ George S. Isaacson

George S. Isaacson
Matthew P. Schaefer
BRANN & ISAACSON
184 Main Street, P. O. Box 3070
Lewiston, ME 04243−3070
Tel.: (207) 786−3566
Fax:  (207) 783−9325
E−mail: gisaacson@brannlaw.com
         mschaefer@brannlaw.com
*Attorneys for the*
*Direct Marketing Association*

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2010, I electronically filed the foregoing Plaintiff's Response in Opposition to Defendant's July 30, 2010, Motion to Dismiss Plaintiff's First Amended Complaint [Doc. No. 14], using the CM/ECF system, which will send notification of such filing to counsel of record:

Stephanie Lindquist Scoville
Senior Assistant Attorney General
State of Colorado
1525 Sherman Street, 7th Floor
Denver, CO 80203
stephanie.scoville@state.co.us

Robert H. Dodd, Jr.
Senior Assistant Attorney General
State of Colorado
1525 Sherman Street, 7th Floor
Denver, CO 80203
robert.dodd@state.co.us

Jack Wesocky, Jr.
Senior Assistant Attorney General
State of Colorado
1525 Sherman Street, 7th Floor
Denver, CO 80203
Jack.Wesocky@state.co.us

Attorneys for Defendant

/s/ George S. Isaacson
George S. Isaacson