IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-01546-REB-CBS

The Direct Marketing Association,

       Plaintiff,

v.

Roxy Huber, in her capacity as Executive Director,
Colorado Department of Revenue,

       Defendant.

---

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S
MOTION FOR A PRELIMINARY INJUNCTION**

---

Defendant, Roxy Huber, in her capacity as the Executive Director of the Colorado

Department of Revenue ("DOR") submits this Response in Opposition to Plaintiff's

Motion for Preliminary Injunction ("Motion") filed on August 13, 2010 [Dkt.15].

## I.    INTRODUCTION

DMA seeks a preliminary injunction to halt DOR's enforcement of a bill signed

into law in February 2010, now codified at COLO. REV. STAT. § 39-21-112(3.5) ("HB

1193"), and its implementing regulations, 1 Colo. Code. Regs. § 201-1:39-21-112.3.5

("Regulations") (together, "the Law"), which provide an additional means for Colorado to

enforce its use tax.  *See* Ex. 1, HB 1193 and Ex. 2, Regulations.

After states adopted sales taxes in the 1930s, they faced two concerns: 1) loss of

business to local merchants as customers made out-of-state purchases to avoid sales

tax liability, and 2) loss of revenue as a result of the diversion of sales outside the state.

*See* Jerome R. Hellerstein & Walter Hellerstein, *State Taxation*, vols. I and II, Part V,

Chapter 16, ¶16.01[2] (3d ed. 1998-2010).  To address these concerns, states enacted

complementary use taxes on goods brought into the state for use.  *Id.*  Colorado

enacted a sales tax in 1935 and a use tax in 1937; the rate under each is 2.9%.  *See*

COLO. REV. STAT. § 39-26-106(1)(a)(II), § 39-26-202(1)(b) (2010).  As in many states,

the sales and use taxes are an integral part of Colorado's budget.  *See* Ex. 3, Saliman

Decl. ¶¶7-8.  Given the current fiscal state of the State, collection of all revenue,

including sales and use tax, is absolutely essential.  The Law, therefore, is intended to

be another tool in DOR's toolbox to enforce the sales and use tax.

The Law imposes three regulatory requirements on retailers that do not collect

Colorado sales tax and imposes penalties for failure to comply.  First, non-collecting

retailers must notify purchasers that although the retailer does not collect sales tax, the

purchase may be subject to Colorado's use tax and state law requires purchasers to file

a use tax return ("Transactional Notice").  Ex. 2, Reg. 29-31-112.3.5(2); Ex. 4, Stevens

Dec., Ex. B (Transactional Notice Template).  Retailers may use a variety of methods to

display the Transactional Notice, including putting the notice on a separate slip of paper

in a delivery box.  Ex. 4, Stevens Dec., Ex. A (FYI Sales 79).[1]

Second, non-collecting retailers must send customers who purchase more than

$500 annually a statement listing the dates, general categories, and amounts of their

purchases and reminding them of their use tax obligations ("Annual Customer Report").

---

[1] This option is available as long as retailers do not suggest to the customer that no sales tax is due on the purchase. Ex. 4, Stevens Dec., Ex. A (FYI Sales 79).  If a retailer indicates during the purchase process that no tax is due, the retailer must include the Transactional Notice at the time of purchase.  *Id.*

Ex. 2, Reg. 29-31-112.3.5(3); Ex. 4, Stevens Dec. Ex. C (Sample Annual Customer Notice).

Third, non-collecting retailers must send an annual report to DOR listing customer names, addresses, and total amounts spent ("Annual Retailer Report").  Ex. 2, Reg. 29-31-112.3.5(4).  Although DMA repeatedly attempts to characterize the Law as requiring disclosure of "individual customer transaction information," "personally identifiable purchase information," "private" or "sensitive purchasing information," (Motion, pp. 2, 9, 16, 21, 29), non-collecting retailers are prohibited from sending DOR any information about the goods purchased by individuals.  Ex. 2, Reg. 29-31-112.3.5(4)(a)(iv).  DOR allows retailers to submit the Annual Retailer Report in plain text format using secure internet protocols to ensure that customer data is protected.  Ex. 5, Thompson Dec. ¶¶4, 6.  DOR also has provided step-by-step instructions and samples for smaller, less-sophisticated retailers.  *Id.* at ¶6.  Additionally, DOR employees must strictly maintain the confidentiality of all tax documentation, and are subject to criminal and civil penalties as well as termination for failure to do so.  COLO. REV. STAT. § 39-21-113(4)(a), -113(6) (2010).

The Law applies to all retailers who do not collect sales tax, regardless of their location.  Ex. 2, Reg. 29-31-112.3.5(1)(a).  Because the Law exempts retailers with less than $100,000 in gross annual sales in Colorado, the vast majority of retailers in the country are not subject to the Law.  *Id.*; Ex. 6, Gable Rpt., pp.5-6.

The Law is based on the widely-accepted principle that compliance with tax laws dramatically increases when a third party reports taxable activity to the taxing authority.

Exs. 7-8, IRS Tax Gap Studies (relevant portions highlighted).  The Law was driven by Colorado's extraordinary budget crisis and the sizeable tax "gap" between what is owed in sales and use tax and what is actually paid.

## II.   PRELIMINARY INJUNCTION STANDARDS.

DMA filed suit seeking to enjoin DOR from enforcing the Law, claiming it violates several provisions of the U.S. Constitution.  The Motion is limited to DMA's claims that the Law violates the dormant Commerce Clause.

Preliminary injunctions are "extraordinary remed[ies]," and "the right to relief must be clear and unequivocal."  *Aid for Women v. Foulston*, 441 F.3d 1101, 1115 (10th Cir. 2006) (internal quotations omitted).  In assessing the effect of a requested injunction, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter v. Natural Res. Def. Council*, ___ U.S. ___, 129 S.Ct. 365, 376-77 (2008) (internal citation omitted).

To obtain a preliminary injunction, Plaintiff must establish: (1) a substantial likelihood of success on the merits, (2) that Plaintiff will suffer irreparable injury if the preliminary injunction is denied, (3) that the threatened injury to Plaintiff outweighs the injury to Defendant caused by the preliminary injunction, and (4) that an injunction is not adverse to the public interest.  *Aid for Women*, 441 F.3d at 1115.  Plaintiff bears the burden of proof to demonstrate that each factor tips in its favor.  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188-89 (10th Cir. 2003).  DMA cannot demonstrate to the degree required these four factors.

