The estimate of the self-employment tax underreporting gap is $39 billion, which accounts for about 11 percent of the overall tax gap. Self-employment tax is underreported primarily because self-employment income is underreported for income tax purposes. Taking individual income tax and self-employment tax together, then, it can be seen that individual underreporting contributes approximately 68 percent of the overall tax gap.

Figure 3 presents the same information, broken out by type of taxpayer (as defined by the IRS operating divisions that serve the taxpayer) rather than by type of noncompliance. This indicates that most of the underreporting of individual income tax is associated with individuals who have business income. The underreporting of self-employment tax is closely associated with the underreporting of business income by individuals; sole proprietors who understate their business income for income tax purposes are not likely to report the unreported income for employment tax purposes either.

*Figure 3*

**Tax Year 2001 Gross Tax Gap by Type of Tax and IRS Operating Division (in $ billions)**

| Type of Tax | IRS Operating Division | | | | | | TOTAL | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Wage & Investment | Small Business / Self-Employed | | | Large & Mid-Size Business | Tax-Exempt & Gov't Entities | Tax Gap | Non-Compliance Rate |
| | | Individuals | Corporations | Total | | | | |
| Individual Income Tax | 50 | 195 | N/A | 195 | N/A | N/A | 245 | 20.9% |
| Corporation Income Tax * | N/A | N/A | 6 | 6 | 25 | 1 | 32 | 18.5% |
| Employment Tax | 0 | 40 | 7 | 47 | 8 | 4 | 59 | 8.1% |
| Self-Employment | N/A | 39 | N/A | 39 | N/A | N/A | 39 | 51.9% |
| FICA and FUTA | 0 | 1 | 7 | 8 | 8 | 4 | 20 | 3.0% |
| Estate & Gift Tax | # | 8 | N/A | 8 | N/A | N/A | 8 | 22.9% |
| Excise Tax † | 0 | 0 | 0 | 0 | 0 | 0 | 1 | |
| TOTAL Gap Percent of Total | 50 14.5% | 243 70.5% | 14 4.0% | 257 74.5% | 34 9.8% | 4 1.2% | 345 100.0% | |
| Noncompliance Rate | 12.1% | 27.1% | 5.3% | 22.3% | 8.0% | 3.4% | | 16.3% |

\* Unrelated Business Income Tax is shown as corporation income tax.
† Includes underpayment gap only.
# No estimate is available for this component.

Amounts may not add to totals due to rounding. Zeros indicate amounts less than $0.5 billion. See Figure 1 regarding reliability of estimates.

D027
Exh.7

Individual income tax accounts for over 71 percent of the overall tax gap estimate of $345 billion. This is due, in part, to the fact that individual income tax is the largest single source of federal receipts.

The individual income tax underreporting gap can be broken out by the various line items on a typical return – income sources, offsets to income (i.e., exemptions, adjustments, and deductions), and offsets to tax (i.e., credits). Figure 4 provides updated estimates of both the tax gap arising from misreporting on each line item and the corresponding Net Misreporting Percentage (NMP).[1] These estimates are based on thorough audits of a representative sample of returns, but they also account for underreporting that is not detected in those audits.

As in previous compliance studies, the NRP data suggest that well over half ($109 billion) of the individual underreporting gap came from understated net business income (e.g., unreported receipts and overstated expenses). Approximately 28 percent ($56 billion) came from underreported non-business income, such as wages, tips, interest, dividends, and capital gains. The remaining $32 billion came from overstated subtractions from income (i.e., statutory adjustments, deductions, and exemptions) and from overstated tax credits.

An obvious conclusion from Figure 4 is that the accuracy of reporting the various line items on the average income tax return varies widely, depending on the type of income or offset being reported. Figure 5 presents the same line items grouped by the degree to which the items are "visible" to the IRS – that is, the extent to which they are subject to information reporting and withholding. The conclusion is striking: reporting compliance is strongest in the presence of substantial information reporting and withholding. This is illustrated graphically in Figure 6. Although the contribution to the underreporting gap depends on the dollars of income or offset at stake, the NMP is clearly inversely related to the degree of visibility.

