**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 10–CV–01546–REB–CBS

The Direct Marketing Association,

    Plaintiff,

    v.

Roxy Huber, in her capacity as Executive
   Director, Colorado Department of Revenue,

    Defendant.

_____

**PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION
TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION [DOC. 50]**
_____

Plaintiff, the Direct Marketing Association ("the DMA"), submits this reply to the Defendant's opposition to the DMA's motion for a preliminary injunction ("Opp."), filed on November 19, 2010 [Doc. 50].

**I.  THE DEFENDANT MISCHARACTERIZES AND IGNORES CONTROLLING TENTH CIRCUIT AUTHORITY CONCERNING IRREPARABLE HARM.**

The Defendant begins her opposition by insisting that the unprecedented notice and reporting obligations imposed on out-of-state retailers under Colorado House Bill 10-1193 ("the Act") and the regulations promulgated by the Colorado Department of Revenue ("Department") to implement the Act ("the Regulations") will not cause DMA members irreparable harm.  Her argument, however, is demonstrably at odds with

1

Tenth Circuit case law that is directly on point, including *ACLU v. Johnson*, 194 F.3d 1149 (1999), and the Court of Appeals' 2010 decision in *Chamber of Commerce of the United States v. Edmondson*, 594 F.3d 742 (10th Cir. 2010).

### A. The Tenth Circuit in *ACLU v. Johnson* Held That A Violation Of The Commerce Clause Supports The Entry Of A Preliminary Injunction.

The Defendant argues that the "Tenth Circuit has not definitively resolved" whether a violation of the Commerce Clause constitutes irreparable harm for purposes of a preliminary injunction. According to the Defendant, the Court should regard the Tenth Circuit's holding on this issue in *ACLU v. Johnson,* 194 F.3d at 1163, as mere dicta, and its citation to *American Libraries Ass'n v. Pataki,* 969 F. Supp. 160, 168 (S.D.N.Y. 1997)) as lacking in analysis. *See* Opp. at 5-6. Contrary to the Defendant's attempts to minimize the Court of Appeals' decision in *Johnson*, however, the Tenth Circuit carefully considered the Commerce Clause claims presented, and expressly endorsed the *Pataki* court's analysis, in upholding the entry of a preliminary injunction. The Court of Appeals' ruling in *Johnson* thus squarely applies to the DMA's claim of irreparable harm based on violations of the Commerce Clause.

*ACLU v. Johnson* concerned a challenge to a New Mexico statute arising under both the First Amendment and the Commerce Clause. The Tenth Circuit analyzed the strength of the plaintiff's First Amendment claims and then expressly addressed the merits of each of the plaintiff's three contentions regarding the Commerce Clause. 194 F.3d at 1160 ("Although we do not need to reach this issue [plaintiff's claims under the Commerce Clause] . . . <u>we do so</u>, albeit briefly.") (bracketed language, ellipses, and emphasis added). In upholding the entry of an injunction, the Tenth Circuit stated:

2

> The court below largely relied upon <u>the detailed Commerce Clause analysis</u> in *American Libraries Ass'n v. Pataki,* 969 F. Supp. 160, 168-83 (S.D.N.Y. 1997). <u>We agree with that analysis</u>.

.*ACLU v. Johnson*, 194 F.3d at 161 (emphasis added). This is not dicta, and the Court of Appeals could not have been clearer. The Tenth Circuit stated that it had carefully considered the plaintiff's Commerce Clause claims as grounds for the preliminary injunction, based on the holding in *Pataki*.[1] Indeed, although the District Court in *Johnson* had relied solely on the First Amendment violation in finding the irreparable harm necessary for the injunction (*see* 4 F. Supp.2d 1029, 1034 (D.N.M. 1998)), the Tenth Circuit went farther, and specifically cited the deprivation of rights under <u>both</u> the First Amendment <u>and the Commerce Clause</u> as establishing the element of irreparable harm, by "noting that the '[d]eprivation of the rights guaranteed under the Commerce Clause constitutes irreparable injury.'" *Johnson*, 194 F.3d at 1163. The Defendant's sampling of decisions from other district courts outside of the Tenth Circuit (Opp. at 6) to show that there is a conflict among federal district courts on this issue is patently irrelevant, because there is controlling Tenth Circuit case law on the subject.[2]

