IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

**EXHIBIT**
Reply
C

The Direct Marketing Association,  )
                                   )
       Plaintiff,                  )     Civil Action No:
                                   )     10-CV-01546-
vs.                                )     REB-CBS
                                   )
Roxy Huber, in her capacity as     )
Executive Director, Colorado       )
Department of Revenue,             )
                                   )
       Defendant.                  )
_____   )

DEPOSITION OF DIETER GEORGE GABLE

Phoenix, Arizona

November 17, 2010

Prepared by:
Meri Coash, RMR, CRR
Realtime Reporter
Certified Reporter #50327

(Copy)



PHOENIX DEPOSITION REPORTERS & VIDEOCONFERENCING
www.coashandcoash.com  602-258-1440

1    A.   I believe it's the California Corporation

2  Commission, and what it is, is a consumer or corporation

3  finance lender, is what CFL stands for.

4            When they cleared up who should do what and

5  under what license, that's when we relicensed ourselves

6  under DRE, and we had a DRE license, and the CFL issued a

7  desist and refrain to all CFL licensees to ensure they all

8  knew that nobody could operate with that anymore.

9    Q.   Your recollection is it was the CFL that did

10 that?

11   A.   Well, the thrust was that you could not use a CFL

12 license anymore.  I don't know who ultimately issued that

13 order.  Somebody at the state of California issued that

14 order.

15   Q.   Let me make sure I understand by reframing the

16 question.

17            Have you ever been ordered by any state

18 agency to desist and refrain from soliciting borrowers

19 and/or performing services for borrowers or lenders in

20 connection with loans secured directly or collaterally by

21 one or more liens on real property?

22   A.   Yes.

23            MR. SCHAEFER:  And we'll mark as the next

24 exhibit --

25            (Deposition Exhibit 109 was marked for

1                   identification.)

2                   MR. SCHAEFER:  -- this document which has

3     been marked as Exhibit 109.  And for the record, I'll

4     represent that it is an order to desist and refrain

5     entered by the Department of Real Estate of the state of

6     California directed to you, Dieter Gable, a number of

7     other individuals, all of whom were listed as dba

8     IntelliChoice Mortgage Services, LLC.

9     BY MR. SCHAEFER:

10        Q.   And have you seen that document before?

11        A.   I have.

12        Q.   On page 1 of the order, toward the middle of the

13    paragraph of text, it indicates that "Based on that

14    investigation, the Commissioner has determined that Gable,

15    Bard, Walker, Papike, Jacabson, and Sabarra have engaged

16    in acts or practices constituting a violation of

17    Section 10130 (engaging in the business of, advertising,

18    or assuming to act as a real estate broker without first

19    obtaining a real estate license), of the California

20    Business and Professions Code (Code) and/or Section 2970

21    (requirements for advance free agreements) and

22    Section 2972 of Title 10, Chapter 6, California Code of

23    Regulations (Regulations)."

24                   Did I read that right?

25        A.   I believe so.

1    Q.   The date of this order --  According to the last

2  page, the order is dated July 28th, 2009.  Is that

3  correct?

4    A.   That is correct.

5    Q.   Page 2 sets forth the department's findings of

6  fact.  Do you see that?

7    A.   Yes.

8    Q.   Did you submit anything to the department before

9  it entered its order to contest these findings of fact?

10                MS. SCOVILLE:  Object to the form.

11                Sorry.  Go ahead.

12                THE WITNESS:  We did not.

13  BY MR. SCHAEFER:

14    Q.   How about after the order was entered?

15    A.   We did not.

16    Q.   Page 3 sets forth the conclusions of law of the

17  department, including in the middle of paragraph 13 there,

18  the following:  "Gable, Bard, Walker, Papike, Jacabson,

19  and/or Sabarra participated in charging, collecting, and

20  accounting of advance fees, as defined in Section 1026 of

21  the Code, in a manner that was not in compliance with

22  Section 2970 and 2972 of the Regulations."

23                Did I read that right?

24    A.   Yes.

25    Q.   Did IntelliChoice collect fees in advance from

1  customers for services to be provided?

2      A.    Yes.

3      Q.    Have you sought to contest or appeal the

4  conclusions of law?

5      A.    We sought advice of counsel.

6      Q.    Did you file any appeal or other request for

7  review of this decision?

8      A.    It was not a worthwhile effort, given the passage

9  of the state bill that, essentially, made the entire

10 industry and approach moot, as far as we were concerned.

11 And the counsel also said that --

12            MS. SCOVILLE:  I'm going to actually stop

13 you right there.  You probably have an attorney-client

14 relationship with them, and it's up to you whether or not

15 to waive that privilege, but you just might think about

16 whether or not you want to waive your attorney-client

17 privilege with your counsel on this matter.  It's fine.

18 Go ahead.  I'm just --

19            THE WITNESS:  Essentially, I mean, there was

20 nothing to be gained by contesting it.

21 BY MR. SCHAEFER:

22     Q.    So you did not contest it?

23     A.    We did not --  Well, we did not believe it was

24 something that you could win against the state in the

25 environment and the method by which the state was acting.

1    Q.   So you did not contest the order or otherwise

2  appeal?

3    A.   No.

4    Q.   The order at page 4 sets forth the department's

5  specific desist and refrain order.  And it orders

6  IntelliChoice and you, Mr. Gable, along with the other

7  individuals named, to "Immediately desist and refrain from

8  performing any acts within the State of California for

9  which a real estate license broker license is required."

10  Is that correct?

11   A.   That is correct.

12   Q.   In particular, the department orders you to

13  desist and refrain from "providing and participating in

14  property management services for others and for

15  compensation unless and until you, individually, obtain an

16  appropriate license issued by the Department."  Is that

17  correct?

18   A.   Yes.

19   Q.   Again, this is the Department of Real Estate.

20        It also orders you to desist and refrain

21  from "soliciting borrowers and/or performing services for

22  borrowers or lenders in connection with loans secured

23  directly or collaterally by one or more liens on real

24  property."  Is that correct?

25   A.   That is correct.

1    Q.   And finally, it orders you to "Immediately desist

2  and refrain from collecting advance fees, as that term is

3  define in Section 10026 of the Code, in any form;

4  particularly with respect to loan modification, loan

5  refinance, principal reduction, foreclosure abatement or

6  short sale services, unless and until you demonstrate and

7  provide evidence satisfactory to the Commissioner that you

8  have," and then there are two conditions listed on page 5

9  of the order.  Is that correct?

