

EXHIBIT
Reply
E

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 10–CV–01546–REB–CBS

The Direct Marketing Association,
    Plaintiff,

v.

Roxy Huber, in her capacity as Executive
Director, Colorado Department of Revenue,
    Defendant.

---

## DECLARATION OF THOMAS J. ADLER, PHD.

---

I, Thomas J. Adler, PhD., pursuant to 28 U.S.C. § 1746, do depose and state as follows:

1. I am the President of Resource Systems Group, Inc. ("RSG"), a professional research and consulting firm with offices in White River Junction and Burlington Vermont, Salt Lake City, Utah and Chicago, Illinois. I make this declaration upon my personal knowledge.

2. I previously filed a declaration in this matter, dated 10 August 2010. I was given a copy of the 4 November 2010 *Report of Opinion* submitted by Professor Donald R. Lichtenstein on behalf the Colorado Department of Revenue, his client in this matter. At the request of Brann & Isaacson, counsel to the Direct Marketing Association ("DMA"), I reviewed that *Report of Opinion* and prepared the following rebuttal comments.

1

3. In his filing of 4 November 2010, Professor Lichtenstein expresses his opinion that the conclusions reached by Professor Keller and me are not supported by our survey and that "... several factors undermine the conclusions..." He cites eight bases for his opinion, seven of which relate directly to the study that I directed. When examined against the specifics of this case, rather than the broad generalities on which these opinions are based, it is clear that the bases that Professor Lichtenstein cites for his opinions do not "undermine" the original conclusions presented in my expert report.

4. The one overwhelming gap in Professor Lichtenstein's *Report of Opinion* dated 4 November 2010 is that he has not conducted any primary survey research of his own to refute the findings of our research. To the extent that he found our survey lacking, he could easily have conducted a survey of his own design and chose not to do so. The "evidence" that he presents consists entirely of secondary references to the literature, none of which deals with the specifics of these particular questions: whether this disclosure of information about non-Colorado purchases to the Department of Revenue is perceived by Colorado residents to constitute a violation of their privacy and whether it will have significant effects on their purchase behavior. I continue to believe, as explained in detail here, that our study does answer both of these questions in the affirmative.

5. In the following, I address each of the seven points that Professor Lichtenstein presents to support his opinions regarding my work.

A. *Lichtenstein Point 1: The size of the effect lacks "face" validity.*

In this claim, Professor Lichtenstein significantly misinterprets my expert opinion. Specifically, he incorrectly infers that invasion of privacy concerns alone would lead to the large diversion from non-Colorado retailers. In fact, the study that we conducted had two separate objectives (p. 3 of Declaration): 1) to determine whether Colorado residents considered the provision of purchase information to the Department of Revenue to be an invasion of privacy; and 2) to determine whether the reporting requirement would affect purchases from non-Colorado retailers. The "effect" that Professor Lichtenstein questions relates to our findings related to the latter objective. We did not explore nor speculate as to all of the reasons for this effect but certainly did not assume that the effect was due entirely to any perceived invasion of privacy.

Disclosure of information to the Department of Revenue has a far different effect than the disclosures of information to private companies which constitute all of the examples cited by Professor Lichtenstein. Just for example, the effect of this disclosure, among other things, carries the weight of legal enforcement of the state's purchase and use sales tax reporting requirements. Individuals will have a clear and enforceable obligation to compile the information diligently for filing with the Department. The fact that the Department will have access to exact purchase information reinforces this obligation; individuals would surely feel an additional weight to organize these reports and keep similarly accurate records. As a result, they may simply decide that it is simpler to just deal with an in-state retailer who

collects the tax for them and removes this burden. However, I would emphasize that our purpose was not to understand all of the reasons for the stated changes in behavior except that they would be occasioned by the new law and we certainly do not contend that the full effect is due to perceived invasion of privacy.

