IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-01546-REB-CBS

The Direct Marketing Association,

      Plaintiff,

v.

Roxy Huber, in her capacity as Executive Director,
Colorado Department of Revenue,

      Defendant.

---

## DEFENDANT'S REPLY IN SUPPORT OF MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

---

Defendant, Roxy Huber, Executive Director of the Colorado Department of

Revenue ("DOR"), submits this Reply to Plaintiff, the Direct Marketing Association

("DMA")'s Response in Opposition to Defendant's Motion to Dismiss Plaintiff's First

Amended Complaint, filed August 27, 2010 [Dkt. 23] ("Response" or "Resp.").[1]

## I.    DMA LACKS STANDING AS TO COUNTS III, VII, AND VIII.[2]

To sustain standing as an association, DMA must sufficiently allege: 1) its

members would otherwise have standing to sue in their own right; 2) the interests it

seeks to protect are germane to the organization's purpose; and 3) that neither the

claim asserted nor the relief requested requires the participation of individual members

---

[1] DMA has agreed to the dismissal, without prejudice, of its State Constitutional Claims (Count IV- Right to Privacy, Count VI- Free Speech, relevant portions of Counts VII- Due Process and VIII- Taking). *See* Resp., pp.35-36.

[2] After DMA submitted a sworn declaration from an individual with personal knowledge to establish at least one DMA member is subject to the Law, DOR agreed not to contest DMA's standing to assert its Commerce Clause claims and filed a motion to withdraw that portion of the Motion. *See* Defendant's Notice of Partial Withdrawal of Motion to Dismiss, filed September 16, 2010 [Dkt. 30].

of the association.  *Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977).  DMA's Takings claims (Counts VII and VIII) fail to meet the first requirement[3] and its First Amendment claim (Count III) fails to meet the third.

The crux of Count III is that some retailers' identities or product lines are sufficiently expressive to implicate the free speech rights of those retailers and their customers, such that the Law would chill their free speech rights.  Resp., p.25.  As detailed *infra* Part VI, the Complaint, however, does not allege that any DMA members fit this profile.  *See* Compl. ¶105 ("many" businesses, organization, and retailers fit this profile).  The participation of a retailer with a name so revealing or controversial that anyone who purchases from it contends they enjoy constitutional protection from disclosing its name is required.  Without identifying any particular DMA members at issue, the parties will not only be reduced to litigating hypotheticals in a vacuum, but also, DMA has failed to properly assert standing.

## II.    DMA LACKS *JUS TERTII* STANDING AS TO COUNTS III AND V.

*Jus tertii* standing arises in two circumstances: 1) where enforcement of a restriction against a litigant prevents a third party from entering into a relationship with the litigant to which the third party has a constitutional entitlement ("enforcement of a restriction"); and 2) where a plaintiff brings a First Amendment challenge to a statute affecting a third party's rights ("First Amendment challenge").  DMA conflates these two lines of analysis, and fails to demonstrate standing under either test.

---

[3] As discussed *infra* Part VI, DMA fails to state a takings claim and thus a procedural due process claim. DMA has no standing because its members have no standing to sue in their own right.

**A.    Enforcement of a Restriction.**

To establish *jus tertii* standing in an enforcement of a restriction case, DMA must make two showings in addition to having its own Article III standing.  It must demonstrate: 1) a sufficiently close relationship with the third party to assure that the plaintiff will operate as effectively as the third party in asserting that party's rights; and 2) a hindrance or inability of the third party to pursue his own claim.  *Aid for Women v. Foulston*, 441 F.3d 1101, 1111-1113 (10th Cir. 2006).  As shown above, DMA has not sufficiently alleged its own standing to raise a First Amendment claim, and DMA also has not demonstrated either the close relationship with its members' customers to justify *jus tertii* standing or any hindrance of its Colorado customers to bring their own suit.

