```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLORADO
 2


 3


 4    THE DIRECT MARKETING ASSOCIATION,

 5                   Plaintiff,

 6    v.                              CIVIL ACTION NO.

 7                                    10-cv-01546-REB-CBS

 8    ROXY HUBER, in her capacity
      as Executive Director, Colorado
 9    Department of Revenue,

10                   Defendant.

11

12

13          *  *  *  *  *  *  *  *  *  *  *  *  *  *

14


15              DEPOSITION OF WILLIAM F. FOX

16

17                 November 16th, 2010

18

19    =======================================================
                      TRUESDEL & RUSK
20            Registered Professional Reporters

21            Ginger Truesdel, RPR, RDR, CRR
                 Certified Realtime Reporter
22                      LCR #003
                  7047 Duncan's Glen Drive
23             Knoxville, Tennessee  37919
                     (865) 450-9772
24
                    www.truesdelrusk.com
25                 gingertrue@comcast.net
```

1          It is to my understanding a copy of

2    your report with your attached Vita.  Have you had

3    an opportunity to look at that?

4          A          I did, and I agree it does appear

5    to be my report and my attached Vita.

6          Q          And on Page 5 of that document, is

7    that not your original, but is that your signature

8    there in this photocopy?

9          A          It is.

10         Q          And the date of the report is

11   November 5, 2010?

12         A          That's correct.

13         Q          Can you tell me in what areas you

14   are an expert?

15         A          Well, generally, in economics and

16   also in taxation and with much of that focused on

17   state and local taxation.

18         Q          Now, am I correct that the report

19   that you prepared in connection with this case

20   marked as Exhibit 95 was derived from another report

21   that you did outside of this litigation in 2009?

22         A          That's correct.

23         Q          And, in fact, on Page 1, you

24   indicate:  "The estimates and methodology discussed

25   below are drawn specifically from the 2009 report

```
 1   written by several colleagues and myself that is
 2   referenced immediately above it."
 3                    Do you see that just below the
 4   list?
 5           A       Just below the list.  I think it's
 6   true, I just don't see it on the page, but it is
 7   true, nonetheless.
 8           Q       Just for purposes of the -- right
 9   below the five bullets you'll see a sentence that
10   begins "the estimates and methodology."
11           A       Yes.
12           Q       And that's correct --
13           A       That is correct.
14           Q       -- that it's drawn from the 2009
15   report.
16           A       Yes.
17           Q       When was that 2009 report
18   published?
19           A       Well, we prepared it in the late
20   winter and mostly in -- sorry, in the early and late
21   winter of 2009.  It was published then in May of
22   2009.
23           Q       Okay.  As indicated, it was
24   published in State Tax Notes?
25           A       That's correct.
```

1    Q    We'll mark as the next exhibit this

2 document.

3    (Exhibit No. 96 marked)

4    Q    So I'm showing you what we marked

5 as Exhibit 96, which is a document entitled State

6 and Local Government Sales Tax Revenue Losses from

7 Electronic Commerce dated April 13th, 2009.  This

8 one is Bates stamped WF000033 through WF000068.

9    Is that there the report that you

10 just described that was published in the State Tax

11 Notes in May 2009?

12    A    It certainly looks to be, yes.

13    Q    And is that the report that has

14 formed the basis of your report in this case,

15 Exhibit 95?

16    A    Yes.

17    Q    In preparing Exhibit 95, did you,

18 in essence, extract data specific to Colorado from

19 your 2009 report?

20    A    Yes, plus describe a general

21 methodology.

22    Q    In preparing Exhibit 95, did you do

23 anything to update your work from 2009?

24    A    No.  Well, let me -- let me make an

25 exception to that.  I did, however, go back and

1    compare estimates that were included in the 2009

2    report with data that are currently available from

3    the U.S. Department of Census.   I do remember adding

4    that.

5            Q        Okay.   Other than that update with

6    regard to a comparison to census data or data

7    available from the U.S. Census Bureau, anything else

8    to update it?

9            A        I don't think.   And then the data

10   for Colorado that are used in my current report did

11   come, for Colorado, did come from this 2009 report.

12           Q        How many hours did you spend

13   preparing Exhibit 95?

14           A        Well --

15           Q        The report in this case.

16           A        Yeah.   What I have spent is 15

17   hours on the case in total.   That includes preparing

18   the report, gathering documents for you and for the

19   Attorney General's Office, you know, getting my

20   resume prepared and so forth.

21           Q        Okay.   Are you able to isolate from

22   the 15 hours how much time was spent preparing the

23   actual report?

24           A        I didn't keep my time in that

25   fashion.

1          A          No.

2          Q          Can you tell me what you discussed?

3          A          I would describe it as general

4    advice for me in terms of the deposition, things

5    like make sure to answer the questions that you ask,

6    that sort of general advice.  I don't remember

7    any -- any noticeable conversation about the

8    substance of the report itself.

9          Q          Okay.  Did you talk about any other

10   issues not contained in your report that -- related

11   to sales and use tax?

12         A          You know, let me admit that I'm a

13   person who doesn't remember telephone conversations

14   all that well, and we did have conversations, I'm

15   not sure I'll be able to give you any specifics, it

16   wasn't that long of an overall telephone call, but

17   about some other kinds of questions that might be

18   posed.

19                    But, you know, just that, just a

20   couple of examples of the kinds of questions that

21   might be posed.

22         Q          What other kinds of questions did

23   you talk about?

24         A          That's what I'm trying to remember

25   and -- you know, one issue I remember us talking

```
 1    about was, you know, the best approach to dealing

 2    with states' difficulties in collecting sales and

 3    use taxes on remote commerce.  That's actually

 4    literally the only example that occurs to me.

 5            Q        What do you mean by dealing with

 6    states difficulties in collecting remote -- taxes on

 7    remote sales?

 8            A        My view is that states and local

 9    governments need to be able to effectively

10    administer the sales and use tax on all sales to

11    their residents and businesses, and the Colorado

12    statute is one approach to -- to dealing with that

13    issue.

14            Q        Come back to that in a moment.

15                     Did you communicate about any other

16    subjects that you can remember?

17            A        Nothing else that I remember.

18            Q        Did you communicate by e-mail in

19    preparation for this deposition?

20            A        No.

21            Q        How much time did you spend

22    preparing in total?

23            A        For the deposition itself?

24            Q        Yes, for the deposition.

25            A        About two hours including reading
```

1   business that did not market to Colorado, for

2   example, or a particular state; in other words,

3   there's no reason not to market to a state, per se?

