IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLORADO

|  |  |
|---|---|
| The Direct Marketing Association,  ) | |
| ) | |
| Plaintiff,  ) | Civil Action No: |
| ) | 10-CV 01546 |
| vs.  ) | REB-CBS |
| ) | |
| Roxy Huber, in her capacity as  ) | |
| Executive Director, Colorado  ) | |
| Department of Revenue,  ) | |
| ) | |
| Defendant.  ) | |

DEPOSITION OF DIETER GEORGE GABLE

Phoenix, Arizona

November 17, 2010

Prepared by:
Meri Coash, RMR, CRR
Realtime Reporter
(Copy)         Certified Reporter #50327

**Coash & Coash, Inc.   602-258-1440**

Dieter George Gable - November 17, 2010                    12

```
1    apologize for interrupting.
2              What is the business of Finance Law Center?
3        A.   HR sourcing.
4        Q.   Meaning that you place employees with --
5        A.   People.
6        Q.   -- with other companies?
7        A.   Yes.
8        Q.   You said "Law Center."  It there a particular
9    type of company for whom you place employees?
10       A.   For attorneys and in the area of experts for
11   mortgages, mortgage-related matters.
12       Q.   Okay.  The experts, though, they're intending to
13   be employed?
14       A.   Contract.
15       Q.   Contract.  Okay.
16       A.   HR placement.
17       Q.   I see.
18              So temp, sort of?
19       A.   Yes.
20       Q.   Okay.  All right.  Any other actively operating
21   LLCs?
22       A.   Next Step Advisors.
23       Q.   Okay.  LLC?
24       A.   Yes.
25       Q.   And where is Next Step Advisors located?
```

1      A.   Nevada.  Operations in Arizona.

2      Q.   All right.  When was it founded?

3      A.   2003.

4      Q.   You're currently a manager of that?

5      A.   Yes.

6      Q.   What is its business?

7      A.   That's how I run any consulting work for myself

8   primarily.

9      Q.   Have you engaged --  Does Next Step

10  Advisors, LLC, have any part in your engagement in this

11  case?

12     A.   No.

13     Q.   So what type of consulting, then, would you be

14  managing for yourself through Next Step Advisors?

15     A.   Example would be work I did for the Colorado

16  lottery.  Essentially work outside of the scope of what I

17  would do as TB Consulting.

18     Q.   Do you have partners in TB Consulting or other --

19     A.   In TB Consulting?

20     Q.   Yes.

21     A.   Yes.

22     Q.   Okay.  How many other folks are principals of --

23     A.   One.

24     Q.   How many other people are principals, if any, in

25  AZ Merchant Partners?

Dieter George Gable - November 17, 2010                    14

```
 1        A.    One.

 2        Q.    Is it the same person?

 3        A.    No.

 4        Q.    Who is it for TB?

 5        A.    Marcus Sipolt, S-i-p-o-l-t.

 6        Q.    And for AZ?

 7        A.    Shannon, S-h-a-n-n-o-n, Bard, B-a-r-d.

 8        Q.    All right.  Other than Finance Law Center and

 9   Next Step Advisors, any other actively operating LLCs?

10        A.    I don't believe so.

11        Q.    Okay.  Now, you mentioned that there were some

12   that are not actively operating but may still be in

13   existence based on Arizona's treatment of LLCs.  So

14   inactive LLCs, are you currently a manager of any inactive

15   LLCs?

16        A.    Yes.

17        Q.    Okay.  Which ones?

18        A.    I don't even know the exact names of them.  I

19   would honestly have to look that up.  I can give you my

20   best approximation and my best list of them, but --

21        Q.    Okay.  That's fine.

22        A.    I honestly was not prepared for this part of --

23   what you were looking for.

24        Q.    Okay.  Give me your best list.  That's all I can

25   ask for if that's the best you can do.
```

Coash & Coash, Inc.  602-258-1440

Dieter George Gable - November 17, 2010                    17

```
 1    all the different variations of that.  There's also
 2    IntelliChoice Home Services.  There might be one more
 3    iteration of that.  I don't know.  I don't recall.
 4         Q.   When you say "different iterations," does that
 5    mean -- Are they dbas?  Are they --
 6         A.   No.  They are different -- IntelliChoice
 7    Mortgage Services was the main one.  And then other ones
 8    were meant to branch off, but those were never -- we never
 9    did anything with them.
10         Q.   Okay.  When did IntelliChoice Mortgage
11    Services, LLC, come into existence?  When was it founded?
12         A.   2005.
13         Q.   And where was it located?
14         A.   Phoenix.
15         Q.   What was its business?
16         A.   Mortgage origination.
17         Q.   What does that mean exactly?
18         A.   So mortgage origination and loan modifications.
19    So mortgage origination for the vast majority of that
20    time.  And that's -- When you go to a mortgage broker to
21    get your financing, that's considered mortgage
22    origination.  So the company was doing that on behalf of
23    whoever they brokered it out to, Wells Fargo or
24    Fannie Mac (sic) and so forth.  Those are mortgage brokers
25    doing mortgage origination.
```

Dieter George Gable - November 17, 2010                    21

```
 1        A.    I don't think so.
 2        Q.    When did mortgage -- IntelliChoice Mortgage
 3    Services, LLC, stop operating?
 4        A.    2009.
 5        Q.    Okay.   And why did it discontinue its operations?
 6        A.    It's a very long story.   Bottom line is we did an
 7    acquisition of a firm in California in the business of
 8    loan modifications.
 9        Q.    Okay.
10        A.    And we were licensed through the California --
11    it's CFL.   It's a corporation finance license, I think is
12    what it's called.
13        Q.    Okay.
14        A.    Because California has two ways to license
15    mortgage brokers.   One is through the Corporation
16    Commission with a CFL license.   The other is through the
17    Department of Real Estate with what they call a DRE
18    license.
19        Q.    Okay.
20        A.    After --  I'm sorry.  Go ahead.
21        Q.    I was just going to ask, when was the acquisition
22    of this company in California?
23        A.    I believe late 2008 or early 2009.
24        Q.    And what was that firm called?
25        A.    Mantis, M-a-n-t-i-s, Inc.
```

**Coash & Coash, Inc.   602-258-1440**

Dieter George Gable - November 17, 2010                22

```
 1        Q.    Okay.  Where was it located?

 2        A.    San Diego.

 3        Q.    Was the acquisition of Mantis the manner in which

 4   you began doing business in California?

 5        A.    No.  That's the manner by which we expanded into

 6   loan modifications in California.

 7        Q.    Okay.  Prior to that, you were doing --

 8        A.    Mortgage originations.

 9        Q.    In California?

10        A.    Yes.

11        Q.    Okay.  And was Mantis doing business in any other

12   states than California?

13        A.    I don't believe so.

14        Q.    Okay.  After the acquisition, what happened with

15   regard to the business of IntelliChoice?

16        A.    The state of California changed the rules as to

17   who was allowed to do loan modifications from allowing

18   either a CFL or a DRE licensee to only DRE licensees.  We

19   applied for a DRE license and for an approved contract to

20   do loan modifications, which they called an advance fee

21   agreement.  We were granted the license and the contract.

22             The legislature passed -- California

23   legislature then passed -- and I don't remember the exact

24   act, but I believe it might have been -- I should probably

25   remember it better.  SB 1902 is my best guess as to what
```

Dieter George Gable - November 17, 2010                    23

1    the number was.

2        Q.    When was this?

3        A.    This would have been summer of '09, June of '09,

4    somewhere in that time frame.   They passed that act which

5    made any advance fee agreement void, including the ones

6    approved by the state under our license.

7              We had completed about 1,200 loan

8    modifications, and we had, I am thinking, about 500 called

9    in flight or in process.   And essentially, we had to

10   refund the money to those people, and that put us out of

11   business.

12       Q.    Okay.  When you said --  When you were using the

13   term "we," was it including we with regard to applying for

14   a DRE license?  Who is the "we" that applied for a DRE

15   license?

16       A.    My partner Shannon Bard and I.

17       Q.    And you obtained such a license?

18       A.    Yes.

19       Q.    When did you get your DRE license?

20       A.    Spring of '09.  Maybe March time frame.

21       Q.    Okay.  Did the firm need to be licensed?  Did

22   IntelliChoice need to be licensed?

23       A.    Absolutely.

24       Q.    So did you apply on behalf of IntelliChoice or as

25   an individual?

Dieter George Gable - November 17, 2010                    24

1      A.    You have to apply as both.  It's like an alcohol

2    license, I suppose.  It's not only the establishment.

3    Plus the individuals have to be vetted.

4      Q.    The --

5      A.    Sorry.  I just realized we had an FHA and a VA

6    license, so even though -- I want to make sure.  We may

7    have originated loans in other states where we're allowed,

8    where we, through FHA or VA, wouldn't need to be licensed

9    in that state.  So we're still doing that through Arizona.

10   I mean, the operation is all in Arizona, but ultimately,

11   the customer could have been in a -- could have been in

12   Utah.

13     Q.    When you say "Utah," is that specifically

14   because --

15     A.    A random -- a random --  It has to be in our

16   region.

17     Q.    What was your region?

18     A.    So we weren't doing a --  I don't recall.  It's

19   southwest.  So it would be --  Southwestern states is the

20   FHA region that we operated in.

21     Q.    It's a region defined by the FHA?

22     A.    Yes.  So those are the two other licenses we had,

23   was FHA and VA.

24     Q.    You also indicated that you applied for approval

25   of an advanced fee agreement.

**Coash & Coash, Inc.  602-258-1440**

1      A.    Yes.

2      Q.    Who applied for that?

3      A.    The company has to apply for that.

4      Q.    When did you receive that approval?

5      A.    Shortly after we got approval of the DRE license.

6      Q.    So you think that was in spring of '09?

7      A.    Yes.

8      Q.    And your recollection is that the law changed

9   soon after in California?

10     A.    All the rules started changing early in '09, and

11  whenever that state bill was put the nail in the coffin

12  for anybody, even if they had approved agreements by the

13  state.   So it was a -- what's called a fluid environment

14  at that time.

15     Q.    When were the loan modifications you've

16  described -- you say there were 1,200 or so.   When did you

17  begin contracting for the loan modification services with

18  individuals in the state of California?

