IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-CV-01546-REB-CBS

The Direct Marketing Association,

    Plaintiff,

    v.

Roxy Huber, in her capacity as Executive
   Director, Colorado Department of Revenue,

    Defendant.

---

**PLAINTIFF'S RESPONSE IN OPPOSITIONTO DEFENDANT'S AMENDED MOTION TO EXCLUDE THE TESTIMONY OF PLAINTIFF'S EXPERT WITNESSES F. CURTIS BARRY, THOMAS ADLER, AND KEVIN LANE KELLER [#71]**

---

Plaintiff, the Direct Marketing Association ("the DMA") submits this response in opposition to the **Defendant's Amended Motion to Exclude the Testimony of Plaintiff's Expert Witnesses F. Curtis Barry, Thomas Adler, and Kevin Lane Keller [#71]** ("Amended Motion"), filed on December 20, 2010. After stipulating on December 3, 2010, to the admission of the reports and testimony of Plaintiff's experts submitted in connection with the Plaintiff's motion for a preliminary injunction, the Defendant filed her Amended Motion to exclude the testimony of the Plaintiff's experts from a future, as-yet-unscheduled trial on the merits. The Court should reject the Defendant's Amended Motion to Exclude, which in no way undermines the strength of the opinions offered by

the DMA's experts or the DMA's right to a preliminary injunction suspending the notice and reporting requirements of H.B. 10-1193 ("the Act").

### I. THE DEFENDANT'S AMENDED MOTION SHOULD BE DENIED WITHOUT PREJUDICE BECAUSE IT IS UNTIMELY ON ITS FACE AND IN VIOLATION OF THE COURT'S PRACTICE STANDARDS.

As set forth in the Plaintiff's Motion to Strike the Amended Motion, filed on by the DMA on December 22, 2010 [#72], the Defendant's Amended Motion is clearly untimely as a motion filed in anticipation of trial, and also violates the Court's Civil Practice Standard V.G.1 for motions under Rule of Evidence 702. Indeed, as a purported pre-trial motion, the Defendant's Amended Motion to exclude is so pre-mature that a refusal to act on the motion is the only viable action the Court can take on the Defendant's request at this time. The Plaintiff has not even offered the testimony of its experts for admission at trial, and it is very probable that developments in the case will result in certain additions and modifications in the opinions of Plaintiff's experts before the time of trial. *See* Plaintiff's reply in support of its motion to strike filed January 6, 2011 [#74], at 2 n.1. Therefore, the Defendant's Amended Motion, if not stricken, should be denied without prejudice for the reasons set forth in the Plaintiff's Motion to Strike and supporting reply.

In a thinly-veiled attempt to use the Amended Motion to obtain additional briefing in opposition to the Plaintiff's motion for preliminary injunction, the Defendant asks the Court to consider her arguments under Fed. R. Evid. 702 now in weighing the testimony of the Plaintiff's experts. The Defendant's critiques of the Plaintiff's experts are, however, baseless. Contrary to the Defendant's assertions, the testimony of each of

the DMA's experts is reliable, and strongly supports the DMA's contention that its members will suffer irreparable harm as a result of the Act.

## II. THE DMA'S EXPERT, CURT BARRY, TESTIFIES RELIABLY WITH RESPECT TO THE COSTS OF RETAILERS TO COMPLY WITH H.B. 10-1193, BASED UPON MORE THAN TWENTY-FIVE YEARS OF EXPERIENCE WORKING WITH DIRECT MARKETERS.

The DMA presents the testimony of Curt Barry, an expert in the systems and operations of direct marketers, to testify concerning the costs affected retailers will incur to comply with H.B. 10-1193.  *See* DMA's Reply in support of its motion for a preliminary injunction [#56], Ex. A.1 (Barry Report).  The core of Mr. Barry's testimony is that retailers affected by H.B. 10-1993 will incur significant costs in satisfying the notice and reporting requirements of the Act and regulations.  Barry Report, Statement of Opinions, First Bullet ("Each of the three broad requirements of the law (Transactional Notice, Annual Purchase Summary, and Annual Disclosure Report) will require retailers affected by the statue and regulation to incur costs of compliance. In many cases, those costs will be significant . . .")

