**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No. 10-cv-01546-REB-CBS

THE DIRECT MARKETING ASSOCIATION,

      Plaintiff,

v.

ROXY HUBER, in her capacity as Executive Director, Colorado Department of
Revenue,

      Defendant.

---

**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION**

---

**Blackburn, J.**

      This matter is before me on the **Plaintiff's Motion for a Preliminary Injunction
and Incorporated Memorandum of Law** [#15][1] filed August 13, 2010.  The defendant
filed a response [#50], and the plaintiff filed a reply [#56].  Having considered the
evidence, the parties' written arguments, the relevant law, and the oral arguments
presented by counsel for the parties at a hearing held on January 13, 2011, I find and
conclude that the motion for preliminary injunction should be granted.

**I.  JURISDICTION & STANDING**

      I have jurisdiction over this case under 28 U.S.C. § 1331 (federal question).
Although the defendant challenges the plaintiff's standing to pursue certain of its claims
in this case, the defendant does not challenge the plaintiff's standing to present its
claims under the Commerce Clause.  The plaintiff seeks a preliminary injunction based

---

[1]  "[#15]" is an example of the convention I use to identify the docket number assigned to a
specific paper by the court's case management and electronic case filing system (CM/ECF). I use this
convention throughout this order.

only on its Commerce Clause claims.  Therefore, I need not and do not address standing.

## II.  BACKGROUND

The plaintiff, The Direct Marketing Association (DMA), asks the court to enjoin the defendant from enforcing the notice and reporting obligations imposed on many out-of-state retailers under a new Colorado law, now codified at §39-21-112(3.5), C.R.S. (2010) (the Act), and under the concomitant regulations promulgated by the Colorado Department of Revenue (DOR) to implement the Act, 1 Colo. Code Regs. § 201-1:39-21-112.3.5 (2010) (the Regulations).  A copy of the Regulations is attached to the DMA's motion [#15] as Exhibit 2.  In general, the Act and Regulations require retailers that sell products to customers in Colorado, but do not collect and remit Colorado sales tax on those transactions, to report certain information about the customers' purchases from the retailer to each customer and to the Colorado Department of Revenue. DMA is an association of businesses and organizations that market products directly to consumers via catalogs, magazine and newspaper advertisements, broadcast media, and the internet.  The Act and the Regulations will affect many members of the DMA. The defendant, Roxy Huber, is the Executive Director of the Colorado Department of Revenue, the state agency charged with enforcing the Act and the Regulations.  The DMA alleges that certain requirements of the Act and the Regulations violate the constitutional rights of many members of the DMA.  In its motion for preliminary injunction, the DMA relies on its allegation that the Act and the Regulations violate the rights of many of its members under the Commerce Clause of the United States Constitution.  ***U.S. Const.*** art. I, § 8.  The DMA asserts other claims in its complaint, but the DMA does not rely on those claims as bases for its motion for preliminary injunction.

The Act and the Regulations establish three new obligations for retailers who sell products to customers in Colorado, but do not collect and remit Colorado sales tax on those transactions.  First, such retailers must notify their Colorado customers that the retailer does not collect Colorado sales tax and, as a result, the purchaser is obligated to self-report and pay use tax to the DOR (Transactional Notice).  Second, such retailers must provide to each of their Colorado customers an annual report detailing that customer's purchases from the retailer in the previous calendar year, informing the customer that he or she is obligated to report and pay use tax on such purchases, and informing the customer that the retailer is required by law to report the customer's name and the total amount of the customer's purchases from that retailer to the DOR (Annual Purchase Summary).  The Annual Purchase Summary must be provided only the customers who spend more than 500 dollars in the calendar year with a particular retailer.  Third, such retailers must provide the DOR with an annual report concerning each of the retailer's Colorado customers stating the name, billing address, shipping addresses, and the total amount of purchases from the retailer by each of the retailer's Colorado customers (Customer Information Report).  The Law exempts retailers with less than 100,000 dollars in gross annual sales in Colorado.  In its motion for preliminary injunction, the DMA asks the court preliminarily to enjoin Huber from enforcing those provisions of the Act and the Regulations that require retailers to provide Transactional Notices, Purchase Summaries, and Customer Information Reports.