4

### III.   DMA MEMBERS WILL NOT SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION.[2]

DMA has not met its burden to demonstrate that complying with the Law will result in certain and great harm to its members.  In order to meet its burden on the irreparable harm factor, DMA must establish that the injury to its members is "both certain and great," and not "merely serious or substantial."  *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1262 (10th Cir. 2004).  The burden to demonstrate irreparable harm is "not an easy burden to fulfill."  *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003).

### A.   A Violation of Commerce Clause Rights Is Not Irreparable Injury Per Se.

DMA's first contention that a violation of the Commerce Clause is sufficient irreparable harm to warrant an injunction is misplaced.  To the extent DMA has not demonstrated a likelihood of success on the merits, the Court need not consider this issue.  In any event, DMA's contention is misplaced.

DMA relies primarily on *ACLU v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999), where the court found that the plaintiffs had demonstrated irreparable harm due to the curtailment of their free speech rights.  Without any additional analysis, the court included a citation to *Am. Libraries Ass'n v. Pataki*, 969 F. Supp. 160, 168 (S.D.N.Y. 1997), which found that a violation of Commerce Clause rights constitutes irreparable injury.  *Pataki*, however, is part of a split among district courts as to whether the

---

[2] Because the discussion of the alleged harm also bears on the analysis of whether the Law unduly burdens interstate commerce, DOR addresses the first two preliminary injunction factors in reverse order.

irreparable harm factor is satisfied when any violation of Constitutional rights is alleged. A number of district courts have concluded that this factor may be automatically satisfied when there is a violation of an individual's constitutional rights, but that a violation of "structural" constitutional rights – such as under the Commerce Clause – does not result in a presumption of irreparable harm.  *See, e.g., Prof'l Towing & Recovery Operators v. Box*, 2008 WL 5211192, at *12-13 (N.D. Ill. Dec. 11, 2008); *N.Y. State Restaurant Ass'n v. N.Y. City Bd. of Health*, 545 F. Supp. 2d 363, 367 (S.D.N.Y. 2008); *Alliance of Auto. Mfr. v. Hull*, 137 F. Supp. 2d 1165, 1173 (D. Ariz. 2001) (refusing to find a presumption of irreparable harm based on an alleged violation of the dormant Commerce Clause); *Atl. Coast Demolition & Recycling, Inc. v. Bd. of Chosen Freeholders*, 893 F. Supp. 301, 308-09 (D.N.J. 1995); *Grand Cent. Sanitation, Inc. v. City of Bethlehem*, 1994 WL 613674, at *2 (E.D. Pa. 1994); *Am. Petroleum Inst. v. Jorling*, 710 F. Supp. 421, 431-32 (N.D.N.Y. 1989); *Norfolk S. Corp. v. Oberly*, 594 F. Supp. 514, 522 (D. Del. 1984).

Although the Tenth Circuit has not definitively resolved this issue, this Court has held that not all constitutional claims are entitled to a presumption of irreparable harm. *S.W. Shattuck Chem. Co. v. City & County of Denver*, 1 F. Supp. 2d 1235, 1238-39 (D. Colo. 1998) (noting a presumption arises only when fundamental rights are implicated or when a future injury is demonstrated that cannot be compensated by monetary damages alone).  Because DMA has not unequivocally demonstrated irreparable harm beyond the assertion of a Commerce Clause violation, it has not met its burden.

### B. The Alleged Economic Harm to DMA's Members is Speculative and Does Not Constitute Irreparable Harm.

DMA has not met its burden of proof to show harm that is great and more than speculative.  To obtain a preliminary injunction, DMA must demonstrate that irreparable injury is likely.  *Winter*, ___ U.S. ___, 129 S.Ct. at 375.  The harm must be actual, not theoretical.  *Heideman*, 348 F.3d at 1189.  Speculative harm will not amount to irreparable injury.  *Greater Yellowstone Coalition*, 321 F.3d at 1258.  Moreover, economic loss generally in and of itself does not constitute irreparable harm.  *Id.*; *see also Am. Republic Ins. Co. v. Great-West Life & Annuity Ins. Co.*, 2010 WL 582368, at *5 (D. Colo. Feb. 17, 2010).   DMA has asserted its members will be irreparably harmed by 1) incurring costs to comply with the Law and 2) losing customers as a result of the Law.  Each of these contentions, however, is based on DMA's experts' opinions, whose methodology is flawed, resulting in vastly overstated harm.

### 1. The Alleged Compliance Costs Are Unsupported and Do Not Constitute Irreparable Harm.

Courts across the country have rejected the notion that the cost of complying with government regulations constitutes irreparable harm.[3]  The Third Circuit explained the rationale as follows:

---

[3] *See, e.g., Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005) ("ordinary compliance costs are typically insufficient to constitute irreparable harm."); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328,1331 (7th Cir. 1980) (injury from compliance with government regulation ordinarily is not irreparable harm); *IMS Health Inc. v. Sorrell*, 631 F. Supp. 2d 429, 432 (D. Vt. 2009) ("Spending money to comply with the law is simply a fact of doing business."); *Pennsy Supply, Inc. v. Susquehanna River Basin Comm'n,* 2007 WL 551573, at *3-4  (M.D. Pa. Feb. 20, 2007) (rejecting argument that irreparable injury exists simply because the interim costs of compliance with new regulations are not recoverable against the governmental entity if the regulations are later declared invalid).

> [T]he alleged injury was "unrecoverable costs and commitment of diverse
> business resources." Without intending to disparage the importance of
> such an injury, we observe that all that is lost is profits. Any time a
> corporation complies with a government regulation that requires
> corporation action, it spends money and loses profits; yet it could hardly
> be contended that proof of such an injury, alone, would satisfy the
> requisite for a preliminary injunction. Rather, in cases like these, courts
> ought to harken to the basic principle of equity that the threatened injury
> must be, in some way, "peculiar".   These are not "small" corporations;
> there is no contention that compliance with the [Law] would render any
> appellee unable to meet its debts as they come due. Nor is there any
> contention that the cost of compliance would be so great vis a vis the
> corporate budget that significant changes in a company's operations
> would be necessitated. Nor is this a case where compliance would
> permanently injure the corporation's reputation, or its goodwill.