It appears that compliance rates for sections of the Form 1040 where the most noncompliance occurs have not changed dramatically since the last compliance study for TY 1988. The amounts least likely to be misreported on tax returns are subject to both third-party information reporting and withholding and are, therefore, the most visible (e.g., wages and salaries). The net misreporting percentage for wages and salaries is only 1.2 percent.

Amounts subject to third-party information reporting, but not to withholding (e.g., interest and dividend income), exhibit a somewhat higher misreporting percentage. For example, there is about a 4.5 net misreporting percentage rate for items subject to substantial information reporting, such as interest, dividends, pensions, and social security benefits.

Amounts subject to partial reporting by third parties (e.g., capital gains) have a still higher net misreporting percentage rate of 8.6 percent. As expected, amounts not subject to withholding or third-party information reporting (e.g., sole proprietor income and the "other income" line on Form 1040) are the least visible and, therefore, are most likely to be misreported. The net misreporting percentage for this group of line items is 53.9 percent.

---

[1] The net amount of income misreported divided by the sum of the absolute values of the amounts that should have been reported. The NMP measures provide insight into the extent of noncompliance for any given provision. However, caution should be applied when comparing NMPs across tax provisions. First, a provision may have a large NMP but contribute only slightly to the tax gap (e.g., the total true tax liability for a particular item is relatively small). Second, the NMP contains an adjustment for income amounts that were underreported but does not have a corresponding adjustment for offset amounts that were not claimed.

Figure 4

**Tax Year 2001 Individual Income Tax Underreporting Gap and Net Misreporting Percentage (NMP) Associated with Income and Offset Line Items**

| Type of Income or Offset | Underreporting Gap ($B) | Net Misreporting Percentage [†] |
|---|---|---|
| **Total Underreporting Gap** | 197 | 18% |
| **Underreported Income** | 166 | 11% |
| *Non-Business Income* | 56 | 4% |
|   Wages, salaries, tips | 10 | 1% |
|   Interest income | 2 | 4% |
|   Dividend income | 1 | 4% |
|   State income tax refunds | 1 | 12% |
|   Alimony income | * | 7% |
|   Pensions & annuities | 4 | 4% |
|   Unemployment compensation | * | 11% |
|   Social Security benefits | 1 | 6% |
|   Capital gains | 11 | 12% |
|   Form 4797 income | 3 | 64% |
|   Other income | 23 | 64% |
| *Business Income* | 109 | 43% |
|   Non-farm proprietor income | 68 | 57% |
|   Farm income | 6 | 72% |
|   Rents & royalties | 13 | 51% |
|   Partnership, S-Corp, Estate & Trust, etc. | 22 | 18% |
| **Overreported Offsets to Income** | 15 | 4% |
|   Adjustments | -3 | -21% |
|     SE Tax deduction [§] | -4 | -51% |
|     All other adjustments | 1 | 6% |
|   Deductions | 14 | 5% |
|   Exemptions | 4 | 5% |
| **Credits** | 17 | 26% |
| **Net Math Errors (non-EITC)** | * | |

[†] The amount of income or offset misreported divided by the amount that should have been reported. The NRP contains an adjustment for income amounts that were underreported, but does not have a corresponding adjustment for offset amounts that were not claimed.
* Less than $0.5 billion.
[§] Taxpayers *understate* this adjustment because they understate their self-employment income and, thereby, their self-employment tax. Therefore, the gap associated with this item is negative.