---

[1] The Commerce Clause grounds for enjoining the Act and Regulations in this case are even stronger than in *Johnson* (or *Pataki*). First, the New Mexico legislation enjoined in *Johnson* did not discriminate against interstate commerce (indeed, the Defendant argued that the law applied only to <u>intrastate</u> communications, 194 F.3d at 1161). Moreover, the local interest served by the law enjoined in *Johnson* was "protecting minors from sexually oriented materials," (*id.*) a state interest of far greater importance than promoting compliance with the state's sales and use tax. In addition, the Colorado law at issue in this case even more clearly regulates commerce occurring outside of the state's borders, since the Colorado law applies to sales made by out-of-state retailers to out-of-state purchasers, where the only connection to Colorado is the fact that the donee of the purchaser (*e.g.,* Grandma's grandchild) is located in Colorado and receives the package via mail. Finally, like the New Mexico law, the Colorado law in this case improperly "subjects the use of the Internet to inconsistent regulations." 194 F.3d at 1162.

[2] The District of Colorado's decision in *S.W. Shattuck Chem. Co. v. City & County of Denver*, 1 F. Supp.2d 1235 (D. Colo. 1998), cited by the Defendant (Opp. at 6), pre-dates the

**B.      The Tenth Circuit in *Chamber of Commerce v. Edmondson* Held That More Modest Compliance Costs Than Those Faced By Out-Of-State Retailers in This Case, As Well As Lost Business Opportunities, Constitute Irreparable Harm.**

The Defendant furthers her mischaracterization of controlling Tenth Circuit authority on the issue of irreparable harm by ignoring completely the Court of Appeals' 2010 decision in *Edmondson*.  The Defendant asserts that the unavoidable harm faced by DMA members, each of whom (by Defendant's own admission) will be forced either to incur thousands of dollars of expense to comply with the law, or face tens of thousands of dollars in penalties for non-compliance, is inadequate as a matter of law to warrant an injunction.  The Defendant declares that "[c]ourts across the country have rejected the notion that the cost of complying with government regulations constitutes irreparable harm."  Opp. at 7.  Although she points to cases from within the Second and Third Circuits, which themselves do not support this categorical assertion,[3] the

---

Tenth Circuit's decision in *ACLU v. Johnson.*  To the extent *S.W. Shattuck* has any relevance, it supports the DMA's right to an injunction.  The Court in *S.W. Shattuck* held that constitutional deprivations that could be fully remedied by monetary damages would not warrant injunctive relief, but that harm for which compensation was unavailable would.  *Id.* at 1238-39 (finding irreparable harm because the plaintiff could not be fully compensated for its injuries). DMA members have no adequate remedy at law against the State of Colorado for the expenses they will incur, and the business they will lose, as a result of the Act and Regulations.

[3] The Defendant principally relies upon *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527-28 (3d Cir. 1976), to which a number of the other cases she relies upon likewise cite.  In addition to being directly at odds with the Tenth Circuit's decision in *Edmondson*, the Court in *A.O. Smith* expressly stated that it was "not fashion[ing] a general rule" (530 F.2d at 527 n.9a) and left open the issue of whether compliance costs could support a finding of irreparable harm for purposes of a *permanent* injunction.  *Id.* at 528. The Court in *A.O. Smith* rejected costs of compliance as a basis for entry of an injunction in the circumstances of that case because it found they were "unsupported" and based upon government reports, rather than evidence offered by the plaintiffs.  *Id.*  In this case, the DMA offers evidence of compliance costs through the declaration and expert report of F. Curtis Barry, and the Defendant herself offers competing evidence of a different level of compliance costs through her own expert, Dieter Gable.  There is no dispute that DMA members will incur compliance costs; there is only a dispute as to their amount.  Both parties' estimates vastly exceed the costs held to be sufficient in *Edmondson*.