10    A.   That is correct.

11    Q.   Have you complied with or otherwise attempted to

12  provide evidence to the California Department of Real

13  Estate indicating you have complied with the two

14  conditions on page 5?

15    A.   We shut down the business, so --

16    Q.   So you did not?

17    A.   Did not.

18    Q.   Now, does this order from the Department of Real

19  Estate change your recollection at all regarding the

20  nature of the events in California or your licensure in

21  California?

22         MS. SCOVILLE:  Object to the form.

23         THE WITNESS:  Not at all.

24  BY MR. SCHAEFER:

25    Q.   So you believe that you obtained a license in

1  California in the spring of 2009 to act as a mortgage

2  broker, a DRE license?

3      A.   Yes.  Honestly, you would have to --  There's a

4  whole lot of documentation you would have to look at to

5  understand how this doesn't make sense to people who were

6  going through it at the time, which is why, essentially, I

7  think the legislature finally passed that bill and said,

8  "You know what?  We're not allowing it in any form with or

9  without license, with or without advance fee agreement."

10     Q.   If you'll look at the first finding of fact on

11  page 2, it indicates, "At no time herein mentioned has

12  IMS" -- that's IntelliChoice Mortgage Services -- "been

13  licensed by the Department in any capacity."

14              Does that change your recollection about

15  your licensure status with the Department of Real Estate?

16     A.   No.  There are material errors in all of this,

17  including --  Well, like I said, you would have -- you

18  would have to have a whole bunch of information to go

19  along with this.  These were churned out by the department

20  when they were shutting everything down, so there are

21  material errors throughout this.

22     Q.   Did you receive a request from the Department of

23  Real Estate to submit information in connection with this

24  investigation?

25     A.   I don't believe so, or I am certain we would have

1   provided facts.

2       Q.   It's your belief that if we contact the

3   Department of Real Estate of the state of California, they

4   will have on file for you a DRE license number?

5       A.   Probably not anymore, but they should have some

6   historical record.

7       Q.   Other than this order entered by the Department

8   of Real Estate of the state of California, have you been

9   ordered by any other state agency to discontinue offering

10  any financial service in the state?

11      A.   Not that I know of.

12      Q.   More specifically, have you ever been ordered by

13  any state agency to discontinue the practice of offering

14  loan modification services or otherwise conducting the

15  business of a mortgage broker or loan originator in the

16  state?

17      A.   Not that I know of.

18              MR. SCHAEFER:  Mark as the next exhibit --

19              (Deposition Exhibit 110 was marked for

20              identification.)

21              MR. SCHAEFER:  And that's Exhibit 110.  The

22  document entitled "Final Order," issued by the State of

23  Washington, Department of Financial Institutions, Division

24  of Consumer Services, in the matter determining whether

25  there has been a violation of the Mortgage Broker

Dieter George Gable          November 17, 2010          56

```
 1   Practices Act of Washington by IntelliChoice Mortgage
 2   Services, LLC; Dieter Gable, member; and Shannon Bard,
 3   member.
 4   BY MR. SCHAEFER:
 5       Q.   Have you ever seen this document before?
 6       A.   I don't believe so.  I saw materials leading up
 7   to it.
 8       Q.   Okay.  And, in fact, if you look at the bottom
 9   of -- in the middle of the paragraph on page 1, there's a
10   sentence which begins, "On May 17, 2010, the Director,
11   through Consumer Services Division Director Deborah
12   Bortner, entered a Statement of Charges and Notice of
13   Intention to Enter an Order to Cease and Desist, Prohibit
14   from Industry, Impose Fine, Order Restitution, and Collect
15   Investigation Fee (Statement of Charges)."  And a little
16   further on --
17                Did I read that right?
18       A.   I believe so.
19       Q.   A little further on, it says that "The Statement
20   of Charges was accompanied by a cover letter dated May 18,
21   2010, a Notice of Opportunity to Defend and Opportunity
22   for Hearing, and blank Applications for Adjudicative
23   Hearing for All Respondents."  Do you see that?
24       A.   Yes.
25       Q.   It goes on to indicate that the department sent
```

Dieter George Gable          November 17, 2010          57

1   those documents by both United States first-class mail and

2   by Federal Express overnight delivery and that both the

3   Federal Express package was delivered and the first-class

4   mail was not returned.  Do you see that?

5        A.   Uh-huh.  Yes.

6        Q.   Did you receive a copy of the statement of

7   charges?

8        A.   I did.

9        Q.   Now, on page 2 of this order, the director of

10  financial institutions for the state of Washington entered

11  a final order in five parts.  Is that correct?  Do you see

12  that on page 2?

13       A.   Sorry.  I don't.  Where are you?

14       Q.   Under Final Order.

15       A.   Gotcha.

16       Q.   There are five parts to the Final Order.  Is that

17  correct?

18       A.   Yes.

19       Q.   First, you and IntelliChoice Mortgage

20  Services, LLC, are ordered to cease and desist offering

21  loan modification services or otherwise conducting the

22  business of a mortgage broker or loan originator in the

23  state of Washington.  Is that correct?

24       A.   That is correct.

25       Q.   Next, ". . . IntelliChoice Mortgage Services LLC

Dieter George Gable        November 17, 2010        58

1    and Dieter Gable are prohibited from participation in the

2    conduct of the affairs of any mortgage broker subject to

3    licensure by the Director, in any manner, for a period of

4    five years."  Is that correct?

5        A.   Yes.

6        Q.   Next, IntelliChoice and you are jointly and

7    severally ordered to pay a fine of $4,000.  Is that

8    correct?

9        A.   As it reads here, yes.

10       Q.   Has that fine been paid?

11       A.   No.  I have not seen this final order.

12       Q.   Next, IntelliChoice and you were jointly and

13   severally ordered to pay an investigation fee of $648.  Is

14   that correct?

15       A.   As it reads.

16       Q.   Was that fee paid?

17       A.   I have not seen this order, so no.

18       Q.   And last, "Respondents IntelliChoice Mortgage

19   Services LLC and Dieter Gable are ordered to maintain

20   records in compliance with the Act and provide the

21   Department with the location of the books, records and

22   other information relating to Respondent IntelliChoice

23   Mortgage Services LLC's business, and the name, address

24   and telephone number of the individual responsible for

25   maintenance of such records in compliance with the Act."

1  participate in the call?

2      A.    No.

3      Q.    Did an individual named Phil Horwitz participate

4  in the call?

5      A.    Roxy I would have recognized.  I know that to be

6  no.  You can probably throw a lot of other names at me

7  that I'm not going to know.  I apologize.