Professor Lichtenstein also argues that there are often "no close substitutes" for purchases from non-Colorado retailers and thus consumers are unlikely to switch to retailers within the state. In fact, as demonstrated by the purchases recorded by our survey respondents, the majority of these purchases are for types of items that are readily and conveniently available from the "brick and mortar" retailers in Colorado that he refers to; Books/Music/Videos, Clothing, Drugs/Cosmetics together constitute the majority of reported purchases. He also says that non-Colorado internet-based retailers have a "large advantage" over Colorado retailers because of convenience and several other factors. This of course is a gross simplification and implies a condition that is not borne out by actual sales data. According to the 2008/2009 fiscal year report prepared by the Department of Revenue, out of state sales for taxable items constituted only 4.2% of total taxable retail sales for the state.[1] Thus, even assuming some degree of under-reporting, non-Colorado retailers occupy a decidedly inferior position relative to their in-state competitors and one that can surely be influenced by small changes

---

[1] Motor vehicle sales and auto parts were removed from the in-state total because arguably the majority of those sales are for motor vehicles that are not as easily bought from out-of-state retailers. Had motor vehicle and auto parts sales been included, the non-Colorado fraction declines to 3.3%.
http://www.colorado.gov/cs/Satellite?blobcol=urldata&blobheader=application%2Fpdf&blobkey=id&blobtable=MungoBlobs&blobwhere=1251602456786&ssbinary=true

4

in the competitive environment, such as the new disclosure requirement for non-Colorado retailers. For example, non-Colorado purchases from Colorado residents declined in a similar way as in-state purchases between 2007/2008 and 2008/2009 in response to the decline in national economic conditions.

B. *Lichtenstein Point 2: There is an obvious means-end relationship between the reporting of data to the Department of Revenue and paying higher prices.*

Professor Lichtenstein again incorrectly asserts that I concluded that loss of privacy alone would cause major shifts away from non-Colorado retailers. As noted above, this is simply not the case as a plain reading of my Declaration demonstrates. He moves from this assertion to the more sweeping conclusion that our study was "fatally flawed". To support this, he asserts that respondents would substitute the word "tax" in place of the word "disclosure requirement" in their reading of our survey question. He asserts that the shift in consumer purchases indicated by respondents in our survey would occur because they read into this a simple dislike of taxes. And he further asserts that consumers would read "higher prices" into the new disclosure requirement. All of these assertions directly contradict both the law itself and the actual wording of the survey questions neither of which suggests the raising of taxes or prices. Even if some consumers associate the new law with other factors, there is every reason to believe that these associations would also affect their actual behavior just as they may have influenced some of their survey responses.

5

C. *Lichtenstein Point 3: One of the two of the first four survey questions implies a falsehood to respondents, the perception of which will likely affect responses to subsequent survey questions.*

The questions in our survey related to privacy concerns were carefully constructed to insure that they accurately measured the sentiment of Colorado residents. Our survey contained a question presenting two statements designed to test the question of whether Colorado residents consider the disclosure required by the new law to constitute an invasion of their privacy. The statements were preceded by a description of the disclosure requirement. This description precisely described and framed the relevant sections of the new law. The first of our two privacy-related statements used the exact elements listed in the disclosure requirement -- name, billing address, shipping address and amount of purchases – and asked whether the respondent considered the reporting of this information to the State an invasion of his or her privacy. The second used more colloquial wording asking whether the respondent "minded" the State knowing "the kinds of products I buy, from whom I buy them, where I have them shipped, and how much I spend." The order of the statements was randomized so roughly half of the individuals saw the precise "invasion of privacy" wording while the others saw the colloquial wording first.

Professor Lichtenstein first of all asserts that the "kind of products" an individual buys cannot be inferred from the information that is disclosed and thus the colloquially worded statement "implies a falsehood". He uses examples of

6

purchases from three very large and diverse retailers to make the case that the kinds of purchases made from these retailers cannot be easily inferred from the name of the retailer. However, there are equally many counter examples of specialty web retailers who focus on a very narrow range of products (including those products that Professor Lichtenstein used as examples) and whose purchases may be especially sensitive from a privacy perspective.

However, all of this misses the point of the original survey question framing which was to determine whether individuals' perceptions of violation of privacy are affected by wording type (direct listing of "invasion of privacy" vs. colloquial "do not mind") and polarity (agree vs. disagree) and whether their responses were generally consistent across the two statements. The result was that, with only small numbers of exceptions, those who agreed that it was an invasion of privacy also disagreed that they did not mind the reporting. And, the fact that the responses were statistically the same regardless of statement order contradicts Professor Lichtenstein's contention that the colloquially-worded statement compromised the response to the "invasion of privacy" statement.