1.    No Sufficiently Close Relationship.

The close relationship requirement for *jus tertii* standing assures that the litigant will properly frame and present the issues and litigate with appropriate adversarial zeal. *Aid for Women,* 441 F.3d at 1113 (citing *Sec'y of State of Md. v. Joseph H. Munson Co., Inc.*, 467 U.S. 947, 956 (1984)).  A "close relationship" is typified by a relationship of trust or reliance.  *See, e.g., United States v. Triplett*, 494 U.S. 715, 721 (1990) (attorney-client relationship); *Aid for Women,* 441 F.3d at 1112-1113 (physician-patient relationship); *Penn. Psychiatric Soc. v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 289-290 (2002) (psychiatrist-patient relationship).  DMA broadly contends that an association has *jus tertii* standing to bring claims on behalf of third parties whose interests the association's members can represent.  That statement, however, is not borne out by an analysis of the cases DMA cites. In *Pennsylvania Psychiatric Society*,

3

the case turned on the existence of a doctor-patient relationship, which is a far different relationship that the one alleged here by DMA.  280 F.3d at 289-290.  Moreover, in neither *Ohio Assoc. of Indep. Schools v. Goff*, 92 F.3d  419, 422 (6th Cir 1996) nor *Fraternal Order of Police v. United States*, 152 F.3d 998, 1002 (D.C. Cir. 1998), did the court address the close relationship requirement.

In some instances a vendor-customer relationship may suffice for a close relationship.  The vendor cases on which DMA relies, however, permitted a vendor to assert customers' constitutional rights when the vendor was prohibited or restricted by a law from selling to the third party customer under threat of sanction thereby reducing or restricting its market.  *Craig v. Boren*, 429 U.S. 190 (1976) (analyzing a law that prohibited and criminalized the sale of beer to males between the ages of 18 and 20); *see also Carey v. Population Servs. Int'l., Inc.*, 431 U.S. 678 (1977) (challenged law criminalized and prohibited the distribution or advertisement of contraceptive devices); *Eisenstadt v. Baird*, 405 U.S. 438 (1972) (statute prohibited the distribution of contraceptives).  As the Court noted in *Craig,* "[i]n both *Eisenstadt* and here, the challenged statutes compel *jus tertii* claimants either to cease their proscribed activities or to suffer appropriate sanctions."  429 U.S. at 196, n.5.  In the these cases, the concern that the litigant properly frame and present the issues and litigate with appropriate adversarial zeal was satisfied because the challenged statute severely restricted or foreclosed the vendor's market, giving it the incentive to advocate for the third party.  The elimination or reduction of the vendor's market caused by the

4

challenged law is the lynchpin for the vendor's right to represent the interests of the third party customer, not the mere existence of a vendor-customer relationship. *See Craig*, 429 U.S. at 195 ("[V]endors and those in like positions have been uniformly permitted to resist efforts at restricting their operations by acting as advocates of the rights of third parties who seek access to their market or functions." );  *Rothner v. City of Chicago*, 929 F.2d 297 (7th Cir. 1991) (distributor and operator of video games had *jus tertii* standing to represent constitutional rights of minors under 17 in challenge to ordinance prohibiting minors under 17 from playing video games during school hours); *Hejira Corp. v. MacFarlane*, 660 F.2d 1356 (10th Cir. 1981) (vendor of drug paraphernalia had *jus tertii* standing to raise due process claims of its customers in challenge to law forbidding and criminalizing sale or advertisement of drug paraphernalia).

Unlike either *Craig* or *Eisenstadt,* the challenged law in this case does not prohibit or proscribe an entire realm of conduct.   DMA's members are not forbidden from selling to Colorado customers and are not penalized if they do.  Similarly, their customers are not forbidden from purchasing from DMA's members or patronizing them in any way.  Because the Law does not restrict DMA's members' markets by foreclosing any part of the market (particularly when all members will be subject to the same requirements), DMA lacks the appropriate vendor-vendee relationship to give it *jus tertii* standing for the claims of its members' customers.