4          A       It just would depend --

5                  MS. SNYDER:  Objection to the form.

6          Q       You can go ahead.

7          A       It would depend on what they're

8   selling, I think, as to whether or not Colorado

9   would be a target for a particular thing or not.

10         Q       But an internet seller, and you've

11  analyzed e-commerce, correct?

12         A       Yes.

13         Q       So you're actually talking about

14  internet sellers.  Internet sellers, their websites

15  are available essentially indiscriminately over the

16  United States to those who have access to the

17  internet?

18         A       Yes.

19         Q       For purposes of allocating income

20  or allocating sales, rather, for your report, you

21  have allocated the e-commerce sales based, as I

22  understand it, on -- well, tell me and I'll see if I

23  can find it in the report.  Based on their share of

24  total state and local tax revenues?

25         A       That's correct.

```
 1          Q          And this allocated about
 2   1.7 percent of the national e-commerce sales in each
 3   category to Colorado, is that correct?
 4          A          Yes, that is correct.
 5          Q          So if we were using that measure,
 6   1.7 percent, we could take a firm's national sales
 7   and we could apply 1.7 percent to get an estimate of
 8   its Colorado sales?
 9          A          Well, let me re-emphasize, that
10   we're in no way trying to apply this to individual
11   firms --
12          Q          Correct.
13          A          -- so what one can do in an
14   aggregate sense and is meaningful is very different
15   from what makes sense to apply to a particular
16   business.  That's the part that I am being hesitant
17   about here.
18          Q          Okay.  But over the run of
19   businesses in the United States, you've done this to
20   apply it to sales of e-commerce nationally --
21          A          Yes.
22          Q          -- and you've used that percentage
23   to -- that 1.7 percent against national e-commerce
24   sales?
25          A          That's correct.
```

1      Q        So over the run of businesses

2   dealing in e-commerce, you've viewed it as being a

3   reasonable measure to apply about 1.7 percent of

4   those sales to Colorado?

5      A        We do.

6      Q        Page 2 of your report, Exhibit 95,

7   under the heading Estimated Sales and Use Tax Losses

8   for Colorado, you provide certain estimates, is that

9   correct?

10     A        Yes.

11     Q        And to be more specific, why don't

12   you tell me what those estimates are listed there in

13   the first line of that section?

14     A        The estimates are the dollar amount

15   that we believe will go uncollected in Colorado in

16   2010, 2011, and 2012 because of the state's

17   inability to fully collect the sales and use taxes

18   due on e-commerce sales.

19     Q        Okay.  And what you're measuring

20   there is the loss on all e-commerce sales delivered

21   into Colorado?

22     A        That's correct.

23     Q        And I think as you note on the same

24   page in the prior paragraph, these are almost

25   exclusively use taxes, not sales taxes?

```
1            A           Yes.

2            Q           When you say almost exclusively,

3    what percentage are we talking about?

4            A           Yeah, I mean it's very high.  It's

5    hard for me to come up with examples when it would

6    not have been a use tax situation that's involved,

7    but I'm not saying it's impossible, it's just -- all

8    the examples that I think of would be use tax.

9            Q           Now, if you look at your April 2009

10   report, Exhibit 96, Page 4 of that report --

11           A           Okay.

12           Q           -- talking about national findings,

13   you indicate there at the top of Page 4, and tell me

14   if I read these right:

15                       "These losses are equal to what

16           states would collect if they could achieve

17           100 percent compliance on the sales and use

18           taxes due on e-commerce sales, and arise

19           because states are unable to enforce

20           collection, particularly because of

21           limitations such as those imposed by Quill

22           v. North Dakota."

23                       Did I read that right?

24           A           You did.

25           Q           And is that same statement
```

1    applicable to the estimates you have here in Exhibit

2    95 with regard to Colorado?

3            A        Yes.

4            Q        So these are amounts that could be

5    collected if Quill v. North Dakota were overturned

6    by the Supreme Court or by federal legislation

7    enacted by Congress, is that correct?

8            A        And if there was 100 percent

9    compliance.

10           Q        So Quill would need to be

11   overturned by the legislation or by the Supreme

12   Court, 100 percent compliance.  Is it also true

13   that, I think you note in your 2009 report that it

14   presumes there's no small seller exception?

15           A        That is true.

16           Q        Okay.

17           A        If it were federal legislation, it

18   would depend on the characteristics of that

19   particular federal legislation.

20           Q        And, in fact, isn't it true that

21   your longer report from 2009 has been cited by

22   advocates of federal legislation seeking to overturn

23   Quill as a -- in support of their efforts to

24   convince Congress to enact such legislation?

25           A        At least they've used the numbers

1       Q      So you have year by year and then

2  the far right column is an average of those years.

3         Do you see that with regard to

4  both, assuming a small business exception and then

5  assuming there is no small business exception, that

6  Eisenach and Litan conclude that the average

7  uncollected use tax on e-commerce is something less

8  than half of your estimate?

9       A      I do see that.

10       Q      Now, are you aware that there are

11  others besides Eisenach and Litan, who have also

12  opined that your estimates might be too high?

13       A      I am.

14       Q      We'll mark as the next document

15  this Exhibit 98, which I have handed you and,

16  Melanie, I'll read it carefully for you, it's a

17  document entitled "Setting The Record Straight:  The

18  Modest Effect of E-commerce on State and Local Sales

19  Tax Collections," prepared by Peter A. Johnson,

20  Ph.D., and this dated July 31, 2008.

21        (Exhibit No. 98 marked)

22       Q      Now, among the folks who have

23  offered counter-estimates is, in fact, the Direct

24  Marketing Association, is that correct?

25       A      That was my understanding, right.

1    But I was not familiar with this report.

2              Q       Okay.  Professor Johnson is, as

3    identified here, is a senior economist with the

4    Direct Marketing Association.

5              A       Okay.

6              Q       Were you aware that Professor

7    Johnson had prepared a report?

8              A       I was not.  I was aware that Direct

9    Marketing Association, in my memory, had done one

10   some years before, I was not aware of this study.

11             Q       Okay.  Several years before in

12   connection with federal legislation that had been

13   pending before Congress at the time?

14             A       Well, back in the early 2000's when

15   our first report was put out, my remembrance is that

16   the Direct Marketing Association had a response at

17   that time.