19     A.    State of California?   I don't know when exactly.

20  Most of them was -- I would say the vast majority of our

21  business was Arizona, California.   It was the fall of '08,

22  maybe summer of '08.   I honestly don't -- I don't have

23  that exact --  I mean, I was, I guess, ill prepared for

24  that, the details.   But I can --  Those are approximately

25  right.

Dieter George Gable - November 17, 2010                    30

1   Marcus Sipolt and I individually invested in the firm, and

2   then we are providing services to the company in the area

3   of conversions and ongoing advice.

4       Q.   Okay.  When you say "conversions," what do you

5   mean?

6       A.   So these are when doctors convert whatever method

7   they have right now for electronic medical records, they

8   convert to this platform.  It might be training the people

9   and converting their old data, their patient data, patient

10  records into a format that's usable in the system.

11      Q.   Do you have, yourself, a background in

12  programming of software?

13      A.   Yes.

14      Q.   Just tell me briefly about that.

15      A.   I grew up, so to speak, in the Arthur Andersen --

16  what was called the management information consulting

17  division, MICD, and everybody there went through the

18  training course to learn COBOL.  So I programmed in COBOL,

19  RPG, Assembler, Machine Instructions, and Job Control

20  language.  I don't know.  You can list a whole bunch of

21  other things -- I've got a very good background in

22  programming, because that's how everybody got trained at

23  that firm at that time.

24      Q.   Have you programmed in Linux?

25      A.   I have not.

```
 1    case in just a moment, but just so that the question is
 2    resolved, you yourself -- would you identify yourself as
 3    an expert in any other areas?
 4                 MS. SCOVILLE:  Same objection.
 5                 THE WITNESS:  Lottery systems and services.
 6    BY MR. SCHAEFER:
 7        Q.   Any others?
 8        A.   No.
 9        Q.   Okay.  Which areas of expertise are you applying
10    in this case?
11                 MS. SCOVILLE:  Object to the form.
12                 THE WITNESS:  I believe the systems
13    integration, probably the program management as well.  And
14    for that matter, I suppose the running of a business and
15    realities of running a business.
16    BY MR. SCHAEFER:
17        Q.   Okay.  Any others?
18                 MS. SCOVILLE:  Same objection.
19                 THE WITNESS:  No.
20    BY MR. SCHAEFER:
21        Q.   Have you ever been employed by a company that
22    derives a substantial portion of its revenues from
23    direct-to-the-consumer sales of goods?
24        A.   No.
25        Q.   Have you ever served as an officer or a manager
```

Dieter George Gable - November 17, 2010          38

1    of a company that derives a substantial portion of its
2    revenues from direct-to-the-consumer sales of goods?
3        A.    Yes.
4        Q.    Which company?
5        A.    F1 Race Factory.
6        Q.    What does F1 Race Factory sell?
7        A.    Indoor karting.
8        Q.    Indoor karting?
9        A.    Karting.
10       Q.    C-a-r-t-i-n-g?
11       A.    No.   Ironically, it's k-a-r.   There's a slight
12   difference there.   Probably only appreciated by people in
13   the industry.   But they do indoor karting.   Primary
14   business is consumers and companies for team-building
15   events, probably the easiest way to understand it.
16       Q.    So what do they sell?
17       A.    Indoor kart racing.
18       Q.    A package?   Are they selling a service or a good?
19       A.    Well, they sell some goods in the sense that
20   there's a pro shop that sells racing gear, and the rest is
21   services, so it's racing and entertainment.   We have a
22   kitchen, bar.
23       Q.    The pro shop is located on-premise of a place
24   that has indoor karting?
25       A.    On-premise and on the web.

**Coash & Coash, Inc.   602-258-1440**

Dieter George Gable - November 17, 2010                     39

1        Q.    So -- But with regard --  Sort of to separate
2    the service from the product for the moment, what is the
3    service they're providing?  They're providing a service
4    of --
5        A.    Entertainment.
6        Q.    Of entertainment.
7                    And it has a location here in Arizona?
8        A.    Yes.
9        Q.    Does it have locations anywhere else?
10       A.    No.
11       Q.    Do you provide the service of developing similar
12   businesses in other locations?
13       A.    We do provide consulting services, yes.
14       Q.    So if someone wants to start indoor karting, they
15   can come to you and say, "How do I do this?"
16       A.    Yes.
17       Q.    Do you sell franchises?
18       A.    We do not.
19       Q.    And you have a pro shop located at the site in
20   Arizona?
21       A.    Yes.
22       Q.    People can come into the store and buy there?
23       A.    Yes.
24       Q.    What's the average in-store inventory?
25       A.    25,000 probably.

**Coash & Coash, Inc.   602-258-1440**

Dieter George Gable - November 17, 2010                    40

1        Q.    And how many SKUs?
2        A.    You're asking a level of detail I don't know.
3    It's certainly not a grocery store.   It doesn't have
4    thousands.   It has maybe -- less.
5        Q.    Are you involved in the operation of the pro
6    shop?
7        A.    From an advisory capacity, yes.
8        Q.    The pro shop is available at the Internet at what
9    URL?
10       A.    f1racefactory.com.
11       Q.    Were you involved in the development of the -- of
12   the website at which you can find --
13       A.    Yes.   I was involved --   I cofounded it, so I was
14   involved in, I would say, every aspect of that business.
15       Q.    What are the online sales of that entity?   What
16   were they in 2009?
17       A.    I don't know.
18       Q.    Are you aware of whether or not the
19   f1racefactory.com makes sales to consumers in Colorado?
20       A.    I don't know.
21       Q.    Does it have a warehouse?
22       A.    It's in a warehouse, 120,000-square-foot
23   warehouse.
24       Q.    Where are orders that are placed over the
25   Internet fulfilled from?

Dieter George Gable - November 17, 2010                    41

```
 1        A.    In the facility.
 2        Q.    Do they take goods right out of the pro shop?
 3        A.    Or the storage.
 4        Q.    How many employees work in the pro shop?
 5        A.    Well, everybody can work in the pro shop.  The
 6   pro shop is part of the operation, so total employees are
 7   50.  I don't think we have it broken down by --  We
 8   cross-train people, so --
 9        Q.    Who supports the operation of the website?  How
10   many employees?
11        A.    We have it outsourced.
12        Q.    To whom is it outsourced?
13        A.    I don't know the name of the company right now.
14        Q.    In connection with your work for either
15   TB Consulting or AZ Merchant Partners, LLC, have you ever
16   been engaged as a consultant by a company that derives a
17   substantial portion of its revenues from
18   direct-to-the-consumer sales of goods?
19        A.    Yes.
20        Q.    What were those engagements?
21        A.    First one is Succeed Corporation.
22        Q.    What is that?
23        A.    They provide, for sake of simplicity, a
24   storefront in a box for people who want to have a web
25   presence.
```

**Coash & Coash, Inc.   602-258-1440**

Dieter George Gable - November 17, 2010                    42

1        Q.     Is this a software product that they sell?

2        A.     Yes.

3        Q.     So if an individual wished to operate a online

4   store, they would potentially purchase this software?

5        A.     They would buy the software, and they could buy

6   ancillary services, which could mean everything, including

7   building out and providing things all the way down to

8   inventory for them, meaning things that they could

9   actually sell.

10       Q.     Do they have product?

11       A.     Through fulfillment houses.   So they're

12   drop-shippers.

13       Q.     So an individual who is interested in having an

14   online store but doesn't want to have the inventory

15   themselves, they basically contract with a drop-shipper

16   and utilize that inventory as their product mix?

17       A.     Fulfillment.   So they could have that.   They

18   could have their own product; they could have a mix of it.

19   Generally, it would be --   The typical consumer for that

20   would be somebody who has a -- either group or personal

21   affinity --   Maybe they're, for an example, into fishing

22   and they build custom lures, so they would put a

23   storefront out there, sell their custom lures, but they

24   could then layer on top of that a whole host of fishing

25   gear things that would be drop-shipped for them through

Dieter George Gable - November 17, 2010                    43

1    national suppliers.
2         Q.   How many software packages did Succeed sell in
3    2009?  Do you know?
4         A.   I don't know.  So my involvement with them was
5    2007 and 2008 primarily.  We helped --  We were engaged as
6    a result of the accountant coming to us.  The company was
7    in some financial -- facing some financial challenges,
8    let's say.  We turned around the company, and they're
9    making sales in the low millions.  So I would say on a
10   number of customer bases, we're probably talking in the
11   less than 10,000-a-year category of storefronts.
12        Q.   Okay.  Any other engagements as a consultant with
13   companies that derive a substantial portion of their
14   revenues from direct-to-consumer sales of goods?
15        A.   Well, I put --  Well, let me ask you, if it's
16   a -- if we have confidentiality agreements with a client,
17   where does that fall here with respect to disclosing a
18   company name?  It's a well-known --
19             MS. SCOVILLE:  Well, we don't have a
20   protective order in place yet.
21             Matt, would it be sufficient if he described
22   the type of engagement without giving you the company
23   name?
24             MR. SCHAEFER:  Probably.  Let's start there.
25             THE WITNESS:  Okay.  A company that sells

Dieter George Gable - November 17, 2010                    44

```
 1    seminars, books, CDs, DVDs, so forth and so on, both
 2    domestically and internationally.
 3    BY MR. SCHAEFER:
 4         Q.    What are its annual sales?
 5         A.    In the 10s of millions.
 6         Q.    Sells these through what channels?
 7         A.    Everything from web to affiliates, resellers.
 8         Q.    What was the nature of your engagement?
 9         A.    We developed their website, and we provide
10    hosting, meaning the technical infrastructure hosting.
11         Q.    For the website?
12         A.    For the website and their entire information
13    technology infrastructure.  So that would be, you know,
14    e-mail and file servers and so forth.
15         Q.    Does that mean that you actually have on-site
16    servers at --  Is it AZ Merchant Partners?
17         A.    This is through TB Consulting.
18         Q.    Inside TB Consulting, the servers that provide
19    the hosting?
20         A.    We keep the servers at IO Data Centers, which is
21    a -- basically a high-tier data center.  You wouldn't keep
22    those at an office.  You would have redundant power and
23    all the things that come with that.
24         Q.    Did you contract out the hosting service to
25    IO Data Centers?
```