Far from being unreliable, Mr. Barry's opinion that retailers will incur such costs to comply with the law is uncontested.   The Defendant has offered testimony from her own expert, Dieter Gable, that the Act will impose between $2,500 and $6,000 in first year compliance costs in response to the law, and additional costs on retailers each year thereafter.  *See* Defendant's Response to motion for preliminary injunction [#50], Ex. 6.1 (Gable Report) Statement of Opinions, ¶ H; DMA's Reply [#56] Ex. C (Gable Deposition) at 161:18 – 162:10.  Under Tenth Circuit law, compliance cost of approximately $1,000 per company, which represents only a fraction of the costs of

compliance projected by both Gable and Barry in this case, are sufficient to establish irreparable harm for purposes of a preliminary injunction. *Chamber of Commerce of the United States v. Edmondson*, 594 F.3d 742, 756, 771 (10th Cir. 2010).

Moreover, Mr. Barry reaches his conclusion that retailers will incur such significant costs in a reliable manner – indeed, using the same fundamental methodology employed by Mr. Gable. Both experts approached the task of determining the costs of compliance by reviewing the requirements of the new law, analyzing the steps retailers would be required to take to comply, and estimating the associated expense. *See generally*, Barry Report;[1] *see also* DMA Reply [#56] Ex. B (Barry Deposition) at 218:20-25; Gable Report, Methodology Used in Formulating Opinions, ¶ H and Ex. A. In short, Mr. Barry's core opinion, that retailers will incur meaningful costs to comply with the Act and regulations is not only unquestionably reliable, but completely consistent with the opinion of Defendant's own expert. Such uncontested costs of compliance alone establish a significant risk of irreparable harm to DMA members as a result of the new law sufficient to support injunctive relief.

The DMA is not required, in order to satisfy the elements for an injunction, to substantiate a precise measure of compliance costs, such as might be required to make out a claim for damages suffered by its members (indeed, neither the DMA nor its members would have the right to recover such costs from the State under the Eleventh Amendment). Thus, any dispute between the parties regarding the relative *magnitude*

---

[1] For example, Ex. B to Mr. Barry's report details (at section 1.a) the 12 steps a retailer will be required to take to isolate, extract and verify the data regarding Colorado purchasers it will need to comply with the Act's annual notice and reporting requirements.

4

of the compliance expense retailers will incur in order to comply with the Act is of only secondary importance, at best, but Mr. Barry's projections regarding the likely range of such costs are reliable, as well. As Mr. Barry's report makes clear, the law will affect a wide variety of retailers — as many as 10,000, by Gable's estimate (Gable Dep. at 96:25 – 102:15) — with different levels of sales, types of systems, kinds and ages of technology, available personnel, and financial resources. As a result, there will be a wide variation in the level of expense incurred by different retailers, necessitating estimated ranges of costs based on a broad understanding of the businesses of affected direct marketers. Barry Dep. at 219:1 – 220:18.

The facts and data Mr. Barry needed in order to provide an estimated range of costs of compliance for all affected direct marketers are straightforward.[2] In order to project the expenses associated with complying with the Act, Mr. Barry required knowledge of: (1) the notice and reporting requirements of the new law; (2) the types of systems and business operations of the companies (*i.e.*, direct marketers) affected by the law; and (3) the relative costs experienced by various direct marketers in developing or modifying their systems. From his day-to-day work over the past 25 years, Mr. Barry understands the business operations of direct marketers and of the costs to modify

---

[2] Federal Rule of Evidence 702 provides:
"If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

them.  Barry Report, Section II.B; Barry Dep. at 17:3 – 21:25; 214:9 – 218:5.[3]  Mr. Barry's resume details his extensive work with direct marketers and his knowledge of their systems, operations, and costs of doing business.  Barry Report, Curriculum Vitae.  Moreover, as revealed even in the sampling contained in his resume of the hundreds of publications Mr. Barry has authored regarding the operations of direct marketers, he has frequently evaluated and published information regarding such systems and costs.  Barry Report, Curriculum Vitae at 3-6 (*e.g.*, "How to Reduce Labor Management Costs" (Multichannel Merchant, Aug. 17 2010), "Sharpening Your E-Commerce Spend" (Multichannel Merchant, Nov. 19, 2009), "Reducing Costs in the Contract Center" (Parts 1 and 2) (ROI, Dec. 2007 & Jan. 2008)).[4]

Although the Defendant repeatedly insists that Mr. Barry's methodology was not sufficiently "scientific," the Defendant ignores the admonition of the Supreme Court in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1999) that "there are many different kinds of experts, and many different kinds of expertise," and that the reliability of an expert's testimony in a particular case may best be measured by the expert's

---

[3] Pages 214-20 of the Barry Dep. are submitted herewith.  To minimize duplicative submissions, other deposition citations are included in material submitted with the parties' briefs in connection with the motion for preliminary injunction or the Joint Additional Designation of Deposition Testimony [#65].