### III.  STANDARD OF REVIEW

FED. R. CIV. P. 65 authorizes federal courts to issue preliminary injunctions. Because a preliminary injunction is an extraordinary remedy, the plaintiff's right to such

relief must be clear and unequivocal.  *See Federal Lands Legal Consortium ex rel. Robart Estate v. United States*, 195 F.3d 1190, 1194 (10th Cir. 1999).  The plaintiff is entitled to a preliminary injunction only if it proves (1) that there is a substantial likelihood that it will prevail on the merits; (2) that it will suffer irreparable harm unless the preliminary injunction is issued; (3) that the threatened injury to the plaintiff outweighs the harm the preliminary injunction might cause defendant; and (4) that the preliminary injunction is in the public interest.  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001).

## IV. ANALYSIS

### A.  LIKELIHOOD OF SUCCESS

To secure a preliminary injunction, the plaintiff first must establish a substantial likelihood that it is likely to prevail on the merits of the substantive claims that are the basis for its motion.  *Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1246 (10th Cir. 2001).  "The determination of a motion for a preliminary injunction and a decision on the merits are different."  *Valdez v. Applegate*, 616 F.2d 570, 572 (10th Cir. 1980).  "It is not necessary that plaintiffs show positively that they will prevail on the merits before a preliminary injunction may be granted."  *Atchison, Topeka and Santa Fe Railway. Co. v. Lennen*, 640 F.2d 255, 261 (10th Cir. 1981).  Rather, plaintiff need only establish "a reasonable probability of success, . . . not an 'overwhelming' likelihood of success[.]"  *Id.*

The plaintiff asserts two claims under the Commerce Clause of the United States Constitution and argues that it has demonstrated a substantial likelihood of success on both of these claims.  The Commerce Clause expressly authorizes Congress to "regulate Commerce with foreign Nations, and among the several States."  *U.S. Const.*

art. I, § 8.  The Commerce Clause long has been read as having a negative or dormant

sweep as well. The clause, "'by its own force' prohibits certain state actions that

interfere with interstate commerce." *Quill Corp. v. North Dakota By and Through*

*Heitkamp*, 504 U.S. 298, 309 (1992) (quoting *South Carolina State Highway Dept. v.*

*Barnwell Brothers, Inc.*, 303 U.S. 177, 185 (1938)).  The negative Commerce Clause

"denies the States the power unjustifiably to discriminate against or burden the

interstate flow of articles of commerce." *Oregon Waste Systems, Inc. v. Department*

*of Environmental Quality of State of Or.*,  511 U.S. 93, 98 (1994).  A state law

violates the discrimination aspect of the dormant Commerce Clause if it discriminates

against interstate commerce either facially or in practical effect.  *Hughes v. Oklahoma*,

441 U.S. 322, 336 (1979).  If a law discriminates against interstate commerce, then the

state has the burden to demonstrate a legitimate local purpose served by the law which

cannot be achieved through reasonable nondiscriminatory alternatives.  *Id*. at 336 - 337.

If the law in question regulates evenhandedly among in-state and out-of-state interests,

"and its effects on interstate commerce are only incidental, [the law] will be upheld

unless the burden imposed on [interstate] commerce is clearly excessive in relation to

the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).

i.  Discrimination Claim

In its first claim for relief, the DMA alleges that the Act and the Regulations

discriminate against out-of-state retailers who do not collect Colorado sales tax,

because the Act and the Regulations impose on those retailers notice and reporting

obligations that are not imposed on Colorado retailers.  Under Colorado law, all retailers

doing business in Colorado and selling to Colorado purchasers must obtain a sales tax

license and must collect and remit the sales tax applicable to each sale.  §§39-26-103,

104, C.R.S.  Under the Act and the Regulations, retailers who collect and remit

Colorado sales tax are not obligated to provide the Transactional Notice, the Annual

Purchase Summary, and the Customer Information Report otherwise required by the

Act and the Regulations.  Under the law established in *Quill* and related cases,

Colorado may not impose any duty to collect sales and use taxes on out-of-state

retailers whose only connection to Colorado is by common carrier or the U.S. mail.

*Quill*, 504 U.S. at 315.  Thus, out-of-state retailers that do not have a physical presence

in Colorado generally are not obligated to collect and remit sales tax on their sales in

Colorado.  The plaintiff contends that the Act and the Regulations discriminate against

this group of out-of-state retailers by imposing on those retailers burdens that need not

be borne by in-state retailers.