*A.O. Smith Corp. v. FTC,* 530 F.2d 515, 527-28 (3d Cir. 1976) (internal citations and

footnote omitted).

Even if compliance costs could be considered irreparable harm, DMA has not

come forward with reliable evidence demonstrating that compliance costs are great and

certain.   The opinions of DMA's expert on this issue, F. Curtis Barry, are not founded in

the scientific method and are wholly speculative.   Mr. Barry did not perform any studies

to estimate the costs of compliance, did not refer to any published literature, and did not

obtain data of actual costs of compliance.   Ex. 9, Barry Dep. 53:25-11; 63:14-64:4.[4]

Instead, Mr. Barry used his "best judgment," working "in his head" to estimate what the

costs might be.   *See, e.g., id.* at 32:9-33:16; 131:25-132:22.

---

[4]Although Mr. Barry talked to 15 different retailers or software companies about the "process" for
complying with the regulations, he "didn't do anything methodically."  Ex. 9, Barry Dep. 57:8-11; 58:14-19;
63:14-64:4.  He did not ask them about their actual costs, keep any detailed records, and could not even
recall the names of any retailers to whom he spoke.  *Id.*; *see also* 61:19-22; 65:16-25.

Based on current e-commerce data, DOR's expert, Dieter Gable, concluded that only "a relatively small number of retailers" will be subject to the Law.  Ex. 6, Gable Rpt., p.5.  Mr. Gable also concluded that all retailers are using computer automation to conduct their businesses.  Smaller businesses may have some initial costs, but those costs likely would be wrapped up in software upgrades and may be ultimately absorbed by software vendors.  *Id.* at pp.7-10.  Larger retailers will be sophisticated enough to meet the Law with nominal effort as part of their regular technology enhancements, and their costs are so inconsequential, particularly when viewed as a percentage of sales, that they cannot be quantified.  *Id.* at p.11.

### a.  Transactional Notice.[5]

Mr. Barry's estimated "non-discretionary" costs for the Transactional Notice are $10,000-$18,000 in the first year and an additional $1,500-$2,000 in later years.  Ex. 10, Barry Rpt., Ex. A and A.1.[6]  Up to $7500 of these costs are attributable to management deciding how they want to comply with the regulation.  Ex. 9, Barry Dep. 101:21-102:4.

---

[5]When assessing irreparable harm, the Court may consider only future harm; harm that has already occurred is not grounds for a preliminary injunction.  *Mountain Med. Equip., Inc. v. Healthdyne, Inc.*, 582 F. Supp. 846, 848 (D. Colo. 1984).  Non-collecting retailers have been complying with the Transactional Notice requirement for nine months.  As a result, harm stemming from the Transactional Notice is relevant only to the extent that it constitutes alleged ongoing harm.

[6] Mr. Barry's lack of methodology is illustrated in his progression of his estimated costs.  Based on his experience, Mr. Barry initially estimated the costs for an e-commerce retailer to modify an order path to create a Transactional Notice as $30,000-$50,000.  Ex. 9, Barry Dep. 103:22-105:23.  Based on the same experience and without doing any additional studies, Mr. Barry then estimated the same cost at $15,000-$25,000, then $5,000-$10,000.  *Id.* at 107:10-108:21; 109:2-13.  Some of these revisions were based on suggestions from DMA's counsel who wanted the numbers to be conservative.  *Id.* at 74:6-21; 75:25-76:17; 134:14-135:15. Mr. Barry went through a similar estimating and revision process with his estimate for retailers to modify an invoice or packing slip, the number of call center inquiries that would be generated, and the amount of professional assistance retailers would require.  *Id.* at 114:18-117:18; 119:17-120:11; 122:7-22; 131:25-132:6; 132:15-22; 133:19-135:15.

As Mr. Barry admitted, his final numbers "are small numbers as estimates go for IT changes. They may look big to a novice, but they're not…" *Id.* at 106:16-25. Relying on labor studies and market data, Mr. Gable put the maximum cost for the smallest-affected retailer at $263-$1038 in the first year, with customer service inquiries resulting in an additional one time change of $735-$1470. Ex. 6, Gable Rpt., pp.11-12. Larger retailers would not realize these costs. *Id.* at p.11.

Under either expert's analysis, when viewed as part of retailers' overall information technology (IT) costs and their annual sales, the cost of compliance with the transactional notice is very small. According to Mr. Barry, moderate to large retailers (those Mr. Barry estimates would be subject to the Law) have total IT support costs that range from $200,000 to up to 1-2% of total net sales. Ex. 9, Barry Dep. 37:4-21; 38:15-23; 41:16- 42:10; 43:18-44:8; 55:12-20. Using Mr. Barry's estimates, Amazon.com's total IT costs run around $50 Million. *See* Ex. 11, Internet Retailer Research, Top 500 Guide. When viewed as an additional cost of overall IT costs, the cost of a Transactional Notice is a proverbial drop in the bucket. When normalized for gross sales, the burden imposed on retailers by the Transactional Notice amounts to only 0.001%-0.017% of annual sales. *See* Ex. 6, Gable Rpt., Exh. A.1; *see also* p.10 (explaining why any costs should be viewed as incremental costs).[7]

The experts' estimates are based on modifications to an electronic order path, but there are a number of ways for retailers to comply with the Transactional Notice

---

[7]When doing work for his own clients, Mr. Barry estimates costs as a percent of net sales. Ex. 9, Barry Dep. 18:5-19:3.

requirement.  Retailers could use a linking notice to a separate web page or the company's FAQ's or policies page, a pop-up window, or other "work arounds."  Ex. 9, Barry Dep. 93:9-94:6; 94:13-15; 95:10-20; 97:20-98:1.  As long as retailers do not lead customers to believe that no tax is due on the purchase, they even may put a slip of paper with the Transactional Notice into packages for delivery.  Ex. 4, Stevens Dec., Ex. B (Transactional Notice Template).  DOR has already created language that companies may use for the notice.  *Id.*  Mr. Barry estimated that a simple packing insert costs less than ten cents per package.  Ex. 9, Barry Dep. 226:3-5.

  b.  Annual Customer Report and Annual Revenue Report.