13

*Figure 5*

**Tax Year 2001 Individual Income Tax Underreporting Gap and Net Misreporting Percentage (NMP) Associated with Income and Offset Line Items, By Visibility Groups**

| Visibility Group<br>Type of Income or Offset | Underreporting Gap ($B) | Net Misreporting Percentage[†] |
|---|---|---|
| **Total Underreporting Gap** | 197 | 18% |
| **Items Subject to Substantial Information Reporting and Withholding** | 10 | 1% |
| Wages, salaries, tips | 10 | 1% |
| **Items Subject to Substantial Information Reporting** | 9 | 5% |
| Interest income | 2 | 4% |
| Dividend income | 1 | 4% |
| State income tax refunds | 1 | 12% |
| Pensions & annuities | 4 | 4% |
| Unemployment compensation | * | 11% |
| Social Security benefits | 1 | 6% |
| **Items Subject to Some Information Reporting** | 51 | 9% |
| Partnership, S-Corp, Estate & Trust, etc. | 22 | 18% |
| Alimony income | * | 7% |
| Capital gains | 11 | 12% |
| Deductions | 14 | 5% |
| Exemptions | 4 | 5% |
| **Items Subject to Little or No Information Reporting** | 110 | 54% |
| Non-farm proprietor income | 68 | 57% |
| Farm income | 6 | 72% |
| Rents & royalties | 13 | 51% |
| Form 4797 income | 3 | 64% |
| Other income | 23 | 64% |
| Total statutory adjustments | -3 | -21% |
| **Not Shown on Figure 6[§]** | 17 | 26% |
| Credits | 17 | 26% |

[†] The aggregate amount of income or offset misreported divided by the sum of the absolute values of the amount that should have been reported. The estimates of the amounts that should have been reported account for underreported income that was not detected by the audits, but do not have a corresponding adjustment for unclaimed offsets (e.g., deductions, exemptions, statutory adjustments, and credits) that were not detected.

\* Less than $0.5 billion.

[§] Since credits are offsets to tax, it is difficult to combine them with income and income offset items when calculating a combined NMP.

14



*Figure 6*

**Tax Year 2001 Individual Income Tax Underreporting Gap**
Misreporting of Income and Offsets by "Visibility" Categories

Based on updated estimates derived from the TY01 National Research Program study of individual income tax reporting compliance.

With transactions that are less visible to the IRS, and with very low audit rates by historical standards, some sole proprietors may have become emboldened to cut corners on their taxes. Other small business owners may fail to comply fully because they are overwhelmed by the cost and complexity of meeting their tax obligations and their business requirements. Whatever the reasons, there is a serious problem with underreporting for those items not subject to information reporting.

The underpayment gap is the simplest component of the tax gap to measure since, for the most part, it is observed in full. The underpayment gap is the difference between the tax that taxpayers report on their timely filed returns and the amount that is actually paid by the payment due date. The first amount is tabulated from the Individual Master File. With the exception of employer under-deposit of withheld income tax, the amount paid is also tabulated from the Individual Master File.

Figure 7 summarizes the underpayment gap and rates for TY 2001 arrayed by taxpayer type (rather than tax type as in Figure 1). Almost all of what is voluntarily reported is also paid on time, and more than two-thirds of the balance is paid within two years. Individual income tax contributes almost two-thirds of the total underpayment gap, and over three-quarters of the individual income tax underpayment gap is associated with taxpayers who have business income.

D031
Exh.7

Since sole proprietors report their self-employment tax on their individual income tax returns (Form 1040), the TY 2001 NRP study provided new compliance data with which to estimate this component of the tax gap. Self-employment tax is sometimes not reported correctly (or at all) in connection with reported self-employment income that is reported. However, most of this component of the tax gap is associated with unreported self-employment income. The NRP auditors detected some of this unreported income, but not all of it. The IRS estimate of the self-employment tax underreporting gap accounts for this undetected income. Estimates also account for the fact that some of this unreported income would not be subject to full self-employment tax, given the annual cap on Social Security taxes. Accounting for all of these factors, the updated estimate of the self-employment tax gap for TY 2001 is $39 billion.

The remaining tax gap estimates shown on the Tax Gap Map (Figure 1) are based on data older than TY 2001. In order to develop estimates based on the latest data, but for a common tax year, the IRS projected the most recent previous estimates to TY 2001 using a simple approach. Lacking information to the contrary, the IRS assumed that the compliance rate for each major component remained constant. The tax gap in a given component was projected to grow at the same rate as tax receipts in that component. The IRS plans to update these estimates as newer compliance data become available.