Defendant fails even to cite, let alone distinguish, the Tenth Circuit's decision in *Edmondson*, on which the DMA relies.  In direct contradiction to the Defendant's argument, the Tenth Circuit stated:

> The imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury. [Internal citations omitted.] <u>If forced to comply with the Oklahoma Act, the Chambers' members will face a significant risk of suffering financial harm</u> as described in Part II.[4]  Yet, because Oklahoma and its officers are immune from suit for retrospective relief, *Edelman*, 415 U.S. at 667-68, 94 S.Ct. 1347, these financial injuries cannot be remedied. ... <u>These consequences, in and of themselves, demonstrate a likelihood of irreparable harm</u>.

594 F.3d at 770-71 (emphasis and ellipses added).  The Tenth Circuit's ruling could not be clearer: compliance costs of "more than a thousand dollars" per association member that cannot be later recovered from the State constitute irreparable harm.

### 1. Both Parties Project That Affected Out-Of-State Retailers Will Incur Thousands Of Dollars Of Compliance Costs.

There is nothing "speculative" about the compliance costs that out-of-state retailers will incur.  Moreover, the discovery mandated under the Court's October 1 Scheduling Order has provided specific evidence of those costs, calculated by the parties' competing experts.  The estimates of the DMA's expert, Curt Barry, should be viewed as more reliable, as he has performed hundreds of projects for direct marketers to modify their systems and operations. *See* Reply Ex. A (Barry Decl.), ¶5; Reply Ex. B

---

[4] In Part II of the opinion, the Court stated:

<u>Both compliance and non-compliance with Section 7(B) injure the Chambers' members</u>. As noted above, Section 7(B) effectively forces members to use Basic Pilot. . . <u>Adopting Basic Pilot imposes significant economic injuries in the form of implementation and training expenses, which the Chambers allege may total well more than a thousand dollar per year.</u>  594 F.3d at 756 (emphasis added).

(Barry Deposition) at 217:16 – 218:1.  In contrast, Defendant's expert is an IT consultant who only recently familiarized himself with current industry practices and costs by reviewing literature.  Opp. Ex. 6, Ex. 1 (Report of Dieter G. Gable) at 4-5.  According to Mr. Barry, affected retailers will incur upwards of $26,500 to comply in the first year, and perhaps $9,000 annually thereafter, plus mailing/postage expense.  Barry Decl., Ex.1 (Report at 2 & Exs. A.1, B.1, C.1).  Even Mr. Gable, whose estimates are unrealistically low, acknowledges costs between $2,500 and $6,000 in the first year, and additional expenses every year thereafter.  Reply Ex. C (Gable Deposition)  at 161:18 – 162:10.[5]

Regardless of which estimates the Court accepts, compliance costs for HB 10-1193 will greatly exceed the $1,000 per association member that the Tenth Circuit held were sufficient to establish irreparable harm in *Edmondson*.  Of course, the penalties imposed for non-compliance could easily exceed the compliance costs.  *See* Motion at 15 (detailing penalties).  As in *Edmondson*, DMA members cannot recover these costs from the State, due to its sovereign immunity under the Eleventh Amendment.