8      Q.    Okay.  Why is it that you would be familiar with

9  Roxy Huber participating in the call?

10     A.    I know her to be the executive director of the

11 Department of Revenue.  Plus, obviously, she's the

12 defendant in her capacity.

13     Q.    Are you --  Have you ever met Ms. Huber?

14     A.    Yes.

15     Q.    When was the first time you met her?

16     A.    Summer of 2008.

17     Q.    And in what capacity did you meet Ms. Huber?

18     A.    She was at a state of Colorado lottery all-hands

19 meeting.

20     Q.    Is the state of Colorado lottery administered by

21 the Department of Revenue?

22     A.    It is.

23     Q.    And I believe you mentioned earlier that you have

24 done work in connection with the Colorado lottery.

25     A.    Yes.

Dieter George Gable          November 17, 2010          84

```
 1        Q.    Did you have reason to interact with Ms. Huber in
 2   connection with your work for the Colorado lottery?
 3        A.    Casually.  Not in any substantive manner.
 4        Q.    How many times have you met her since the summer
 5   of 2008?
 6        A.    It would have been one more all-hands meeting and
 7   a number of lottery board meetings.  She is one of the
 8   board members, so I don't know what the number would be.
 9   But, again, none of those would have been of any
10   substantive interaction.
11        Q.    Why did you attend the lottery board meetings?
12        A.    Because they discussed things of interest and
13   we're a significant vendor to the lottery.
14        Q.    Were these public meetings that anyone could
15   attend, or were you on the agenda?
16        A.    No.  They were public meetings.
17        Q.    Did you speak at any of these board meetings?
18        A.    I don't believe so.
19        Q.    Do you have an ongoing relationship with the
20   Colorado lottery?
21        A.    We do -- TB Consulting does.
22        Q.    What do you do for them?
23        A.    We implemented our proprietary back office system
24   and provide ongoing support and services.
25        Q.    Do you actually operate the back office for the
```

Dieter George Gable          November 17, 2010          85

1   Colorado lottery?

2        A.    No.

3        Q.    Is that done by the employees of the Department

4   of Revenue?

5        A.    They are lottery employees.  I don't know if they

6   are technically Department of Revenue employees or not.

7   We interact with the lottery.  We really, other than the

8   contract being through the Department of Revenue, don't

9   have much interaction there.  So I don't know what the --

10  if there is a separation of Department of Revenue versus

11  their state employees.

12       Q.    The ongoing support services that you provide,

13  are those in the nature of IT support?

14       A.    Primarily.

15       Q.    When you say "back office system," this is the

16  management of the lottery administration, not of the

17  lottery itself or --

18       A.    So this is the lottery core functions except for

19  the online terminals and systems that are at the retailer

20  and the network that goes with it.  So with respect to

21  Powerball, Mega Millions, Lotto, and all those games,

22  those are administered by Scientific Games using their

23  system.  We handle all the scratch ticket, accounting,

24  inventory control, distribution, marketing, the retailer

25  licensing, security, billing, accounting.

1      Q.    How is that contract with the Colorado lottery

2   structured in terms of compensation for TB -- is it

3   TB Consulting?

4      A.    Yes.

5              It's a time and materials, with a

6   not-to-exceed, I believe.

7      Q.    Is the not-to-exceed set on an annual basis?

8      A.    On a contract basis.

9      Q.    What's the term of the contract?

10      A.    It is up October of 2011.

11      Q.    When did it go into effect?

12      A.    Would have been October 2008.

13      Q.    So this is a three-year?

14      A.    Three-year contract.

15      Q.    What's the not-to-exceed for the three-year

16   contract?

17      A.    I don't have that number handy.  It's in the

18   neighborhood of probably $4 million.  That includes

19   hardware, third-party, and so forth, TB Consulting

20   professional fees.

21      Q.    Are you familiar with any other officials of the

22   Colorado Department of Revenue?

23              Actually, before I ask that, who is the

24   point person with Colorado lottery that you interact with,

25   if there is one?

1      A.    Yes.

2      Q.    -- or meaning --

3      A.    Both.

4      Q.    Did you also review the statute?

5      A.    I did not review the statute.

6      Q.    Did you do anything else to prepare?

7      A.    No.

8      Q.    How long in total did you spend preparing for

9  this deposition?

10     A.    Two hours.

11             MR. SCHAEFER:  Off the record for a moment.

12             (An off-the-record discussion ensued.)

13  BY MR. SCHAEFER:

14     Q.    With regard to Exhibit 116, your report, if you

15  will turn to page 2, the Statement of Opinions,

16  opinion A -- it's cap A -- you state, "Based on the

17  minimum threshold of $100,000 in gross annual Colorado

18  sales, the relatively small number of retailers are

19  subject to the Requirements."  Did I read that correctly?

20     A.    Yes.

21     Q.    The report elaborates, to a certain extent, on

22  these opinions.  With regard to opinion A, there's

23  additional material on pages 5 and 6.  Is that correct?

24     A.    That's correct.

25     Q.    Right at the bottom of the page on page 5, last

Dieter George Gable          November 17, 2010          97

1  few words, you indicate that "the number of affected

2  retailers should be in the low thousands."  Is that

3  correct?

4       A.   I do.

5       Q.   What do you mean by the "low thousands"?

6       A.   If I draw a -- or extrapolate from the numbers

7  that are provided on sales data and see that we're going

8  from somewhere north of a billion, excluding outlying data

9  points like Amazon, but retailers with north of a billion

10  dollars of sales down to 10 million in sales -- so down to

11  1 percent of that -- and that encapsulates 500, that would

12  suggest to get down to 6 million is not going to be an

13  overly significant number of retailers.  So there are no

14  stats that track every possible retailer, but I would

15  extrapolate out that it would be reasonable to say that

16  the number we're talking about is, as I stated, low

17  thousands and not a significant number of the entire

18  retailer base that exists in the United States or

19  elsewhere.

20       Q.   So --  But how many do you mean when you use the

21  word "low thousands"?  What number?

22       A.   I don't have a number for you.  I think you can

23  statistically extrapolate and the argument would then be

24  whether or not that's statistically valid, because there's

25  really no data.  But I think it's a minority of

Dieter George Gable        November 17, 2010        98

1   retailers -- a small minority of retailers.

2       Q.   Can you provide a range?  When you say "low

3   thousands," what's the range of numbers you're talking

4   about?

5       A.   I would hesitate to give a range, but I would say

6   we can be reasonably certain that it's closer to 10,000

7   than any other much larger number.