D. *Lichtenstein Point 4: A concern of "invasion of privacy" is prompted by the question.*

Our survey directly asked Colorado residents whether they consider the law to be an invasion of privacy and they overwhelmingly answered in the affirmative. As detailed in my Declaration, one objective of the survey was to determine whether

7

Colorado residents consider the new law to constitute an invasion of privacy. And as noted above, we asked the question in two ways -- both precisely and colloquially worded and with both positive and negative polarity. We asked it in reference to a specific purchase rather than generally. Whether individuals would have raised the issue in an open-ended question as Professor Lichtenstein would prefer is irrelevant. This would depend on how the open-ended question was framed. Professor Lichtenstein does not suggest any specific wording for such a question and of course has not himself conducted a survey of Colorado residents with such a question.

The framing of open-ended questions can directly lead respondents to (or divert them away from) many different types of response. For example, a simple question such as "What do you think about this law?" might prompt any number of comments about its merit as a public policy or feelings about the Department of Revenue. Responses to open-ended questions in surveys tend to be very parsimonious and responses to this type of question generally address only top-of-the-mind issues. Whether privacy is the "top-of-the-mind" issue, however, is not the relevant question here. The relevant question is "How many Colorado residents perceive this law to constitute an invasion of their privacy?" and there is no reason to believe that respondents will lie about their opinions when asked directly.

8

The simple point is that, when asked, individuals clearly stated their overwhelming sentiment that they do consider the law an invasion of privacy.

E. *Lichtenstein Point 5: Customers do not have enough information to answer some of the questions.*

Our survey carefully constructed a context for the question about future purchases by having the respondent describe a specific past purchase from an out-of-state retailer and asking them how they would make that same type of purchase with the disclosure requirement in place. We provide three specific answer choices (purchase from the seller, purchase from a Colorado retailer, not purchase the item) as well as an open-ended choice which allowed the respondent to indicate uncertainty or other options. As described above, the types of purchases that respondents described were predominantly of the types that could easily be obtained from Colorado retailers (books, music, videos, clothing, drugs, cosmetics) and so it is not surprising that they would have (and choose) local alternatives. In the open-ended responses, some indicated that they would find online alternatives such as sellers on eBay who were not subject to the disclosure regulations.

In short, Professor Lichtenstein's general contention that customers are somehow uninformed about their alternatives is contradicted by the particulars of this survey; the survey was framed around a specific purchase context and the

types of products being purchased are for the most part widely available from a wide range of both Colorado and non-Colorado retailers.

F. *Lichtenstein Point 6: The observed correlation between intentions and behavior (from the general intentions-behavior literature field) tells us that, on average, intentions explain only somewhere in the neighborhood of 10% of the variance in behavior.*

Professor Lichtenstein suggests that there is only a weak link between respondents' stated intentions with actual future behavior. To substantiate his point, he refers to general academic literature which includes a meta-analysis of numerous past studies, relating to a wide variety of choice contexts. The measured correlations reported in these studies between intentions and behavior range from 0.10 for a study of work absence to 0.84 for presidential candidate voting to 0.96 for a decision to have an abortion. Some of the studies in this meta-analysis deal with subjects such as weight loss intentions and intentions of students to use condoms in which there are clear reasons for differences between individuals' prior intentions and behavior. None of these examples, however, deals with the choice of a class of retailer (online/mail vs. local store). And taking a weighted average across studies with widely varying contexts and measures is simply not a reliable way to infer intentions-behavior correlations for a specific study with a context well outside the range of those included in the academic literature cited. Finally, I would note that the 10% of variance estimate that Professor Lichtenstein constructs by combining results from two separate studies relates to replication of each individual's behavior. It decidedly does not

relate directly to an estimate of aggregate (population) behavior as was presented in our study and does not suggest any biases (up or down) in those estimates.

Our survey asked respondents to indicate how they would likely make a specific type of purchase with the disclosure law in place and I continue to believe that respondents were able to reliably indicate their likely behavior under that simple and very specific context.

G. *Lichtenstein Point 7: Evidence from within the privacy research stream specifically shows that stated intentions are a poor predictor of actual behavior.*

On this issue, Professor Lichtenstein once again makes a false assumption that we attempted to link privacy concerns alone to changes in purchase intentions/behavior. Setting that issue aside, the studies to which he refers all deal with provision of data to private entities rather than to a government entity. Provision of purchase data to the Colorado Department of Revenue clearly implies different, and potentially more intrusive, uses of those data than providing information to a web retailer.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of November, 2010.

s/ Thomas J. Adler
Thomas J. Adler, PhD.