2.     No Obstacle or Hindrance.

DMA has not alleged that its members' customers are hindered in any way in bringing their own suit to protect their interests, and its Response ignores this second

requirement of *jus tertii* standing.  A hindrance or obstacle may be exemplified by a third

party's concern for privacy, *Aid For Women*, 441 F.3d at 1114 (patients' desire to keep

information about their sexual activities private), or age (minority) and lack of legal

sophistication, *id.*, stigma associated with receiving mental health services or impaired

mental condition, *Penn. Psychiatric Soc'y*, 280 F.3d at 289-90, or fluid membership in a

potential class, *Craig* 429 U.S. at 194.  *See also Miller v. Allbright*, 523 U.S. 420, 449-

450 (1998) (Justice O'Connor concurring) (Third party standing is permitted only when

"daunting barriers" deter the rightholder from bringing suit, e.g., death of rightholder,

difficulty of demonstrating likelihood of recurring discrimination, privacy concerns

deterring third party, insurmountable procedural obstacle (imminent mootness in

abortion case or challenge to age-related beer sale restriction)).  A hindrance suggests

that a rightholder did not simply decline to bring suit, but rather, could not do so.  *Id.*

Here the opposite is true. This is not a case in which the third party customer

would be reluctant to engage in the activity (buying from a DMA member) for fear of

prosecution or penalty, *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973), or a case in

which the customer could not demonstrate that the alleged injury was likely to reoccur,

*Powers v. Ohio*, 499 U.S. 400, 414-415 (1991).  DMA simply has not alleged any

obstacle to a customer's bringing a claim based on a privacy or First Amendment

challenge that rises to the level of a hindrance to his bringing a suit.

### B.    First Amendment Challenge

The usual requirements for third party standing are relaxed for facial challenges

due to overbreadth.  *Joseph H. Munson, Inc.,* 467 U.S. at 956-57.  The requirements,

however, are not eviscerated.  *See IMS Health Inc. v. Ayotte*, 550 F.3d 42, 49-50 (1st Cir. 2008) (no court has exhibited a willingness to write the hindrance element out of the standing test).  Even under the relaxed standards for First Amendment cases, DMA has not alleged any hindrance to individuals bringing a facial challenge to the Law.

Even if DMA has sufficiently pleaded a hindrance to third parties, it must still allege facts that, if proved, show substantial threats to the free speech rights asserted on behalf of its members' customers.  Mere interference with third parties' rights does not suffice; DMA must plead that the Law "substantially abridges the First Amendment rights" of the third parties.  *The Pitt News v. Fisher*, 215 F.3d 354, 364 (3d Cir. 2000) (quoting *Village of Schaumberg v. Citizens for a Better Environment*, 444 U.S. 620, 634 (1980)).  DMA has simply failed to do so.

Here DMA's members' customers do not face any sanction under the Law, nor are they foreclosed from purchasing from DMA members or from purchasing elsewhere. Additionally, their First Amendment rights are not implicated by the vast majority of commercial transactions that are covered by the Law.  As a result, DMA has not sufficiently alleged a First Amendment claim to demonstrate *jus tertii* standing.

## III.   DMA'S TAKINGS CLAIMS ARE NOT RIPE (COUNTS VII AND VIII).

The Court lacks subject matter jurisdiction over Counts VII and VIII because they are not ripe.  A takings claim is not ripe until 1) the defendant government entity has reached a final decision on the application of the regulations in question; and 2) the plaintiff has sought compensation through procedures provided by the state.  *Rocky Mountain Christian Church v. Bd. of County Comm'rs of Boulder County*, 481 F. Supp.

7

2d 1213, 1218 (D. Colo. 2007) (internal citiions omitted).  Equitable relief is not available to enjoin an alleged taking, duly authorized by law,[4] when a subsequent suit for compensation can be brought.  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1016 (1984).  Here, DMA members have failed to exhaust adequate state law remedies.  *See* COLO. REV.STAT. § 38-1-101; §§7-74-101. *et. seq.* (2010).

In its Response, DMA now asserts that its takings claims mount only a facial challenge to the Law and thus its claims were ripe upon enactment of the Law.[5]  Resp., pp.34-35.  To the extent DMA cites cases that preceded *Lingle v. Chevron USA, Inc.*, 544 U.S. 528 (2005)*,* its reliance is  misplaced.  *See, e.g., San Remo Hotel, L.P. v. City & County of San Francisco*, 545 U.S. 323, 340, n.23 (2005) (finding facial challenges ripe); *Yee v. City of Escondido*, 503. U.S. 519, 534 (1992) (same).   *Yee* and *San Remo* applied the "substantially advances" test in holding that facial takings challenges are ripe.  *Id.*  The Supreme Court, however, repudiated that test in *Lingle*.  544 U.S. at 545.