18             Q       Okay.  And if you look at this

19   document, Exhibit 98, turn to Page 8, if you would,

20   and you'll see that on Page 8 there is a Table 5

21   that is entitled "Total Unremitted Tax on E-commerce

22   Sales in Billions," and it gives a listing by year

23   for 2005 through 2008.  Do you see that?

24             A       I do.

25             Q       And the total uncollected tax

1    identified in Professor Johnson's report for 2008 is

2    estimated to be 5.4 billion?

3        A      Yes.

4        Q      And in your report, Exhibit 96, at

5    Page 7, so your 2009 report, which is Exhibit 96, if

6    you turn to Page 7?

7        A      Yeah.

8        Q      Your estimate for 2008 with

9    baseline as opposed to optimistic was 7,726,000,000?

10       A      That's correct.

11       Q      So --

12       A      I'm sorry, seven billion, seven

13   hundred --

14       Q      Twenty-six?

15       A      Sorry, sorry, you're right, you're

16   right.

17       Q      So Johnson's estimate is about

18   30 percent less than your estimate for 2008?

19       A      That sounds about right, yes.

20       Q      With regard to your report, Exhibit

21   95, you've relied on various sources of information

22   cited in your report to support your conclusions

23   regarding the level of uncollected sales and use tax

24   in Colorado as set forth in the report?

25       A      That's correct.

1        Q        And those sources, many of them are
2   cited also in the 2009 report regarding the
3   nationwide picture?
4        A        Yes.
5        Q        Among those is a compliance stated
6   by the Washington Department of Revenue?
7        A        That's correct.
8        Q        Do you recall that?
9        A        Yes.
10        Q        And so, for example, I think it's
11   cited in two places, at least it's identified in
12   Footnote 3, I believe, first, on Page 3, and then
13   again in Footnote 12 on Page 5.
14        A        Yes.
15        Q        And for what principle or point did
16   you rely upon the Washington Department of Revenue
17   study?
18        A        One aspect of the study is -- of
19   our study, is to be able to anticipate what level of
20   compliance is anticipated both with use tax by
21   vendors when they comply and by use tax when
22   individuals or businesses comply.  The Washington
23   study provides estimates of that.
24        Q        The Washington study is a business
25   compliance, yes?

1          A          Yes.

2          Q          So it's a B to B sales -- and it's

3     use tax compliance as well as sales tax compliance?

4          A          In fact, all taxes.

5          Q          Okay, by Washington businesses.

6                     So -- and the report that you

7     relied upon indicates it was from 2008?

8          A          That's correct.

9          Q          Okay.  So looking at your report at

10    Page 3, I believe you indicate that there is

11    approximately 25 percent noncompliance with

12    e-commerce sales for use tax, is that -- do I have

13    that right?

14                     What is the level of, based on the

15    Washington report, the level of noncompliance with

16    use tax for businesses?

17         A          Right.  I want to be clear, the

18    numbers in this paragraph that you're referring to

19    on Page 3 did not derive directly and solely from

20    the Washington study.  We do use the 75 percent

21    compliance rate, I'm being approximate now, from the

22    Washington study in our calculations.

23                     It just so happens that it's also

24    true that when you work through all of our

25    calculations, you end out with about 75 percent

1   compliance overall with e-commerce and that's what's

2   being reported in the paragraph that you're

3   referring to.

4           Q        So when you say overall compliance,

5   it's by businesses with regard to reporting use tax

6   on e-commerce?

7           A        And by individuals.  And so what we

8   have is both.  What's going on in our calculations

9   here is, first of all, allowing for the possibility

10  that there is sales tax compliance by firms that

11  either have nexus or agree to voluntarily comply

12  with the tax.  And then -- and then a second level

13  is for those transactions where vendor compliance

14  did not take place, we then allow for use tax

15  compliance.  And so we're doing that at both levels

16  for both B to B and B to C transactions.

17          Q        Okay.  And that's what you're

18  saying is in the paragraph on Page 3 that we're

19  looking at?

20          A        That's right, is an aggregate of

21  all of our analysis that's in that paragraph.

22          Q        But if I want to focus for a moment

23  on the use tax compliance by businesses --

24          A        Yes.

25          Q        -- is that a -- is that number

1     derived from the Washington study?

2          A          Yes, it's taken from the Washington

3     study.

4          Q          Okay.   And there's -- with regard

5     to business compliance with regard to sales tax, it

6     appears that you indicate that it's about a

7     1.7 percent noncompliance rate by businesses in the

8     Washington study with regard to sales tax?

9          A          That's correct.

10          Q          And just to be clear, those are

11    businesses registered in the state of Washington?

12          A          That's correct.   The Washington

13    study, in fact, underestimates noncompliance because

14    it only includes registered vendors.

15          Q          Obviously, the problem that you

16    have attempted to describe in your report, if the

17    1.7 percent were the national compliance rate on

18    sales taxes, it wouldn't be nearly the same issue.

19                     I mean, in other words, the

20    1.7 percent, that would indicate 98.3 percent by all

21    firms nationwide and that's not what we're talking

22    about here, this is Washington registered

23    businesses?

24          A          Right.

25                     MS. SNYDER:   Objection to the form.

1    MR. SCHAEFER:   Fair enough.

2    Q      Go ahead if you understood it.

3    A      I mean, this does refer

4    specifically -- the 1.7 percent refers specifically

5    to compliance in the state of Washington by

6    registered vendors.  It does not include

7    nonregistered vendors that might, in fact, have

8    nexus under current constitutional rulings in the

9    state, but aren't choosing to comply with the law.

10   Q      Right.

11   A      And I can give you a variety of

12   examples of why that and how that might be

13   happening.  And so we view both the sales and use

14   tax estimates as lower bounds of what the reality is

15   in the state of Washington.

16   Q      At the risk of getting way too

17   sales and use tax wonky, the -- in fact, the firm

18   that may have nexus, but isn't registered, their

19   liability may actually be for use tax and, in fact,

20   it may be a use tax they should be collecting

21   because they may not be --

22   A      It could be, but it doesn't need to

23   be.  You could envision a situation along the

24   Washington border where you have Oregon with no

25   sales tax and Washington with a sales tax, and you

1 could envision a situation, in fact, accountants

2 tell me this absolutely happens with great degree of

3 regularity where firms driving from Oregon into

4 Washington, thereby almost surely establishing

5 nexus, engaging in selling their product, driving

6 back to Oregon and delivering it by common carrier

7 from Washington -- from Oregon and saying we have no

8 sales tax liability and not registering, that's a

9 use tax problems.  Sorry, sorry, that's a sales tax

10 problem.