1     A.    I believe that's the customer file, as best I
2  understand it.
3     Q.    What is the term "householding" as that term is
4  used in the direct marketing industry?
5     A.    My understanding of it is to aggregate purchases
6  within a household by household members.
7     Q.    What is a "fulfillment center" as that term is
8  used in the direct marketing industry?
9     A.    As I understand it, it's the packaging and
10 distribution supplier.  I don't know if I --  The company
11 that takes the product and fulfills the order is the
12 fulfillment center, is how I think --  Hopefully that's a
13 decent definition for you.
14    Q.    Are there retailers that do that for themselves?
15    A.    Fulfillment for themselves?  Yes.
16    Q.    Have you ever been ordered by any state or state
17 agency to discontinue offering any financial service in
18 the state?
19    A.    We got related to the relicensing from our CFL to
20 DRE license, the CFL -- looking for the right word --
21 basically documented the fact we could not use a CFL
22 license anymore with a -- and I hope I got the term
23 right -- desist and refrain order.
24    Q.    Your recollection is CFL, you said, was the
25 California --

Dieter George Gable - November 17, 2010

48

```
1       A.      I believe it's the California Corporation
2   Commission, and what it is, is a consumer or corporation
3   finance lender, is what CFL stands for.
4               When they cleared up who should do what and
5   under what license, that's when we relicensed ourselves
6   under DRE, and we had a DRE license, and the CFL issued a
7   desist and refrain to all CFL licensees to ensure they all
8   knew that nobody could operate with that anymore.
9       Q.      Your recollection is it was the CFL that did
10  that?
11      A.      Well, the thrust was that you could not use a CFL
12  license anymore.  I don't know who ultimately issued that
13  order.  Somebody at the state of California issued that
14  order.
15      Q.      Let me make sure I understand by reframing the
16  question.
17              Have you ever been ordered by any state
18  agency to desist and refrain from soliciting borrowers
19  and/or performing services for borrowers or lenders in
20  connection with loans secured directly or collaterally by
21  one or more liens on real property?
22      A.      Yes.
23              MR. SCHAEFER:  And we'll mark as the next
24  exhibit --
25              (Deposition Exhibit 109 was marked for
```

Coash & Coash, Inc.   602-258-1440

```
 1      Q.   And finally, it orders you to "Immediately desist
 2  and refrain from collecting advance fees, as that term is
 3  define in Section 10026 of the Code, in any form;
 4  particularly with respect to loan modification, loan
 5  refinance, principal reduction, foreclosure abatement or
 6  short sale services, unless and until you demonstrate and
 7  provide evidence satisfactory to the Commissioner that you
 8  have," and then there are two conditions listed on page 5
 9  of the order.  Is that correct?
10      A.   That is correct.
11      Q.   Have you complied with or otherwise attempted to
12  provide evidence to the California Department of Real
13  Estate indicating you have complied with the two
14  conditions on page 5?
15      A.   We shut down the business, so --
16      Q.   So you did not?
17      A.   Did not.
18      Q.   Now, does this order from the Department of Real
19  Estate change your recollection at all regarding the
20  nature of the events in California or your licensure in
21  California?
22              MS. SCOVILLE:  Object to the form.
23              THE WITNESS:  Not at all.
24  BY MR. SCHAEFER:
25      Q.   So you believe that you obtained a license in
```

Dieter George Gable - November 17, 2010                    54

1   California in the spring of 2009 to act as a mortgage

2   broker, a DRE license?

3        A.    Yes.   Honestly, you would have to --   There's a

4   whole lot of documentation you would have to look at to

5   understand how this doesn't make sense to people who were

6   going through it at the time, which is why, essentially, I

7   think the legislature finally passed that bill and said,

8   "You know what?   We're not allowing it in any form with or

9   without license, with or without advance fee agreement."

10       Q.    If you'll look at the first finding of fact on

11  page 2, it indicates, "At no time herein mentioned has

12  IMS" -- that's IntelliChoice Mortgage Services -- "been

13  licensed by the Department in any capacity."

14                Does that change your recollection about

15  your licensure status with the Department of Real Estate?

16       A.    No.   There are material errors in all of this,

17  including --   Well, like I said, you would have -- you

18  would have to have a whole bunch of information to go

19  along with this.   These were churned out by the department

20  when they were shutting everything down, so there are

21  material errors throughout this.

22       Q.    Did you receive a request from the Department of

23  Real Estate to submit information in connection with this

24  investigation?

25       A.    I don't believe so, or I am certain we would have

Dieter George Gable - November 17, 2010                    84

```
 1        Q.    Did you have reason to interact with Ms. Huber in
 2   connection with your work for the Colorado lottery?
 3        A.    Casually.  Not in any substantive manner.
 4        Q.    How many times have you met her since the summer
 5   of 2008?
 6        A.    It would have been one more all-hands meeting and
 7   a number of lottery board meetings.  She is one of the
 8   board members, so I don't know what the number would be.
 9   But, again, none of those would have been of any
10   substantive interaction.
11        Q.    Why did you attend the lottery board meetings?
12        A.    Because they discussed things of interest and
13   we're a significant vendor to the lottery.
14        Q.    Were these public meetings that anyone could
15   attend, or were you on the agenda?
16        A.    No.  They were public meetings.
17        Q.    Did you speak at any of these board meetings?
18        A.    I don't believe so.
19        Q.    Do you have an ongoing relationship with the
20   Colorado lottery?
21        A.    We do -- TB Consulting does.
22        Q.    What do you do for them?
23        A.    We implemented our proprietary back office system
24   and provide ongoing support and services.
25        Q.    Do you actually operate the back office for the
```

**Coash & Coash, Inc.   602-258-1440**

Dieter George Gable - November 17, 2010                    85

```
 1    Colorado lottery?
 2         A.    No.
 3         Q.    Is that done by the employees of the Department
 4    of Revenue?
 5         A.    They are lottery employees.   I don't know if they
 6    are technically Department of Revenue employees or not.
 7    We interact with the lottery.   We really, other than the
 8    contract being through the Department of Revenue, don't
 9    have much interaction there.   So I don't know what the --
10    if there is a separation of Department of Revenue versus
11    their state employees.
12         Q.    The ongoing support services that you provide,
13    are those in the nature of IT support?
14         A.    Primarily.
15         Q.    When you say "back office system," this is the
16    management of the lottery administration, not of the
17    lottery itself or --
18         A.    So this is the lottery core functions except for
19    the online terminals and systems that are at the retailer
20    and the network that goes with it.   So with respect to
21    Powerball, Mega Millions, Lotto, and all those games,
22    those are administered by Scientific Games using their
23    system.   We handle all the scratch ticket, accounting,
24    inventory control, distribution, marketing, the retailer
25    licensing, security, billing, accounting.
```

Dieter George Gable - November 17, 2010                86

```
 1        Q.     How is that contract with the Colorado lottery
 2   structured in terms of compensation for TB -- is it
 3   TB Consulting?
 4        A.     Yes.
 5               It's a time and materials, with a
 6   not-to-exceed, I believe.
 7        Q.     Is the not-to-exceed set on an annual basis?
 8        A.     On a contract basis.
 9        Q.     What's the term of the contract?
10        A.     It is up October of 2011.
11        Q.     When did it go into effect?
12        A.     Would have been October 2008.
13        Q.     So this is a three-year?
14        A.     Three-year contract.
15        Q.     What's the not-to-exceed for the three-year
16   contract?
17        A.     I don't have that number handy.  It's in the
18   neighborhood of probably $4 million.  That includes
19   hardware, third-party, and so forth, TB Consulting
20   professional fees.
21        Q.     Are you familiar with any other officials of the
22   Colorado Department of Revenue?
23               Actually, before I ask that, who is the
24   point person with Colorado lottery that you interact with,
25   if there is one?
```

Coash & Coash, Inc.   602-258-1440

1      A.    Currently?

2      Q.    Yes.

3      A.    J.E. Lewellen, L-e-w-e-l-l-e-n, I believe.

4      Q.    And was there a person in that role prior to

5    Ms. or Mr. Lewellen --

6      A.    Mr. Lewellen.

7      Q.    Was there a person prior to Mr. Lewellen?

8      A.    Jack Boehm, B-o-e-h-m.

9      Q.    Who is the top official of the Colorado lottery,

10   if you know?

11     A.    The current executive director of the lottery is

12   Abel Tapia.

13     Q.    Is that an appointed position?

14     A.    Yes, it is.

15     Q.    Who does the appointment?  Do you know?  Is it

16   Ms. Huber who makes the appointment, or is it the

17   governor?

18     A.    I do believe it's the executive director of the

19   Department of Revenue, so Roxy Huber would be making that

20   appointment.

21     Q.    In this conference call in which individuals from

22   the Colorado Department of Revenue participated, did they

23   provide you any information in connection with the

24   preparation of your report?

25     A.    They reviewed the materials that were on the

Dieter George Gable - November 17, 2010                    96

```
1      A.    Yes.

2      Q.    -- or meaning --

3      A.    Both.

4      Q.    Did you also review the statute?

5      A.    I did not review the statute.

6      Q.    Did you do anything else to prepare?

7      A.    No.

8      Q.    How long in total did you spend preparing for

9  this deposition?

10     A.    Two hours.

11           MR. SCHAEFER:   Off the record for a moment.

12           (An off-the-record discussion ensued.)

13  BY MR. SCHAEFER:

14     Q.    With regard to Exhibit 116, your report, if you

15  will turn to page 2, the Statement of Opinions,

16  opinion A -- it's cap A -- you state, "Based on the

17  minimum threshold of $100,000 in gross annual Colorado

18  sales, the relatively small number of retailers are

19  subject to the Requirements."  Did I read that correctly?

20     A.    Yes.

21     Q.    The report elaborates, to a certain extent, on

22  these opinions.  With regard to opinion A, there's

23  additional material on pages 5 and 6.  Is that correct?

24     A.    That's correct.

25     Q.    Right at the bottom of the page on page 5, last
```

**Coash & Coash, Inc.   602-258-1440**

Dieter George Gable - November 17, 2010                    97

1    few words, you indicate that "the number of affected

2    retailers should be in the low thousands."  Is that

3    correct?