[4] So, for example, with regard to the changes in direct marketers systems and operations necessary to comply with the law, Mr. Barry provided an estimate of the costs for companies making such changes using their own personnel, as well as the costs of using outside consultants and service providers.  Barry Report, Sect. II.B.1.a.  With regard to the Annual Purchase Summaries to customers purchasing over $500, Mr. Barry provided a detailed per piece estimate of the printing and mailing expense of $2 to $3 for each Annual Purchase Summary the retailer is required to send.  *Id.*, Ex. B.1., § 1.c and Barry Dep. 231:1 – 233:3.  All of these estimates are based on the relevant facts and a reliable methodology of carefully assessing the steps required in order to implement the particular requirements of the law.

"knowledge and experience," rather than the application of some "scientific" method. In this case, Mr. Barry is, based upon his particular knowledge and experience, ideally suited to determine and explain what a broad class of affected direct marketers will need to do in order to comply with H.B. 10-1193, and to estimate a correspondingly broad range of costs to accomplish such tasks. Since starting his company, F. Curtis Barry & Co., in 1985, Mr. Barry has handled hundreds of projects designing, developing, and modifying the systems and operations of direct marketers to meet their specific needs and requirements. Barry Report Section II.B.; Barry Dep. at 214:9 – 218:5. In that regard, he has prepared or reviewed hundreds of cost proposals. *Id.*

The Defendant's criticisms of Mr. Barry for not contacting specific businesses to inquire about their costs fall flat because Mr. Barry was not attempting to determine the costs for any particular business. Rather, the he was estimating the range of costs to be incurred by businesses of many different sizes and capabilities. Likewise, the criticism that Mr. Barry did not consult published sources to determine, for example, labor rates, is misplaced. Mr. Barry has knowledge of such rates from his own work, without needing to "look them up." Because Mr. Barry has the relevant knowledge and experience to determine what steps affected catalog and Internet retailers would need to take to comply with the law, as well as the costs associated with implementing such changes, his detailed explication and range of estimated costs are reliable. In any case, because there is no dispute between the parties that affected retailers will incur thousands of dollars of expense complying with the Act, the Defendant's criticisms of Mr. Barry's calculations in no way limit the DMA's right to injunctive relief.

### III. THE SURVEY DESIGNED AND IMPLEMENTED BY TOM ADLER AND RESOURCE SYSTEMS GROUP WAS CONDUCTED ACCORDING TO ACCEPTED SURVEY METHODOLOGY, AND THE OPINIONS OFFERED BY DR. ADLER BASED UPON IT ARE RELIABLE.

In support of its contention that affected DMA members face a significant risk of irreparable harm from lost sales to Colorado consumers if they are compelled to report the name, billing address, ship-to addresses and purchase amounts of their customers to the Department, the DMA has submitted the results of a survey conducted by Resource Systems Group, Inc. ("RSG") and the sworn testimony of RSG's president, Dr. Thomas Adler.  *See* Declaration of Thomas Adler dated August 13, 2010 [#19] and DMA Reply [#56], Ex. E (Adler rebuttal declaration).  The survey results unequivocally show that a substantial portion of Colorado consumers will be less likely to buy in the future from out-of-state retailers required to comply with the law.  (*See* [#19], Ex. B (Final Results, at 2, 5-6)). Some two-thirds of survey respondents stated that they would decrease their purchases from affected retailers as a result of the requirements that retailers report their purchasing information to the Department.  *Id.*  The Defendant asserts, however, that the Court should disregard the survey results and Dr. Adler's testimony because the survey was purportedly not conducted with the "same level of intellectual rigor" that would be used by other survey experts.  Amended Motion at 10.  The Defendant is wrong.

It is well-established in the Tenth Circuit that the results of a survey are admissible if the survey was conducted according to generally accepted principles of survey methodology. *Brunswick Corp. v. Sprinit Reel Co.*, 832 F.2d 513, 522 (10th Cir. 1987). In that regard, "[t]he survey should sample an adequate or proper universe of

respondents" so that the persons interviewed "adequately represent the opinions which are relevant to the litigation."  *Harolds Stores, Inc. v. Dillard Dept. Stores*, 82 F.3d 1533, 1544 (10th Cir. 1996) (internal citations omitted).  More specifically, a survey is admissible if conducted in accordance with the following factors:

1. The universe was properly chosen and defined;
2. The sample chosen was representative of that universe;
3. The questions were framed in a clear, precise and non-leading manner;
4. Sound interview/survey procedures were followed;
5. The data gathered were accurately reported;
6. The data were analyzed in accordance with accepted statistical principles;
7. Objectivity of the process was ensured.