In the context of the dormant Commerce Clause, a law discriminates against

interstate commerce if it imposes "differential treatment of in-state and out-of-state

economic interests that benefits the former and burdens the latter." ***Oregon Waste***

***Systems, Inc. v. Department of Environmental Quality of State of Or.***,  511 U.S. 93,

99 (1994).   In ***Oregon Waste Systems***, for example, the Supreme Court concluded

that Oregon's two dollar and twenty-five cent per ton surcharge on out-of-state solid

waste brought into Oregon for disposal was discriminatory in violation of the dormant

Commerce Clause, when compared to the eighty-five cents per ton surcharge imposed

on in-state solid waste.  *Id*. at 100.  The ***Oregon Waste Systems*** Court noted that the

degree of a differential burden or charge on interstate commerce "is of no relevance to

the determination whether a State has discriminated against interstate commerce." *Id*.

at n. 4 (internal quotation and citation omitted).

The text of the Act and the Regulations does not explicitly target out-of-state

retailers as opposed to in-state retailers.  The defendant argues that the plain language of the Act and the Regulations applies to all retailers, in-state and out-of-state, that sell to Colorado purchasers but do not collect Colorado sales tax.  Accordingly, the defendant contends that the Act and the Regulations are not discriminatory.  I note, however, that under Colorado law, in-state retailers long have been required to collect and remit Colorado sales tax and are subject to civil and criminal penalties if they fail to do so.  §§39-26-103 (4); 39-21-118(2), C.R.S.  Unless they defy these legal requirements, these retailers are not subject to the notice and reporting requirements of the Act and the Regulations.  Evidence submitted by the defendant indicates that the Tax Compliance Section of the Colorado Department of Revenue discovers each year only a very small number of Colorado retailers who are not complying with their legal obligation to collect and remit sales tax.  *Response* [#50], Exhibit 16 (Reiser Affidavit).

Under Colorado law, any retailer who is not subject to the statutory obligation to collect and remit Colorado sales tax necessarily is an out-of-state retailer.  The Act and the Regulations impose a notice and reporting burden on these out-of-state retailers and that burden is not imposed on in-state retailers, except for the very few in-state retailers who defy their statutory sales tax obligations.  Given these circumstances, I conclude that the plaintiff has shown a substantial likelihood that it will succeed in showing that the Act and the Regulations are discriminatory because, in practical effect, they impose a burden on interstate commerce that is not imposed on in-state commerce.

If the DMA succeeds in showing that the Act and the Regulations are discriminatory, then "the burden falls on the State to justify [them] both in terms of the local benefits flowing from the statute and the unavailability of nondiscriminatory

alternatives adequate to preserve the local interests at stake." *Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).  However, it is exceedingly difficult to meet this standard.  "If a restriction on commerce is discriminatory, it is virtually per se invalid." *Oregon Waste Systems*, 511 U.S. at 99.  In this case, the defendant asserts Colorado's need to collect tax revenue as the local benefit that justifies the Act and the Regulations.  Without question, this is a legitimate local interest.  However, the DMA has noted the availability of non-discriminatory alternatives.  For example, like other states, Colorado might collect use tax from Colorado taxpayers via the Colorado income tax form.  Given this and other alternatives, I conclude that it is unlikely that the defendant will be able to show a lack of nondiscriminatory alternatives to the Act and the Regulations.

Regardless of the state's salutary local purposes, its enactment of a statutory scheme and concomitant regulations that produce, in effect,  a geographic distinction between in-state and out-of-state retailers discriminates patently against interstate commerce, *id*. at 100, which triggers the virtually per se rule of facial invalidity that has not been surmounted by a demonstration by the state of a legitimate local purpose that can not be served adequately by reasonable nondiscriminatory alternatives. *Id*. (internal quotation and citations omitted). Thus, on the current record, I conclude that the DMA has demonstrated a substantial likelihood of success on its discrimination claim under the dormant Commerce Clause.

ii.  Undue Burden Claim

In its second claim for relief, the DMA alleges that the Act and the Regulations impose improper and burdensome regulation of interstate commerce.  The DMA relies heavily on the law established in *Quill Corp. v. North Dakota By and Through Heitkamp*, 504 U.S. 298, 309 (1992) to support its undue burden claim.  In *Quill*, the

8

Court concluded that undue burdens on interstate commerce sometimes may be avoided by the application of a bright line rule.  The *Quill* court concluded that the dormant Commerce Clause and the Court's earlier holding in *National Bellas Hess, Inc. v. Department of Revenue of State of Ill.*, 386 U.S. 753, 758 (1967) create a bright line rule with regard to the collection of sales and use tax.  This law creates a "safe harbor for vendors whose only connection with customers in the [taxing] State is by common carrier or the United States mail.  Under *Bellas Hess*, such vendors are free from state-imposed duties to collect sales and use taxes." *Quill*, 504 U.S. at 315 (internal quotation omitted).