  The experts' estimates for the Annual Customer Report and the Annual Revenue Report are similarly slight.  Mr. Barry estimated that Annual Customer Notices will cost retailers $8,000-$20,000, plus an additional $2.00-$3.00 per customer.   Ex. 10, Barry Rpt., Ex. B and B.1.[8]  The $8,000-$20,000 is due solely to 225 hours of internal computer programming costs (or 135 hours of external programming costs).  *Id.*  In contrast, for the smallest retailers subject to the Act, Mr. Gable found one-time costs of $1601-$3023, representing 0.027%-0.050% of annual sales, and ongoing yearly costs

---

[8] Defendant further notes that Mr. Barry's estimated costs on the Annual Customer Report and the Annual Revenue Report suffered from the same methodological flaws as his cost opinions on the Transactional Notice.  Although Mr. Barry obtained some quotes from printing houses, he based the remainder of the estimates on his general experience and did not conduct any studies or refer to any published research.  *See, e.g.*, Ex. 9, Barry Dep. 191:2-7; 192:3-193:25.  Mr. Barry also continually revised his numbers downward, including after discussions with counsel.  For example, Mr. Barry initially estimated the Annual Revenue Report costs at $34,000-$46,000, then $28,000-$38,000, and finally, $8500-$13,000.  *Id.* at 207:6-21.

of $354-$530, representing 0.006-0.009% of gross annual sales.  Ex. 6, Gable Rpt., p.12.  Many retailers' costs would be far less than that.  *Id.* at pp.7-10, 20.

As to the Annual Revenue Report, Mr. Barry estimated retailers will incur $8500-$13,000 in costs.  Ex. 10, Barry Rpt., Ex. C, C.1.  Mr. Barry attributes $7,500-$10,000 of these costs to management time trying to determine how to do the report.  Ex. 9, Barry Dep. 194:13-195:2.  The remaining $1,000-$3,000 is expense to comply with DOR's privacy protocols.  Ex. 10, Barry Rpt., Ex. C, C.1.  Mr. Gable reviewed DOR's processes and found costs to comply with privacy protocols would be $0, and Mr. Barry agrees that these costs may never materialize.  Ex. 6, Gable Rpt., pp.14-15; Ex. 9, Barry Dep. 190:7-191:1.  Mr. Gable found that the Annual Revenue Report could cost the smallest retailers $235-$470, or 0.004%-0.008% of annual sales, and that many retailers' costs would be far less.  Ex. 6, Gable Rpt., p. 13.  Particularly when normalized for retailers' annual sales and when compared to retailers' overall IT budgets, the costs of the annual reports are nominal.

Moreover, the data to create these reports already exists.  Ex. 9, Barry Dep. 157:5-6; 158:5-16.  Most retailers' customers track customer data in very detailed ways, including tracking what customers purchase, how much they spend, how long they shop, which internet browsers or IP addresses they use, whether they visit after receiving an email or special offer, and "endless" other benchmarks.  *Id.* at 137:9-140:7. Most retailers keep this data for more than one year.  *Id.* at 147:5-7.  Moreover, most retailers "rent" their data to marketing service bureaus by providing customer names and addresses, part of the same data set required for the Annual Customer Report and

12

the Annual Revenue Report.  *Id.* at 46:1-49:3; 140:14-141:8.  This is confirmed by Defendant's expert Dr. Lichtenstein, who notes that at least one company, Datalogix, has data on 100% of customers 18 years and older, including personally identifiable information and individual item purchases.  Ex. 12, Lichtenstein Rpt., p.7.  According to Mr. Gable, given retailers' constant tracking and manipulation of data, the additional incremental effort required to create an Annual Customer Report and an Annual Revenue Report is nominal.  Ex. 6, Gable Rpt., pp.13-14.

The effort for the Annual Customer Report also should be viewed according to the number of actual reports required.  Given that the regulations require reports only for customers who spend more than $500 annually, Mr. Barry estimated that retailers would have to create annual reports for fewer than 20% of Colorado purchasers, and it could be as low as 10%.  Ex. 9, Barry Dep. 169:11-20; 170:3-5.

Given the lack of methodology employed by DMA's expert and the small overall costs to comply with the various reporting requirements, DMA has not met its burden to show certain and great irreparable harm in the form of compliance costs.

2.  <u>Loss of Customers</u>

DMA next asserts its members will suffer harm by a loss of customers.  Although customer loss or a loss of goodwill can constitute irreparable injury, DMA must substantiate its assertion that customers or goodwill will, in fact, be lost.  *Am. Republic Ins. Co.,* 2010 WL 582368, at *5.  DMA must prove that the harm is more than speculative.  *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).

13

DMA relies on a survey conducted by Dr. Thomas Adler and interpreted by Dr. Kevin Keller.  The survey purportedly demonstrated that 67% of Colorado residents will decrease purchases from retailers who comply with the Law.  Defendant retained an expert, Dr. Donald Lichtenstein, to assess the survey and conclusions.  Dr. Lichtenstein concluded that DMA's survey is "fatally flawed" in at least four respects, resulting in flawed conclusions as well.  Ex. 12, Lichtenstein Rpt., pp.5, 14.

First, the survey is flawed because it contained false information.  *Id.* at pp.18-22. One of the early questions asked respondents to agree whether they minded "the State of Colorado **knowing the kinds of products I buy**, from whom I buy them, where I have them shipped and how much I spend." (emphasis supplied).  *Id.* at p.19.  This question was false because retailers are specifically prohibited from supplying this information as part of the Annual Revenue Report.  *Id.* at p.18.  In addition to being misleading, this question influenced answers to later questions, rendering the entire survey unreliable.  *Id.* at pp.18-22.

Second, the survey questions themselves suggested a response.  *Id.* at pp.22-24.  Because the survey questions prompted a concern about invasion of privacy, the results of the survey supposedly showed a large majority of respondents are concerned with a loss of privacy.  This "reactivity bias" makes the survey unreliable.  *Id.*

Third, the survey did not follow accepted survey standards in offering respondents enough information and "don't know" as a possible response.  *Id.* at pp.24-27.  Particularly given the subject of the survey, this omission calls into question the entire survey.  *Id.*

14

Fourth and most importantly, the survey does not permit an inference of causality because it contains a "confound." *Id.* at pp.13-17.  The survey conflated customer privacy concerns with customer's resistance to paying higher taxes.  The survey did not follow established methodologies for factoring out this confound.  *Id.* at p.16. Particularly given strong consumer resistance to paying higher prices in the form of taxes, the survey's failure to account for this confound rendered the survey "fatally flawed."  *Id.* at pp.14-15.