==The main lesson from the Tax Gap Map is that noncompliance is worst where the barriers to voluntary compliance or the opportunities for noncompliance are greatest. This is seen even more vividly in Figure 6, which shows the importance of third-party information reporting.==

*Figure 7*

**Tax Year 2001 Underpayment Gap By Type of Taxpayer**

| Type of Taxpayer | Gross Underpayment Gap ($ Billions) | Voluntary Payment Compliance Rate† | Net Underpayment Gap ($ Billions) | | Cumulative Payment Compliance Rate† | |
|---|---|---|---|---|---|---|
| | | | After 1 Year | After 2 Years | After 1 Year | After 2 Years |
| All Taxes * | 31.7 | 98.6% | | | | |
| Wage & Investment | 4.3 | 98.9% | 2.1 | 1.8 | 99.4% | 99.6% |
| Small Business / Self-Employed | 23.7 | 97.6% | 7.3 | 6.5 | 99.2% | 99.3% |
| Large & Mid-Size Business | 3.3 | 99.6% | 2.0 | 2.0 | 99.7% | 99.7% |
| Tax Exempt / Government Entities | 0.4 | 99.87% | 0.2 | 0.1 | 99.95% | 99.97% |

† The Voluntary Payment Compliance Rate is the portion of tax reported on timely filed returns that is paid on time. The Cumulative Payment Compliance Rate is the portion of tax reported on timely filed returns that is paid as of a certain date.

* The $31.7 billion total for all taxes excludes $1.6 billion of individual income taxes withheld by employers but neither reported on timely filed employment tax returns nor paid by employers.

Return to Table of Contents

D032
Exh.7

# VOLUNTARY COMPLIANCE

A wide range of factors influence voluntary compliance, although there is little empirical confirmation as to the most important of these factors or their magnitudes. However, it is generally agreed that IRS actions are not the sole – or perhaps even the primary – determinants of voluntary compliance. In addition to whether information reporting and withholding requirements exist as mentioned previously, other important factors include the following:

- Tax law changes, including:
    - opening or closing opportunities for noncompliance
    - tax law complexity may confuse taxpayers or make noncompliance more difficult to observe
    - tax rates may affect incentives to report income

- The economy, including:
    - income and unemployment levels
    - the mix of industries

- Demographics, including:
    - the aging of the population
    - changing household arrangements
    - growth in the number of non-English-speaking taxpayers

- Socio-political factors, including:
    - swings in patriotic sentiments
    - taxpayer perceptions of whether they are getting their money's worth from their taxes

Additionally, there are both direct and indirect effects of enforcement activities. Direct effects refer to the collection of additional revenue from taxpayers who are subject to enforcement actions. Indirect effects refer to "spillover" effects when enforcement activity on one set of taxpayers has positive effects on the compliance behavior of the rest of the taxpayer population in response to heightened enforcement activity.

## MEASURING VOLUNTARY COMPLIANCE

It is very difficult to determine the impact that any IRS activity has on voluntary compliance. While the direct effect of IRS enforcement activities is identifiable through the impact on collections, the IRS cannot easily estimate the indirect effects. That is partly because the IRS cannot observe taxpayers' true tax liabilities (they must be estimated), and partly because so many factors may influence the extent to which they pay their tax voluntarily and timely – including many factors outside of IRS control. The challenge is to estimate the impact of each IRS activity on observable behaviors – returns filed, tax reported, and tax paid – controlling for other influences as much as possible. Only then will the IRS know the best mix of activities that will foster the greatest degree of voluntary compliance.

## Long-Term Goal for Voluntary Compliance

The Voluntary Compliance Rate (VCR) is the amount of tax for a given tax year that is paid voluntarily and timely, expressed as a percentage of the corresponding amount of tax that the IRS estimates should have been paid. It reflects taxpayers' compliance with their filing, reporting, and payment obligations. The latest estimate of VCR is 83.7 percent for all taxes and all taxpayers for TY 2001.