### 2. The Defendant Offers No Survey Evidence To Refute The Prospective Lost Sales Demonstrated By The DMA.

As the Defendant concedes, and *Edmondson* held, lost future business also constitutes irreparable injury for purposes of an injunction. *See* Opp. at 13; *Edmondson*, 194 F.3d at 1156, 1171.  In support of its motion, the DMA presented the results of a

---

[5] Mr. Gable's opinion in this case must be weighed in light of serious questions about his objectivity and credibility.  Gable testified at his deposition that his firm has a **$4 million** contract with the Colorado lottery, whose executive director is appointed by Ms. Huber (who also sits on the lottery's board).  Gable  Dep. at 83:17 – 86:20.  The Colorado lottery work was not included on his resume. Gable Dep. Ex. 108.  In addition, Gable was ordered by two different states to cease engaging in mortgage loan transactions through Intellichoice Mortgage Services LLC, a company that Gable also did not include on his resume. Gable Dep. at 48:15 – 58:5 and Exs. 109, 110.

survey conducted by an internationally–respected research firm,[6] regarding the effect of the law on the future purchasing decisions of Colorado consumers, as well as the corroborating testimony of one of the nation's leading marketing experts, Professor Kevin Keller.[7]  Nowhere in her opposition does the Defendant dispute Keller's opinion that the Act will harm retailers, potentially permanently. *See* Keller Dep. at 30:14 – 31:22 and Keller Decl. [Doc. 18],  ¶¶ 6-9, 12-13.

The Defendant seeks to minimize the weight the Court should afford the survey through the declaration of Donald Lichtenstein, but his criticisms are unfounded and readily rebutted by Dr. Adler. *See generally,* Reply Ex. E (Adler Decl.).  First, Professor Lichtenstein's opinion is unsupported by any counter-survey. *See id.* at 2 (¶4).  The RSG survey was disclosed to the Defendant on August 13, 2010, when the DMA filed its motion.  The Defendant and Lichtenstein had ample time to conduct their own survey regarding the effects of the law on consumer purchasing decisions, but did not.

Second, three of the four criticisms raised in the Defendant's opposition concern the survey question regarding consumer privacy, rather than the issue of future purchasing decisions now before the Court.[8]  The Defendant's only criticism on that

---

[6] Resource Systems Group, Inc. ("RSG") and its founder, Thomas Adler have conducted hundreds of surveys for major business (including American Airlines, Motorola, Ford, and Time Warner) and governmental agencies (including the U.S. Department of Transportation, New York MTA, and Texas DOT).  *See* [Doc.19] (Adler Decl.) (filed 8/13/10), Ex. A (curriculum vitae) at 1.  Dr. Adler is not a professional "litigation witness," he is a prominent researcher who has conducted studies in 30 U.S. states, 5 Canadian provinces, and 20 other countries.  *Id.*

[7] Professor Keller's textbook on consumer marketing is the best-selling textbook on the subject in the world, Reply Ex. D (Keller Deposition) at 131:17 – 132:6, and his writings have been recognized as among the most-influential works in the field of marketing over the past 25 years.  *See* [Doc. 18] (Keller Decl.) (filed 8/13/10) Ex. A (curriculum vitae) at 12.

[8] The criticisms of the privacy question are groundless, in any event.  Reply Ex. E (Adler Decl.) at 3-7.  For example, Lichtenstein's claim that the use of the phrase "kinds of products I

issue fundamentally misreads the survey.  Adler Decl. at 9-10.  Lichtenstein presents no direct criticism of the survey's core question, which shows that 67% of Colorado consumers will decrease their purchases from out-of-state retailers. [Doc. 19], Ex.B at 6.

Lichtenstein instead insists that consumers' stated intentions in response to a survey do not equate to their actual behavior.  He bases his conclusion, however, on literature concerning utterly inapplicable surveys (*e.g.*, presidential voting, weight loss, and condom use), and not consumer purchasing decisions.  Adler Decl. at 10-11.  The DMA's experts contend that the survey represents strong evidence of consumers' future purchasing decisions.  Keller Dep. at 124:17 – 128:10; Adler Dep. at 112:18 – 114:19.