8       Q.   The affected retailers that we are talking about

9   and that you're mentioning here are all those having

10  annual gross sales in Colorado in excess of a hundred

11  thousand dollars.  Is that right?

12      A.   That's correct.

13      Q.   And I think you, on page 5, in paragraph 1 of

14  opinion A, indicate that a hundred thousand in gross sales

15  in Colorado translates into approximately $6 million in

16  total nationwide sales?

17      A.   If we assume that there is a proximate

18  relationship between population and sales, it came out to

19  be just north of $6 million in sales.

20      Q.   That's the assumption you've made for purposes of

21  this report?

22      A.   Yes.

23      Q.   So when you refer to "affected retailers," you

24  are referring to retailers having sales in excess of

25  $6 million that do not collect Colorado sales tax.  Is

Dieter George Gable          November 17, 2010          99

1   that right?

2       A.   Not necessarily.

3       Q.   Okay.

4       A.   I think I'm referring to retailers that have more

5   than a hundred thousand in gross sales.  The 6 million

6   comes into play merely to point to the fact that the

7   number of retailers should be low.

8       Q.   Fair enough.

9               In estimating the number of affected

10  retailers, you're using the $6 million benchmark.  You're

11  talking a moment ago in your answer extrapolating downward

12  from annual -- from annual sales figures that were

13  nationwide.

14      A.   Yes.

15      Q.   So for purposes of approximating, you're using

16  that $6 million annual sales on a nationwide basis

17  benchmark?

18      A.   I think that's the best benchmark I could come up

19  with to approximate how big of an issue this would be.

20      Q.   So we know that we have the 500 potentially

21  affected retailers in the Internet, top 500 that you

22  identified, and of course some of them report Colorado

23  tax.  So it's not going to be all 500.  Is that a fair --

24      A.   I think that's --  Nothing would suggest

25  otherwise.

1     Q.    So the challenge is to identify those between

2  6 million and 10 million, in essence?

3     A.    Essentially.

4     Q.    On page 6, you indicate there are certainly

5  hundreds of thousands, at least, of total retailers,

6  because as you cite, there are even just two Internet

7  sales software -- strike that --  Two e-commerce platform

8  software vendors that you're aware of have more than

9  160,000 customers between them.

10     A.    Yes.

11     Q.    So we know there are at least hundreds of

12  thousands of retailers.

13     A.    I agree.  If I can add one more facet to this, is

14  if we look at the customer base for Succeed, which was an

15  e-commerce platform, the relative number of merchants that

16  opened a web front or storefront or start selling their

17  wares to whoever they sell them to, the number that reach

18  a meaningful level of -- I would argue even six-figure

19  sales in aggregated total, forget about what locale -- is

20  a very small percentage.  So, again, everything leads me

21  to believe we're talking a very small number here.

22     Q.    Relative to the total number?

23     A.    Relative to the total.

24     Q.    Are you aware that there are some estimates that

25  place the number of e-commerce sellers total from zero on

1    up, that's something like 5 million?

2         A.   I think when you add in the hobby e-commerce

3    seller, who might be selling purely through eBay and

4    doesn't even have their own storefront, I would suspect

5    that's probably a good number as any.

6         Q.   Okay.  So you think 5 million is a reasonable

7    estimation?

8         A.   Sure.

9         Q.   And as you say, even if it were only -- I can do

10   the math -- even if there were only .2 of 1 percent of all

11   of those retailers above 6 million in sales, that would be

12   10,000 retailers?

13        A.   Am I allowed to use my calculator?

14        Q.   Absolutely.

15        A.   You say .2 of 1 percent?

16        Q.   Yes, of the 5 mil.

17        A.   .2 of 1 percent.

18        Q.   That's right.

19             If it were half of a percent of all online

20   retailers above 6 million, then we would be at 25,000

21   potentially affected retailers?

22             MS. SCOVILLE:  Object to form.  I'm not

23   sure --  Could you say that again?

24             MR. SCHAEFER:  Sure.

25

1  BY MR. SCHAEFER:

2      Q.   Based on the same estimate of 5 million total

3  e-commerce sellers, if a half a percent of those total

4  e-commerce sellers had annual sales in excess of

5  6 million, it would approximately mean 25,000 potentially

6  affected retailers.

7      A.   From a pure mathematical standpoint, I can do the

8  math and get to 25,000.  From a legitimate likelihood of

9  that being the real number, I think that's without any

10  foundation I can find, at least in the statistics I looked

11  at.

12      Q.   So you think something more like 10,000 is more

13  reasonable?

14      A.   I would have no reason to believe it would be

15  over 10,000.

16      Q.   Now, that estimate is just e-commerce vendors

17  that I mentioned.  Is it your understanding that the

18  Colorado law applies to other types of remote sellers?

19      A.   The catalog and everything I think would be, yes.

20  Anybody selling into the state of Colorado, yes.

21      Q.   So that would be potentially other types of

22  remote sellers affected by the law, potentially?

23      A.   Absolutely.

24      Q.   That would include not only catalog vendors but,

25  for example, direct-to-consumer television vendors.

**Coash & Coash, Inc.  602-258-1440**

1  that a fair statement?

2      A.   Well, I think to extrapolate from that, whenever

3  you do business anywhere, you have to know what to do in

4  that state.  So it always causes you to read and amend and

5  append and keep up current with whatever it is.

6      Q.   Okay.  And that takes some time and some level of

7  expense?

8      A.   That's business, yes.

9      Q.   Would you agree with me that if other states

10  beyond Colorado and Oklahoma adopted a transactional

11  notice requirement with different elements, from either

12  Colorado or Oklahoma, retailers would incur additional

13  costs to comply with those state requirements?

14              MS. SCOVILLE:  Object to the form.

15              Go ahead and answer.

16              THE WITNESS:  To the extent that everybody

17  wants to have their own unique set of terms and

18  conditions, potentially.  If it's like Colorado, then you

19  would have a minimal, if no, cost to implement additional

20  states.

21  BY MR. SCHAEFER:

22      Q.   Okay.  If other states were to do something more

23  like Oklahoma and have other requirements specific to

24  their state, there would be some additional time and

25  expense for affected retailers?

1    Q.   So for example --  That is one that I didn't see

2   cited.

3              Number 2, the Forrester Research, The

4   Forrester Wave, I don't recall it being cited.  Is that

5   one you reviewed or relied upon?

6    A.   Reviewed for the same purposes.

7    Q.   Item 4, the Forrester Research.  Market Overview,

8   October 31, 2008, also I don't believe it was cited.  Is

9   that one you reviewed or relied upon?