Counts VII and VIII are not ripe and the effect of DMA's facial challenge to the Law substantially raises its burden.  *Dias v. City & County of Denver,* 567 F.3d 1169, 1180 (10th Cir. 2009) (noting a plaintiff's "heavy burden" associated with a facial challenge); *see also infra* Part VI.B. (failure to state a facial challenge on takings claim).

---

[4] *See Custer County Action Assoc. v. Garvey*, 256 F.3d 1024, 1042 (2001) ("'Unauthorized' conduct in the takings context equates to the *ultra vires* actions of an agency, i.e., action explicitly prohibited or outside the normal scope of agency responsibilities.").

[5] DMA contends that because the Law does not guarantee confidentiality, "the extent of the injury" to its member retailers' property rights is "even worse."  Resp., pp.29-30.  Aside from being false, this allegation regarding the extent of DMA retailers' alleged injury further belies DMA claim that its takings claim advances solely a facial challenge.  *See* Resp., pp.34-35   (discussing its limited facial challenge and that its taking claim "does not depend on the extent to which [member retailers] are deprived of the use of their…property").

**IV.    DMA FAILS TO STATE A CLAIM THAT THE LAW VIOLATES CONSTITUTIONALLY-RECOGNIZED PRIVACY RIGHTS (COUNT III).**

DMA's Count III first fails to state a claim because neither the Supreme Court nor the Tenth Circuit has recognized that a constitutional right of privacy exists in information about an individual's shopping habits.  Even DMA's Response does not point to any authority indicating that courts have expressly recognized that a report to the State, which reveals the names of retailers with whom an individual shops and the amounts spent, is deserving of constitutional protection.

Constitutionally-protected privacy rights are only those that are "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (internal citations omitted). Courts have not recognized that information about Americans' shopping preferences is so fundamental as to fall within the Constitution's notions of ordered liberty.  Rather, the Supreme Court has counseled restraint in this area, recognizing that a designation of fundamental rights "to a great extent, places the matter outside the arena of public debate and legislative action and risks transforming the Due Process Clause into the policy preferences of the Members of the Court."  *Seegmiller v. LaVerkin City*, 528 F.3d 762, 770 (10th Cir. 2008), *citing Glucksberg*, 521 U.S. at 720.  As a result, for example, neither the Supreme Court nor the Tenth Circuit has recognized a constitutionally-protected interest in the privacy of financial information.  *See, e.g. United States v. Miller*, 425 U.S. 435, 440 (1977) (no constitutional right of privacy in bank records).

DMA's argues that the Annual Customer Report could reveal private information such as medical conditions, financial situation, family issues, sexual orientation, religious beliefs or political opinions.  The Law, however, does not seek to collect information on these topics, and any collection of such information is indirect and incidental to the Law's purpose.  Taxing authorities regularly indirectly collect personal information about taxpayers of the type asserted by DMA, including information regarding taxpayers' marital status, family status, employment status, financial condition, charitable and/or religious interests, health expenditures beyond a certain threshold, and gambling winnings or debts.  Courts have not found that such incidental revelations to a taxing authority result in a violation of constitutional privacy rights.  *Cf., e.g., Yorkshire v. Internal Revenue Serv.*, 829 F. Supp. 1198, 1202 (C.D. Cal. 1993) (no recognized right of privacy under the federal constitution in the confidentiality of consolidated tax returns); *Plante v. Gonzales*, 437 F. Supp. 536, 540 (N.D. Fla. 1977) ("The secrecy of one's personal assets and business transactions has never been granted the freedom from governmental scrutiny traditionally accorded the sanctity of the family.") (internal citations omitted); *see also Whalen v. Roe*, 429 U.S. 589, 602 (1977) (holding that a state government's collection of prescription information did not violate individuals' constitutional privacy rights).[6]

---

[6] In *Whalen*, the Court also rejected the argument made by DMA that individuals' privacy is jeopardized because the Act does not sufficiently provide for safeguards of the data submitted to DOR.  *See* Compl. ¶85.  The *Whalen* Court held that the mere possibility of a deliberate or inadvertent disclosure of personal information was not sufficient to challenge the validity of a statute on its face.  429 U.S. at 600-601.