11     They're in Washington, they have

12 physical presence in Washington, it's a transaction

13 in Washington, might even be drop-shipped into

14 Washington, and so you know it could be either one,

15 just depends on the specifics of the situation.

16   Q  That did get too sales and use tax

17 wonky.

18     You applied the rates, though, the

19 Washington rates with regard to -- of compliance

20 rates from the Washington DOR study with regard to

21 the estimates for Colorado?

22   A  That's correct.

23   Q  Now, it's true, is it not, that use

24 tax compliance rates, in fact, vary state to state?

25   A  They will.

1      Q        Is there a reason that you've used

2  the Washington study?

3      A        Yes, because Washington -- and let

4  me note here, there have been a series of these

5  Washington studies.  We relied on the most recent

6  one for this particular analysis, but we have relied

7  on earlier ones for other estimates that we did.

8                 And the results in them are very

9  consistent, very, very little deviation in terms of

10  their compliance rates.  And so it's a consistent

11  set of studies from the state of Washington.

12      Q        Okay.

13      A        And to our knowledge, they are the

14  best estimates of sales and use tax compliance that

15  are available for U.S. states.

16      Q        Okay.  When you said they are

17  consistent, you meant within Washington study to

18  Washington study, they are consistent?

19      A        I did mean that, yes.

20      Q        If the Colorado experience differ

21  in some respects in terms of compliance, that would

22  change your estimates.  If you had correct

23  information for Colorado, if it were available, as

24  you say, it would change the estimates with regard

25  to Colorado?

```
 1          A          It could either decrease or
 2   increase the revenue implications for Colorado.
 3          Q          But you think the Washington study
 4   is a reliable one and a good basis for estimating
 5   compliance in other states, including Colorado?
 6          A          Yes.
 7          Q          Now, you mentioned they have data,
 8   are you aware that the Washington DOR, in fact,
 9   updated its study in August of 2010?
10          A          I have not gone out and looked at
11   it.
12          Q          Okay.
13          A          Thank you for letting me know.
14          Q          Your report, of course, continues
15   to rely on the 2008 study?
16          A          Well, because we didn't redo the
17   report, yes.
18          Q          I'm going to mark a copy of that
19   2010 Washington DOR compliance study as the next
20   exhibit, I think as Exhibit 99.
21                     (Exhibit No. 99 marked)
22          Q          So handing you a copy of Exhibit
23   99, which is a document entitled Department of
24   Revenue Compliance Study, it's on State of
25   Washington Department of Revenue letterhead,
```

1    indicates that it was prepared -- dated August 20th

2    of 2010.

3                        Does this look similar in format to

4    the other studies from Washington that you recall?

5            A        It does.

6            Q        And if you look at Page 2, there's

7    a chart on Page 2, which in fact compares the 2008

8    compliance study that you've relied upon to the 2010

9    compliance study.  Do you see that?

10           A        I do.

11           Q        So looking at first a use tax, it

12   indicates that the rate of noncompliance for 2010 is

13   estimated to be 23 percent as opposed to the

14   25.5 percent from 2008?

15           A        Yes, that's correct.

16           Q        Okay.  Now, if you use this new

17   rate, this new 23 percent rate instead of 25.5, that

18   would reduce somewhat your estimates of uncollected

19   tax, would it not?

20           A        If I were going to redo the study,

21   I would of course redo all of the numbers, I

22   wouldn't just pick one number and make a change.  I

23   would use -- if I were to redo my 2009 study, I

24   would use this 23 percent use tax compliance, but I

25   also would make a lot of other changes, including

1    the fact that our estimates of e-commerce are much

2    lower than the reality that we've seen in the

3    meantime.

4         Q        I'm trying to isolate the effect of

5    this change, that this particular updated report

6    would indicate that there is a lower level of

7    noncompliance, at least according to the Washington

8    Department of Revenue, than you had estimated for

9    your 2009 report?

10        A        Than what we used in the earlier

11   report, that's correct.

12        Q        And than used in your Exhibit 95,

13   your report in this case?

14        A        That's correct.

15        Q        And in looking at the sales tax

16   line immediately above it, that indicates that

17   noncompliance with the sales tax, again by

18   Washington registered businesses, is now one percent

19   estimated for 2010 as compared to the 1.7 percent

20   estimated for 2008?

21        A        That's correct.

22        Q        And so similarly, just isolating

23   that effect, that would have the effect of reducing

24   estimated levels of uncollected or unreported tax

25   all other things being equal?

```
 1         A        All other things being equal, but
 2    they are not equal, I have to re-emphasize.
 3         Q        So in terms of just that effect,
 4    the effect of that change, of that indication that
 5    there is a somewhat higher compliance rate, lower
 6    noncompliance rate for the sales tax with regard to
 7    registered businesses, that would tend to reduce the
 8    estimates of uncollected tax.
 9         A        Holding everything else equal,
10    that's not equal, that's correct.
11         Q        In your report, Exhibit 95, you
12    also relied upon a University of Maryland study,
13    which I believe is cited in Footnote 11 --
14         A        Yes.
15         Q        -- Page 5.
16         A        Yes.
17         Q        And this is a study from a group of
18    academics at the University of Maryland, is that
19    correct?
20         A        Yes.
21         Q        So I'm going to mark a copy of
22    that, which is among the documents that you produced
23    or that the Attorney General's Office produced in
24    connection with your report, and mark that as
25    Exhibit 100.
```

1            (Exhibit No. 100 marked)

2        Q        So I'm handing you Exhibit 100,

3   which is a document Bates stamped -- and when I say

4   Bates stamped, Professor Fox, maybe you're familiar

5   with it from other cases, maybe you're not, the

6   Bates numbers is the lower right-hand number that

7   attorneys in litigation assign so that they can keep

8   track of documents by a more simplified numbering

9   system rather than having to do something else, so

10  we know what we're looking at.  This one's Bates

11  stamped WF000177 through WF000184.  And the document

12  is entitled "The Tail is Longer Than You Think:  The

13  Surprisingly Large Extent of Online Sales by Small

14  Volume Sellers."

15              The authors are Joe Bailey,

16  B-A-I-L-E-Y, and a series of other individuals

17  identified as being associated with the Robert H.

18  Smith School of Business at the University of

19  Maryland, and the report is dated May 12, 2008,

20  marked draft.

21              Is this the document that you cite

22  in your report, Exhibit 95?

23        A        It is.

24        Q        Now, you state on Page 5 of your

25  report, Exhibit 95, our survey -- excuse me, strike

1    that.