4          A.    I do.

5          Q.    What do you mean by the "low thousands"?

6          A.    If I draw a -- or extrapolate from the numbers

7    that are provided on sales data and see that we're going

8    from somewhere north of a billion, excluding outlying data

9    points like Amazon, but retailers with north of a billion

10   dollars of sales down to 10 million in sales -- so down to

11   1 percent of that -- and that encapsulates 500, that would

12   suggest to get down to 6 million is not going to be an

13   overly significant number of retailers.  So there are no

14   stats that track every possible retailer, but I would

15   extrapolate out that it would be reasonable to say that

16   the number we're talking about is, as I stated, low

17   thousands and not a significant number of the entire

18   retailer base that exists in the United States or

19   elsewhere.

20         Q.    So -- But how many do you mean when you use the

21   word "low thousands"?  What number?

22         A.    I don't have a number for you.  I think you can

23   statistically extrapolate and the argument would then be

24   whether or not that's statistically valid, because there's

25   really no data.  But I think it's a minority of

Dieter George Gable - November 17, 2010                    98

1    retailers -- a small minority of retailers.

2        Q.    Can you provide a range?   When you say "low

3    thousands," what's the range of numbers you're talking

4    about?

5        A.    I would hesitate to give a range, but I would say

6    we can be reasonably certain that it's closer to 10,000

7    than any other much larger number.

8        Q.    The affected retailers that we are talking about

9    and that you're mentioning here are all those having

10   annual gross sales in Colorado in excess of a hundred

11   thousand dollars.   Is that right?

12       A.    That's correct.

13       Q.    And I think you, on page 5, in paragraph 1 of

14   opinion A, indicate that a hundred thousand in gross sales

15   in Colorado translates into approximately $6 million in

16   total nationwide sales?

17       A.    If we assume that there is a proximate

18   relationship between population and sales, it came out to

19   be just north of $6 million in sales.

20       Q.    That's the assumption you've made for purposes of

21   this report?

22       A.    Yes.

23       Q.    So when you refer to "affected retailers," you

24   are referring to retailers having sales in excess of

25   $6 million that do not collect Colorado sales tax.   Is

1   that right?

2       A.   Not necessarily.

3       Q.   Okay.

4       A.   I think I'm referring to retailers that have more

5   than a hundred thousand in gross sales.  The 6 million

6   comes into play merely to point to the fact that the

7   number of retailers should be low.

8       Q.   Fair enough.

9               In estimating the number of affected

10  retailers, you're using the $6 million benchmark.  You're

11  talking a moment ago in your answer extrapolating downward

12  from annual -- from annual sales figures that were

13  nationwide.

14      A.   Yes.

15      Q.   So for purposes of approximating, you're using

16  that $6 million annual sales on a nationwide basis

17  benchmark?

18      A.   I think that's the best benchmark I could come up

19  with to approximate how big of an issue this would be.

20      Q.   So we know that we have the 500 potentially

21  affected retailers in the Internet, top 500 that you

22  identified, and of course some of them report Colorado

23  tax.  So it's not going to be all 500.  Is that a fair --

24      A.   I think that's -- Nothing would suggest

25  otherwise.

Dieter George Gable - November 17, 2010                 100

```
 1        Q.    So the challenge is to identify those between
 2   6 million and 10 million, in essence?
 3        A.    Essentially.
 4        Q.    On page 6, you indicate there are certainly
 5   hundreds of thousands, at least, of total retailers,
 6   because as you cite, there are even just two Internet
 7   sales software -- strike that --   Two e-commerce platform
 8   software vendors that you're aware of have more than
 9   160,000 customers between them.
10        A.    Yes.
11        Q.    So we know there are at least hundreds of
12   thousands of retailers.
13        A.    I agree.  If I can add one more facet to this, is
14   if we look at the customer base for Succeed, which was an
15   e-commerce platform, the relative number of merchants that
16   opened a web front or storefront or start selling their
17   wares to whoever they sell them to, the number that reach
18   a meaningful level of -- I would argue even six-figure
19   sales in aggregated total, forget about what locale -- is
20   a very small percentage.  So, again, everything leads me
21   to believe we're talking a very small number here.
22        Q.    Relative to the total number?
23        A.    Relative to the total.
24        Q.    Are you aware that there are some estimates that
25   place the number of e-commerce sellers total from zero on
```

1   up, that's something like 5 million?

2       A.      I think when you add in the hobby e-commerce

3   seller, who might be selling purely through eBay and

4   doesn't even have their own storefront, I would suspect

5   that's probably a good number as any.

6       Q.   Okay.  So you think 5 million is a reasonable

7   estimation?

8       A.   Sure.

9       Q.   And as you say, even if it were only -- I can do

10  the math -- even if there were only .2 of 1 percent of all

11  of those retailers above 6 million in sales, that would be

12  10,000 retailers?

13      A.   Am I allowed to use my calculator?

14      Q.   Absolutely.

15      A.   You say .2 of 1 percent?

16      Q.   Yes, of the 5 mil.

17      A.   .2 of 1 percent.

18      Q.   That's right.

19              If it were half of a percent of all online

20  retailers above 6 million, then we would be at 25,000

21  potentially affected retailers?

22              MS. SCOVILLE:  Object to form.  I'm not

23  sure --  Could you say that again?

24              MR. SCHAEFER:  Sure.

25

Dieter George Gable - November 17, 2010                 102

```
 1   BY MR. SCHAEFER:
 2        Q.   Based on the same estimate of 5 million total
 3   e-commerce sellers, if a half a percent of those total
 4   e-commerce sellers had annual sales in excess of
 5   6 million, it would approximately mean 25,000 potentially
 6   affected retailers.
 7        A.   From a pure mathematical standpoint, I can do the
 8   math and get to 25,000.  From a legitimate likelihood of
 9   that being the real number, I think that's without any
10   foundation I can find, at least in the statistics I looked
11   at.
12        Q.   So you think something more like 10,000 is more
13   reasonable?
14        A.   I would have no reason to believe it would be
15   over 10,000.
16        Q.   Now, that estimate is just e-commerce vendors
17   that I mentioned.  Is it your understanding that the
18   Colorado law applies to other types of remote sellers?
19        A.   The catalog and everything I think would be, yes.
20   Anybody selling into the state of Colorado, yes.
21        Q.   So that would be potentially other types of
22   remote sellers affected by the law, potentially?
23        A.   Absolutely.
24        Q.   That would include not only catalog vendors but,
25   for example, direct-to-consumer television vendors.
```

1          Yes?

2     A.    Yes.

3          MS. SCOVILLE:  I think if you need to make

4  any notes, you sure can.

5  BY MR. SCHAEFER:

6     Q.    Turning to opinion B -- we may as well work with

7  the statement of it as contained in the body of your

8  report.  The bold headings within the body of the report

9  are restatements of the list at the front, are they not?

10    A.    They are intended to be identical, yes, sir.

11    Q.    Okay.  So statement B -- or opinion B, as set

12 forth on page 6, states, "Requirements provide sufficient

13 leeway for variances in approaches for compliance to allow

14 affected retailers to comply with reasonable efforts."

15         Did I read that correctly?

16    A.    Yes.

17    Q.    The first heading underneath opinion B concerns

18 the transactional notice.  And your first subsection under

19 Transactional Notice states, "The Requirements allow for a

20 generalized tax statement in the event the retailer is

21 subject to a number of taxing authorities or

22 jurisdictions."

23         Did I state that correctly?

24    A.    I believe so.

25         MR. SCHAEFER:  Let's mark this document as

Dieter George Gable - November 17, 2010                 115

```
1        A.    Yes.
2        Q.    So we may be talking about those as we go along,
3    some of the individual aspects of each of them.  I just
4    wanted us to have a framework for the discussion --
5        A.    Yes.
6        Q.    -- moving forward.
7                    So under B3, the annual disclosure to the
8    DOR, after referencing the Colorado Department of Revenue
9    instructions in subpart A, you say in subpart B, "The
10   format is a simple, well described, file that can be
11   produced with information readily available within any
12   viable eCommerce platform, using widely used Microsoft
13   product Excel or an equivalent application available for
14   free," then a citation to a couple of the documents you
15   reviewed.
16                    What do you mean by "viable eCommerce
17   platform"?
18       A.    Well, I would say viable in the sense -- and I
19   use "viable" throughout here to encompass applications
20   that have a meaningful life left in them.  I suppose that
21   there -- you could theoretically produce somebody who is
22   still running on a mainframe from the '60s and doing punch
23   cards.  I would say that they may not have that readily
24   available.  But for somebody who's got a reasonable
25   e-commerce platform, that should be readily available.
```

Dieter George Gable - November 17, 2010                116

1        Q.     Okay.   So you mean viable in the current market
2    environment?
3        A.     Yeah.
4        Q.     Okay.   You indicate that they could use Microsoft
5    Excel or an equivalent application to produce the report.
6        A.     To produce the extract.   The report's really a
7    file for the department, and you can produce that extract
8    of information using either Excel or what's available
9    through Google tools for free, if somebody doesn't have
10   that.
11       Q.     What is the format that has to go to the
12   department?   If it's not a .xls Excel file, what is it?
13       A.     .csv or a comma-delimited file.
14       Q.     And is that something that you can create using
15   Excel?
16       A.     You can save your file, simple as save as, and go
17   from Excel to a comma-delimited file with no intervention.
18       Q.     Are you aware of the fact that Excel has certain
19   limitations regarding the amount of data that can be
20   contained in one Excel file?
21       A.     Absolutely.
22       Q.     It's a fairly large amount of data, but there is
23   a limitation, is there not?
24       A.     It's a very significant amount of data.
25       Q.     To your understanding, is it something like

Coash & Coash, Inc.   602-258-1440

Dieter George Gable - November 17, 2010                117

```
 1    70,000 lines?
 2         A.      I would not venture an exact guess, but I
 3    actually would believe it's higher than that.  But for
 4    orders of magnitude, that's fine.
 5         Q.      Larger retailers may well have tens of thousands
 6    or even hundreds of Colorado customers.  Is that true?
 7         A.      I'm certain that's a possibility.
 8         Q.      Okay.  If they were to reach the capacity of
 9    Excel to contain data from their house file or customer
10    file, they would have to do something else, wouldn't they?
11         A.      I would say that the report really doesn't
12    address the requirements for somebody who has got a
13    customer base of that order of magnitude, because their
14    capabilities would probably lead me to believe that Excel
15    would not be in their normal operating procedures, that
16    they have much more sophisticated tools and would extract
17    this into a comma-delimited file using their existing
18    systems with the proverbial flip of a switch.
19         Q.      There would be some cost, but it wouldn't be
20    associated with converting to an Excel file.  And they
21    would do something else that was within their systems?
22         A.      It would be -- I would expect a nonmeaningful
23    number in the scheme of somebody of that size retailer.
24         Q.      Okay.  I want to jump ahead in your opinions to
25    opinion H, if you would, which is on page 11.  Opinion H
```

**Coash & Coash, Inc.   602-258-1440**

Dieter George Gable - November 17, 2010                    118

1   is the one that sets forth some actual cost estimates.   So

2   on page 11, opinion H, you state as follows:   "The

3   Requirements" -- that's a capital R.   It's meant to be a

4   term of having a definition within the scope of this

5   report.   As you use the term "the Requirements," with a

6   capital R, you mean all of the requirements in the

7   statute, yes?