*Hodgdon Power Co. v. Alliant Techsystems, Inc.*, 512 F.Supp.2d 1178, 1181 (D. Kan. 2007).  As Dr. Adler affirmed at length in his original declaration ([#19] ¶¶ 4, 6-10), and again during his deposition (*e.g.,* Adler Dep. at 94:3 – 97:17), the RSG survey clearly satisfies each of these basic requirements.

Indeed, the Defendant in her Amended Motion does not contest that the survey sampled the proper universe of respondents (*i.e.*, Colorado consumers) and challenges only one of the seven factors of basic survey methodology, but her critique lacks merit. Repeating the groundless complaints set forth in her opposition to the Plaintiff's motion for preliminary injunction, the Defendant asserts that the words "the kinds of products I buy" in the survey's privacy question were misleading, because the law prohibits the disclosure to the Department of the specific products purchased by consumers.  As

noted in the DMA's reply in support of the motion for preliminary injunction ([#56] at 7-8 n. 8), the Defendant ignores the fact that the specific requirements of the statute are clearly set forth in the framing terms for the question appearing immediately before the words which the Defendant lifts out of context. *See also* Adler Dec., Ex. B (Final Results), at 18.

With no genuine basis for challenging the survey methodology, the Defendant uses the Amended Motion to set forth, again, the arguments made by her own expert, Professor Donald Lichtenstein, regarding the survey. Amended Motion at 11-14. The DMA has already thoroughly responded to each of these critiques in its reply in support of the motion for preliminary injunction and, most notably, in the rebuttal declaration of Dr. Alder submitted with the reply ([#56], Ex. E), to which the DMA respectfully refers the Court.[5]

The Defendant's overarching contention that no conclusions can be drawn from the survey is simply wrong. Both Dr. Adler and the DMA's marketing expert, Professor Kevin Keller, have opined that the survey results show that Colorado consumers are likely to decrease their purchases from affected retailers in the future as a result of the new law, and shift those purchases to Colorado businesses that are not required to

---

[5] The only other argument advanced by the Defendant, that the survey was unduly "influenced" by counsel for the DMA, is nonsense. Dr. Adler testified that it is routine for the party requesting a survey (typically businesses and government agencies in Dr. Adler's case) to have input into the goals of the study and questions to be asked of respondents. Adler Dep. at 152:14-22. Dr. Adler and RSG designed, prepared and fielded the survey, recorded and tabulated the data, and reported the results, and Dr. Adler, a highly-respected professional with more than 30 years experience in the industry, has sworn to his opinions regarding the survey under oath. Adler Dec. at p. 7; Adler Dep. at 150:17 – 152:5. Despite the Defendant's efforts to minimize the results of the survey, it fairly presented certain basic questions to Colorado consumers regarding the new law. The Defendant may not like the responses Coloradans gave, but the suggestion that their responses were somehow influenced by anything other than their reaction to the law's requirements is utterly without merit.

report customer names and other purchasing information to the Department. The survey thus likewise demonstrates that DMA members face a significant risk of irreparable harm as a result of H.B. 10-1993. The Act's notice and reporting requirements should be enjoined.

### IV. PROFESSOR KEVIN KELLER'S OPINIONS REGARDING THE LIKELY EFFECT OF THE ACT ON CONSUMER PURCHASING DECISIONS ARE LIKEWISE RELIABLE.

The DMA has also offered the testimony and opinions of Professor Keller in support of its request for an injunction. As detailed in his declaration, after reviewing the law, Professor Keller reached the conclusion that the disclosure to the Department of the purchasing information of Colorado consumers would tend to cause Colorado consumers to decrease or discontinue purchases from affected retailers and would have a potentially harmful and permanent affect on the relationships of affected retailers with their customers and potential customers in Colorado. Keller Dec. ¶¶ 6-8; *see also* Keller Dep. 30:1 – 31:22. Keller explained that these conclusions were subsequently reinforced by the results of the RSG survey. Keller Dec. ¶ 8; Keller Dep. 30:3-13.