The *Quill* Court examined and applied the quadripartite test enunciated in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977).  Under *Complete Auto*, a state tax will be sustained against a Commerce Clause challenge as long as the tax (1) is applied to an activity with a substantial nexus with the taxing state; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the state.  *Complete Auto*, 430 U.S. at 279. *Complete Auto* rejected the previously applied distinction between direct and indirect taxes on interstate commerce "because that formalism allowed the validity of statutes to hinge on legal terminology, draftsmanship and phraseology." *Quill*, 430 U.S. at 310 (internal quotation, citation, and brackets omitted).  The *Complete Auto* test emphasizes the importance of looking past the formal language of a tax statue to its practical effect. *Quill*, 504 U.S. at 310.  The first and fourth prongs of the *Complete Auto* test "limit the reach of state taxing authority so as to ensure that state taxation does not unduly burden interstate commerce." *Quill*, 504 U.S. at 313.  The safe harbor

established in *Quill* is a meant to delineate and define the limits of the substantial nexus requirement of the *Complete Auto* test to ensure that a state tax law does not impose an undue burden on interstate commerce. *Id*.

The Act and the Regulations do not require out-of-state retailers to collect sales and use taxes. However, they do require out-of-state retailers to gather, maintain, and report information, and to provide notices to their Colorado customers and to the defendant about their Colorado customers. The sole purpose of these requirements is to enhance the collection of use taxes by the State of Colorado. I conclude that these requirements likely impose on out-of-state retailers use tax-related responsibilities that trigger the safe-harbor provisions of *Quill*. Although the burden of the notice and reporting obligations imposed by the Act and the Regulations may be somewhat different than the burden of collecting and remitting sales and use taxes, the sole purpose of the burdens imposed by the Act and the Regulations is the ultimate collection of use taxes when sales taxes cannot be colleted. Looking to the practical effect of the Act and the Regulations, I conclude that the burdens imposed by the Act and the Regulations are inextricably related in kind and purpose to the burdens condemned in *Quill*. The Act and the Regulations impose these burdens on out-of-state retailers who have no connection with Colorado customers other than by common carrier or the United States mail. Those retailers likely are protected from such burdens on interstate commerce by the safe-harbor established in *Quill*.

iii.  Conclusion

I find and conclude that the DMA has demonstrated a substantial likelihood of success on both its discrimination claim and its undue burden claim under the dormant Commerce Clause. Thus, consideration of this first factor weighs in favor of the

issuance of a preliminary injunction.

## B.  IRREPARABLE INJURY

The parties dispute whether or not a deprivation of the Commerce Clause rights at issue here, without more, constitutes irreparable injury.  In a recent case, the United States Court of Appeals for the Tenth Circuit  indicated that violation of Commerce Clause rights constitutes irreparable injury. ***American Civil Liberties Union v. Johnson***, 194 F.3d 1149, 1163 (10th Cir. 2010) (citing ***American Libraries Ass'n v. Pataki***, 969 F.Supp. 160, 168 - 183 (S.D.N.Y. 1997)).  Although the Tenth Circuit's statement in ***Johnson*** is dicta, I conclude that violation of the constitutional Commerce Clause rights of DMA's members constitutes irreparable injury.

In addition, it is undisputed that many DMA members will face compliance costs if they are required to comply with the Act and the Regulations in the future.  The amount of those costs is disputed.  Huber's expert concludes that the smallest retailers affected by the Act and the Regulations will incur first-year compliance costs ranging from about 3,100 dollars to 7,000 dollars. *Response* [#50], Exhibit 6 (Report of Dieter G. Gable), p. 2.  If, in the end, the Act and the Regulations are found to be unconstitutional because they violate the Commerce Clause, the affected retailers would be unable to recover these compliance costs from the State of Colorado.  Under the Eleventh Amendment, Colorado is immune from suit for such damages.  Under these circumstances, the compliance costs faced by retailers subject to the Act and the Regulations constitute irreparable injury. ***Chamber of Commerce of U.S. v. Edmondson***, 594 F.3d 742, 770 - 771 (10th Cir. 2010) (compliance costs of more than a thousand dollars per year per business constitute irreparable injury if such costs cannot later be recovered because of sovereign immunity). Thus, consideration of this second

factor weighs also in favor of the issuance of a preliminary injunction.