Dr. Lichtenstein further explained how the conclusions drawn from the survey are faulty.  He examined academic data, which demonstrates that consumers' stated intentions are an unreliable predictor of their actual future behavior and that consumers are particularly poor at predicting their behavior when privacy concerns are involved.  *Id.* at pp.10-11, 30-35.  To the extent consumers ultimately change behavior based on the Law, Dr. Lichtenstein concluded that changes in price (via higher taxes) account for the change.  *Id.* at p.6.  Additionally, when all retailers are subject to the Law, the consumer behavior may not result at all.  *Id.* at pp.12, 27-29.  Data disclosure to DOR also is not a powerful enough factor to change the behavior (purchasing from a non-collecting retailer) when the benefits of Internet shopping are considered.  *Id.*  Academic studies show that customers are willing to trade privacy for products when they believe sellers can be trusted.  *Id.* at pp.8-9.  As a result, Dr. Lichtenstein concluded that the Law cannot account for the alleged consumer behavior.  *Id.*

Finally, the survey and its conclusions are flawed because causality cannot be found from a correlational study.  DMA's survey was correlational - it took an event (the

Law) and attempted to correlate behavior (customers stopping shopping) to it. However, the survey was not designed as a causality survey. In this case, the Law's effect of higher prices/taxes may change consumer behavior. At most, the survey shows a correlational, but not a causal, effect. *Id.* at p.17. In fact, Mr. Gable's research based on current e-commerce data shows that the Law will not materially impact the rate at which customers abandon their shopping carts. Ex. 6, Gable Rpt. P.16.

Because DMA's survey and the conclusions drawn from it are flawed, DMA has not met its burden to demonstrate harm that is certain and great. DMA does not offer any evidence from actual members who have lost sales attributable to the Law, does not contend that any losses would be so serious as to jeopardize its members, and does not offer other evidence detailing its losses.[9] Accordingly, DMA has not met its burden to demonstrate irreparable harm.

## IV. DMA HAS FAILED TO ESTABLISH A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

DMA has not demonstrated a substantial likelihood of success on the merits of its Commerce Clause claims. The Law does not discriminate either facially or in effect against interstate commerce (Count 1) and the limitations on state action set forth in *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992), do not apply (Count 2). Accordingly,

---

[9] Mr. Barry estimated that the Law will lead 25-50% of customers to abandon their shopping carts, but he did not base this on any data or studies and admitted he can't "mathematically" quantify how much retailers would lose. Ex. 9, Barry Dep. 195:12-197:25.

the Law should be reviewed and upheld in accordance with the test set forth in *Pike v. Bruce*, 397 U.S. 137, 142 (1970).

The Commerce Clause establishes both an affirmative power in Congress to regulate commerce amongst the states and also a dormant limitation on the power of the states to enact laws that impose substantial burdens on such commerce. *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1039 (2009). The modern law of the dormant Commerce Clause is "driven by concern about economic protectionism- that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dept. of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-338 (2008).[10]

When a state's law is not motivated by protectionism, but rather serves a traditional government function for the benefit of the public, the Supreme Court has recently taken a more permissive approach in its Commerce Clause analysis. In *United Haulers Assoc., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330 (2007), the Court upheld a waste flow control ordinance that benefitted a public facility while treating private companies the same. The Court reasoned that laws favoring local government "may be directed toward any number of legitimate goals unrelated to protectionism," and cautioned that the dormant Commerce Clause "is not a roving license for federal courts to decide what activities are appropriate for state and local

---

[10]Economic protectionism is defined by laws that burden out-of-state businesses simply to give a competitive advantage to in-state businesses, *Granholm v. Heald*, 544 U.S. 460, 472 (2005), or shield in-state industries from out-of-state competition. *Maine v. Taylor*, 477 U.S. 131, 148 (1986).

government to undertake, and what activities must be the province of private market competition." *Id.* at 343. This hesitancy by the Court to interfere with states' exercise of traditional government functions resurfaced again recently in *Davis*. 553 U.S. at 341 ("[w]e should be particularly hesitant to interfere … under the guise of the Commerce where a local government engages in a traditional government function") (quoting *United Haulers*, 550 U.S. at 344). The Court reiterated its approach in *United Haulers* and confirmed that a government function is "not susceptible to standard dormant Commerce Clause scrutiny owing to its likely motivation by legitimate objectives distinct from the simple economic protectionism the Clause abhors." *Id.* The key, therefore, is whether the motivation of the law is "for the benefit of a government fulfilling governmental obligations or for the benefit of private interests, favored because they are local." *Id.* at 341 n.9.

In *United Haulers*, the Court applied a truncated analysis under *Pike*. *See* 550 U.S. at 346 (analyzing the ordinances under the *Pike* test, but finding it "unnecessary to decide whether the ordinances impose any incidental burden on interstate commerce because any arguable burden does not exceed the public benefits of the ordinances"). Finding that the ordinances allowed local governments to finance their waste disposal systems, the Court determined that "[w]hile revenue generation is a not a local interest that can justify discrimination against interstate commerce…it is a cognizable benefit for purposes of the *Pike* test." *Id.* (citing *C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 393 (1994)).

18

The Law is part of the State of Colorado's approach to enforcing its sales and use tax, a vital component of the State budget. *See* Ex. 3, Saliman Decl. ¶¶7-8. As discussed *supra* Part IV, the Law does not discriminate against interstate commerce and is not motivated by a protectionist purpose. Rather, the aim of the Law is to improve collection of sales and use tax due to the State for the benefit of the public as a whole. Revenue collection is a legitimate state interest and traditional government function. The Supreme Court has consistently found that the levying of taxes is a means of distributing the burden of the cost of government and is a fundamental principle of government existing primarily to provide for the common good. *Commonwealth Edison Co. v. Mont.*, 453 U.S. 609, 622-623 (1981) (citing *Carmichael v. So. Coal & Coke Co.*, 301 U.S. 494, 521-533 (1937); *see also Carbone*, 511 U.S. at 429 (finding the protection of the public fisc to be a legitimate non-protectionist benefit); Donald H. Regan*, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause,* 84 Mich.L.Rev. 1091, 1120 (May, 1986) ("[R]aising revenue for the state treasury is . . . a federally cognizable benefit.").