In the Administration's budget request for FY 2007, the IRS established a long-term goal of an 85 percent voluntary compliance by TY 2009. In February of 2007, the IRS Oversight Board, as part of establishing a strategic direction for the IRS, established a long-term goal of an 86 percent voluntary compliance rate by TY 2009. Senator Baucus, Chairman of the Senate Finance Committee, has asked for a 90 percent voluntary compliance goal by TY 2017.

An increase in the VCR to 86 percent by TY 2009 may not seem large, but the available evidence suggests that the VCR has not changed dramatically over the last 20 to 30 years. For example, based on TCMP data from the 1960s through the 1980s, the IRS estimates that the VCR has moved within a range of two percentage points and was virtually the same in TY 2001 as it had been in TY 1985.

Much of the estimated fluctuation during this time likely was due to the inherently imprecise nature of these estimates, the impact of the Tax Reform Act of 1986, and the changing relative sizes of revenues from different taxes. Since the IRS has estimated the overall VCR for just a few selected years in that period, it is possible that compliance may have fluctuated in the intervening years. However, the evidence from individual income tax underreporting – by far the largest portion of the tax gap, and the component most frequently measured – indicates that there was no consistent trend over this time period.

The IRS and the public must have realistic expectations about the magnitude and timing of the impact of any reasonable actions to reduce the tax gap, particularly if it is not accompanied by broader simplification and reform of the tax code, or significant advances in compliance technology. Implementing efforts to reduce the tax gap will take time; changing taxpayer behavior significantly will also take time. Accordingly, results from these efforts will be realized incrementally over a number of years. As part of the actions outlined in this report, the IRS will, for example, acquire and analyze new data, improve document-matching programs, refine examination selection criteria, purchase and test new technology, and train employees to handle new enforcement and customer service responsibilities.

Moreover, while it may be possible to take action to *reduce* the tax gap, it is not possible to implement a policy that *eliminates* the tax gap without an unacceptable change in the fundamental nature of the current tax compliance system. The IRS is, however, committed to addressing all levels of noncompliance. Therefore, the efforts to reduce the tax gap will continue to be developed and refined to achieve the highest level of compliance possible.

Return to Table of Contents

# COMPONENTS

With an estimated net tax gap of $290 billion for TY 2001, no single approach will be successful at substantially reducing noncompliance. Accordingly, the Treasury Strategy set out a comprehensive, integrated, multi-year strategy that must be implemented within the context of the annual budget process. This report builds on the work of the Treasury Strategy to provide a comprehensive framework that will be institutionalized by the IRS as part of sound tax administration.

This report includes seven components, detailed below:

1. **Reduce Opportunities for Evasion** (pages 20-25)

2. **Make a Multi-Year Commitment to Research** (pages 26-27)

3. **Continue Improvements in Information Technology** (pages 28-32)

4. **Improve Compliance Activities** (pages 33-41)

5. **Enhance Taxpayer Service** (pages 42-49)

6. **Reform and Simplify the Tax Law** (page 50-52)

7. **Coordinate with Partners and Stakeholders** (page 53-56)

## Component 1
## Reduce Opportunities for Evasion

Legislative changes and published guidance will reduce opportunities for evasion.

**Legislative Proposals**

The Administration's FY 2007 Budget contained five legislative proposals that would reduce evasion opportunities by focusing on employment taxes, information reporting, streamlining collection procedures, and problem return preparers. The Administration's FY 2008 Budget expands on those five and contains several additional proposals that would further reduce opportunities for evasion without unduly burdening honest taxpayers. Collectively, the Department of Treasury estimates that these 16 legislative proposals would generate $29.5 billion over the next 10 years. The IRS is encouraged to see that three of the proposals have already become law (in modified form) and that Congress is taking action on a number of the remaining proposals.