The evidence shows a "significant risk" of irreparable harm to DMA members "that cannot be compensated after the fact by monetary damages." *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1210 (10th Cir. 2009).  In contrast, the only consequence to the State that would result from the Court entering an injunction, if the Court ultimately determines the law is constitutional, is a modest delay in the notice to consumers and in the Department's receipt of information regarding Colorado consumers' purchases.

## II.   THE DEFENDANT'S COMMERCE CLAUSE ANALYSIS IS WRONG.

The Defendant argues that the Act is not motivated by a "protectionist" purpose and, therefore, is non-discriminatory.  In support of her argument that the Supreme Court "has recently taken a more permissive approach" to state legislation under the

---

buy" misled respondents regarding the nature of the data to be disclosed to the Department ignores the question's introduction, which specifically informed respondents to assume that the law requires out-of-state retailers "to report your name, billing address, shipping address, the amount of your purchases and the name of the retailer to the Colorado Department of Revenue."  *Id.* at 6-7; *see* [Doc. 19] (Adler Decl.)(filed 8/13/10), Ex. B ("Final Results") at 18.

dormant Commerce Clause (Opp. at 17), the Defendant relies upon a narrow, and inapplicable, exception derived from the state–as–market–participant doctrine. *See Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 343-44 (2008) ("[t]his case, like *United Haulers*, may also be seen under the broader rubric of the market participation doctrine"). The Defendant asserts that this exception has become the rule that supplants over 150 years of established constitutional law. The Defendant is wrong.

In two recent cases, the Supreme Court held that where a state law gives preferential treatment to "a public facility [or enterprise], while treating all private companies exactly the same," the law should be analyzed differently than laws that favor in-state businesses over their out-of-state competitors. *United Haulers Association, Inc. v. Oneida-Herkimer Solid Waste Authority*, 550 U.S. 330, 340-45 (2007) (bracketed language added); *Davis*, 553 U.S. at 339-346. This narrow exception in no way alters traditional Commerce Clause analysis of state laws that mandate "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 99 (1994). Such discriminatory laws affecting purely private interests continue to face a "virtually *per se* rule of invalidity" and only survive if the State proves it has "<u>no other means</u> to advance a legitimate local purpose." *United Haulers*, 550 U.S. at 338-339 (internal citation omitted and emphasis added).

The new Colorado law challenged by the DMA does not favor a State enterprise over private businesses. Rather, it prescribes onerous duties that apply to out-of-state

9

retailers but not to in-state Colorado retailers.   The exception described in *Davis* and *United Haulers* is, therefore, utterly inapplicable.[9]

The Defendant's next argument that, even though Colorado law imposes criminal sanctions on in-state retailers that fail to collect Colorado tax, the Act, nevertheless, "applies equally to all retailers that sell to Colorado purchasers and do not collect sales tax" (Opp. at 21), makes the DMA's case.  The Defendant insists that because the Act treats criminally–operated in-state retailers the same as lawfully–operated out-of-state retailers, the law is non-discriminatory.  To state the argument is to prove its weakness.

There can be no serious doubt that the legislation was directed exclusively at out-of-state retailers, with unique burdens imposed on their relations with customers. The bill's history and implementation make this clear. The title of the Act, as adopted by the General Assembly and signed by the Governor, expressly refers to "sales made by out-of-state retailers." *See* Opp. Ex. 1.  The Joint Budget Committee's "Appropriations Report: Fiscal Year 2010-11," likewise explains that HB 10-1193 applies to "out-of-state retailers that do not collect Colorado sales tax."[10]   The Department's own "Statement of Basis and Purpose" for the Regulations states that HB 10-1993 "sets forth new criteria for retailers who are not required to collect Colorado sales and use tax," a category that

---

[9] The fact that the Defendant denies a protectionist motive for the Act does not change the constitutional analysis.  A law may be discriminatory in either intent or effect, or both. *See Hughes v. Oklahoma*, 441 U.S. 322, 336-37 (1979).  Moreover, while the Defendant argues that the "non-protectionist" purpose of the law is improving the collection of use tax due to the State (Opp. at 19) that purported interest cannot make a law "non-discriminatory" within the meaning of the Commerce Clause.  As the Defendant concedes (*id.* at 18), the Supreme Court has made clear a State's interest in generating revenue cannot justify discrimination against interstate commerce.  *C&A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 393 (1994).