10   A.   All of these you're talking about, essentially,

11  helped to guide our research and the building of

12  appendix B.

13   Q.   Okay.  Same as item 5 -- D5?

14   A.   Yes.  Although I do believe that I quoted that --

15  or one of --  I don't know which one of these with respect

16  to retailers not developing their own custom solutions and

17  that not being a viable alternative.

18   Q.   With regard to the smaller sellers that you

19  described in your report and we've talked about here today

20  that was outside the Internet 500, I take it that it is --

21  you had stated that it's your opinion that the first-year

22  costs for that group will range from $2,571 to $6,000.  Is

23  that correct?

24   A.   Yes.

25   Q.   And with regard to the same group, it is your

Dieter George Gable          November 17, 2010          162

1  opinion that the first-year cost --  Sorry.

2          Starting again, with regard to the same

3  group of small sellers, it's your opinion that the ongoing

4  costs will be between $589 and $1,000 per year?

5      A.   Yes.

6      Q.   Again, were someone to have a different opinion

7  about certain of the components of your calculations, be

8  it the hours or hourly rate, cost of materials, those

9  costs would go up as a result?

10     A.   Yes.

11          MR. SCHAEFER:  I have no further questions.

12          MS. SCOVILLE:  Okay.  I think we're done.

13          (The deposition was concluded at 2:23 p.m.)

14

15                    _____
                              DIETER GEORGE GABLE

16

17

18

19

20

21

22

23

24

25

# DIETER GABLE

4455 E Camelback Road, A-240
Phoenix, Arizona 85018

Cell: 602-300-9270
Work: 480-343-9478

## SUMMARY

Highly involved and action oriented senior executive experienced in working with "C-Level" executives to understand business challenges and define well founded strategic initiatives and business solutions with focus on measurable outcomes. Proven ability to build and inspire teams to solve problems and reach strategic business goals. Over 20 years experience both domestically and internationally, with deep experience in state & local government and financial services. Specific strengths include:

- Corporate & Board Governance
- Organizational Restructuring
- Complex Program Management
- Business & IT Transformation
- Structured Systems Development Methods

- Large Client Development
- Financial / P&L Management
- Capital and Debt Structuring
- Complex Negotiations
- International Work / Multi-lingual



Exhibit: 108
Name: Gable
Meri Coash 11/7/10

## EXPERIENCE

**TB Consulting, LLC**, Scottsdale, AZ                                    2007 – Present
**CEO, Director**
Technical Services and Software Development firm focused on SMB marketplace including State & Local Government. Select client experiences:

- Multi-year, multi-million dollar contract for client with $500m revenue
- Multi-year contract with Court Trustee for applications management and infrastructure support
- Customer focused solutions to upgrade technology yielding immediate measurable benefits
- Identified opportunities for streamlining and reducing work flow/efforts up to 80%

**AZ Merchant Partners, LLC**, Scottsdale, AZ                              2003 – Present
**Founder, Director**
Consultancy founded to address the needs of mid-sized, mainly Arizona based, businesses leveraging four key components (Strong Corporate Governance, Strategy Development, Experienced Management and Capital Formation) to deliver meaningful and quantifiable results. Select client experiences:

**IPSA (Financial investigations & risk advisory firm)**, Phoenix, AZ
Structured acquisition of company and formation of Fortune 100 level board
- Structured acquisition with no cash up-front and no outside equity or debt
- Restructuring of operations for increase in value of company by ~$10 million within first year

**Succeed (eCommerce solution provider)**, Tempe, AZ
Restructured overall operations, cost structure and focus of struggling company
- Year 1 cost savings of nearly 25%/$1 million; provided for capital to invest in product development
- Increased sales and positioned company as #1 fastest growing software company in AZ (2007)

**Champion College Solutions (School loan default prevention)**, Mesa, AZ
Restructured operations, aligned staff and reengineered processes with updated technology under budget
- Implemented new management and sales team to deliver major accounts (20% annual growth)
- Decreased headcount by over 50% with improved throughput and customer satisfaction

**NeoSurg (Laparoscopic device manufacturer)**, Houston, TX
Led capital campaign with unique investment structure providing company needed funds and flexibility
- Jointly developed the go-to-market strategy aimed at positioning company for acquisition
- Positioned for acquisition by rival (Cooper Surgical) within 24 months at substantial multiple

## DIETER GABLE

**F1 Race Factory (Indoor karting & entertainment)**, Phoenix, AZ
Co-founded company with focus on providing corporate meeting & team building capabilities
- Developed into leading US track hosting US indoor karting finals since inception in 2003
- Restructured cost structure during economic downturn yielding highest single year profitability

**ACCENTURE, LLP**, Phoenix, AZ                                                          1989 – 2003
**Partner, Financial Services (State & Local Government until 1996)**
A $23B Management Information, Technology Consulting and Outsourcing Company, providing service to
FORTUNE 100/500 and large Corporations internationally in a variety of industries and governments.
Specialized in large programs with focus on 'metrics & measurements.' Select client experiences:

**Chase Bank (WaMu)**
**Optis Program Development Director**
Directed $300 million plus dollar program to streamline home loan originations
- Integrated numerous internal and 3rd party systems enabling significant increase in market share
- Implemented technology to improve speed of decision by ~80% and speed of close by ~35%

**American Express (US & UK)**
**Triumph Program Development Director**
Directed software development effort for $500 million dollar plus program over 3 years (200+ team)
- Enabled leading credit card products -- Blue Card US/Europe, Black Card and Affinity cards
- Eliminated tens of thousands of hours of unwarranted software development backlog and costs

**JusticeLink™ Justice Product**
**Practice Lead**
Assumed leadership of stalled project and delivered working solution within 9 months
- Implemented first of kind electronic filing capability at no cost to Prince George's County (MD)
- Project and benefits featured on national news; product spun off to venture group & Lexis Nexis.