Count III fails to state a claim for the ancillary reason that the Complaint does not plausibly allege disclosures of private information.  DMA illustrates this precisely when it lists a handful of websites that potentially could reveal personal customer information.  These facts, however, are nowhere contained in the Complaint.  Moreover, in neither the Complaint nor the Response does DMA make the necessary corollary allegations that the operators of these websites are DMA members, that they do enough business to be subject to the thresholds of the Act, that the business name for the Annual Customer Report is the same as the website, or that the business name readily reveals private information.  The allegations relating to privacy fail to extend beyond the assertion that private information hypothetically could be revealed.  *See* Compl. ¶¶80, 83.  DMA's failure to support these conclusory assertions with particular facts renders the claim subject to dismissal.

## V.   DMA SIMILARLY FAILS TO STATE A CLAIM THAT THE LAW VIOLATES THE FIRST AMENDMENT RIGHTS OF DMA OR ITS MEMBERS (COUNT V).

DMA's Count V fails to state a claim for the same reasons as its privacy claim.  First, the First Amendment claim should be dismissed because courts have not yet recognized that First Amendment protection extends to the speech or conduct alleged – in this case, the information contained in the Annual Customer Report.  In fact, several courts have suggested that the First Amendment is not implicated in the disclosure to the government of customer names and amounts spent with a particular retailer.  *Amazon.com, LLC v. Lay*, No. 10-cv-00664-MJP, 2010 WL 4262266 (W. D. Wash 2010) (attached as Exh. 1); *Tattered Cover, Inc. v. City of Thornton*, 44 P.3d 1044, 1053 n.17

(Colo. 2002).  Recently, in the *Amazon.com, LLC* litigation, the court determined that a state department of revenue's collection of data regarding the specific items purchased by taxpayers would violate the First Amendment, but held that the collection of customer names, addresses, and general product information would be permissible.  Exh. 1, *Amazon*, 2010 WL at *10-11.  Similarly, in *Tattered Cover*, the Colorado Supreme Court determined that disclosure of particular book titles would violate the First Amendment, but noted that records, such as billing invoices, would not.  44 P.3d at 1053 n.17.

DMA's Response does not offer any authority demonstrating that courts have recognized that the First Amendment covers the data at issue.  Rather, DMA's Response asserts that its Complaint states a claim that the Act chills the exercise of freedom of speech by dissuading buyers and sellers from transactions involving expressive content.  This response misses DOR's point.  The Court need not reach the question of whether the exercise of speech may be chilled, because the exercise of speech (here, the buying and selling of goods), as a matter of law, is not implicated.

DMA's Response additionally highlights that its Complaint brings a facial challenge of overbreadth under the First Amendment.  Compl., ¶109.  When bringing a facial challenge, DMA must show that the Law "creates an impermissible risk of suppression of ideas" "in <u>every</u> application."  *Colorado Right to Life Comm., Inc. v. Coffman,* 498 F.3d 1137, 1155 -1156 (10th Cir. 2007) (emphasis in original).  This is a "heavy burden."  *Id.* at 1155.   When a facial challenge is brought, the Court's "first task" is to determine whether the Act reaches an amount of constitutionally protected conduct

that is both real and substantial when "judged in relation to the statute's plainly legitimate sweep." *Jordan v. Pugh*, 425 F.3d 820, 828 (10th Cir. 2005).

The Complaint does not assert that the First Amendment covers the vast sea of regular transactions for goods from direct marketing sellers.  DMA, for example, does not assert that the First Amendment bars the reporting of data from sellers of office supplies, tennis shoes, or computers.  Rather, the Complaint focuses on alleged sellers of expressive content, contending that "<u>many</u> businesses and organizations that employ direct marketing methods and sell products and services at retail are highly specialized and closely associated with particular ideas, issues, opinions and beliefs."  Compl., ¶105 (emphasis added).  The Complaint, however, does not offer any particular examples or assert any specific facts that plausibly allege that the Act's reach over constitutionally-protected conduct is real and substantial when compared to the legitimate transactions that the Act covers.[7]  The Complaint's sweeping statements about the Act's propensity to chill conduct do not sufficiently allege the particulars – that real and substantial numbers of sellers of expressive content are covered by the Act and that the Act would reveal particular information about them that is protected by the First Amendment.  *See Murphy v. Matheson*, 742 F.2d 564, 569 (10th Cir. 1984) ("That some unconstitutional applications of the law can be imagined is insufficient to invalidate the statute on overbreadth grounds.").  As a result, DMA has failed to plausibly state a claim as to Count V, and that claim should be dismissed.