2                      Looking at the sentence to which

3    the Footnote 11 is attached:  "Vendor compliance

4    relies on a survey of large internet vendors and the

5    Maryland Long Tail Study."

6            A        Yes.

7            Q        This document, Exhibit 100, is the

8    Maryland Long Tail Study?

9            A        That's correct.

10           Q        To make sure that I'm not missing

11   something, can you show me where in Exhibit 100, the

12   Maryland Long Tail Study, the authors of that study

13   analyze vendor compliance with sales and use tax?

14           A        Well, they don't.

15           Q        Oh, okay.

16           A        I think that wasn't exactly what it

17   said.  It said that our vendor compliance relies

18   upon that study, but we don't use compliance numbers

19   from that study.

20           Q        Okay, so you're not relying on the

21   study for rates of compliance?

22           A        That's right.

23           Q        What are you relying upon the

24   Maryland Long Tail Study for?

25           A        For a distribution of the size of

1    e-commerce vendors.

2         Q       So, help me out with what you mean

3    by the distribution of the size of e-commerce

4    vendors?

5         A       There are a relatively small number

6    of large, as measured by volume, e-commerce vendors.

7         Q       Volume of sales?

8         A       Volume of sales.  There are a huge

9    number of small vendors as measured by volume of

10   sales, and that is -- that information is drawn from

11   this report.

12        Q       Okay.  I believe that you also cite

13   the Long Tail Study in your 2009 report, Exhibit 96.

14        A       I'm sure we do.

15        Q       And if you'll get that document,

16   I'll find the reference I'm looking for.  Marked as

17   an exhibit, the one that has some highlighting in

18   it, which is fine with me.

19        A       Page 5, is that what you're looking

20   for?

21        Q       It could be.

22        A       Second paragraph.

23        Q       Thank you.

24                So in the second paragraph on Page

25   20 of Exhibit 96, there is a similar statement you

1    make:   "The vendor tax compliance was informed using

2    the results from the Maryland Long Tail Study."

3                    And then it goes on to say:

4                    "The study evidences that

5                37 percent of e-commerce is conducted by

6                large vendors, 20 percent by medium size

7                vendors that generally maintain their own

8                website and have annual gross receipts

9                between $1 million and $10 million, and

10               43 percent by vendors that operate on a

11               platform other than their own and have sales

12               under $1 million."

13                   Did I read that right?

14       A       Yes.

15       Q       And is that the principle on which

16   you -- for which you rely on the Maryland Long Tail

17   Study?

18       A       Yes.

19       Q       So, in other words, you're using it

20   to determine relative amounts of electronic commerce

21   conducted within those three segments of businesses?

22       A       Yes.  I mean, that is -- we do use

23   the information the way you just described it, yes.

24       Q       So the three groups are over ten

25   million in annual sales, gross receipts or sales

```
 1    between one and ten million, and gross receipts

 2    under one million?

 3          A        Yes.

 4          Q        Okay.  Now, the study is marked

 5    draft, but do you consider the study, the Maryland

 6    Long Tail Study, to be a reliable -- to be reliable

 7    in its estimate of the amount of e-commerce sales in

 8    each of those groups that I just listed?

 9          A        Well, you know, at the time I read

10    it, the methodology seemed reasonable and was done

11    by people, who had, you know, worked a lot on

12    internet-based issues and so we did accept that as a

13    reasonable estimate, yes.

14          Q        Okay.  And you relied on it in your

15    report that's marked as Exhibit 95 in this case?

16          A        Yes.

17          Q        So you continue to think it's

18    reasonable, at least as of preparing that report?

19          A        Yes.

20          Q        And I assume as you're sitting here

21    now?

22          A        Yes.

23          Q        And what the Maryland Long Tail

24    Study shows is there is a significant amount of

25    electronic commerce that is conducted by firms with
```

1    sales under $1,000,000?

2            A        Yes.

3            Q        By your calculation from the study,

4    43 percent, in fact, of e-commerce is conducted by

5    firms with sales under one million?

6            A        From their calculations, yes.

7            Q        From the Maryland Long Tail Study.

8            A        Yes.

9            Q        Now -- and you've used that number

10   yourself, that estimate of 43 percent of below one

11   million in preparing your 2009 report and in

12   connection with your report in this case?

13           A        That's correct.

14           Q        Now, on Page 20 of your report from

15   2009, you also indicate at the end of that same

16   paragraph that you assume that small vendors only

17   comply part of the time, even within their home

18   states, you assume a one percent compliance?

19           A        Yes.

20           Q        So in addition to there being a

21   fairly high volume of sales among that segment under

22   one million, total e-commerce sales being something

23   like 43 percent of all e-commerce sales made by

24   firms under a million, those same firms also exhibit

25   low compliance?

1          A          That's correct.

2          Q          Now, so am I correct then, given
3   the high volume of sales among sellers under a
4   million in the aggregate, and their low levels of
5   compliance, that exempting small sellers from the
6   obligation to report sales and use tax will
7   significantly reduce the estimates of uncollected
8   tax that can be obtained?

9          A          Well, it doesn't reduce the
10  estimates.  It does, however, if you had a small
11  seller's exception, which said they don't have to
12  comply and they don't have to pay tax, then you'll
13  reduce what you get from a more -- a broader
14  requirement to collect the tax.

15         Q          Okay, that's better stated.

16                    So, were you to institute, either
17  an overturning of Quill or some other program that
18  would require the collection of sales and use tax on
19  e-commerce sales by businesses regardless of their
20  nexus, but except from that, those small sellers, it
21  would reduce --

22                    MS. SNYDER:  Object to the form.
23         And, Matt, you're starting to cut out toward
24         the end.

25                    MR. SCHAEFER:  Okay, I think the

1       reason it sounds like I cut out is because

2       I'm trying to form the question.  So -- in

3       fact, I hadn't finished my question.

4                MS. SNYDER:  Okay, I apologize.  It

5       just got very quiet and I could hear a

6       little bit of noise, I couldn't tell if you

7       were still talking or not.

8                MR. SCHAEFER:  Yeah.  I think what

9       you are probably hearing is the typing or

10      fan noise or something, but let me try

11      again.

12  BY MR. SCHAEFER:

13          Q       Dr. Fox, I think you clarified to

14  say essentially that you will -- were you to

15  institute a program requiring the collection of

16  sales and use tax on e-commerce sales, however that

17  might occur, through an overturning of Quill or

18  otherwise, but except from that requirement, small

19  sellers, under a million dollars, it would reduce

20  significantly the amount of additional tax you could

21  collect?