8        A.    The three meaningful parts, yes.

9        Q.    The transactional notice, the annual notice to

10  consumers, and the annual report to the DOR taken

11  together?

12       A.    Yes.

13       Q.    So beginning again, you state, "The Requirements

14  will require additional effort by affected retailers

15  resulting in onetime, non-recurring first year, costs that

16  range from $2,571 to $6,000 (0.043 percent - 0.100 percent

17  as a percent of sales) plus annual recurring costs

18  estimated at $589 to $1,000 (0.010 percent to

19  0.017 percent as a percentage of gross annual sales)."

20                 Now, those ranges of cost that you provide

21  there, you have given more detail for the manner in which

22  you calculated those in Exhibit A -- Exhibit A.1, yes?

23       A.    I -- I gave more detail behind the calculations

24  but also provided the italicized parenthetical comment

25  after that to notate what retailers we're talking about.

**Coash & Coash, Inc.   602-258-1440**

1    determined the percentage of annual sales that that

2    represented for your small seller, or did you do it the

3    other way around?  How did you -- how did you get to your

4    dollar figures identified in opinion H?

5        A.    Yeah, I'm not sure built up to the number.  I

6    essentially took the levels of effort and the people

7    involved in that level of effort and quantified that.

8    Then I came to quantifying what is the cost of those

9    resources, tabulated that, and then afterwards attempted

10   to normalize this to give some relative meaning to the

11   numbers by putting it as a percentage of sales.

12       Q.    So it wasn't -- I think that was clear, but what

13   you didn't do is say, "I think it's going to cost

14   X percent of sales," apply that to some number like

15   6 million, then come up with a --

16       A.    No.

17       Q.    -- range.

18       A.    No.

19       Q.    And as you indicate in opinion H, the

20   parenthetical on page 11, it states, "Note:  the costs are

21   estimated for the compliance efforts of the smallest of

22   the affected retailers."  I'll stop there.  When you say

23   "the smallest of the affected retailers," what are you

24   referring to?

25       A.    I'm referring to the people who are marginally

Dieter George Gable - November 17, 2010                    121

1    meeting the minimum requirement, so they've exceeded the
2    threshold, but they have not gotten to the level of a top
3    500 retailer.
4         Q.    Okay.
5         A.    Because I think those would skew the numbers, and
6    honestly, their costs are very different because theirs
7    are, in the great scheme of things, probably difficult to
8    segregate from just doing business and just maintaining
9    their normal, day-to-day operations.
10        Q.    Okay.  The --  When you say the smallest, you
11   mean below the Internet 500.  Is that the 6 to $10 million
12   range?
13        A.    Somewhere in that range, yes.
14        Q.    You go on to say, "The costs for compliance by
15   larger affected retailers is ignored as the impact, when
16   normalized on a percentage of sales basis, is expected to
17   be lower or even inconsequential."  Did I read that right?
18        A.    Yes.
19        Q.    Okay.  Now, I just want to clarify, you're not
20   saying, are you, that there are -- retailers larger than
21   the smallest retailers will incur no costs of compliance,
22   are you?
23        A.    I think I stated that for the larger affected
24   retailers, when you normalize the cost, rather than take
25   the absolute cost of them doing anything, that it becomes

**Coash & Coash, Inc.   602-258-1440**

1   inconsequential.  And I put that in the context of and --

2   a top-10 retailer may spend tens of millions a year in

3   server and hosting and management of their infrastructure,

4   but that number is meaningless when it gets to the smaller

5   retailer.  So I'm trying to do it for the smaller

6   retailer.  The larger retailers have large cost bases, and

7   whatever requirements are within this are a drop in the

8   proverbial bucket.

9        Q.    Two things I want to clarify from your answer.

10  The first is -- I think we already confirmed, but let me

11  just make sure, because it's slightly different from what

12  the report says.

13              When you say "the smallest retailers,"

14  you're using the $6 million benchmark for purposes of your

15  discussion in your report.  Is that fair to say?

16       A.    Somebody who is in that ballpark --

17       Q.    Okay.

18       A.    -- plus or minus.

19       Q.    You're not saying, though, that a retailer with

20  $7 million in annual revenues doesn't have costs?  They

21  have costs?

22       A.    They may be identical in cost.

23       Q.    Similar to the 6 million?

24       A.    Similar to, exactly.

25       Q.    I think we already discussed this.  But same for

Dieter George Gable - November 17, 2010                    123

1    8 million, you're not saying they have no costs.   Same
2    approximate costs as the -- in absolute terms if you like,
3    as the $6 million seller?
4         A.   I think in absolute terms, they may be similar or
5    identical.
6         Q.   The same was true up to about the 10 million
7    level, from what I understood from our prior
8    conversations.  Sellers with 9 million in sales have some
9    costs, you agree?
10        A.   I don't know where the delineation is.  You'll,
11   I'm sure, be able to find retailers at the $6 million
12   level that are ahead of the game and can do this for a lot
13   less.  And there are retailers who will proportionately
14   spend about the same who are $20-million-a-year retailers.
15   My report intended to reflect what is the impact on the
16   people who, on a percentage of sales basis, would probably
17   be most impacted.
18        Q.   Okay.  Your thinking in that regard is the folks
19   outside the Internet 500, the Internet retailer?
20        A.   Absolutely.
21        Q.   Now, the other thing I want to clarify from that
22   is your use of the term "normalization."  It appears to me
23   that you're using that term based upon what you've done in
24   your report to mean as a percentage of net sales.
25   Essentially, you're normalizing costs to view them through

Dieter George Gable - November 17, 2010                    124

1    the lens of -- as a percentage of net sales?

2                        MS. SCOVILLE:   Object to the form.

3    BY MR. SCHAEFER:

4        Q.    Is that a fair statement of your use of the term

5    "normalization"?   And if it's not, please clarify.

6        A.    I think I attempted to use percentage of sales as

7    a way to show relative impact.

8        Q.    Okay.   And is that the same process as

9    normalizing the costs, in your term?

10       A.    In the way I used it, yes.

11       Q.    Okay.   Now, it is true, is it not, that even

12   retailers with over a billion dollars in sales will have

13   some costs, but on this percentage of sales basis, they

14   may be tiny, almost inconsequential in your --

15       A.    Yes.   Either inconsequential or potentially

16   immeasurable.

17       Q.    Now, there are some costs, are there not, of the

18   Colorado law that will increase with the size of the

19   retailer.   Is that a fair statement?

20       A.    If nothing else, if you have a lot of notices and

21   you have a billion-dollar retailer, they have more postage

22   than another retailer, yes.

23       Q.    Okay.

24       A.    It probably reflects their overall cost of

25   business is much higher on everything they do.

Dieter George Gable - November 17, 2010                    125

1      Q.     Just to make clear we're talking about the same
2  thing, the annual notices to the consumers is what you're
3  referring to with regard to -- if they have more notices
4  they have to send to consumers on an annual basis because
5  they are a larger retailer?
6      A.     Absolutely.  And they have a larger warehouse and
7  more light bills, and they have a larger warehouse and
8  more personnel.  Everything for them is probably going to
9  be more expensive in order to generate whatever larger
10  sales number they have.
11      Q.     Okay.  But they'll actually have to send out in
12  the mail more notices.  You're saying the postage, for
13  example, at least will cost them somewhat more, although,
14  again, it may be small to that retailer in terms of a
15  relative cost?
16      A.     I think I state in other places in the report
17  that Colorado provides flexibility where they can offset,
18  diminish, or eliminate the incremental cost.
19      Q.     Right.  We'll talk about that in a minute.
20              They may have to send more annual notices if
21  they're larger?
22      A.     I would agree.
23      Q.     Okay.  H1 is the transactional notice.  In
24  part b, you give a range for compliance with the
25  transactional notice, which reads as follows:  "The cost

**Coash & Coash, Inc.   602-258-1440**

Dieter George Gable - November 17, 2010                126

1    for compliance with the Transactional Notice Requirement,

2    if any, would range from $263 (low end for retailer

3    modifying existing Transactional Notice to comply with

4    Requirements) to $1,038 (high end for retailer having to

5    create a new Transactional Notice to comply with

6    Requirements)."

7                    Did I read that right?

8          A.    Yes.

9          Q.    Now, if you accept my representation from earlier

10   this afternoon that Colorado is the first state to

11   implement a transactional notice requirement, would you

12   agree that all retailers are -- fall into the category you

13   identify as being toward the higher end, that is,

14   retailers having to create a new transactional notice?

15         A.    I do not.

16         Q.    Okay.  And why not?

17         A.    I believe retailers who are in many jurisdictions

18   and may have multiple physical locations and be subject to

19   tax in multiple locations already have some form of a

20   transactional notice related to tax with respect to -- For

21   example, we operate in Texas, Vermont, and Oklahoma, and

22   you'll be charged taxes there but not elsewhere.  So even

23   though they don't have a transaction notice in the sense

24   of what we're talking about here, they have a

25   transactional notice related to taxes to cover their

**Coash & Coash, Inc.   602-258-1440**

Dieter George Gable - November 17, 2010                    127

1    collecting states requirements.