In arguing that Professor Keller did not employ a reliable methodology in reaching his conclusions regarding the affect of H.B. 10-1193 on consumer purchasing decisions, the Defendant primarily asserts that Professor Keller was unjustified in relying upon the RSG survey. Because, as set forth above, the RSG survey was conducted in accordance with sound survey principles and methodology, Professor Keller's reliance upon it is entirely appropriate, and the Defendant's arguments regarding Professor Keller should be rejected. Indeed, Professor Keller had the

opportunity to review the survey as it was being prepared and reached his own conclusion that it was a sound survey. Keller Dec. ¶¶ 4-5. Moreover, contrary to the Defendant's contention that Professor Keller lacked sufficient information to rely upon the survey, he testified that he was familiar with, and had worked in the past with, not only Adler, but also KnowledgeNetworks, the outside firm that assisted RSG in identifying respondents for the survey. Keller Dep. at 12:3-20; 76:13-15; 120:2-8. In addition, Professor Keller testified that he was familiar with the methodology they used in designing and conducting the survey. *Id.* at 118:3-20; 120:2-8. The argument that Professor Keller had insufficient information to rely upon the RSG survey is without merit.

Apart from criticizing Professor Keller's endorsement and use of the RSG survey results, the Defendant otherwise seems to argue only that Professor Keller did not spend enough time reaching his opinion that consumers would react negatively to the disclosure of their name, address and purchase amount information to the Department. Professor Keller is one of the leading experts in the nation on consumer behavior. He has published extensively on the subject, and is the author of the leading consumer marketing textbook in the world. Before offering his opinions, Professor Keller read the new law and regulations, evaluated the law's requirements, and formulated his conclusions. He testified, moreover, that his work on this matter coincided with a revision of his textbook, so that he was reviewing a wealth of materials regarding consumer behavior and considering consumer purchasing and privacy issues in the process. Keller Dep. 25:18 – 29:13. In short, the Defendant's strained argument that

Professor Keller should have required more than 8 hours of work to understand the law and reach certain fundamental conclusions regarding its impact on consumers utterly fails to show that his testimony is in any way unreliable.[6]

## V.   CONCLUSION

For the foregoing reasons, the DMA respectfully requests that the Court deny the Defendant's Amended Motion to Exclude the Testimony of Plaintiff's Expert Witnesses F. Curtis Barry, Thomas Adler, and Kevin Lane Keller.

Dated: January 10, 2011

                                                          s/ Matthew P. Schaefer
George S. Isaacson
Matthew P. Schaefer
BRANN & ISAACSON
184 Main Street, P. O. Box 3070
Lewiston, ME 04243−3070
Tel.: (207) 786−3566
Fax:  (207) 783-9325
E-mail: gisaacson@brannlaw.com
          mschaefer@brannlaw.com
*Attorneys for The Direct Marketing Association*

---

[6] The Defendant's criticism that Professor Keller failed to "rule out alternative causes" for the change in purchasing reported by survey respondents misses the mark. Professor Keller was not asked by the DMA to explain the causes of an observed reduction in sales already experienced by retailers, but rather to evaluate the effect on future purchasing behavior of Colorado consumers, in light of the new notice and reporting requirements imposed upon them by H.B. 10-1193. The law's reporting requirements represent a new factor which, all other things being equal, creates a significant risk that consumers will decrease, or stop purchasing altogether, from affected out-of-state retailers, and shift their purchases to unaffected Colorado retailers.  *See* Keller Dec. 127:1-9.

13

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2011, I electronically filed the foregoing, Plaintiff's Response in Opposition to the Defendant's Amended Motion to Exclude the Testimony of Plaintiff's Expert Witnesses F. Curtis Barry, Thomas Adler, and Kevin Lane Keller [#71] using the CM/ECF system, which will send notification of such filing to counsel of record:

Jack Wesoky
Senior Assistant Attorney General
State of Colorado
1525 Sherman Street, 7th Floor
Denver, CO 80203
Jack.Wesoky@state.co.us

Stephanie Lindquist Scoville
Senior Assistant Attorney General
State of Colorado
1525 Sherman Street, 7th Floor
Denver, CO 80203
stephanie.scoville@state.co.us

Melanie J. Snyder
Assistant Attorney General
State of Colorado
1525 Sherman Street, 7th Floor
Denver, CO 80203
melanie.snyder@state.co.us

Attorneys for Defendant

s/ Matthew P. Schaefer
Matthew P. Schaefer