## C.  BALANCE OF HARMS

When considering the balance of harms, a court must balance "the competing

claims of injury and must consider the effect on each party of the granting or withholding

of the requested relief."  *Amoco Prod. Co. v. Gambill*, 480 U.S. 531, 542 (1987).  The

DMA argues that the need to protect the constitutional rights of certain of its members

outweighs the interest of the State of Colorado in enforcing a law that likely is

constitutionally infirm.  In addition, absent an injunction, some DMA members will incur

compliance costs that cannot later be recovered.  Huber argues that these

considerations do not outweigh Colorado's interest in enforcing a state law that will

provide revenue to its strapped coffers.

If, ultimately, the Act and the Regulations are upheld against the DMA's

challenge, the reports and notices required by the Act and the Regulations can be

prepared and delivered.  This might delay the state's collection of some use taxes, but it

will not prevent the ultimate collection of those taxes.  On the other hand, preserving the

status quo with a preliminary injunction will prevent the irreparable injuries discussed

above while the issues raised by the DMA are resolved completely.  Given these

circumstances and considerations, I find and conclude that the balance of harms favors

the DMA, and thus, the issuance of a preliminary injunction.

## D.  PUBLIC INTEREST

Generally, the public interest is served by enjoining the enforcement of a law that

likely violates the Constitution.  *Chamber of Commerce of U.S. v. Edmondson*, 594

F.3d 742, 771 (10th Cir. 2010).  Huber argues that it is not in the public interest to enjoin

the enforcement of a law which has the primary goal of raising revenue to ensure the

fiscal well-being of the state.  As Huber notes, a court of equity must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  ***Winter v. Natural Resources Defense Council, Inc.***, 555 U.S. 7, ___, 129 S.Ct. 365, 376 -377 (U.S. 2008).  I find and conclude that the public's interest in revenue raising by the state will not be impaired substantially by the issuance of a preliminary injunction.  At most, the state may suffer some delay in implementing its new technique for enforcing its use tax laws, if the Act and the Regulations are upheld against the DMA's challenge.  On the other hand, the enforcement of a law that likely is unconstitutional, even if the goal of the law is important and legitimate, does not serve the public interest.  Thus, the public interest factor weighs in favor of the issuance of a preliminary injunction.

## V. ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That the **Plaintiff's Motion for a Preliminary Injunction and Incorporated Memorandum of Law** [#15] filed August 13, 2010, is **GRANTED** on the following terms;

2.  That effective forthwith defendant Roxy Huber, in her capacity as Executive Director, Colorado Department of Revenue, together with her agents, servants, employees, attorneys-in-fact, or anyone acting on their behalf, are **ENJOINED AND RESTRAINED** from enforcing the provisions of §39-21-112(3.5), C.R.S. (2010) (the Act) and the regulations promulgated thereunder, 1 Colo. Code Regs. § 201-1:39-21-112.3.5 (2010) (the Regulations), to the extent that the Act and the Regulations require

A.  that a retailer must notify their Colorado customers that the retailer does not collect Colorado sales tax and, as a result, the purchaser is obligated to self-report and pay use tax to the Colorado Department of

Revenue (Transactional Notice); and

  B.  that a retailer must provide to each of its Colorado customers an annual report detailing that customer's purchases from the retailer in the previous calendar year, informing the customer that he or she is obligated to report and pay use tax on such purchases, and informing the customer that the retailer is required by law to report the customer's name and the total amount of the customer's purchases from that retailer to the Colorado Department of Revenue (Annual Purchase Summary); and

  C.  that a retailer must provide the Colorado Department of Revenue with an annual report concerning each of the retailer's Colorado customers stating the name, billing address, shipping addresses, and the total amount of purchases from the retailer by each of the retailer's Colorado customers (Customer Information Report);

  3.  That this preliminary injunction **SHALL LIMIT** the enforcement of the Act and the Regulations against retailers who sell to customers in Colorado, but whose only connection to the State of Colorado is by common carrier or the United States Mail;

  4.  That this preliminary injunction **SHALL NOT LIMIT** the enforcement of the Act and the Regulations against retailers who do not fall into the class of retailers defined in paragraph three (3), above;

  5.  That under FED. R. CIV. P. 65(c), the plaintiff, the Direct Marketing Association, **SHALL POST** with the Clerk of the Court a bond in the amount of five thousand (5,000) dollars on or before Friday, January 28, 2011, at 12:00 p.m. (mountain standard time); and

6.  That this preliminary injunction **SHALL REMAIN IN EFFECT** until modified or rescinded by further order of the court.

Dated January 26, 2011, at Denver, Colorado.

BY THE COURT:

Robert E. Blackburn
United States District Judge