**B. The Law Does Not Facially Discriminate Against Interstate Commerce**.

DMA has failed to meet its burden to demonstrate that the Law discriminates against interstate commerce. The burden to show discrimination falls on the party challenging the statute. *Kleinsmith*, 571 F.3d. at 1040 (citing *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979)). If a law clearly discriminates against interstate commerce, the

state must demonstrate a legitimate local purpose that cannot be achieved through reasonable nondiscriminatory alternatives.  *Hughes*, 441 U.S. at 336-37 (1979).[11]

DMA makes much of the title of House Bill 10-1193[12] and incorrectly alleges that the Law discriminatorily targets and applies solely to out-of-state retailers.  This is not the case.  The plain language of the Law applies to <u>all</u> non-collecting retailers that sell to Colorado purchasers.  *See, e.g.,* COLO. REV. STAT. §§ 39-21-112(3.5)(a) and (c)(I) (referring to "any retailer that does not collect Colorado sales tax" and "each retailer that does not collect," respectively); Ex. 2, Regulations (referring throughout to "non-collecting retailers").  Retailers doing business in Colorado and selling to Colorado purchasers must obtain a license and collect and remit the sales tax on sales of tangible personal property.  COLO. REV. STAT. §§ 39-26-103, -104 (2010).  <u>Any</u> retailer that sells

---

[11] Assuming discrimination and advocating a strict scrutiny standard, the DMA points to alternative tools that the Department might employ in its enforcement and collection efforts.  As discussed *supra*, however, revenue collection and combating tax evasion are legitimate state interests that are unrelated to a protectionist purpose.  These interests cannot be successfully achieved through the alternatives DMA suggests.  For example, DMA suggests that Colorado include a line on the income tax return for reporting use tax.  For nearly a decade, the Department included a use tax return with its income tax return forms; it ultimately discontinued this practice, however, because the amount of use tax collected did not justify the expense of printing and including the use tax return with the income tax forms.  *See* Ex. 13, Williams Dec. ¶3.  Further, although DMA cites approximately $40 million collected annually by New York from the line item approach, that figure includes both state and local tax remitted and thus includes revenue from various localities with combined rates approaching 9%.  *See* Ex. 14, Duran Dec. ¶4, Ex. C thereto, New York State Sales and Use Tax Rates.  Consequently, the Law would survive strict scrutiny analysis.

[12] As initially introduced, HB 10-1193 was titled *An Act Concerning the Collection of Sales and Use Taxes on Sales Made by Out-of-State Retailers,* and was substantively different than the Law at issue in this case.  The bill originally required online and remote retailers with affiliates within Colorado to <u>collect</u> sales tax from Colorado residents.  The bill was substantially amended and adopted in its current form; the title of the bill, however, did not change with these amendments.  DMA's references to the bill title and fiscal note therefore pertain to the bill as introduced and not the Law.  The title of the bill is not part of the Law itself and does not affect the plain meaning of the statute.  *See Johnston v. Comm'r of Internal Revenue*, 114 F.3d 145, 150 (10th Cir. 1997) (noting that under general rules of statutory interpretation the title of a statutory provision is not part of the law but may be used to interpret an ambiguous statute); *State of Okla. v. United States Civil Serv. Comm'n*, 153 F.2d 280, 283 (10th Cir. 1946) (the title of an act may be considered in construction but it "cannot add to or subtract from the plain meaning of the text").

to Colorado purchasers and does not collect sales tax is subject to the notice and reporting requirements and penalties of the Law.  Thus it is of no import whether a retailer is located within or without the state; the focus is solely upon collection of sales tax.  Further, retailers that do not meet the statutory definition of doing business in Colorado may either voluntarily obtain a license and collect and remit sales tax, or, comply with the notice and reporting requirements of the Law and Regulations.  In fact, many retailers with no physical presence in Colorado already voluntarily collect sales tax.  Ex. 15, Corujo Decl. ¶7.

DMA incorrectly concludes that because in-state retailers must collect and remit Colorado sales tax or face criminal sanctions, retailers that do not collect by definition must be located outside the state.  The Law applies equally to all retailers that sell to Colorado purchasers and do not collect sales tax.  In fact, compliance agents within DOR discover retailers each year, which are not licensed and/or not collecting sales tax in accordance with Colorado law.  *See* Ex. 16, Reiser Decl. ¶6.  These in-state retailers are equally subject to the Law, and arguably, are subject to a greater burden as they must comply with the collection requirements.

## C.  The Law and Regulations Do Not Discriminate in Effect Against Out-of-State Retailers.

DMA further has failed to meet its burden of showing that the Law has the effect of discriminating against interstate commerce.  As the party claiming discrimination, the DMA has the burden of putting on evidence of discriminatory effect that is "significantly probative, not merely colorable."  *Kleinsmith*, 571 F.3d at 1039.  This requires a showing

21

that local interests are favored and out-of-state interests are burdened; however, "[n]ot every benefit or burden will suffice- only one that alters the competitive balance between in-state and out-of-state firms." *Id.* at 1041.  Further, DMA must show a discriminatory effect upon interstate commerce as a whole; evidence of a discriminatory impact upon a single business or class of businesses is not sufficient. *Id.* at 1043.

The Supreme Court has long recognized that the Commerce Clause does not "relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing business.  Even interstate business must pay its way." *W. Live Stock v. Bureau of Revenue*, 303 U.S. 250, 254 (1938) (noting that businesses that engage in interstate commerce are regularly subjected to state property, income, and franchise taxes).  Retailers that avail themselves of profits from the purchases of Colorado consumers must bear the incidental burden of complying with the State's laws.  As outlined *supra* Part IV, revenue collection and tax compliance are legitimate local concerns, and the Law has, at best, only incidental effects on interstate commerce.

DMA's argument that the effect of the Law is to redirect business away from out-of-state merchants to the benefit of Colorado businesses is unsupported and incorrect. First, as discussed *supra* Part III.B.2, DMA has failed to produce any credible evidence on this point and instead relies upon unsubstantiated expert opinions and a fatally flawed survey.  Second, DMA incorrectly equates all non-collecting retailers with those that are located outside of Colorado and the inverse, that collecting retailers are all

22

within the State.  From this fallacy, DMA proceeds to conclude that in-state retailers benefit from the burdens of the Law upon out-of-state merchants.  The reality is that whether a retailer collects or does not collect sales tax is not a proxy for whether interstate commerce is implicated.  This is because there are many businesses that collect Colorado sales tax that are not Colorado businesses *per se*.  *See* Ex. 15, Corujo Dec.  For example, a retailer headquartered in Minnesota may have bricks and mortar stores in Colorado and every other state in the nation.  This retailer must collect Colorado sales tax, but can hardly be placed in the category of Colorado businesses.  To the extent collecting retailers sustain any benefits from the Law, such benefits do not implicate interstate commerce.