Public Law 110-28, Title VIII, the Small Business and Work Opportunity Tax Act of 2007, enacted proposals on amending the collection due process procedures for employment tax liabilities, expanding preparer penalties, and creating an erroneous refund claim penalty. These proposals, along with others contained in the FY 2008 Budget, are described below in more detail:

*Expanding Information Reporting:* Third-party reporting is critical for ensuring voluntary compliance. Without reliable third-party data, the IRS cannot easily detect errors in the absence of expensive and intrusive audits. The IRS receives over 1.5 billion information returns a year, reporting income from employers, financial institutions, third-party payers, and state and federal governments. However, the IRS still lacks reliable information on certain types of income, most notably income earned by small businesses and the self-employed. Information reporting proposals in the Administration's FY 2008 Budget would:

- *Require information reporting on payments to corporations.* This proposal would require a business to file an information return for payments aggregating to $600 or more in a calendar year to a corporation (except a tax-exempt corporation). This proposal is estimated to generate $7.7 billion over the next ten years.

- *Require basis reporting on security sales.* This proposal would require certain brokers to report information regarding adjusted basis in connection with the sale of certain publicly traded securities. Brokers would also be required to report acquisition or disposition dates to help determine gain or loss for taxpayers. This proposal is estimated to generate $6.7 billion over the next ten years.

- *Expand broker information reporting.* This proposal would require a broker who is an auctioneer or operates a consignment business (electronic or other) to file an information return showing customer information and gross proceeds from the sale of tangible personal property. The requirement would apply only for customers with 100 or more separate transactions generating at least $5,000 in gross proceeds in a year. This proposal is estimated to generate $2.0 billion over the next ten years.

- *Require information reporting on merchant payment card reimbursements.* This proposal would provide the IRS with authority to put into effect regulations requiring merchant acquiring banks (organizations that process card payments for merchants) to report to the IRS annually the gross reimbursement payments made to merchants in a calendar year. This proposal is estimated to generate $10.7 billion over the next ten years.

- *Require a certified Taxpayer Identification Number from contractors.* This proposal requires a contractor receiving payments of $600 or more in a calendar year from a particular business to furnish to the business its certified Taxpayer Identification Number (TIN). This proposal would require a business to verify the TIN with the IRS, which would be authorized to disclose whether the TIN-name combination matches IRS records. If a contractor fails to furnish an accurate certified TIN, the business would then be required to withhold a flat rate. This proposal is estimated to raise $749 million over the next ten years.

- *Require increased information reporting for certain government payments for property and services.* This proposal would authorize the IRS and Treasury Department to issue regulations requiring information reporting on all non-wage payments by federal, state and local governments to procure property and services. This proposal is estimated to generate $390 million over the next ten years.

- *Increase information return penalties.* This proposal would increase the $50 and $100 penalty amounts to $100 and $250, respectively, and would increase the $250,000 and $100,000 penalty caps to $1,500,000 and $500,000, respectively. This proposal is estimated to generate $546 million over the next ten years.

<u>Improving Compliance by Businesses</u>: More efficient filing mechanisms, clearer rules on who is liable for employment taxes, and streamlined collection due process will contribute to improved business tax compliance.

- *Require e-filing by certain large organizations.* This proposal would require all corporations and partnerships required to file Schedule M-3 to file their income tax returns electronically. In the case of large taxpayers not required to file Schedule M-3, such as exempt organizations, the regulatory authority to require electronic filing would be expanded beyond the current 250-return minimum.

- *Implement standards clarifying when employee leasing companies can be held liable for their clients' federal employment taxes.* This proposal would set standards for holding employee leasing companies jointly and severally liable with their clients for federal employment taxes. This proposal would provide standards for holding employee leasing companies solely liable if they meet specified requirements. This proposal is estimated to generate $57 million over the next ten years.

- *Amend collection due process procedures for employment tax liabilities.* Legislation was signed May 25, 2007, implementing a modified version of this proposal. It expands the exception to the requirement for pre-levy Collection Due Process proceedings to include certain levies issued to collect federal employment taxes. The change will generate an estimated $364 million over the next ten years.