[10] Available at http://www.state.co.us/gov_dir/leg_dir/jbc/FY10-11apprept.pdf.  Copies of the relevant pages from sections on both the Department of Law (at 342) and Department of Revenue (at 553) are attached to Reply Ex. G (Woock Decl.) as Ex. 1.

excludes all in-state retailers. Woock Decl., Ex. 2.  Indeed, even the Department's "Template for Transactional Notice" provides a sample notice that begins "[COMPANY NAME] is not required, and does not, collect Colorado sales or use tax." (Emphasis added.)[11]  The Court should reject the Defendant's strained position, adopted for this litigation, that the Act applies even-handedly to in-state and out-of-state retailers.[12]

The discriminatory effect of the Act is dramatic.  The Defendant's own expert estimated that the law would affect up to 10,000 smaller, out-of-state Internet retailers, in addition to many larger retailers within the Internet "Top 500."  Gable Dep. at 96:25 – 102:15.  Even if the Act requires such retailers to incur only $5,000 in first-year costs and $1,000 annually thereafter, the aggregate impact on interstate commerce would be $50 million in the first year and $10 million per year thereafter.  The DMA's expert puts the costs much higher.  Furthermore, the survey and expert opinions presented to the Court project a significant shift by consumers (43% according to RSG) to Colorado retailers as a result of the law. *See* [Doc. 19], Ex. B  at 6.  Such discriminatory effects, even for a statute having "facial neutrality" (which is not the case here), subject the law

---

[11] Available on the DOR's website and at Opp. Ex. 4 (Stevens Decl.), Ex. B.  As this sample notice highlights, the Defendant's litigation argument that non-collecting in-state retailers are expected to comply with the Act necessarily implies that such retailers, even as they are violating Colorado law by not collecting the tax, are supposed to give a notice to the consumer on each such unlawful transaction, informing the consumer that the in-state business is breaking the law, but that the consumer will need to obey the law by self-reporting.

[12] The fact that some out-of-state retailers volunteer or are required to collect Colorado sales and use does not make the law non-discriminatory.  It is not constitutionally-permissible to discriminate against any portion of interstate commerce in favor of in-state interests.  *New Energy Co. v. Limbach*, 486 U.S 269, 273 (1988) (law burdening only one out-of-state company violated the Commerce Clause).  Moreover, as the Department's own director of tax policy admitted, the Act is expressly targeted at non-collecting out-of-state retailers with the goal of imposing alternative burdens that are so severe that they will surrender their constitutional rights under *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992) and begin collecting Colorado use tax.

to strict scrutiny and require the State to prove it lacked non-discriminatory alternatives. *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 352-53 (1977).

Since the Department now concedes that the Act has no purpose other than generating revenue, a state interest which cannot justify discrimination against interstate commerce, the Court need not even consider such non-discriminatory alternatives, although there are many.[13] It is important to recognize that the actual revenue estimate associated with the Act, which the Defendant never mentions in her opposition or ten supporting declarations, was projected at the time of enactment (*see* [Doc. 17], Ex. B) to be $4.7 million per year — slightly more than $2/1000^{ths}$ (0.0022) of total sales/use tax revenues, and less than $1/1000^{th}$ (0.00067) of the total $7 billion in state tax revenues. *See* Opp. Ex. 3 (Saliman Decl.) at ¶ 7. The inflated, and irrelevant, figure of over $130 million in uncollected tax referred to by her expert, William Fox, reflects his estimate of total uncollected use tax in Colorado resulting from the state's inability under *Quill Corp. v. North Dakota* to require out-of-state retailers with no physical presence in the state to collect the tax. Reply Ex. H (Fox Deposition) at 31:6 – 33:9.[14] Tellingly, while decrying