**ACCLAIMS™ Lottery Product**
**Practice Lead**
Directed group in providing systems and services to US state and foreign lotteries
- Increased market share of back office systems to over 25% of US States' market
- Improved market place positioning with international presence in Canada and Europe

### EDUCATION/PROFESSIONAL CERTIFICATIONS

Bachelor of Science, Finance                    University of Arizona, Tucson, Arizona

Bachelor of Science, Real Estate                University of Arizona, Tucson, Arizona

### AFFILIATIONS AND RECOGNITION

- Project Management Institute, Member
- Ryan House Children's Health Charity, Chairman of Board, Board of Directors
- Luke Air Force Base, Honorary Commander, Fighter Country Partnership
- University of Arizona, MIS National Board of Advisors
- University of Arizona, Presidents Club

DEPARTMENT OF REAL ESTATE
P. O. Box 187007
Sacramento, CA  95818-7007

Telephone:  (916) 227-0789

F I L E D

JUL 2 9 2009

DEPARTMENT OF REAL ESTATE

By _____

STATE OF CALIFORNIA

DEPARTMENT OF REAL ESTATE

| | | |
|---|---|---|
| TO:<br><br>DIETER GABLE,<br>SHANNON BARD,<br>STEVE WALKER,<br>ZACK PAPIKE,<br>JOHN JACABSON, and<br>RANDY SABARRA,<br>dba INTELLICHOICE MORTGAGE,<br>SERVICES, LLC, and/or any other<br>names or fictitious names | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO. H-3995 SD<br><br>ORDER TO DESIST AND REFRAIN<br>(B&P Code Section 10086) |

    The Commissioner (Commissioner) of the California Department of Real Estate

(Department) caused an investigation to be made of the activities of DIETER GABLE (GABLE),

SHANNON BARD (BARD), STEVE WALKER (WALKER), ZACK PAPIKE (PAPIKE),

JOHN JACABSON (JACABSON) and RANDY SABARRA (SABARRA), doing business as

INTELLICHOICE MORTGAGE SERVICES, LLC. (IMS).  Based on that investigation, the

Commissioner has determined that GABLE, BARD, WALKER, PAPIKE, JACABSON, and

SABARRA have engaged in acts or practices constituting a violation of Section 10130 (engaging

in the business of, advertising, or assuming to act as a real estate broker without first obtaining a

real estate license), of the California Business and Professions Code (Code) and/or Section 2970

(requirements for advance fee agreements) and Section 2972 of Title 10, Chapter 6, California

- 1 -

Exhibit: 109
Name: Gable
Meri Coash 11-17-10

1  Code of Regulations (Regulations).  Furthermore, based on the investigation, the Commissioner

2  hereby issues the following Findings of Fact, Conclusions of Law, and Desist and Refrain Order

3  under the authority of Section 10086 of the Code.

4                                          FINDINGS OF FACT

5        1.      At no time herein mentioned has IMS been licensed by the Department in

6  any capacity.  GABLE, BARD, and WALKER are the owners, officers, and/or partners of IMS.

7        2.      During the periods of time set below, IMS has solicited consumers and

8  provided loan modification services to consumers in exchange for the payment of an advance fee

9  without having first obtained a real estate license, in violation of Section 10130 of the Code.

10       3.      At no time herein mentioned has JACABSON or SABARRA been

11  licensed by the Department in any capacity.

12       4.      PAPIKE has been licensed by the Department as a real estate salesperson

13  affiliated with Cabrillo Mortgage and Realty.  PAPIKE's license expires on February 8, 2010.

14       5.      During the period of time set out below, PAPIKE, JACABSON, and/or

15  SABARRA solicited borrowers and negotiated to do one or more of the following acts for

16  another or others, for or in expectation of compensation: negotiate one or more loans for, or

17  perform services for, borrowers and/or lenders in connection with loans secured directly or

18  collaterally by one or more liens on real property; and charge, demand or collect an advance fee

19  for any of the services offered.

20       6.      For an unknown period of time beginning no later than September 15,

21  2008, and continuing to the present time, GABLE, BARD, WALKER, PAPIKE, JACABSON,

22  and/or SABARRA advertised and/or continue(s) to advertise services under one or more

23  business names including, but not limited to, "Intellichoice Mortgage Services, LLC." in various

24  print and electronic media.  Those advertisements solicited, and continue to solicit, borrowers by

25  offering loan modification services.

26  ///

27  ///

## GARY JOYAL'S TRANSACTION

7.    On or about March 17, 2009, PAPIKE solicited Gary Joyal (Joyal) in order to provide loan modification services to reduce the interest rate on his Joyal's property.

8.    PAPIKE requested an advance fee of $3,000 from Joyal, which in reliance on PAPIKE's promises, Joyal transferred to IMS.

## EDGAR ARGUETA'S TRANSACTION

9.    On or about September 15, 2008, SABBARA solicited Edgar Argueta (Argueta) an offer for short sale, deed in lieu, and loan modification assistance in exchange for an advance fee of $4,500.

10.    Argueta contracted with IMS to perform a loan modification.

## BILLY HUM'S TRANSACTION

11.    On or about November 21, 2008, JACABSON told Billy Hum (Hum) that IMS would perform loan modifications on two of Hum's properties for $3,000.  JACABSON also offered a 100% money back guarantee.

12.    On or about January 20, 2009, Hum had paid IMS $1,000 for short sale and $3,000 for loan modification.

## CONCLUSIONS OF LAW

13.    Based on the findings of fact contained in paragraphs 1 through 12, GABLE, BARD, WALKER, PAPIKE, JACABSON, and/or SABARRA have engaged in acts or practices constituting a violation of Section 10130 of the California Business and Professions Code (Code), by engaging in the business of advertising or assuming to act as a real estate broker without first obtaining a real estate license from the Department.  GABLE, BARD, WALKER, PAPIKE, JACABSON, and/or SABARRA participated in charging, collecting, and accounting of advance fees, as defined in Section 10026 of the Code, in a manner that was not in compliance with Section 2970 and 2972 of the Regulations.

///

///

1                              <u>DESIST AND REFRAIN ORDER</u>

2          Based on the Findings of Fact and Conclusions of Law stated herein, you,

3 INTELLICHOICE MORTGAGE SERVICES, LLC, DIETER GABLE, SHANNON BARD,

4 STEVE WALKER, ZACK PIPIKE, JOHN JACABSON, and RANDY SABARRA, ARE

5 HEREBY ORDERED to:

6               1.     Immediately desist and refrain from performing any acts within the State

7 of California for which a real estate broker license is required.  In particular, you are ordered to

8 desist and refrain from:

9               (i)     providing or participating in property management services for others and

10                      for compensation unless and until you, individually, obtain an appropriate

11                      license issued by the Department; and

12               (ii)     soliciting borrowers and/or performing services for borrowers or lenders

13                      in connection with loans secured directly or collaterally by one or more

14                      liens on real property.

15               2.     Immediately desist and refrain from collecting advance fees, as that term

16 in defined in Section 10026 of the Code, in any form; particularly with respect to loan

17 modification, loan refinance, principal reduction, foreclosure abatement or short sale services,

18 unless and until you demonstrate and provide evidence satisfactory to the Commissioner that you

19 have:

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

(i)    an advance fee agreement which has been submitted to the Department and you are in full compliance with all requirements of Sections 2970 and 2972 of the Regulations relating to charging, collecting, and accounting for advance fees, and

(ii)   placed all previously collected advance fees into a trust account for that purpose and are in compliance with Section 10146 of the Code.