---

[7] The same is true of DMA's privacy claim.  DMA has not plausibly alleged that the Act covers a real and substantial amount of constitutionally-protected conduct as compared to the legitimate reach of the Act.

**VI.  DMA FAILS TO STATE A CLAIM FOR VIOLATIONS OF THE FIFTH AND FOURTEENTH AMENDMENTS (COUNTS VII AND VIII).**

In addition to the grave ripeness deficiencies discussed *supra* Part III, DMA's thin and conclusory assertions fall short of stating claims for a violation of procedural due process (Count VII) and a taking of private property (Count VIII).  Even if DMA had adequately pleaded a takings claim, the Just Compensation Clause of the Fifth Amendment does not require pre-deprivation remedies or compensation.

**A.  Count VII Fails to State a Procedural Due Process Claim.**

DMA contends that Count VII addresses the absence of a pre-deprivation remedy against the disclosure requirements of the Law.[8]  Resp., p.26.[9]  However, it is well-established that the Just Compensation Clause does not require pre-deprivation remedies or compensation.  *See Williamson*, 473 U.S. at 195, n.14 ("Unlike the Due Process Clause, however, the Just Compensation Clause has never been held to require pretaking process or compensation.") (citing *Monsanto*, 467 U.S. at 1016).  As a result, DMA fails to state a procedural due process claim.

DMA's due process claim fails for the additional reason that it has not adequately alleged a violation.  DMA incorrectly contends that the Law does not provide for any "front-end process" or "back-end guarantee" that retailers' trade secrets will be held with the same level of care by DOR as by the retailers.  Resp., p.32.  Colorado law, however, expressly prohibits disclosure of all information obtained by DOR pursuant to

---

[8] Due to the vagueness of the Complaint, it was initially unclear whether Count VII asserted a substantive or procedural due process claim.  *See* Motion, pp.31-33 (addressing both substantive and procedural due process claims).  DMA now states that it only intended to assert the latter.  Resp., p.33 n.12.

[9] DMA's Response cites to the Complaint ¶¶14, 133-136; however, none of these references allege the absence of a pre-deprivation remedy.

Article 21 Title 39 of the Colorado Revised Statutes.  *See*  COLO.REV.STAT. §§ 39-2-112(4)(a) and -112(6) (prohibiting disclosure absent court order and providing for criminal and civil penalties as well as termination from employment for any violation).  In *Monsanto*, the Supreme Court recognized that the value of a trade secret lies in the advantage it gives the owner over competitors, and it is thus a <u>disclosure</u> that allows a competitor access to the trade secret that is of concern in a takings context.  *Id*. at 1012, n.15.  DMA has not and cannot allege, beyond mere speculation, any such disclosure.

Further, DMA's citations to case law requiring notice and a pre-deprivation hearing before property interests are negatively affected by government are inapposite.  Resp., pp.32-33.  As discussed *infra* Part VI.B., DMA has failed to allege, beyond conclusory statements, any negative effect upon retailers' trade secrets as a result of the Law- whether by disclosure to DOR or DOR's theoretical future disclosure to competitors.  For these reasons, DMA fails to state a procedural due process claim.

### B.    Count VIII Fails to State a Takings Claim.

The basis for DMA's takings claim has shifted.  DMA now contends that Count VIII addresses the irreparable harm to the value of DMA member retailers' customer lists as a result of the disclosure requirements of the Law. [10]  Resp., p.26.  DMA employs the following flawed logic to advance its takings claim: 1) DMA member retailers' customer lists are trade secrets (Compl. ¶¶14, 135, 147); 2) the Law compels disclosure of these customer lists to DOR (*id.* at ¶¶136, 148); 3) disclosure of the

---

[10] Because DMA alleges a facial challenge to the Law (Motion, pp. 34-35), it faces a heavy burden of alleging that the Law is unconstitutional in all its applications.  *See Dias*, 567 F.3d at 1180 (affirming Rule 12(b)(6) dismissal because plaintiffs did not allege the law was vague in all applications).