22          A       Based on the numbers I've seen,

23  yes, it would.

24          Q       And I think you indicate that

25  elsewhere in your 2009 study, perhaps in a slightly

1    different context, but if you look at Pages 13 and

2    14, you have a section in your 2009 study about

3    small seller exceptions or de minimis exceptions.

4              At the bottom of Page 13 you say,

5    for example, the last paragraph in the middle of

6    Page 13:

7                   "This means, for example, that the

8              price tag for a $1 million small vendor

9              exception is 30 percent as large as our

10             estimate of losses in 2012."

11                  Did I read that correctly?

12        A         You did.

13        Q         Okay.  Now, why, if sellers under a

14   million dollars account for 43 percent of all

15   e-commerce sales and have a very low compliance

16   rate, do you estimate a small seller exception set

17   at a million dollars will result in only a

18   30 percent reduction in uncollected tax?

19             A         Well, remember in every case here,

20   we have two levels of compliance that are going on.

21   The first level is compliance by the vendor, and the

22   discussion that we've been having about these small

23   firms refers only to small vendor compliance.

24                  Then there's this second level of

25   compliance, which is compliance by the buyer.  And

```
 1    in the case of businesses, we're using about
 2    75 percent compliance.  So our calculations are a
 3    complicated function of what happens at that first
 4    stage, does the vendor collect it, and then for
 5    those sales which the vendor doesn't collect, what
 6    kind of compliance do we get by the buyer.  Both
 7    steps are going into the calculation and that's why
 8    it's not this simple arithmetic that you're looking
 9    for here.
10              Plus, we actually assume a higher
11    share of vendor compliance for B to B sales than we
12    do for B to C sales.  In the part that you're
13    referring to from later in my text there on, like
14    around Page 20, is mostly referring to B to C sales.
15         Q      So the 43 percent estimate is all
16    sales -- 43 percent of all e-commerce at that level
17    of under a million dollars for the amount of
18    sales -- strike that.
19              The 43 percent of e-commerce, total
20    e-commerce sales represented by sales of firms
21    having sales less than a million is both B to B and
22    B to C?
23         A      Yeah, that's my understanding from
24    their study.
25              Q      Now, on the top of Page 14, you
```

1  provide a table showing the small vendor exception

2  at different levels of sales for the small vendor?

3         A        That's correct.

4         Q        And your levels of sales are below

5  500,000, below 1,000,000 and below 5,000,000?

6         A        That's correct.

7         Q        And you have calculated the impact

8  on taxes that are available to be collected based on

9  each of those thresholds of small seller exception?

10        A        That's right.

11        Q        And at a $5 million small vendor

12 exception causes, not surprisingly, an even larger

13 reduction in your estimate of uncollected tax,

14 correct?

15        A        That's correct.

16        Q        And the percentage, instead of the

17 30 percent you mentioned on the prior page, is

18 something more like 36.85 percent?

19        A        It looks like you've calculated

20 that on the copy I'm looking at, so I'll accept that

21 as correct.

22        Q        And just so you'll know, what I've

23 done for 2010 was to take your number from your

24 chart, the Table 8 on Page 14, of 3,177,000,000 and

25 divide it by your estimate from Page 7, baseline

1    estimate from Page 7 of total estimated state and

2    local revenue loss.

3         A        Yes.

4         Q        And so I did the math correctly

5    there?

6         A        It looks like you did.

7         Q        I picked the right numbers?

8         A        Yes, I think so.

9         Q        The correct numbers for 2010.

10                 So the impact of that $5 million

11   small vendor exception would be about a

12   36.85 percent reduction in available uncollected

13   tax?

14        A        It would be large.

15        Q        You don't have an issue with my

16   math.

17        A        It looks correct.  I didn't check

18   it, but it looked like you got the right numbers.

19        Q        Now, would a small seller exception

20   that was set even higher than five million, say at

21   six million, reduce your estimates of uncollected

22   tax available to the states even more?

23        A        Let me re-emphasize, it's not

24   changing our estimates of uncollected tax, it's

25   changing the estimate of what you might expect to

1    collect if you required remote vendors of a

2    particular size to collect at the vendor level.

3         Q        Yes.  But if we except those

4    sellers from the obligation to collect, in effect,

5    the tax -- well, fair enough.  It would reduce

6    further, if we raised the small seller exception

7    above five million, it would reduce further the tax

8    available to be collected by the states?

9         A        The tax that we would expect states

10   to actually be able to collect.

11        Q        Okay.

12        A        Not the amount that is owed.

13        Q        No.

14        A        That's unaffected by these kinds of

15   assumptions.

16        Q        Right, and I used available and

17   I'll accept your word of able to be collected,

18   that's fine.

19                 But you haven't estimated any

20   higher thresholds than five million for a small

21   seller exception?

22        A        We have not.

23        Q        Okay, you haven't estimated six

24   million?

25        A        No.

1       Q       Or 6.25 million?

2       A       Nothing higher than five million.

3   To my remembrance at least, I don't remember us

4   doing anything.   We reported only the numbers we

5   calculated as I remember.

6       Q       There's certainly nothing reported

7   in Exhibit 96 above five million.

8       A       And I did no work associated with

9   the small seller exception, per se, on the work for

10  Colorado.

11      Q       Now, are you familiar from your

12  work generally in the field with efforts by states

13  to improve use tax reporting and compliance by

14  consumers and businesses?

15      A       I think they're continuing

16  regularly to do that.   I'm not a person, who works

17  on administrative issues, per se, but that's

18  certainly my sense, that states are trying to do

19  that.

20      Q       Are you aware of those kinds of

21  efforts?

22      A       Well, I mean the one that I'm

23  obviously aware of is the efforts by states to

24  include a line on their income tax return, which

25  about 20 states do, that give people an opportunity

Case 1:10-cv-01546-REB-CBS   Document 69   Filed 12/17/10   USDC Colorado   Page 41 of 53

66


1   to report.   The numbers that I have seen over the

2   years suggest very little compliance with that.

3                   I think states are continuing to

4   try to improve their auditing techniques, which are

5   applied essentially only to businesses, but the odds

6   again remain very infrequent and of modest success

7   as best I can see.

8           Q       So you've identified inclusion of a

9   use tax line on the individual tax return and audit.

10  Are there any other efforts that you're aware of by

11  states to improve use tax compliance and reporting

12  by consumers?