2         Q.   Understood.   But by the premise of this law,

3    we're talking about folks -- that is, retailers -- who do

4    not have an obligation to collect in Colorado.   So their

5    notices that exist would make no reference to Colorado,

6    would they?

7         A.   They would make no notice or make no reference to

8    Colorado, but they would be able to modify an existing

9    notice.   And from a level of effort standpoint, it's a

10   matter of "Do I have something that we can modify, or do I

11   need to find a new place for it?   Because I have to find

12   room for it.   Now, do I need to move things around?"   That

13   level of effort.   So that's the modification part.   It

14   doesn't imply that there is a modification of a generic

15   transactional notice, because that wouldn't require it.

16   That's covered in item C, which says, theoretically, if

17   they had a generic notice, there would be no cost.

18        Q.   Right.   So just to clarify with regard to item C,

19   you're saying, theoretically, if they had such a thing --

20   if Colorado is the first -- then no one would?

21        A.   At onset.

22        Q.   Right.

23        A.   But the reality is going down five years from now

24   when somebody starts a retailer and grows up and it

25   becomes a retailer subject to this, at that point they may

Dieter George Gable - November 17, 2010                    128

1    have one and may actually not have an incremental cost.

2        Q.   Right.

3        A.   So these are retailers also in the future.  So I

4    understand that currently there may be none, but certainly

5    in the future, as retailers bubble up and get to that

6    mark, they may very well not have any incremental cost.

7        Q.   You're talking about first-year requirements here

8    now being first year of the bill as well as first year

9    of --

10       A.   Yes.  So I think -- I don't believe it's a fair

11   representation to say that everybody's going to be having

12   to create one.  I think there are going to be people who

13   are going to modify an existing multistate transactional

14   notice, and there will be people who will have to create

15   one from scratch.

16       Q.   So in that regard, you're using the term

17   "transactional notice" here broadly, any kind of notice

18   with regard to the transaction -- any kind of notice that

19   concerns taxes on the transaction?

20       A.   As one example.  It's a transactional notice,

21   anything related to some sort of notification to the

22   customer about that.  It could be that they give notices

23   about shipping charges or taxes, something in the general

24   area of your checkout that you can modify to -- and

25   leverage to meet the requirement.

```
 1    specific forms that I don't recall in the Colorado
 2    regulation.  So I'm not entirely certain I could say that
 3    it's all new or so substantially new.
 4         Q.   On page 12, we have the customer service
 5    inquiries item there at the top of the page, item
 6    number 2.  And you indicate that "Retailers may have to
 7    amend or add to their Customer Service call or web-chat
 8    scripts to address inquiries from customers related to the
 9    compliance with the Requirements."  In the next
10    subparagraph, "The estimated cost of this one time change
11    will range from $735 to $1,470."  Did I read those right?
12         A.   Yes.
13         Q.   Does the range 735 to 1470 depend on whether they
14    are amending or adding in the words that you used in the
15    first part?
16         A.   I would say if they have substantially everything
17    in place, it may be lower than this cost.  This is more in
18    the range of having to develop something to address this
19    specific requirement.
20         Q.   Right.  This is your report, though, right?  Your
21    report says it will be between 735 and 1470.  Yes?
22         A.   Exactly.
23         Q.   What I would like to know, for the present
24    purpose, is, is the range from 735 to 1470 dictated by
25    what you describe in the immediately preceding paragraph
```

Dieter George Gable - November 17, 2010                131

1   as being a question of whether or not they have to amend
2   or add?
3        A.   To the extent that the report says may have to
4   amend or add.
5        Q.   So it does depend on whether they're amending or
6   adding?
7        A.   If at all.
8        Q.   Okay.  Is it fair to say that --  I'm
9   interpreting this right to say that if they're amending,
10  their costs are lower; if they're adding, their costs are
11  higher?
12       A.   Yes.
13       Q.   Now, in item 3, the annual notice to consumers,
14  you make a point to indicate again that you're estimating
15  these costs for a retailer on the smaller side, 6 million
16  in magnitude, certainly outside the Internet top 500.  Is
17  that fair?
18       A.   Yes.
19       Q.   You talked a moment ago about the fact that
20  larger retailers will incur costs to send the annual
21  notice, will they not?
22       A.   Yes.
23       Q.   Okay.  So --
24       A.   Subject to them having to send annual notices.  I
25  mean, it's conceivable that somebody could have 20 million

Dieter George Gable - November 17, 2010                    132

1   in sales and not send a single notice if they happen to

2   sell a lot of lower-end ticket items and not reach that

3   threshold.

4        Q.   Right.   They have to have at least one customer

5   who purchases $500 from them in the state of Colorado for

6   that requirement to apply?

7        A.   And they may only have 10, so to speak.  I know

8   we're talking about extremes, but --

9        Q.   Right.

10            And, in fact, you indicate there the annual

11  notice preparation and distribution requires an effort

12  with variability only in the size of the retailer and the

13  number of notices required to be sent.  Is that correct?

14       A.   Yes.

15       Q.   They send more notices, they'll have somewhat

16  more cost associated with the actual mailing and materials

17  costs for the notice, at any rate?

18       A.   Yes.  To the extent that, obviously, the larger

19  retailers will -- I am guessing at least be afforded the

20  opportunity or take the opportunity to mitigate their

21  costs?

22       Q.   Right.  And we'll talk about that.

23            In subpart B, with regard to the first year,

24  you indicate, "For these retailers, the total initial one

25  time or first-year cost would be between $1,601 and $3,023

Dieter George Gable - November 17, 2010                   133

1    or .027 percent and 0.050 percent as a percentage of gross

2    annual sales."

3                Now, that first-year cost includes costs

4    related to understanding the requirement, developing a

5    system to produce it, settling upon the actual language to

6    use, and the mailing costs for that first year.   Is that a

7    fair characterization?

8        A.    I would say that's a reasonable characterization,

9    but I don't believe you mentioned the mechanics of it and

10   a mail merge or some sort of a process by which to bring

11   all that together in an efficient manner.

12       Q.    That would be one other component that's included

13   in that first year also.

14       A.    Yes.

15       Q.    And the range there is based upon how many

16   notices being sent in terms of the actual number of

17   notices?  Your range of costs.

18       A.    I believe the spreadsheet says it was 200

19   notices, which was somebody reaching the $100,000

20   threshold and sending out exactly 200 notices to add up to

21   the hundred thousand dollars worth of sales.

22       Q.    So on Exhibit A.1, your cost calculations, the

23   last set of rows under the word "Consumables," there's an

24   indication that there are 200 annual notices.  Is that --

25       A.    Simply by dividing the hundred thousand by 500

1    and saying that it happened to be that they had 500 or

2    $501 purchases times 200 customers, and that would be a

3    maximum number of notices that they would have to be

4    sending out.

5         Q.    But your range of costs is based on that

6    assumption?

7         A.    On the maximum worst-case scenario.

8         Q.    To make sure we get the number, it's based on the

9    assumption of 200 notices?

10        A.    Yes.

11        Q.    Now, in item -- sub item i under b, you indicate,

12   "Retailers who already have a generic notice to consumers

13   meeting the Annual Notice requirement would not incur a

14   '1st Year' expense but would immediately fall into the

15   'On-going' cost estimate reflected in G.3.c."

16             If you take my representation that Colorado

17   is the very first state to impose such a requirement, do

18   you agree with me that there wouldn't be, in the first

19   year, retailers who already have a generic notice to

20   consumers that meet the annual notice requirement?

21        A.    It would be highly unlikely.  I think this would

22   be more looking at future retailers that are becoming

23   subject to.  But agreed.

24        Q.    Now, with regard to 3c, the ongoing cost, you

25   indicate, "For these retailers, the on-going yearly cost

Dieter George Gable - November 17, 2010                    135

1    would be between $354 and $530 or 0.006 percent and
2    0.009 percent as a percentage of gross annual sales."
3                Did I read that right?
4        A.    Yes.
5        Q.    And your annual sales percentages there, again,
6    are based on a company with 6 million in annual sales?
7        A.    Yes.
8        Q.    Am I right that the ongoing yearly costs of the
9    annual notice are lower because you don't have some of the
10   first-year development costs in those later years?
11       A.    Absolutely.
12       Q.    So what are the -- You have materials costs,
13   correct, in every year?  What are the remaining
14   nonmaterials costs associated with the annual notice?
15       A.    The fulfillment component of that, so the
16   extraction of data, the mail merge, the stuffing of
17   envelopes.
18       Q.    Okay.  The human cost of stuffing envelopes.
19   Okay.
20       A.    And I do believe --  Let me just check something
21   real quick here.
22                I do have in here at least some management
23   time to glance at it and see whether or not there's
24   anything materially different.
25       Q.    Right.  So Exhibit A.1 for that annual notice

Coash & Coash, Inc.  602-258-1440

1    ongoing, it looks like you have between half an hour and

2    an hour of management time?

3         A.    Yes.  At least take a look at it and see if

4    there's anything glaring.

5         Q.    A higher portion of the ongoing cost is in the

6    production.  Almost all of it is in the production?

7         A.    Yes.

8         Q.    That little exception of management.

9         A.    I believe the highest cost is in the -- continues

10   to be labor, because we're talking a reasonably small

11   number of notices and, quite honestly, a very high

12   estimate of what it would take to stuff 200 notices.

13        Q.    And just to -- Again, this is based on how many

14   notices being sent?

15        A.    200 notices.

16        Q.    If we look at Exhibit A.1 for a moment, the

17   spreadsheet, just the consumables set of rows there at the

18   bottom part of the table, going to the next to last column

19   for annual notice ongoing, it appears to me -- tell me if

20   I'm wrong -- that you have total cost of consumables.  You

21   would add together the paper costs of $2, the printing

22   cost of $4, the envelope cost of $68, the mailing label

23   cost of $17, and the stamp or postage cost of $88 to get

24   the cost of consumables for the 200 notices?

25        A.    Understand there is some -- for readability, I

Dieter George Gable - November 17, 2010                137

1    didn't include any cents, but for the -- Yes.