DMA's argument that the Law seeks to regulate commerce that occurs wholly outside Colorado is without merit.  Because the Law is triggered only when there is a sale to a customer located in Colorado or the goods are shipped to a Colorado address, there is no concern for regulation of commerce that occurs entirely outside Colorado.  *See* Ex. 2, Reg. 39-21-112.3.5(1)(b) and (c) (defining Colorado Purchaser and Colorado Purchase, respectively).  Therefore, there is no extraterritorial control of commerce.  *See Quik Payday*, 549 F.3d at 1307-08 (noting that a statute is invalid *per se* if it has the practical effect of controlling commerce occurring entirely outside the state).

Lastly, to the extent the Law impacts interstate commerce, it does not violate the Commerce Clause because it is merely one enforcement mechanism of Colorado's lawful compensatory use tax.  In *Henneford v. Silas Mason Co.*, 300 U.S. 577 (1937),

the Supreme Court established the constitutionality of compensatory use taxes.  The

Court upheld Washington's use tax against a Commerce Clause challenge finding that

the use tax imposed a burden on out-of-state purchases that was identical to the burden

on in-state purchases subject to the state sales tax.  *Id*. at 581.  Here, the Law is but

one tool that the State may use in enforcing its use tax.  *See also* COLO. REV. STAT. §

39-21-112(3.5)(a) (providing for DOR's subpoena authority).

### D.  The Law Passes the *Pike* Test.

Since the Law does not discriminate facially and there is no protectionist purpose

by the State, it is properly assessed under the *Pike* balancing test.  In *Pike*, the

Supreme Court established the following test for review of state laws against Commerce

Clause challenges:

> When the statute regulates even-handedly to effectuate a legitimate local
> public interest, and its effects on interstate commerce are only incidental,
> it will be upheld unless the burden imposed on such commerce is clearly
> excessive in relation to the putative local benefits.  If a legitimate local
> purpose is found, then the question becomes one of degree.  And the
> extent of the burden that will be tolerated will of course depend on the
> nature of the local interest involved, and on whether it could be promoted
> as well with a lesser impact on interstate activities.

397 U.S. at 142.  State laws frequently survive *Pike* scrutiny.  *Davis*, 553 U.S. at 339.

The Law passes the *Pike* test.  As discussed *supra* Part IV, the Law applies

equally to all non-collecting retailers and any alleged burden on out-of-state retailers is

incidental, at best. [13]   The Law advances a legitimate local purpose: revenue collection

---

[13] The reasoning and analysis regarding DMA's alleged irreparable harm, *supra* Part III, overlaps with the
*Pike* burden analysis, therefore, it is incorporated herein.  DMA has not established an undue burden
either through loss of customers or compliance costs.  Further, the Tenth Circuit recognized more than

for the benefit of the public.  *See United Haulers*, 550 U.S. at 346 (finding revenue generation to be a cognizable benefit for purposes of the *Pike* test).  The State of Colorado has a strong interest in enforcing the sales and use tax, which represents one third of the General Fund budget.  *See* Ex. 3, Saliman Decl. ¶¶7-8.  With the advent of electronic commerce, state and local governments have sustained substantial losses in sales and use tax revenue.  Ex. 17, Fox Report, p.2.  It is estimated that Colorado will fail to collect $130.7 million in 2010 in state and local sales or use taxes due on electronic commerce sales alone.  *Id.*  Therefore, the Law aims to improve collection of the sales and use tax from Colorado purchasers and increase compliance.  Given the state of the State's budget, it is absolutely vital that all taxes due are collected.  *See* Ex. 3, Saliman Dec. ¶¶5, 7-9 (noting significant budget shortfalls and the importance of sales and use tax collections to the State).

### E.  The Law is Not a Tax and *Quill* Does Not Apply.

DMA argues in Count II that *Quill* bars the State of Colorado from requiring retailers with no physical presence to comply with the Law.  The limitations, however, on state action set forth in *Quill* do not apply to this case because the Law does not require retailers to collect sales tax.  The Tenth Circuit has recognized that *Quill* concerned the levy of taxes upon out-of-state entities and has declined to extend that decision beyond the area of sales and use taxes.  *Giani*, 199 F.3d. at 1254-55 (declining to extend *Bellas Hess/Quill* to state licensing and registration requirements); *see also OLTRA, Inc. v.*

---

thirty years ago that "[i]n the era of computers... [technical burdens]...would not be such an unreasonable burden as compared to the local interest."  *Aldens, Inc. v. Ryan*, 571 F.2d 1159, 1162 (1978).

*Pataki*, 273 F. Supp. 2d 275, 279 (W.D.N.Y. 2003) (finding the *Quill* line of cases has been properly limited to the area of direct state taxation).   *Quill's* physical presence requirement is not a limitation on state authority under the dormant Commerce Clause unless a tax is at issue.   It therefore does not apply to the Law, which only imposes nominal regulatory requirements.[14]

Further, DMA's representation that the Commerce Clause limits the State of Colorado's authority to require compliance with the Law due to the need for national regulation of the Internet is incorrect.   Rather, the Tenth Circuit has rejected the argument that the dormant Commerce Clause prohibits regulation of commercial exchanges just because parties use the Internet to communicate.   *See Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1311-12 (2008) (upholding Kansas regulation of payday loans over the Internet against Commerce Clause challenge).   "[W]hen an entity intentionally reaches beyond its boundaries to conduct business with foreign residents, the exercise of specific jurisdiction by the foreign jurisdiction over that entity is proper." *Id.* at 1312 (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp.1119, 1124 (W.D. Pa. 1997).

## V.   THE BALANCE OF THE EQUITIES FAVORS DOR.

On this factor, the Court must balance "the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."

---

[14] DMA's suggested "three-way quandary" is groundless, because *Quill* does not limit Colorado's authority to enforce its sales and use tax through the notice, reporting, and penalties of the Law.   Therefore, the Law does not force DMA's members to "surrender their constitutional protection" (Motion, p.16); the protections afforded by *Quill* do not apply here.