---

[13] Publicly-available reports detail many different programs Colorado could implement to increase use tax compliance by consumers (both individuals and businesses), including: (1) a line on its resident income tax return, like those used by 23 other states, including New York; (2) increased audits of business consumers by the Department such as California has undertaken; (3) consumer education campaigns like Maine's recent effort; and (4) correspondence or other consumer notification programs like those undertaken in Indiana, Rhode Island, Massachusetts and Kentucky in recent years. Fox Dep. Ex. 101 at 2, 8 (Study by Minn. House of Reps. Research Dept., http://www.house.leg.state.mn.us/hrd/pubs/usetax.pdf), and Ex. 106 at 1, 6 (Cal. BOE Revenue Estimate, http://www.boe.ca.gov/legdiv/pdf/e-commerce-11-09.pdf).

[14] Professor Fox did no analysis of the revenue impact to HB 10-1193. Fox Dep. at 95:19-21. Fox's estimates of the uncollected tax resulting from *Quill's* nexus requirement are disputed by others as wildly exaggerated. A more recent study (Eisenach and Litan) places the figure at less than half that of Fox. Fox Dep. at 36:5 – 38:9 and Ex. 97. Moreover, Fox admitted that his estimates take no account of either the Regulation's "de minimis" seller threshold (which

the perceived effects of *Quill* and exaggerating the importance of the Act to the State's budget, the Defendant's opposition and supporting declarations nowhere explain how the Department will use the Act to increase tax collection from Colorado consumers.[15]

The Defendant correctly notes that the Act is not a tax law (Opp. at 25), but she misunderstands the two-fold relevance of *Quill*. First, *Quill* is the subtext that underlies this entire case: the Act is an unprecedented attempt by the State to circumvent the limitations on its authority under *Quill* to require out-of-state retailers with no physical presence in the state to collect use tax. By imposing alternative, discriminatory burdens on retailers who exercise their rights under *Quill* and do not collect the tax, the State seeks to compel them to surrender such rights, a strategy abhorrent to the Constitution.

Second, *Quill* is relevant because, along with *National Bellas Hess v. Department of Revenue*, 386 U.S. 753, 759 (1967), it reflects application of the fundamental "structural" concerns of the Commerce Clause to a segment of commerce that is "inherently interstate." As both the Supreme Court and the Tenth Circuit have recognized, the Commerce Clause dictates that such national economic interests must remain "free from interference by the States" through inconsistent laws and instead require a "cohesive scheme of national regulation." *Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 669 (1981); *Johnson,* 194 F.3d at 1163.[16]

---

Fox concedes would reduce by nearly 40% the tax that could be collected) or the fact that most Colorado local taxes are locally–administered and not collected by the State. *Id.* at 96:5- 98:17.

[15] Because the Act is discriminatory, *Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970) does not apply, but the Act's burden on interstate commerce clearly exceeds the local benefit.

[16] The danger of conflicting state regulation posed by the Act's requirements is already evident. Oklahoma has enacted a conflicting Transactional Notice requirement. As Gable conceded, if every state adopted its own Transactional Notice, the burdens and costs for affected retailers would multiply. Gable Dep. 113:2–20 and Ex. 117 (Okla.Reg. 710:65–21–8).

As *Quill* itself makes clear, Congress, rather than individual states or the courts, is "better qualified to resolve" the underlying tension between the state interest in tax collection and burdens imposed on interstate commerce. 504 U.S. at 316. Indeed, there is currently legislation before Congress addressing this issue. H.R. 5660, 111th Cong. (2009-2010), available at http://thomas.loc.gov/cgi-bin/query/z?c111:H.R.5660. As recognized in *Quill*, "it may be that 'the better part of both wisdom and valor is to respect the judgment of [Congress]'" on the perceived problem of uncollected use tax. *Id.* at 318-19. Even the Defendant's expert, Professor Fox, agrees that action by Congress is preferable to individual state efforts that may violate the Commerce Clause. Fox Dep. at 34:16 – 36:4.