DATED: _____

JEFF DAVI
Real Estate Commissioner

By _____

**Notice:**  Business and Professions Code Section 10139 provides that "Any person acting as a real estate broker or real estate salesperson without a license or who advertises using words indicating that he or she is a real estate broker without being so licensed shall be guilty of a public offense punishable by a fine not exceeding twenty thousand dollars ($20,000), or by imprisonment in the county jail for a term not to exceed six months, or by both fine and imprisonment; or if a corporation, be punished by a fine not exceeding sixty thousand dollars ($60,000)."

cc:    Intellichoice Mortgage Services, LLC
       7975 Raytheon Road, Suite 350
       San Diego, CA 92111

- 5 -

1

**STATE OF WASHINGTON**
**DEPARTMENT OF FINANCIAL INSTITUTIONS**
**DIVISION OF CONSUMER SERVICES**

2



3

IN THE MATTER OF DETERMINING                    NO. C-10-095-10-FO01

4

Whether there has been a violation of the
Mortgage Broker Practices Act of Washington by:

5

INTELLICHOICE MORTGAGE SERVICES LLC,          FINAL ORDER

6

DIETER GABLE, Member, and SHANNON BARD,
Member,                                        **INTELLICHOICE MORTGAGE**

7

                                               **SERVICES LLC AND DIETER GABLE**
                                Respondents.

8

9                              I. DIRECTOR'S CONSIDERATION

10          A.      Default.        This matter has come before the Director of the Department of

11   Financial Institutions of the State of Washington (Director), through his designee, Consumer Services

12   Division Director Deborah Bortner, pursuant to RCW 34.05.440(1).  On May 17, 2010, the Director,

13   through Consumer Services Division Director Deborah Bortner, entered a Statement of Charges and

14   Notice of Intention to Enter an Order to Cease and Desist, Prohibit from Industry, Impose Fine,

15   Order Restitution, and Collect Investigation Fee (Statement of Charges).  A copy of the Statement of

16   Charges is attached and incorporated into this order by this reference.  The Statement of Charges was

17

18   accompanied by a cover letter dated May 18, 2010, a Notice of Opportunity to Defend and Opportunity

19   for Hearing, and blank Applications for Adjudicative Hearing for all Respondents.  The Department

20   served the Statement of Charges, cover letter, Notice of Opportunity to Defend and Opportunity for

21   Hearing, and blank Applications for Adjudicative Hearing on Respondents Intellichoice Mortgage

22   Services LLC and Dieter Gable, on May 18, 2010 by United States Postal Service First-Class mail

23   (First-Class mail) and Federal Express overnight delivery. On May 20, 2010, the documents sent via

24   Federal Express overnight delivery were delivered.  The documents sent via First-Class mail were not

25   returned to the Department by the United States Postal Service.

                                                1

Respondents Intellichoice Mortgage Services LLC and Dieter Gable did not request an adjudicative hearing within twenty calendar days after the Department served them with the Notice of Opportunity to Defend and Opportunity for Hearing, as provided for in WAC 208-08-050(2).

B.  Record Presented.  The record presented to the Director's designee for her review and for entry of a final decision included the Statement of Charges, cover letter dated May 18, 2010, Notice of Opportunity to Defend and Opportunity for Hearing, and blank Applications for Adjudicative Hearing for Intellichoice Mortgage Services LLC and Dieter Gable, with documentation of service.

C.  Factual Findings and Grounds For Order.  Pursuant to RCW 34.05.440(1), the Director's designee hereby adopts the Statement of Charges, which is attached hereto.

## II. FINAL ORDER

Based upon the foregoing, and the Director's designee having considered the record and being otherwise fully advised, NOW, THEREFORE:

A.  IT IS HEREBY ORDERED, That:

1.  Respondents Intellichoice Mortgage Services LLC and Dieter Gable cease and desist offering loan modification services or otherwise conducting the business of a mortgage broker or loan originator in the state of Washington; and

2.  Respondents Intellichoice Mortgage Services LLC and Dieter Gable are prohibited from participation in the conduct of the affairs of any mortgage broker subject to licensure by the Director, in any manner, for a period of five (5) years; and

3.  Respondents Intellichoice Mortgage Services LLC and Dieter Gable jointly and severally pay a fine of $4,000; and

4.  Respondents Intellichoice Mortgage Services LLC and Dieter Gable jointly and severally pay an investigation fee of $648; and

5.  Respondents Intellichoice Mortgage Services LLC and Dieter Gable maintain records in compliance with the Act and provide the Department with the location of the books, records and other information relating to Respondent Intellichoice Mortgage Services LLC's business, and the name, address and telephone number of the individual responsible for maintenance of such records in compliance with the Act..

2

FINAL ORDER –
INTELLICHOICE MORTGAGE SERVICES INC AND
DIETER GABLE
C-10-095-10-FO01

DEPARTMENT OF FINANCIAL INSTITUTIONS
150 Israel Rd SW
PO Box 41200
Olympia, WA  98504-1200

      B.    <u>Reconsideration.</u>      Pursuant to RCW 34.05.470, Respondents have the right to file a Petition for Reconsideration stating the specific grounds upon which relief is requested.  The Petition must be filed in the Office of the Director of the Department of Financial Institutions by courier at 150 Israel Road SW, Tumwater, Washington 98501, or by U.S. Mail at P.O. Box 41200, Olympia, Washington 98504-1200, within ten (10) days of service of the Final Order upon Respondents.  The Petition for Reconsideration shall not stay the effectiveness of this order nor is a Petition for Reconsideration a prerequisite for seeking judicial review in this matter.

      A timely Petition for Reconsideration is deemed denied if, within twenty (20) days from the date the petition is filed, the agency does not (a) dispose of the petition or (b) serve the parties with a written notice specifying the date by which it will act on a petition.

      C.    <u>Stay of Order.</u>      The Director's designee has determined not to consider a Petition to Stay the effectiveness of this order.  Any such requests should be made in connection with a Petition for Judicial Review made under chapter 34.05 RCW and RCW 34.05.550.

      D.    <u>Judicial Review.</u>      Respondents have the right to petition the superior court for judicial review of this agency action under the provisions of chapter 34.05 RCW.  For the requirements for filing a Petition for Judicial Review, see RCW 34.05.510 and sections following.