customer lists to DOR effects a taking (*id.* at ¶146); 4) some customers find this disclosure to be an invasion of privacy (*id.* at *Id.* at ¶43); 5) these customers will decrease or discontinue their purchases from DMA members causing the loss of sales and alienation of customers (*id.*); 6) as a result of this alleged loss of sales and customers, the value of the customer lists is lost (Resp., p. 28-29); 7) this <u>loss in value</u> constitutes a taking by the State of Colorado (Resp., pp.33-34).  The Complaint, however, does not support the circuitous theory DMA now advances.  Premise number six is nowhere to be found in even the most generous reading of the Complaint. Perhaps recognizing that disclosure of customer lists by DOR is remote due to the strict confidentiality law, DMA now, in effect, amends its complaint to allege a taking based on the alleged loss of profits and goodwill that renders the customer lists valueless.

DMA's attenuated logic is based on assumptions that do not support a plausible taking.  As such, Count VIII should be dismissed.  *See Rhodes v. Physician Health Partners*, 2010 WL 728213, at *2 (D. Colo. 2010) ("[T]he mere metaphysical possibility that *some* plaintiff could prove *some* set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that *this* plaintiff has a reasonable likelihood of mustering factual support for *these* claims.") (citing *Ridge at Red Hawk, LLC v. Schneider* 493 F.3d 1174, 1177 (10th Cir. 2007).

Even accepting DMA's new takings theory, Count VIII nonetheless fails to state a takings claim based on the following factors set forth in *Penn Cent. Transp. Co. v. City of New York*: 1) the character of the governmental action; 2) the economic impact of the

regulation on the claimant; and 3) the extent to which the regulation interferes with investment-backed expectations.  438 U.S. 104, 124. (1978). [11]

As to the first factor, the Law is a regulatory tool that allows the State of Colorado to enforce its sales and use tax for the benefit of the public and does not effect a taking. "Government regulation often curtails some potential for the use or economic exploitation of private property and not every destruction or injury to property by governmental action has been held to be a taking in the constitutional sense."  *E. Enterprises v. Apfel*, 524 U.S. 498, 523 (1998) (internal citations omitted).  "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law."  *Id.* (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 413 (1922)).  A taking may more readily be found when the government physically invades property than when there is interference with property arising from a public program "adjusting the benefits and burdens of economic life to promote the common good."  *Penn Central*, *438* U.S. at 124.   Because courts

---

[11] The Supreme Court has recognized three categories of governmental takings, the first two of which constitute *per se* takings: (1) physical takings involving the permanent physical invasion of property, *see, e.g., Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (law requiring owners to permit cable companies to install cable in apartment buildings constituted taking), (2) total regulatory takings depriving the owner of all economically beneficial uses of the property, *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992), and (3) all other alleged takings, judged under *Penn Central.  Lingle*, 544 U.S. at 538-39.  While DMA alleges that the Law has "decimated" the value of the customer lists (Resp., p.29), it does not and cannot allege that it has lost all sales from and alienated all Colorado purchasers (Resp., p.34 "extinguishing some or all" customer list value; Compl. ¶43 "substantial majority" of consumers will decrease or discontinue purchases).  *See Clajon Production Corp. v. Petera*, 70 F.3d 1566, 1577 (10th Cir. 1995) (declining to apply *per se* test when plaintiff did not allege a taking of all economically beneficial use of the property).  Because the Complaint and Response do not advance a *per se* takings claim, Count VIII is properly judged under the *Penn Central* factors.

have not recognized that this type of disclosure requirement, properly within the State's taxing authority, amounts to a taking, Count VIII fails to state a claim as a matter of law.