13          A       Those are the ones that occur to me

14  off the top of my head.

15          Q       Have you worked with any states or

16  state departments of revenue in developing consumer

17  compliance initiatives for the use tax?

18          A       No.

19          Q       And are you aware of any other

20  initiatives with regard to business compliance with

21  the use tax that states or state departments of

22  revenue have undertaken?

23          A       Nothing occurs to me.

24          Q       And have you advised any states

25  with regard to such initiatives for business tax for

1   to report.   The numbers that I have seen over the

2   years suggest very little compliance with that.

3                   I think states are continuing to

4   try to improve their auditing techniques, which are

5   applied essentially only to businesses, but the odds

6   again remain very infrequent and of modest success

7   as best I can see.

8           Q       So you've identified inclusion of a

9   use tax line on the individual tax return and audit.

10  Are there any other efforts that you're aware of by

11  states to improve use tax compliance and reporting

12  by consumers?

13          A       Those are the ones that occur to me

14  off the top of my head.

15          Q       Have you worked with any states or

16  state departments of revenue in developing consumer

17  compliance initiatives for the use tax?

18          A       No.

19          Q       And are you aware of any other

20  initiatives with regard to business compliance with

21  the use tax that states or state departments of

22  revenue have undertaken?

23          A       Nothing occurs to me.

24          Q       And have you advised any states

25  with regard to such initiatives for business tax for

```
 1    use tax compliance by businesses?

 2          A       No.

 3          Q       Now, you mentioned the use tax line

 4    on the income tax return as one of those measures.

 5    And you estimated about 20 states have such a line?

 6          A       There was a study at one point that

 7    was available on the FTA website.  My remembrance,

 8    though this might be incorrect, is that it was

 9    written by a person from the Minnesota Department of

10    Revenue research staff and it had a listing of such

11    states.  And my remembrance at the time was that

12    there were over 20 on that list.

13          Q       Do you know if Colorado is one of

14    those states?

15          A       I think Colorado is not one of

16    those states.

17          Q       Is not.

18                  I'm going to mark as the next

19    exhibit, which is Exhibit 101, a document entitled

20    "Use Tax Collection on Income Tax Returns in Other

21    States" from the Research Department of the

22    Minnesota House of Representatives.  This one is --

23    was updated June 2010.

24                  Is this the Minnesota report you

25    just referred to?
```

1          (Exhibit No. 101 marked)

2          A          Except I'm talking about an earlier

3    draft.  This is one that I saw several years ago,

4    and so thank you for alerting me that this more

5    recent report is available now.

6          Q          So, in fact, it was updated in

7    2010.  Does it appear to be in the same sort of

8    format as you're aware of?

9          A          I think so.  Generally it looks

10   like what I have seen.

11         Q          Earlier you mentioned that you

12   advised the legislature in Minnesota on sales and

13   use tax compliance efforts.  Did you have any role

14   in the development of this report?

15         A          Well, let me be a little more

16   precise about what I did.  I testified on tax policy

17   issues in Minnesota, not tax administration issues,

18   which is generally what -- where my expertise lies.

19   And so I have not played any role whatsoever in this

20   report.  I was just familiar with an earlier draft

21   of it.

22         Q          Okay.  And just to clarify the

23   number you mentioned earlier, you believed it to be

24   about 20 states, if you look at Page 2 of this

25   report, the third full paragraph indicates that "23

1          Minnesota's exclusion of clothing from the

2          sales tax base."

3          Q          Do you see that, Dr. Fox?

4          A          I do, yes.

5          Q          Were you aware that Minnesota

6    exempted clothing from the sales tax?

7          A          I was.

8          Q          Do you know if Colorado exempts

9    clothing from the sale and use tax base?

10         A          I don't think so, but I don't know

11   that.

12         Q          If Colorado does not, would you

13   agree with me that it would potentially have

14   higher --

15         A          Well --

16         Q          -- revenues than Minnesota subject

17   to --

18         A          I'm sure there are many, many other

19   differences in their tax bases and so I wouldn't

20   just apply a Minnesota result to another state

21   without looking at the characteristics of that

22   state's tax structure and the breadth of its tax

23   base.

24         Q          But what the Minnesota House of

25   Representatives has done here is analyzed all the

1          MR. SCHAEFER:  She can read it

2     back.  He said it was an issue he hadn't

3     studied.

4          THE WITNESS:  And I couldn't offer

5     an opinion.

6          MS. SNYDER:  Okay.

7     BY MR. SCHAEFER:

8          Q     We've been talking about use tax

9     compliance by individuals.  With regard to use tax

10    compliance by businesses, I believe you indicated

11    that additional audit efforts was one area of

12    activity that states have engaged in to try and

13    increase use tax compliance by businesses, is that

14    right?

15         A     That's correct.

16         Q     Now, am I correct that the

17    overwhelming portion of e-commerce is business to

18    business sales?

19         A     Yes.

20         Q     About what percentage of e-commerce

21    is business to business sales?

22         A     It's over 90.  I think the most

23    recent number I had seen was 93 percent, recognizing

24    that we're approximate in the categorization here.

25         Q     Okay.  Now, am I also right that

1     businesses tend to -- transactions between

2     businesses tend to less often be subject to sales

3     and use tax?

4              A       Yes.

5              Q       And I think you've already

6     testified today that there tends to be a higher rate

7     of compliance for a use tax among businesses than

8     consumers?

9              A       That's correct.

10             Q       So those two factors, it seems to

11    me, but you correct me if I'm wrong, would tend to

12    reduce the relative share of unreported tax by

13    businesses below 93 percent?

14             A       Yes, that's true.

15             Q       Do you know about what portion of

16    unreported use tax is by businesses?

17             A       We don't report that in this study.

18    I believe in one of our earlier studies we had it

19    about 50/50 on a share basis, but we don't report

20    that in this study.

21             Q       So if we took your estimate for

22    Colorado from Exhibit 95, your report in this case,

23    for 2010, 130 million, is it your opinion that it's

24    about 65 million attributable to noncompliance by

25    businesses and about 65 million attributable to

1   noncompliance by consumers?

2          A          Again, we didn't report that here

3   and didn't separately calculate the business to

4   business versus business to consumer share, so I

5   can't offer an opinion on that.  But I sort of agree

6   that it's a much lower share than the 93 percent

7   that's business to business.

8          Q          When you say you didn't calculate,

9   you mean for the 2009 report you didn't do that?