2        Q.   Fair enough.

3             And if I add those up -- you're welcome to

4    use your calculator if you'd like -- I think it's $179 of

5    cost associated with the 200 annual notices.

6        A.   I think that's right.

7        Q.   And if you were to divide that by the 200 annual

8    notices -- tell me if I'm wrong -- but I think it is 89

9    and a half cents per notice.

10       A.   Yes.  That is correct.

11       Q.   So the cost of per notice based on just

12   consumables and meaning materials and postage is about 89

13   and a half cents per notice?

14       A.   For somebody sending out 200 annual notices.

15       Q.   Okay.  Now, companies that have to send more than

16   200 notices will have higher absolute costs in terms of

17   consumables, won't they?

18       A.   Higher absolute costs?

19       Q.   Yes.

20       A.   And potentially lower per-notice cost.  But yes.

21       Q.   Again, I think Amazon is sort of the elephant in

22   the room in all of this discussion.  If we assume the

23   population of Colorado is about 5 million -- do you

24   understand that to be the case?  Population of Colorado,

25   around 5 million people?

**Coash & Coash, Inc.   602-258-1440**

Dieter George Gable - November 17, 2010                138

1      A.    Around 5 million, yes.
2      Q.    Would you agree with me that Amazon, the number
3   one Internet seller on the Internet top 500, may have a
4   million Colorado customers?
5      A.    I would have no basis to say yes or no to that.
6      Q.    Let's assume that they did --
7      A.    Okay.
8      Q.    -- for purposes of the question.   The law --
9   Colorado law at issue in this case also requires that a
10  notice be provided to non-Colorado residents who ship
11  goods into Colorado as well, as long as they are over the
12  500 threshold.   Is that correct?
13     A.    Yes.
14     Q.    So if even only 1 percent of those million
15  customers purchased over $500 in a year, would you agree
16  with me that translates into about 10,000 customers who
17  are supposed to receive a notice?
18     A.    If I -- If is a big if on the 1 percent.   I
19  don't know.   But if it's 1 percent, the math would work
20  out to be 10,000, I agree.
21     Q.    And on a per-notice basis, it's going to be
22  something like 89 and a half cents per notice?
23     A.    I -- I think I -- That would be ignoring the
24  other finding in the report, that a retailer of that size
25  would figure out a way to send out that transactional

**Coash & Coash, Inc.  602-258-1440**

Dieter George Gable - November 17, 2010                139

1    notice probably at little to no cost.

2         Q.    Well, why don't you explain that to me?    Because

3    I think that is highly questionable.    So give me your

4    explanation of that.

5         A.    Do we have the rules handy by any chance?

6         Q.    I don't.

7         A.    So let me just point to something real quick.

8    One second.

9              Okay.    If I look at the opinion J on page 14

10   and I state the opinion that "The incremental cost of

11   mailing Annual Notices can be mitigated by including other

12   information and materials for the consumer," essentially,

13   the requirement is for an annual notice to be sent -- for

14   it to be properly notated on the outside of the envelope

15   and sent first class.    Nothing precludes the retailer from

16   providing inserts, some limited amount of advertisement

17   within the scope, because the limitation, as I recall, is

18   that it just not be part of a regular shipment.    So it

19   can't be part of a shipment of goods.

20              And so I believe that in these cases, it

21   could either be mitigated by marketing costs or

22   third-party material that could be inserted, similar to a

23   utility statement, where you'll get a flyer advertising

24   some other things that, essentially, take the utility

25   company's cost of mailing that down significantly on a

```
 1   per-piece basis.
 2                 And I would expect that Amazon, at that
 3   size, if we're talking about the extreme ends of the
 4   spectrum, would have a reasonable size incentive, if they
 5   had a large order of magnitude of notices, to invest money
 6   into figuring out a way to mitigate that cost.
 7        Q.    Thank you for the explanation.
 8                 I take it that your understanding of the
 9   statute, which is specifically in the statute, not in the
10   regulations promulgated by the department but in the
11   statute promulgated by the general assembly of the state
12   of Colorado, indicates the notice must be sent separately
13   and not as part of any other shipment.
14        A.    That's what it said.
15        Q.    Your belief is that permits a retailer to,
16   nevertheless, include other materials, marketing or
17   otherwise, in the envelope?
18        A.    I'm not here to interpret it other than to
19   provide my perspective.  My perspective is I would expect
20   that a regular shipment would be a shipment of goods.
21   Could be a shipment of a catalog.  It should be something
22   that would otherwise be sent.  But if it's not that, I
23   think there are a number of things that would provide
24   leeway for things to be included in that notice.
25        Q.    But your assumption in this regard, your
```

1    benefits of different efforts all the time, are they not?

2          A.   Absolutely.

3          Q.   Are you aware that there are penalty provisions

4    specific to each requirement of the statute?

5          A.   Yes.

6          Q.   Are you aware that with regard to the annual

7    notice, that the failure to provide a compliant annual

8    notice subjects a retailer to a $10 notice per -- $10

9    penalty per noncompliant notice?

10         A.   That is part of what the statute reads or the

11   rules read.

12         Q.   Isn't it far more likely that retailers

13   evaluating the statute's specific direction that the

14   notice be sent separate from any other shipment, in light

15   of the $10 penalty for noncompliance, will choose to send

16   an annual notice without accompanying material?

17              MS. SCOVILLE:   Object to the form.

18              THE WITNESS:   The numbers used herein

19   reflect no mitigation of the cost, merely a statement that

20   the larger retailers will look to mitigate that cost.   In

21   no way would I expect that the marginal retailer who

22   barely meets the need and has crossed that threshold would

23   spend a whole bunch of time, energy, and money to try to

24   figure out how to mitigate the cost of 200 notices.

25   Doesn't make sense.   By the time they get done figuring

Dieter George Gable - November 17, 2010                    144

1   out how to do it, they would have spent more than they

2   would have to just send the notice.

3                When you bring up Amazon -- and I don't know

4   what the numbers are -- at some point the threshold has

5   been crossed where somebody will look into it and probably

6   invest the time to get an attorney to look at what is or

7   isn't reasonably possible because the numbers are large

8   enough to map.

9   BY MR. SCHAEFER:

10      Q.   But if they invested the time and an attorney,

11   then they will have attorney costs.

12      A.   For the larger retailers, they'll probably have

13   attorneys doing work all day long.  If I go back to my

14   days at Accenture, the attorney was working doing

15   something or another all day long.  I never saw a charge

16   for a specific item I asked a question about.

17                So the reality is the small retailers won't

18   invest that time and energy because it won't make any

19   sense.  The larger retailers that have a lot of costs,

20   possibly, in this area, would invest the time and energy.

21   But, again, on a percentage-of-sales basis to make it

22   meaningful -- a meaningful measure across the breadth of

23   them, it's an insignificant extent amount.

24      Q.   Doesn't the $10 penalty substantially raise the

25   bar for determining that including some other information

Dieter George Gable - November 17, 2010                    145

1    with the notice would be cost-effective?

2        A.    Again, we're talking about the largest retailer.

3    They may very well ask for an opinion -- or ask for

4    clarification on this or --   None of this report is aimed

5    at those people who are much more sophisticated and have

6    almost no cost for any of the other pieces.   They will

7    address the one that is a consumables production cost if

8    it becomes a large enough number.

9        Q.    One other aspect to your answer, we're talking

10   about Internet vendors, by and large, correct?

11                   MS. SCOVILLE:   Object to the form.

12   BY MR. SCHAEFER:

13       Q.    The affected retailers, is it your understanding

14   that most remote sales nowadays -- or remote sellers do

15   business over the Internet?

16       A.    I would say that statistics would support the

17   fact that even catalog retailers have a big move towards

18   the Internet side of the business.

19       Q.    Internet sellers tend to communicate with their

20   customers in electronic means, do they not?

21       A.    That, certainly I would expect to be part of many

22   e-commerce vendors' strategy.

23       Q.    So their strategy is to communicate by e-mail,

24   generally, because, in fact.   They are an electronic

25   vendor?

Dieter George Gable - November 17, 2010                146

```
 1        A.    I would probably say some differentiate
 2   themselves by having nonelectronic communication.
 3        Q.    Isn't it the case that but for this Colorado
 4   requirement of sending an annual notice, the vast majority
 5   of affected retailers wouldn't be sending a mailing on
 6   January 31 of each year to their customers purchasing over
 7   $500?
 8        A.    I would suspect that if given the choice, they
 9   would probably go with -- especially when we're talking a
10   low volume of notices would probably go with an electronic
11   communication if they had their druthers.
12        Q.    Were it to cost a larger vendor 89 and a half
13   cents per notice, their costs -- say they have, in my
14   example, 10,000 notices to send.  That would cost that
15   retailer $8,950.  Is that a fair exercise of math?
16               MS. SCOVILLE:  Object to form.
17               THE WITNESS:  In your -- in your example,
18   yes, it's an exercise in math only.  But if we were to
19   extrapolate and say that that is a cost for Amazon to
20   generate sales in Colorado, I don't think that would be an
21   undue burden on the size retailer like that who has lots
22   of other costs to do business anywhere they open up shop.
23   BY MR. SCHAEFER:
24        Q.    And that's your opinion.  We're talking, for a
25   moment, about the cost associated, not necessarily whether
```

Dieter George Gable - November 17, 2010                    147

1    or not the cost is an undue burden in anyone's point of

2    view.  You're here to assess costs, are you not?  Costs of

3    compliance?

4         A.    You're asking me what the cost is.  It may --

5    You can argue dollars and undue burden.  Maybe that's a

6    bad form of my answer.  But with respect to a percentage

7    of sales, it is a much lower issue for somebody of that

8    size retail operation than it is for what we're talking

9    about in this report.

10        Q.    Okay.  You're not purporting to offer a legal

11   opinion about the relative burden?

12        A.    No, not at all.  Only to say that everything is

13   more expensive for a larger retailer who's doing

14   24 billion in business.

15        Q.    While we're on Exhibit A.1 -- and, again, this is

16   informed by the content of Exhibit A within the report,

17   correct?