*Amoco Prod. Co. v. Gambill*, 480 U.S. 531, 542 (1987). That balance favors DOR, as the State has an interest in enforcing a law that likely passes constitutional scrutiny.

The State has a legitimate and substantial interest in enforcing a statute that will provide revenue to its strapped coffers to continue necessary programs. *See United Haulers*, 550 U.S. at 346 (revenue generation is a cognizable benefit); *Alamo Rent-A-Car, Inc., v. Sarasota-Manatee Airport Auth.,* 825 F.2d 367, 373 (11th Cir. 1987) (revenue raising is a legitimate and substantial government objective).   Enforcement of the tax laws is another important governmental interest that weighs in favor of DOR.  *St. German of Alaska E. Orthodox Catholic Church v. United States*, 840 F. 2d 1087, 1094 (2d Cir. 1988) (enforcement of tax laws is a compelling governmental interest); *United States v. Richey*, 924 F.2d 857, 862 (9th Cir. 1990) (maintaining a workable tax system is a compelling governmental interest); *Schehl v. Comm'r of Internal Revenue*, 855 F.2d 364, 367 (6th Cir. 1988) (promoting public compliance with the tax laws is a legitimate governmental interest).

DMA's speculative compliance costs do not outweigh DOR 's interest in enforcing the Law.  *See infra, § III B. 1.*  DMA also suggests that because its survey shows that customers will not shop with non-collecting retailers because of the Law, the balance of equities lies with it.   Defendant first notes that DMA requests preliminary relief only on the basis of the Commerce Clause and any argument regarding customers' privacy rights should not be considered in their motion.   Secondly, the survey and its results are flawed (*see infra* § III B. 2), and therefore, any conclusions based on it are unreliable.

When balanced against the State's interests in revenue raising and enforcement of the tax laws, DMA's asserted interests are not greater.  Consequently the balance of equities is in favor of the State.

## VI.    THE PRELIMINARY INJUNCTION IS NOT IN THE PUBLIC INTEREST.

When a government entity is sued to enjoin enforcement of a statute, consideration of the public interest overlaps with the balancing of equities.  *Midwest Title Loans v. Ripley*, 616 F. Supp. 897, 908 (S.D. Ind. 2009).  This is especially true here where the challenged statute addresses matters of great public concern - revenue raising to ensure the fiscal well-being of the State and enforcement of the tax laws.  *See* Winter, ___U.S. ___, 129 S.Ct. at 376-377 (2008). (the Court should pay particular regard for the public consequences when considering the extraordinary remedy of injunction).   If the Law does not likely violate the Constitution, the public certainly has an interest that the law be enforced - particularly when that law is designed to ensure that the State will have sufficient revenue to carry out functions for its citizens' benefit.

DMA suggests that the Court consider its privacy challenge to the Law in the public interest analysis.  Even if customers' privacy is considered, the public interest still weighs against an injunction.  DMA's privacy argument is based on a false premise. DOR will not have a data repository of "an enormous amount of personal purchasing information" or "purchasing profiles of thousands of Colorado consumers."  Motion, p.29. n.13.  The Law specifies that no information identifying customers' purchases will be given to DOR and DOR specifically advises to advise their customers of this fact. 2,Reg. 39-21-112.3.5(4)(a)(iv); Ex. 4, Stevens Decl. Exs. A, B, C.

As outlined in DOR's Motion to Dismiss, the names of stores where customers shop and the amount of their purchases has not been recognized as information deserving of protection under the Constitution.  *See Moore v. E. Cleveland*, 431 U.S. 494, 503 (1977) (constitutionally protected right to privacy protects those fundamental rights and liberties which are objectively deeply rooted in the nation's history and tradition).  Where one purchases goods and the amount one spends on goods is not a fundamental right deeply rooted in history.  With the Internet recognized as the "dominant and perhaps the preeminent means in which commerce is conducted," *Fair Housing Council v. Roomates.com LLC*, 521 F. 3d 1157, n.15, 1164 (9th Cir. 2008), no right of privacy should be extended to the circumstances here.  *See Amazon.com, LLC v. Lay*, 2010 WL 4262266, at *10-11, 13 (W.D. Wash. Oct. 25, 2010) (finding no violation of the First Amendment in the disclosure of customer names and amounts spent).

With third party reporting as the best mechanism to enforce compliance with tax laws (*see* Exs. 7-8,Tax Gap Studies; Ex. 4, Stevens Decl. ¶¶1-4), the notice and reporting requirements of the Law are merely tools which allow DOR to enforce the sales and use tax and the public interest weighs in favor of DOR.[15]

## VII.    CONCLUSION

---

[15] Because the use tax is a compensatory tax to the sales tax, and the Law and regulations are designed to enforce the use tax, enjoining their enforcement could implicate the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, which provides that federal courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."  *See In re Pontes*, 310 F. Supp. 2d 447, 450-452 (D.R.I. 2004) (discussion of origin and purpose of the TIA).

For the foregoing reasons, DMA's Motion should be denied.

Respectfully submitted this 19th day of November, 2010.

JOHN W. SUTHERS
Attorney General

s/  Melanie J. Snyder
MELANIE J. SNYDER, 35835*
Assistant Attorney General
JACK M. WESOKY, 6001*
Senior Assistant Attorney General
Business & Licensing Section
1525 Sherman Street, 7th Floor
Denver, Colorado  80203
Telephone:  (303) 866-5273 (Snyder)
Telephone:  (303) 866-5512 (Wesoky)
FAX:  (303) 866-5395
E-Mail:  melanie.snyder@state.co.us
E-Mail:  jack.wesoky@state.co.us

STEPHANIE LINDQUIST SCOVILLE, 31182*
Senior Assistant Attorney General
Civil Litigation and Employment Law Section
Telephone:  303.866.5241
FAX:  303.866.5443
E-Mail: stephanie.scoville@state.co.us

*Counsel of Record
Attorneys for Defendant

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2010, I electronically filed the foregoing **Defendant's Response in Opposition to Plaintiff's Motion for a Preliminary Injunction** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

gisaacson@branlaw.com
mschaefer@branlaw.com

*Attorneys for Plaintiff*

*s/Stephanie Lindquist Scoville*

<u>*cc: Via inter-office mail*</u>
Ms. Roxy Huber
Executive Director
Colorado Department of Revenue
1375 Sherman Street
Denver, Colorado  80261