The cases cited by the Defendant do not compel a different result. *American Target Advertising, Inc. v. Giani*, 199 F.3d 1241 (10th Cir. 2000), involved a Utah statute requiring "all professional fundraising consultants to register with the state and obtain a permit." 199 F.3d at 1246. In stark contrast, the current case, like *Quill*, involves the imposition of onerous, and potentially conflicting, reporting burdens that attach to every sales transaction. The parallel is direct: *Quill* concerned the collection of use tax from consumers on behalf of the State, while the present burden involves reporting confidential consumer purchase information to the State. In *Quik Payday, Inc. v. Stork*, 549 F.3d 1302, 1312-13 (10th Cir. 2008), the Tenth Circuit held that merely requiring an Internet lender to obtain a state license did not unduly burden interstate commerce. The Court, however, reaffirmed *Johnson's* holding that the Commerce Clause prevents burdensome, inconsistent regulation of the Internet, like that imposed by the Act. *Id.*

The continuing vitality of *Quill* in limiting state efforts to regulate interstate commerce is illustrated by the recent case of *Hemi Group LLC v. City of New* York, 130 S.Ct. 983 (2010), in which the Court rejected an effort by the City to find a creative way to "end-run its lack of authority" under *Quill. Id.* at 994 (Ginsburg, J. concurring).  To borrow from Justice Roberts' conclusion for the majority, in the context of HB 10-1193*:* It bears remembering what this case is about.  It is about notice and reporting obligations, and attendant harm, imposed upon out-of-state companies with respect to "lost" use taxes that the companies "had no obligation to collect, remit, or pay, which harmed a party [Colorado] to whom the companies owed no duty." 130 S.Ct at 994.  It is about imposing such notice and reporting obligations "to substitute for or complement a governing body's uncertain ability or desire to collect taxes directly from those who owe them [Colorado's businesses and individuals]." *Id.*  The State's "injuries" resulting from such unreported use taxes were not caused by out-of-state companies; the State cannot impose discriminatory and burdensome obligations upon such companies in an effort to remedy such perceived injuries.  The Act and Regulations should be enjoined.

                                                  Respectfully submitted,

Dated:  November 29, 2010            s/ George S. Isaacson
                                                  George S. Isaacson
                                                  Matthew P. Schaefer
                                                  BRANN & ISAACSON
                                                  184 Main Street, P. O. Box 3070
                                                  Lewiston, ME 04243−3070
                                                  Tel. (207) 786−3566
                                                  gisaacson@brannlaw.com
                                                  mschaefer@brannlaw.com
                                                  *Attorneys for The Direct Marketing Association*

## CERTIFICATE OF SERVICE

I hereby certify that on November 29, 2010, I electronically filed the foregoing, Plaintiff's Reply to the Defendant's Response In Opposition to Plaintiff's Motion for a Preliminary Injunction [Doc. 50], using the CM/ECF system, which will send notification of such filing to counsel of record:

>Jack Wesocky, Jr.
>Senior Assistant Attorney General
>State of Colorado
>1525 Sherman Street, 7th Floor
>Denver, CO 80203
>Jack.Wesocky@state.co.us
>
>Stephanie Lindquist Scoville
>Senior Assistant Attorney General
>State of Colorado
>1525 Sherman Street, 7th Floor
>Denver, CO 80203
>stephanie.scoville@state.co.us
>
>Melanie J. Snyder
>Assistant Attorney General
>State of Colorado
>1525 Sherman Street, 7th Floor
>Denver, CO 80203
>melanie.snyder@state.co.us
>
>Attorneys for Defendant

>s/ George S. Isaacson
>George S. Isaacson