      E.    <u>Non-compliance with Order.</u>  If you do not comply with the terms of this order, the Department may seek its enforcement by the Office of Attorney General to include the collection of the fines and fees imposed herein.

/ /

FINAL ORDER –
INTELLICHOICE MORTGAGE SERVICES INC AND
DIETER GABLE
C-10-095-10-FO01

DEPARTMENT OF FINANCIAL INSTITUTIONS
150 Israel Rd SW
PO Box 41200
Olympia, WA  98504-1200

F.   <u>Service.</u>      For purposes of filing a Petition for Reconsideration or a Petition for

Judicial Review, service is effective upon deposit of this order in the U.S. mail, declaration of service

attached hereto.

DATED this 27th day of July , 2010.

STATE OF WASHINGTON
DEPARTMENT OF FINANCIAL INSTITUTIONS

DEBORAH BORTNER
DIRECTOR
DIVISION OF CONSUMER SERVICES

4

FINAL ORDER –
INTELLICHOICE MORTGAGE SERVICES INC AND
DIETER GABLE
C-10-095-10-FO01

DEPARTMENT OF FINANCIAL INSTITUTIONS
150 Israel Rd SW
PO Box 41200
Olympia, WA  98504-1200

# CHAPTER 65. SALES AND USE TAX

## SUBCHAPTER 21. USE TAX

**710:65-21-8.  Out-of-state retailers or vendors not registered in Oklahoma**
(a) **Definitions.**  For the purposes of this Section:

(1)  "**Non-collecting retailer**" means a retailer, not currently registered to collect and remit Oklahoma sales and use tax, who makes sales of tangible personal property from a place of business outside of Oklahoma to be shipped to Oklahoma for use and who is not required to collect Oklahoma sales or use taxes.

(2)  "**Oklahoma purchaser**" means a purchaser that requests goods be shipped to Oklahoma.

(3)  "**Online auction website**" means a collection of web pages on the Internet that allows persons to display tangible personal property for sale which is purchased through a competitive process where participants place bids with the highest bidder purchasing the item when the bidding period ends.

(4)  "**De minimis retailer**" means any non-collecting retailer that made total gross sales in Oklahoma in the prior year of less than $100,000.00 and reasonably expects Oklahoma sales in the current year will be less than $100,000.00.

(5)  "**De minimis online auction website**" means any online auction website that facilitates total gross sales in Oklahoma in the prior year of less than $100,000.00 and reasonably expects Oklahoma sales in the current year will be less than $100,000.00.

(b)  **Requirements for notice.**  Effective October 1, 2010, every non-collecting retailer must give notice that Oklahoma use tax is due on nonexempt purchases of tangible personal property and should be paid by the Oklahoma purchaser.

(1)  **Notice contents.**  The notice must be readily visible and contain the information set forth as follows:

(A)  The non-collecting retailer is not required, and does not collect Oklahoma sales or use tax;

(B)  The purchase is subject to Oklahoma use tax unless it is specifically exempt from taxation;

(C)  The purchase is not exempt merely because it is made over the Internet, by catalog, or by other remote means;

(D)  The State of Oklahoma requires Oklahoma purchasers to report all purchases that were not taxed and pay tax on those purchases.  The tax may be reported and paid on the Oklahoma individual income tax return [Form 511] or by filing a consumer use tax return. [Form 21-1]; and

(E)  The referenced forms and corresponding instructions are available on the Oklahoma Tax Commission website, www.tax.ok.gov.

(2)  **Website and/or catalog notice.**  Notice on a website shall occur on a page necessary to facilitate the applicable transaction.  It shall be sufficient if the non-collecting retailer provides a prominent linking notice that reads as follows:  "See important Oklahoma sales tax information regarding the tax you may owe directly to the state of Oklahoma", if such linking notice directs the purchaser to the principal notice required by this Section.  Notice in a catalog shall be part of the order form.  It shall be sufficient if the non-collecting retailer provides a prominent reference to a



Exhibit: 117
Name: Cable
Meri Coash  11-17-10

Page 4 of 5

supplemental page that reads as follows: "See important Oklahoma sales tax information regarding the tax you may owe directly to the state of Oklahoma on page ___", if such page includes the principal notice required by this Section.

(3)  **Invoice notice.**  For internet purchases, the invoice notice must occur on the electronic order confirmation.  It shall be sufficient if the non-collecting retailer provides a prominent linking notice that reads as follows: "See important Oklahoma sales tax information regarding the tax you may owe directly to the state of Oklahoma", if such linking notice directs the purchaser to the principal notice required by this Section.  If the non-collecting retailer does not issue an electronic order confirmation, the complete notice must be placed on the purchase order, bill, receipt, sales slip, order form, or packing statement.  For catalog purchases, the complete notice must be placed on the purchase order, bill, receipt, sales slip, order form, or packing statement.

(4)  **Exceptions.**

(A)  For internet purchases, notice on the check-out page fulfills both the website and invoice notice requirements simultaneously.  It shall be sufficient if the non-collecting retailer provides a prominent linking notice that reads as follows: "See important Oklahoma sales tax information regarding the tax you may owe directly to the state of Oklahoma", if such linking notice directs the purchaser to the principal notice required by this Section.

(B)  If a retailer is required to provide a similar notice for another state in addition to Oklahoma, the retailer may provide a consolidated notice so long as such notice includes the information contained in (b) of this Section, specifically references Oklahoma and meets the placement requirements of this Section.

(c)  **Prohibition from advertising no tax due.**  A non-collecting retailer may not state or display or imply that no tax is due on any Oklahoma purchase unless such display is accompanied by the notice required by (b) of this Section each time the display appears.

(1)  For example, a summary of the transaction including a line designated "sales tax" and showing the amount of sales tax as "zero" or "0.00" would constitute a "display" implying that no tax is due on the purchase.  Such a display must be accompanied by the notice required by (b) of this Section every time it appears.

(2)  Notwithstanding the limitation in this subsection, if a non-collecting retailer knows that a purchase is exempt from Oklahoma tax pursuant to Oklahoma law, the non-collecting retailer may display or indicate that no sales tax is due even if such display is not accompanied by the notice required by (b) of this Section.

(d)  **Invoice notification exception for online auction websites.**  With the exception of notification on invoices, the provisions of this Section shall apply to online auction websites as defined in (a) of this Section.

(e)  **De minimis exception.**  A de minimis retailer and a de minimis online auction website, as defined in (a) of this Section, shall be exempt from the notice requirements in (b) of this Section.