As to the second *Penn* factor, the Complaint fails to advance more than conclusory allegations to support the economic impact on its members.  Even if some DMA members have property rights in their customer lists,[12] it does not follow that the mere enactment of the Law resulted in the loss of the economically viable use of all DMA member retailers' customer lists.  *See Keystone Bituminous Coal Assoc. v. DeBenedictis,* 480 U.S. 470, 495 (1987) (noting a plaintiff's "uphill battle" in alleging the "mere enactment" of a law constitutes a taking and limiting the inquiry to whether the law "denies an owner economically viable use of his land").   This inquiry requires a comparison of the value taken from the value that remains.  *Id.* at 497.  The value of a trade secret lies in the advantage it gives the owner over competitors by virtue of the exclusive access to the data that makes up the trade secret.  *Monsanto*, 467 U.S. at 1012.  DMA now discards the theory that it is the potential disclosure of its customer lists to competitors that effectuates the taking.  Rather, it argues that as a result of the Law, customers will not make future purchases and the value of the customer list is thus lost.  Resp., p.29.  This type of loss does not constitute a taking of a trade secret.  *See Monsanto*, 467 U.S. at 1012, n.15 (loss of potential profits and sales due to consumer reaction to trade secret disclosure cannot constitute taking of a trade secret).

---

[12] DMA's failure to go beyond a recitation of the elements to establish that a customer list is a trade secret in the first instance is fatal to its taking claim.  Motion, pp.27-28.

Additionally, resting on its conclusory allegation that a taking occurred the moment the Law was enacted, DMA asks this Court to take a leap of faith that *Ashcroft v. Iqbal*, __ U.S.__,129 S.Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) simply do not allow.  DMA concludes that the Law will cause lost profits and alienation of customers due to their concerns for privacy.  Compl. ¶43; Resp., p.29. However, it is just as likely that any lost profits or alienation may result from customers seeking to avoid paying sales and use tax.  *See Twombly*, 550 U.S. at 567-68 (dismissing a Sherman Act conspiracy claim when there was "an obvious alternative explanation"); *Iqbal*, 129 S.Ct. at 1951("It is the conclusory nature of respondent's allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth.").  Because DMA has not nudged its claims across the line from conceivable to plausible, Count VIII must be dismissed.  *Twombly*, 550 U.S. at 570.

Finally, under the third *Penn Central* factor, DMA has failed to allege that the Law interferes with any reasonable investment-backed expectations.  Even if DMA could adequately plead a taking, which it cannot, the Supreme Court has consistently recognized that government may legitimately adopt laws that adversely affect recognized economic values.  *Penn Central*, 438 U.S. at 124.  Exercise of the taxing authority is "one obvious example."  *Id.*  The Law is a tool the State may legitimately utilize in exercising its authority to enforce the sales and use taxes.

Further, while DMA's taking claim is cloaked in an alleged taking of the value of customer lists, the true loss it alleges is one of potential profits and goodwill.  Compl. ¶43 (retailers "risk losing sales and alienating customers").  However, "goodwill and

profits traditionally have not been regarded as elements of just compensation under either the due process or just compensation clauses of the federal and state constitutions." *Auraria Businessmen Against Confiscation, Inc. v. Denver Urban Renewal Auth.*, 517 P.2d 845, 847 (Colo. 1974).

## VII.    CONCLUSION

DMA has not properly alleged standing or an entitlement to relief on its claims and these basic deficiencies should be "exposed at the point of minimum expenditure of time and money by the parties and the court." *Twombly*, 550 U.S. at 558.  For the foregoing reasons, DOR's Motion to Dismiss should be granted.

Respectfully submitted this 30th day of November, 2010.

JOHN W. SUTHERS
Attorney General

*s/  Melanie J. Snyder*

MELANIE J. SNYDER, 35835*
Assistant Attorney General
STEPHANIE LINDQUIST SCOVILLE, 31182*
JACK M. WESOKY, 6001*
Senior Assistants Attorney General
1525 Sherman Street, 7th Floor
Denver, Colorado  80203
Telephone:  (303) 866-5273 (Snyder)
Telephone:  303.866.5241 (Scoville)
Telephone:  (303) 866-5512 (Wesoky)
FAX:  (303) 866-5395
E-Mail:  melanie.snyder@state.co.us
E-Mail: stephanie.scoville@state.co.us
E-Mail:  jack.wesoky@state.co.us

*Counsel of Record
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 30, 2010, I electronically filed the foregoing **Defendant's Reply in Support of Motion to Dismiss Plaintiff's First Amended Complaint** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

gisaacson@branlaw.com
mschaefer@branlaw.com

*Attorneys for Plaintiff*

*s/ Melanie J. Snyder*

*cc: Via inter-office mail*
Ms. Roxy Huber
Executive Director
Colorado Department of Revenue
1375 Sherman Street
Denver, Colorado 80261