10         A          That's correct.

11         Q          The prior versions of that 2009

12  study were -- you first developed it in 2000, is

13  that correct?

14         A          That's correct.

15         Q          Okay.  And then there was an update

16  in 2001?

17         A          Yes.

18         Q          And an update in 2004?

19         A          That's correct.

20         Q          Do you think it was in the 2004

21  report where you had a rough estimate of 50/50?

22         A          I did not go back and read any of

23  those reports either in preparation for the

24  deposition or for this report, and that's just -- in

25  my head, that's sort of what I remember, that's why

1    I just -- I'm not sure at all what that number was.

2                     But there have been big changes in

3    the relative distribution of e-commerce sales over

4    these years as well as we have better tuned

5    estimates on the tax ability in this latest report,

6    and that's why it's very hard to take a result from

7    an earlier study and apply it specifically to this

8    one.

9           Q        Okay.  Would it be possible to

10   calculate an estimate of the share attributable to

11   noncompliance by businesses from the data that are

12   available in the report?

13          A        No.

14          Q        Okay.  Just as an -- I want to make

15   sure what piece of information may be missing.  I

16   think you said, and I think the report says it's

17   about 93 percent of all e-commerce is business to

18   business?

19          A        Yes.

20          Q        And we have a number for total

21   e-commerce dollars, right?  So we could take the

22   total dollars and apply the 93 percent to that to

23   try and figure out dollars of e-commerce sales to

24   business; is that a fair statement?

25          A        It is, but the categorization

1    matters a lot here and, you know, we're using

2    Colorado's specific tax ability numbers, so the

3    averages don't apply to Colorado.  We would need to

4    go in, you know, to the 51 categories of sales we've

5    used in this study, see what's taxable in Colorado

6    and apply it.  You know, you can't use the aggregate

7    numbers even to get an average, much less for

8    Colorado because of the specific elements of

9    Colorado's tax structure that are included in this

10   analysis.

11          Q      Okay.  Is it fair to say that a

12   substantial portion of the $130 million Colorado

13   estimate for 2010 is attributable to sales between

14   businesses?

15          A      Yes.

16          Q      Okay.

17                 MS. SNYDER:  Matt, I didn't hear

18          your question and if there was an answer, I

19          didn't hear it.

20                 MR. SCHAEFER:  The question was --

21          rather than --

22        (Whereupon, question and answer read back)

23                 MS. SNYDER:  Thank you.

24   BY MR. SCHAEFER:

25          Q      So just to make sure, because that

1    sounds like I either misspoke or perhaps it was just

2    the read back, but is it fair to say that your

3    estimate of $130 million for Colorado for 2010, of

4    that 130 million a substantial portion is

5    attributable to noncompliance by businesses?

6           A        Yes.

7           Q        And you are aware that some states

8    have undertaken initiatives to try to improve the

9    compliance by businesses with the use tax?

10          A        Just generally aware of it, yes.

11          Q        Do you have any states in mind?

12          A        No.

13          Q        Okay.  Are you aware whether or not

14   California has undertaken any such initiative?

15          A        No.

16          Q        We'll mark as the next document,

17   Exhibit 106 --

18          A        Just to be clear on what I know and

19   don't know about this, Harley Duncan, who was the

20   former director of the Federation of Tax

21   Administrators, and I wrote a paper for one of the

22   Georgetown Law School symposiums five years ago,

23   four years ago, on issues associated with tax

24   collection.  In there, we did include some

25   information on various kinds of compliance

1          Q          Would you agree with me that your

2   estimates in your report, Exhibit 95, made differing

3   assumptions than are dictated by the requirements of

4   House Bill 10-1193 with regard to uncollected -- the

5   prospects for -- strike that question.

6                     Under the Colorado law, the

7   Colorado Department of Revenue has instituted a de

8   minimis seller exception, have they not?

9          A          Yes.

10         Q          Do your estimates in Exhibit 95,

11  your report, take into account a de minimis seller

12  exception?

13         A          No.

14         Q          Would you agree with me that how

15  much revenue Colorado realizes as a result of House

16  Bill 10-1193 and the regulations promulgated by the

17  Department of Revenue to implement it depend

18  directly upon the Department of Revenue's

19  enforcement practices with regard to the law?

20         A          We haven't done -- or I haven't

21  done any study of this particular piece of

22  legislation and what its implications are.

23         Q          Okay.  But how much revenue that

24  the department -- that Colorado could realize would

25  depend directly, would it not, on the Department of

1   Revenue's enforcement practices?

2        A      As a general statement, I would

3   agree with that.  Again, as applied to this

4   particular legislation, it's not something I've

5   studied.

6        Q      But, for example, you know that the

7   Bill itself does not require sales and use tax

8   reporting by firms located outside of Colorado; that

9   is House Bill 10-1193 does not require that

10   companies located outside of Colorado, without a

11   physical presence in the state, collect

12   Colorado's --

13         MS. SNYDER:  I'm sorry, Matt, I

14      couldn't hear your question.

15         MR. SCHAEFER:  Sure.

16        Q      Simply, Dr. Fox, you're aware, are

17   you not, that the law at issue in this case does not

18   require or even purport to require sellers located

19   outside of Colorado, having no physical presence in

20   the state, to collect Colorado sales and use tax?

21        A      Yes, I'm aware of that.

22         MS. SNYDER:  Excuse me, can I have

23      the question read back and the answer, I

24      really just couldn't hear either.

25     (Whereupon, question and answer read back)

```
 1   BY MR. SCHAEFER:

 2            Q          With regard to Colorado's sales and

 3   use tax system, are you aware that there are a

 4   number of home rule jurisdictions in Colorado that

 5   are not administered by the Colorado Department of

 6   Revenue?

 7            A          Yes, I'm generally aware of that.

 8            Q          And those home rule jurisdictions

 9   in Colorado administer their own sales and use tax,

10   local sales and use tax system?

11            A          I have never studied that, but

12   that's what I have been told, yes.  Outside of this

13   case in previous times I was told that.

14            Q          Your estimates for Colorado include

15   an estimate of tax collected by such home rule

16   jurisdictions, do they not?

17            A          They do.

18                       MR. SCHAEFER:  I'm going to take a

19            short break, I may be quite close to

20            finishing.

21                       THE WITNESS:  Okay.

22            (Recess from 12:21 p.m. to 12:26 p.m.)

23                       MR. SCHAEFER:  Dr. Fox, I'd like to

24            thank you for your time, I don't have any

25            further questions for you.
```