18        A.    Yes.

19        Q.    Okay.  So, for example, you have in A.1, at the

20   top of your chart, the compliance effort.  You first list

21   the effort in terms of hours for different categories of

22   employees or professionals?

23        A.    Categories, yes.

24        Q.    Okay.  And you give, across the various

25   requirements, an estimate of the number of hours that

Coash & Coash, Inc.  602-258-1440

Dieter George Gable - November 17, 2010                    148

1    someone in that category would need to invest for a

2    retailer the size you were evaluating to comply?

3        A.   Yes.

4        Q.   If someone were to draw a different conclusion

5    about the number of hours that this would require, that

6    would have the overall effect in the way you've done the

7    math of increasing the cost if they believed the number of

8    hours was higher?

9        A.   If you increase the number of hours, that would

10   increase the cost, yes.

11       Q.   Likewise, you have, then, a set of information

12   here under the heading Cost (per hour) for each of the

13   categories of professionals or employees that you

14   identify.  Is it a fair understanding what the numbers are

15   in that sets of rows, that it's cost per hour?  The hourly

16   rate of someone in that category of employee?

17       A.   Yes.

18       Q.   So, for example, just to take the first one,

19   management cost per hour is estimated to be $105 per hour,

20   on average?

21       A.   I don't believe it's on average.  I believe I

22   articulated that's on the high end, based on the high end

23   pay range plus standard benefits and payroll burden,

24   taxes.

25       Q.   By saying "on average," I wasn't intending to

Dieter George Gable - November 17, 2010                    149

1    imply that it was some middle-of-the-road number.  Some
2    companies would have higher costs, some would have lower
3    costs.  This is a number that you're using to estimate --
4    here you're using some approximation for all companies?
5         A.    I'm using a high-end approximation for the
6    companies that we're talking about here.
7         Q.    Fair enough.
8               If someone were to conclude that, in fact,
9    the hourly rate for any of these categories was higher,
10   that would have the overall impact of increasing the cost
11   estimates, would it not?
12        A.    Yes.
13        Q.    Similarly, with regard to the costs of
14   consumables in the final set of rows there, you have
15   assigned certain costs of consumables.  If someone were to
16   conclude that consumables might be somewhat more
17   expensive, it would have the effect of increasing the
18   overall cost of the annual notice to customers?
19        A.    Although that --  On a mathematical basis, yes.
20   But on a basis that these are already on the high end of
21   these types of consumables, I find it highly suspect
22   unless it's linen envelopes and hand inscribed.
23        Q.    That would be nice, wouldn't it?  Perhaps in
24   calligraphy.
25        A.    Calligraphy.

```
 1              (A recess ensued.)
 2   BY MR. SCHAEFER:
 3       Q.   Okay.   In your report, Mr. Gable, Exhibit 116, at
 4   page 13, continuing the discussion that is under the
 5   general opinion H, item 4 is the annual disclosure to the
 6   DOR.  And as you note in subpart a, "Every affected
 7   retailer will have to submit a file complying with the
 8   Colorado Department of Revenue file layout."
 9              That's a fair statement of the law, is it
10   not?
11       A.   My interpretation of it.
12       Q.   Yes.
13              And then in subpart b, you indicate, "For
14   these retailers, for costs for compliance with the Annual
15   Disclosure to DOR Requirement would range from $235 to
16   $470 or 0.004 percent and 0.008 percent as a percentage of
17   gross annual sales."
18              Again, those gross annual sales figures are
19   based on the seller with 6 million in annual sales?
20       A.   Yes.
21       Q.   Your estimate is that a seller with 6 million in
22   annual sales would have -- you estimated approximately a
23   hundred thousand customers.  Is that the estimate you had
24   used?
25              MS. SCOVILLE:  Object to the form.
```

Dieter George Gable - November 17, 2010                    151

```
 1              THE WITNESS:  Not at all.
 2    BY MR. SCHAEFER:
 3         Q.   Okay.
 4         A.   I made no assumption on number of consumers,
 5    because I'm not sure that that materially impacted the
 6    numbers.  The only place where I stipulated a definitive
 7    number was a -- what I would consider, quote, unquote,
 8    worst-case scenario with 200 notices adding up to exactly
 9    a hundred thousand dollars worth of sales and barely
10    meeting the threshold.
11         Q.   Got it.
12              Have you ever worked with a -- with a house
13    file containing several hundred thousand names in any of
14    the work you've done?
15         A.   Yes.
16         Q.   In what part of your work?
17         A.   Credit card services.
18         Q.   And what kind of work were you doing with that
19    house file in that consultancy?
20         A.   We were handling credit card issuance.
21         Q.   So were these prospects?
22         A.   No.  These were existing clients and clients who
23    needed new cards, replacement cards, so forth.
24         Q.   Was it for a financial institution or for a
25    retailer?
```

**Coash & Coash, Inc.   602-258-1440**

1      A.      American Express.

2      Q.      Okay.  And so what you were doing was managing an

3    effort to reissue cards upon expiration, that sort of

4    thing?

5      A.      It was the entire credit card platform for their

6    very broad set of credit card offerings, everything from

7    the green card to the black card and blue card, their

8    affinity cards, Delta, everybody else.

9      Q.      But was it with regard to --  These were existing

10   cardholders receiving new plastic?

11     A.      Everybody.  Existing and prospective.

12     Q.    Okay.  Your estimated listed here in item 4 is --

13   if I'm looking at Exhibit A.1, is driven entirely by time

14   spent by management and a business systems analyst?

15     A.    That is correct.

16     Q.    So, for example, you haven't included any

17   professional time for an accountant or lawyer with regard

18   to compliance with this requirement in the law?

19     A.    I did not because the requirement is, of all of

20   these areas, probably the most straightforward.

21     Q.    Do you think that companies will need to spend

22   time in quality assurance or quality control with respect

23   to the file that they generate for the DOR?

24     A.    I think companies should spend time on the

25   quality of the file irrespective of this requirement, and

1    the quality of their normal day-to-day operations is

2    driving this.

3        Q.    Okay.  To be more clear -- perhaps my question

4    wasn't a good one -- do you think they have to spend time

5    on quality assurance and quality control with regard to

6    the file extract that they need to provide to the

7    Department of Revenue?

8        A.    I think they need to properly extract the data.

9    If the data's bad, that has nothing to do with the

10   extract.  If the data is good, they need to at least

11   verify that what they extracted is the right information.

12       Q.    They do, in fact, need to spend time verifying

13   that what they have done is extracted the right

14   information.

15       A.    Yes.

16       Q.    And, in fact, again, the file to the DOR has to

17   include not only folks with a Colorado mailing address but

18   also all consumers who have -- who live in other states

19   who have shipped goods into Colorado.  Isn't that correct?

20       A.    I believe all-encompassing would be shipped to

21   Colorado.

22       Q.    Okay.  So it includes customers who do not reside

23   in Colorado who may have delivered goods into Colorado or

24   asked that goods be delivered in Colorado?

25       A.    Absolutely.

1    Q.    Would you agree with me that companies will have
2  a high degree of sensitivity to ensuring that they have
3  provided the proper list of customers to the Colorado
4  Department of Revenue in order that they not turn over
5  information to the department regarding individuals who
6  have not directed that goods be shipped into Colorado?
7    A.    I think their diligence of what they are
8  submitting to the Department of Revenue is going to be
9  reflective of their day-to-day operational diligence.   I
10  don't think there's any more or less because of this
11  annual disclosure.
12    Q.    Well, they don't, for any other purpose, have to
13  create a data extract of individuals shipping goods into
14  Colorado, do they?
15    A.    The diligence -- I'm not talking about that as
16  far as diligence.   I'm saying that if they want to be
17  accurate and so forth, that's part of their day-to-day
18  operations?   If they ultimately -- we'll call it wing it
19  on a day-to-day basis, they're not suddenly going to spend
20  more time on this.   And it's right or wrong, but I think
21  that was my point.   Their day-to-day diligence will be
22  reflected in the quality of what they're submitting either
23  to DOR or submitting as part of their other business
24  disclosure requirements.
25    Q.    I think what you're talking about is companies

Dieter George Gable - November 17, 2010                    155

1    that are careful to maintain their customer information do

2    so in a manner that they try to make sure that it's devoid

3    of mistakes, that it has the proper mailing address, that

4    they have -- the information is correct and well

5    maintained?

6         A.    Yes.

7         Q.    What I'm talking about is a separate issue.

8    Certainly how well they maintain their data may provide a

9    degree of additional reliability with regard to any

10   extract they take.    Once they've taken an extract, would

11   you agree with me that a company, especially one that was

12   careful with its customer data, would invest time in

13   quality assurance and quality control to make sure that

14   the data that they were turning over to the Colorado

15   Department of Revenue was the only data that was required

16   and not data regarding individuals whose information need

17   not be submitted?

18        A.    Yes.

19        Q.    Would you agree with me that consumers in

20   general, in today's electronic commerce environment, have

21   a high degree of sensitivity around the privacy of their

22   information -- their personal information?

23              MS. SCOVILLE:    Object to the form.

24              THE WITNESS:    I think that's a

25   generalization.    I would argue that some people transact

**Coash & Coash, Inc.  602-258-1440**

Dieter George Gable - November 17, 2010                    159

1    the protection of the credit card or payment information
2    from a consumer through the order process and retention
3    and handling of that information.
4        Q.    You're aware, are you not, that companies must
5    undergo an audit with regard to their PCI compliance?
6        A.    Once they reach a certain size, yes.
7        Q.    And, in fact, it's viewed as being important by
8    companies that they successfully complete such an audit?
9        A.    Yes.
10       Q.    So the changes with regard to their handling of
11   customer information, whether or not it actually dictates
12   any new measures to remain in PCI compliance, would you
13   agree with me that they may cause a retailer to review
14   their PCI compliance?
15            MS. SCOVILLE:   Object to the form.
16            THE WITNESS:   I don't believe any handling
17   of the information talked about within here would at all
18   make a retailer look at their PCI compliance.
19   BY MR. SCHAEFER:
20       Q.    Opinion L on page 15, you indicate, "Requirements
21   will not materially impact the call volume for customer
22   inquiries regarding Transactional Notice."
23            Did I read that correctly?
24       A.    Yes.
25       Q.    I assume that you're not saying that you expect