**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 10-CV-01546-REB-CBS

The Direct Marketing Association,

        Plaintiff,

        v.

Roxy Huber, in her capacity as Executive
    Director, Colorado Department of Revenue,

        Defendant.

---

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO COUNTS I AND II ALLEGING VIOLATIONS OF THE COMMERCE CLAUSE

The Plaintiff, the Direct Marketing Association ("DMA"), moves pursuant to Fed. R. Civ. P. 56(a) for summary judgment on Counts I and II of its **First Amended Complaint [#10]** ("Complaint") challenging the constitutionality of COLO. REV. STAT. ANN. § 39-21-112(3.5)(c) and (d) ("HB 10-1193" or "the Act") and the regulations promulgated by the Department of Revenue to implement the Act.  [1 COLO. CODE REGS. § 201-1: 39-21-112.3.5 (2010) ("the Regulations").]  The DMA is entitled to judgment as a matter of law on Counts I and II because the notice and reporting obligations imposed on out-of-state retailers under the Act and Regulations, on their face, violate the Commerce Clause of the United States Constitution, art. I, § 8, cl. 3.

The Court is already well-aware of the undisputed facts and familiar with the legal arguments that support the DMA's right to judgment as a matter of law on Counts I and

II for violation of the Commerce Clause.  In ruling upon the **Plaintiff's Motion for Preliminary Injunction and Incorporated Memorandum of Law [# 15],** filed on August 13, 2010 ("Motion for Preliminary Injunction"), the Court determined that the DMA was likely to succeed on the merits of its Complaint with regard to both Count I, asserting that the Act and Regulations impermissibly discriminate against interstate commerce, and Count II, alleging that the Act and Regulations impose improper and burdensome regulations on interstate commerce.  [**Order Granting Motion for Preliminary Injunction [# 79]**, entered January 26, 2011 ("January 26 Order").]   The DMA now seeks final judgment on both claims, in accordance with the Court's **Order Approving Briefing Schedule on Counts I and II, and Staying Further Proceedings on Counts III through VIII [#91]**, entered March 18, 2011 ("March 18 Order").

Nothing has changed since the entry of the Court's January 26 Order granting the preliminary injunction that would alter the core of the Court's analysis regarding the DMA's claims.  Because the parties agreed to submit the matter to the Court for final judgment on the existing record, with no new evidentiary submissions, there are no new facts of which the Court must take account; likewise, there are no necessary facts that the Court presumed to be true for purposes of ruling on the motion for preliminary injunction that can be legitimately disputed.   Furthermore, the Court's rulings of law in its January 26 Order on Counts I and II (with the modest clarifications suggested herein), as well as with regard to the requirements for awarding injunctive relief, were entirely correct.  In fact, there are additional grounds, reiterated by the DMA in its argument below, that support the entry of summary judgment for the DMA on Count II.

In support of its motion, the DMA relies upon the incorporated memorandum of law, the plain language of the Act and Regulations, and the undisputed facts set forth in its Statement of Facts, *infra*.

## II.   JURISDICTIONAL STATEMENT

The Court has jurisdiction over Counts I and II pursuant to 28 U.S.C. § 1331. [Complaint ¶ 4; **Answer to First Amended Complaint – Counts I and II (Commerce Clause) [# 95], ¶ 4**, filed on April 27, 2011("Answer").]  The DMA asserts that the Court also has jurisdiction pursuant to 42 U.S.C. § 1983 and the doctrine of *Ex Parte Young*, 209 U.S. 123 (1908).   The Defendant has agreed that the DMA has standing as to Counts I and II.   [*See* Answer, ¶ 7.]  Furthermore, this lawsuit does not seek to enjoin, suspend or restrain the assessment, levy or collection of any tax, and thus the Court's jurisdiction over the DMA's claims is in no way limited by the Tax Injunction Act, 28 U.S.C. § 1341 ("TIA").[1]

---

[1] The Defendant now asserts, in her Answer [*see* ¶ 4 and "Affirmative Defenses," ¶ 1], that the Court lacks subject matter jurisdiction under the TIA, which precludes federal courts from hearing cases that seek to "enjoin, suspend or restrain the assessment, levy or collection of any State tax."  28 U.S.C. § 1341.  The Defendant is wrong.

The Supreme Court has made clear that the purpose of the TIA is to limit federal court jurisdiction over cases "in which state taxpayers seek federal-court orders enabling them to avoid paying state taxes." *Hibbs v. Winn*, 542 U.S. 88, 107 (2004).  The TIA is not, however, a "'sweeping congressional direction to prevent federal-court interference in all aspects of state tax administration.'"  *Chamber of Commerce v. Edmondson*, 594 F.3d 742, 761 (10th Cir. 2010) (quoting *Hibbs*, 542 U.S. at 105); *see also Luessenhop v. Clinton County, N.Y.*, 466 F.3d 259, 266 (2nd Cir. 2006) (the intent of the TIA is "the prevention of a particular evil; namely, using federal courts as a vehicle to bring suits challenging the validity or amount of a particular tax assessed against an individual person or entity.").

As the Defendant herself conceded in her **Response in Opposition to Plaintiff's Motion for Preliminary Injunction [#50]**, filed November 19, 2010 ("Defendant's Opposition to Motion for Preliminary Injunction"), at 25, HB 10-1193 "is not a tax" and "does not require retailers to collect sales tax."  Rather, HB 10-1193 imposes *notice and reporting obligations* expressly upon *non-taxpayers*, *i.e.*, out-of-state retailers that do not collect Colorado sales and

### III.   STATEMENT OF FACTS

1.       In February 2010, the Colorado General Assembly enacted, and the Governor signed into law, HB 10-1193, "*An Act Concerning The Collection Of Sales And Use Taxes On Sales Made By Out-Of-State Retailers, And Making An Appropriation Therefor*," prescribing new notice and reporting obligations imposed on "each retailer that does not collect Colorado sales tax." [COLO. REV. STAT. ANN. § 39-21-112(3.5)(c), (d); Complaint and Answer, ¶¶ 1, 21.]

2.       On June 18, 2010, the Department adopted a permanent regulation implementing the notice and reporting provisions of the Act.  [1 COLO. CODE REGS. § 201-1: 39-21-112.3.5 (2010); Complaint and Answer, ¶ 23.]

3.       The DMA is a not-for-profit corporation with headquarters in New York, New York and offices in Washington, D.C.  [**Declaration of Jerry Cerasale [#16],** filed August 13, 2010 ("Cerasale Dec."), ¶ 2.]

4.       The Defendant, Roxy Huber, is the duly appointed Executive Director of the Colorado Department of Revenue ("Department"). [Complaint and Answer, ¶ 3.]

---

use tax.  The possibility that such notice and reporting obligations may indirectly lead to increased use tax reporting by Colorado consumers (a supposition without support in the record), does not bring the DMA's suit challenging the Act under the umbrella of the TIA as a suit seeking to enjoin the collection of a state tax.  Indeed, the First Circuit has squarely rejected a similar argument made concerning the proper reach of the Butler Act, 48 U.S.C. § 872, the Puerto Rico analog to the TIA.  *See United Parcel Service, Inc. v. Flores-Galarza*, 318 F.3d 323, 330-32 (1st Cir. 2003) (noting that "[n]ot every statutory or regulatory obligation that may aid the Secretary's ability to collect a tax is immune from attack in federal court"); *see also Wells v. Malloy*, 510 F.2d 74, 77 (2nd Cir. 1975) (the TIA was designed to preserve state measures "that would produce money or other property directly, rather than indirectly through a more general use of coercive power.").

In short, an injunction against enforcement of HB 10-1193 plainly will not "enjoin, suspend or restrain" the collection of Colorado's use tax within the meaning of the TIA.  The Court has subject matter jurisdiction over the DMA's suit.

5.      Founded in 1917, the DMA is the leading trade association of businesses and nonprofit organizations using and supporting multichannel marketing methods, with more than 3,000 members from all fifty states.   [Cerasale Dec., ¶ 2.]

6.      The DMA has members based outside of Colorado.  [*Id.* ¶ 4.]

7.      The DMA has members that market their products directly to consumers via catalogs, print advertisements, broadcast media, and the Internet.  [*Id.* ¶ 2.]

8.      There are DMA members located outside of Colorado that enter into remote sales transactions with Colorado consumers and businesses.  [*Id.* ¶ 4.]

9.      There are DMA members that lack any facilities, employees or other "physical presence" in Colorado and, as a result, do not collect Colorado sales or use tax on their sales to residents in the state.  [*Id.*]

10.     There are DMA members that do not collect Colorado sales tax who have annual gross sales of goods in Colorado that exceed $100,000, and who reasonably expect future annual gross sales of goods in Colorado to exceed $100,000.  [*Id.* ¶ 7.]

11.     According to the United States Census Bureau, Colorado's population is approximately 5 million, or 1.6% of the total United States population of approximately 300 million.  [*Id.* ¶ 8; *see* http://quickfacts.census.gov/qfd/states/08000.html.]

12.     Assuming an even distribution of sales across the United States by population, a company with $6.25 million in annual sales nationwide would have over $100,000 in annual gross sales in Colorado.  [Cerasale Dec., ¶ 8.]

13.     There are DMA members that do not collect Colorado sales tax that have customers who purchase more than $500 of goods from the retailer in a year.  [*Id.* ¶ 9.]

14.     For retail sales on which the retailer does not collect sales or use tax, Colorado purchasers are required to report their use tax liability on a Colorado Consumer Use Tax Return, Form DR 0252W**.** [Complaint and Answer, ¶ 19.]

15.     Colorado's Individual Income Tax Return, Form 104, does not include a section enabling Colorado taxpayers to report their use tax when reporting their state income tax.  [Complaint and Answer, ¶ 20.]

16.     The individual income tax returns of more than 20 other states include a section for a taxpayer to report and pay consumer's use tax in order to facilitate their citizens' self-reporting of use tax.  [**Declaration of Jeana Petillo [#17]**, filed August 13, 2010 ("Petillo Dec."), ¶ 4 and Ex D; *see also* Policy Brief prepared by the Minnesota House of Representatives Research Department ("Minnesota Study"), pages 2 and 5-8, available at http://www.house.leg.state.mn.us/hrd/pubs/usetax.pdf, (a copy of which is attached to **Plaintiff's Reply to Defendant's Response in Opposition to Plaintiff's Motion for  a Preliminary Injunction [# 56],** filed November 29, 2011 ("Plaintiff's Reply on Motion for Preliminary Injunction") , at Ex. H. (Dep. Ex. 101)).]

17.     Press reports indicate that the Department's Tax Policy Director has stated publicly that he believes most retailers subject to the notice and reporting requirements of the Act would choose to collect Colorado sales tax to avoid the more unpleasant option of having to send tax notices to their customers.  [Petillo Dec., Ex. C.]

18.     The legislative history of the Act, as reflected in the re-revised version of HB 10-1193, amended after a third reading in the Senate on February 10, 2010, states that the bill "relates to current law requiring a retailer to collect sales tax from a person

residing in this state only if the retailer has sufficient connections with this state." [*Id.*, Ex. A (available at http://www.leg.state.co.us/clics/clics2010a/csl.nsf/fsbillcont3/ B30F574193882B4B872576A80026BE0C?open&file=1193_rr2.pdf).]

19.     The legislative history of the Act, as reflected in a Colorado Legislative Council Staff Fiscal Note dated February 8, 2010, indicates in its background discussion for HB 10-1193 that "[i]n 1992, the U.S. Supreme Court clarified that states can only make companies collect sales tax if they have a physical presence in the state" and cites *Quill Corp. v. North Dakota*, 504 U.S 298 (1992). [*Id.*, Ex. B (available at http://www.leg.state.co.us/clics/clics2010a/csl.nsf/fsbillcont3/B30F574193882B4B87257 6A80026BE0C?Open&file=HB1193_r4.pdf).]

20.     The Colorado General Assembly, Joint Budget Committee's "Appropriations Report: Fiscal Year 2010-11," states that HB 10-1193 applies to "out-of-state retailers that do not collect Colorado sales tax." [Available at http://www.state.co.us/gov_dir/leg_dir/jbc/FY10-11apprept.pdf.  (Copies of the relevant pages from sections on both the Department of Law (at 342) and Department of Revenue (at 553) are attached to Plaintiff's Reply on Motion for Preliminary Injunction [#56], at Ex. G, Declaration of Carl Woock ("Woock Dec.") as Ex. 1.)]

21.     The Department's "Statement of Basis and Purpose" for the Regulations states that HB 10-1193 "sets forth new criteria for *retailers who are not required to collect Colorado sales and use tax,*" a category that excludes all in-state retailers. [*See* http://www.colorado.gov/cs/Satellite?blobcol=urldata&blobheader=application%2Fpdf&b

lobkey=id&blobtable=MungoBlobs&blobwhere=1251620008600&ssbinary=true (a copy of which is attached to the Woock Dec. as Ex. 2) (emphasis added).]

22.     Out-of-state retailers subject to the Act and Regulations must incur costs to comply with the notice and reporting requirements of the law.  [*See* Plaintiff's Reply on Motion for Preliminary Injunction, Ex. C, Deposition of Dieter Gable ("Gable Deposition") at 161:18 – 162:10.]

23.     The standard United States Postal Service ("USPS") charges for letters sent via First-Class Mail begin at $0.44 per mail piece, and increase with size and weight.  [Complaint and Answer, ¶ 42.]

24.     Affected retailers are required by the Regulations to satisfy the notice and reporting requirements of the law in connection with sales to persons residing outside of Colorado who make purchases for delivery into Colorado.  [Reg. 39-21-112.3.5(1)(b)(i); Complaint and Answer, ¶ 48.]

25.     The Defendant's expert, Dieter Gable, estimated that the law would affect up to 10,000 smaller, out-of-state Internet retailers, in addition to many larger retailers within the Internet "Top 500."  [Gable Deposition at 96:25 – 102:15.]

26.     Mr. Gable acknowledges that the costs per affected retailer to comply with the Act's requirements will be, on average, between $2,500 and $6,000 in the first year, and additional expenses every year thereafter.  [Gable Deposition at 161:18 – 162:10.]

27.     Legislative Council Staff estimated the annual revenue associated with HB 10-1193 at the time of its passage to be $4.7 million per year. [Petillo Dec, Ex. B.]

28.     This amount of $4.7 million is slightly more than 2/1000ths (0.0022) of total

Colorado sales/use tax revenues, and less than 1/1000th (0.00067) of the total $7 billion

in state tax revenues.  [*See* Defendant's Opposition to Plaintiff's Motion for Preliminary

Injunction, Ex. 3, Declaration of Todd Saliman ("Saliman Dec."), at ¶ 7.]

29.     There are various measures that have been initiated by other state

governments, and documented in publicly-available reports, to increase use tax

compliance by consumers (both individuals and businesses), including: (1) a line on

their resident income tax returns, a measure adopted in 23 states; (2) increased audits

of business consumers by departments of revenue; (3) consumer education campaigns;

and (4) consumer notification programs.  [*See* Minnesota Study (available at

http://www.house.leg.state.mn.us/hrd/pubs/usetax.pdf); **Excerpts from the Transcript**

**of the Deposition of William F. Fox [# 69]**, filed December 17, 2010 ("Fox

Deposition"), at 85:8 – 85:15]  There is no evidence in the record that the Colorado

Department of Revenue has implemented these measures.

30.     In the 2010 session of Congress, a bill was introduced that would

authorize states to impose use tax collection obligations upon out-of-state retailers .and

require greater standardization of state sales and use taxes. [H.R. 5660, 111th Cong.

(2009-2010), available at http://thomas.loc.gov/cgi-bin/query/z?c111:H.R.5660:.]

31.     In connection with this litigation, the DMA commissioned a survey of

Colorado Internet and catalog shoppers.  [**Declaration of Thomas Adler [# 19]**, filed

August 13, 2010 ("Adler Dec."), ¶¶ 3, 5 and Ex. B.]   The survey results show that forty-

three percent (43%) of catalog/online purchasers would choose to buy from a Colorado

retailer that is not required to disclose purchaser information to the Department, rather than make a similar purchase from an out-of-state retailer that is required to comply with the Act and Regulations. [*Id.*, Ex. B at 6.]

32.     Following the passage of the Colorado Act, Oklahoma enacted a law, and adopted emergency regulations, that require retailers located outside of Oklahoma who make sales for use in Oklahoma, but are not required to collect Oklahoma sales tax, to provide a notice to customers that the use tax due on such purchases must be paid by the purchaser.  [68 OKLA. STAT. ANN. § 1406.1(a) (2010); OKLA. ADMIN. CODE § 710:65-21-8 (2010) (proposed).]  The Oklahoma statute and emergency regulations require retailers to provide customers different information than do the Act and Regulations.

33.     Following the passage of the Colorado Act, South Dakota enacted a law that requires retailers located outside of South Dakota who make sales for use in South Dakota, but are not required to collect South Dakota sales tax, to provide a notice to customers that the use tax due on such purchases must be paid by the purchaser.  [SB 146 (2011), available at http://legis.state.sd.us/sessions/2011/Bill.aspx?Bill=146 .] The South Dakota law requires retailers to provide customers different information than do the Act and Regulations.

34.     A substantial portion (as much as 50 percent) of unreported Colorado use tax is attributable to purchases by businesses.  [Fox Deposition at 85:8 – 90:10.]

35.     The Tax Compliance Section of the Colorado Department of Revenue discovers each year only a small number of Colorado retailers who are not complying

with their legal obligation to collect and remit sales tax.  [Defendant's Opposition to

Motion for Preliminary Injunction, Ex. 16, Declaration of George Reiser ("Reiser Dec.").]

### III.  PROCEDURAL HISTORY

This case concerns the DMA's constitutional challenge to HB 10-1193, which

prescribes new notice and reporting obligations imposed on "each retailer that does not

collect Colorado sales tax." [COLO. REV. STAT. ANN. § 39-21-112(3.5)(c), (d).]  The Act

was passed by the Colorado General Assembly in February 2010, in an effort to

circumvent the well-established and undisputed Commerce Clause limitation upon the

authority of a state to require a remote seller that has no physical presence in the state

to collect that state's sales or use tax. [*See Quill Corp. v. North Dakota*, 504 U.S. 298,

311-19 (1992).]  The Act and Regulations establish three separate obligations for

affected out-of-state retailers: (1) in connection with each sale transaction, the retailer

must notify its Colorado customers that although it does not collect Colorado sales tax,

the purchaser is obligated to self-report use tax to the Department ("Transactional

Notice");  (2) the retailer must provide Colorado customers annually, by First Class Mail,

a detailed listing of their purchases and also inform the customer that s/he is obligated

to report use tax on such purchases, and that the retailer is required by law to report the

customer's name and total amount of purchases to the Department ("Annual Purchase

Summary"); and (3) the retailer must turn over to the Department annually the name,

billing address, all shipping addresses, and the total amount of purchases of each of its

Colorado customers. ("Customer Information Report").  A retailer subject to the law who fails to comply with the Act and Regulations is subject to substantial penalties.[2]

The DMA filed its original complaint on June 30, 2011, and its First Amended Complaint on July 23, 2011, asserting that the Act and Regulations offend multiple provisions of the United States Constitution, including the Commerce Clause, the First Amendment, the right of privacy, the Due Process Clause, and the Takings Clause.  On August 13, 2010, the DMA filed a motion for a preliminary injunction to suspend enforcement of the Act and Regulations, based solely on its claims for violation of the Commerce Clause.  After discovery and further briefing on the motion, the Court heard argument on the DMA's request for a preliminary injunction on January 13, 2011.  On January 26, 2011, the Court entered its Order Granting Motion for Preliminary Injunction, enjoining the Defendant from enforcing the Act and Regulations.

The parties subsequently negotiated a proposed procedure for seeking final judgment on the Commerce Clause claims, with no further discovery or evidentiary submissions, through the filing of cross motions for summary judgment on Counts I and II of the Complaint, while staying proceedings on all remaining claims.  The parties submitted their proposal as a part of their **Joint Status Report and Proposed Order [#85]**, filed on February 16, 2011.  In making their proposal, the parties requested that the Court certify for interlocutory appeal the Commerce Clause issues presented by the DMA's Complaint, so that these claims can ultimately be resolved by the Tenth Circuit

---

[2] The DMA respectfully refers the Court to its Motion for Preliminary Injunction, at 9-14, for a complete discussion of the notice and reporting requirements of the Act and Regulations, and to Exhibits 1 and 2 thereof for the full text of the Act and Regulations.

Court of Appeals.  By its March 18 Order, the Court agreed that the resolution of the

Commerce Clause claims by the Tenth Circuit "is likely to resolve a controlling issue of

law in this case" [March 18 Order at 2], and approved the parties' proposed procedure.

The DMA mow moves for summary judgment in accordance with the March 18 Order.[3]

## IV.   ARGUMENT

### A. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of

law."  [Fed. R. Civ. P. 56(a); *Rozenzweig v. Manville*, 2011 WL 1533491, *2 (10th Cir.

April 25, 2011).]  Pursuant to the parties' agreed-upon procedure for filing cross-motions

for summary judgment, the record in this case for purposes of Rule 56(c) consists of the

material already on file with the Court, and/or information as to which the Court can take

judicial notice.  [*See, e.g., SBM Site Servs., LLC v. Severin*, 2010 WL 4235853 (D.

Colo. Oct. 20, 2010), *4 (under Fed. R. Evid. 201, the court must take judicial notice of

facts "if requested by a party and supplied with the necessary information"); *Allen v.

United Properties & Constr., Inc.*, 2008 WL 4748511 (D. Colo. Oct. 28, 2008), *3 (court

may take judicial notice of public documents, including reliable sources on the Internet).]

More fundamentally, because the Act and Regulations violate the Commerce

Clause on their face, the core "facts" necessary to award summary judgment largely

derive from a plain reading of the requirements of the law (*i.e.*, the provisions of the Act

---

[3] On April 27, 2011 the Defendant filed her Answer to Counts I and II.

and Regulations that dictate to what retailers and transactions the notice and reporting obligations apply, and the nature of the burdens imposed upon affected retailers with regard to such requirements). Moreover, by conceding, as she must, that the DMA properly has standing to challenge the Act [*see* Answer, ¶ 7], the Defendant has effectively admitted that the DMA has members who are affected by each of the notice and reporting obligations of the law.[4]  In the end, there is no real disagreement between the parties about how the law operates; rather, the parties simply disagree on whether the Act and Regulations, as a matter of law, violate the dormant Commerce Clause.

Even as to secondary facts, however, which expand upon issues such as the intent of the law, the costs that affected retailers will incur to comply with the law, and the availability to the State of non-discriminatory alternatives to accomplish the Act's objectives, there is no genuine dispute between the parties. For example, statements contained in the legislative history of HB 10-1193 and in Department rulemaking documents show that both the General Assembly and the Department intended the Act to apply solely to out-of-state retailers. [SOF, ¶¶ 18-21.]  Furthermore, the Defendant cannot disavow the testimony of her own expert witness, Dieter Gable, that smaller retailers subject to the law will incur compliance costs, on average, between $2,500 and $6,000 in the first year, and additional expenses every year thereafter. [SOF, ¶ 26.]

At the same time, the record is utterly devoid of factual evidence that would enable the Defendant to show that there are no reasonable non-discriminatory

---

[4] The DMA, nevertheless, sets forth in its Statement of Facts ("SOF") the uncontroverted evidence from the record that establishes that it has members who are affected by the law and the nature of the burdens it imposes upon them.  [*See* Section III, *supra*.]

alternatives to the Act and Regulations to achieve the purported purpose of the law, *i.e.,* increased use tax reporting by consumers and businesses.  In the absence of such evidence, the Defendant simply cannot satisfy the "exceedingly difficult" standard that she must meet [January 26 Order at 8] to overcome the presumption that the law is "per se invalid" under the Commerce Clause.

Thus, because the material facts are not in dispute and the law is clear that the notice and reporting obligations of the Act and Regulations both discriminate against, and impermissibly burden, interstate commerce, the DMA is entitled to summary judgment on Counts I and II, as discussed below.

## B. THE ACT AND REGULATIONS VIOLATE THE COMMERCE CLAUSE, ON THEIR FACE.

### 1. The Law Impermissibly Discriminates Against Interstate Commerce.

It has long been understood that the Commerce Clause "directly limits the power of the States to discriminate against interstate commerce."  [*New Energy Co. v. Limbach*, 486 U.S 269, 273 (1988).]  The Supreme Court has stated that "[f]or over 150 years, our cases have rightly concluded that the imposition of a differential burden placed on any part of the stream of commerce–from wholesaler to retailer to consumer– is invalid, because a burden placed at any point will result in a disadvantage to the out-of-state producer."  [*West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 202 (1994).] Indeed, "[t]his rule is essential to the foundations of the Union." [*Granholm v. Heald*, 544 U.S. 460, 472 (2005).]

The first step in analyzing any state law under established Commerce Clause principles is to determine whether it "regulates even-handedly, with only 'incidental'

effects on interstate commerce, or discriminates against interstate commerce." [*Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979).]  Under the Commerce Clause, "discrimination" simply means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 99 (1994).    A state law violates the Commerce Clause if it discriminates against interstate commerce in either purpose or effect.  [*Hughes*, 441 U.S. at 336*; Limbach*, 486 U.S. at 280 (striking down law that discriminated against out-of-state companies on its face); *Hunt v. Washington State Apple Advert. Comm'n,* 432 U.S. 333, 352-54 (1977) (striking down law that had the practical effect of discriminating against out-of-state producers); *Best & Co. v. Maxwell*, 311 U.S. 454, 455 (1940) ("[t]he commerce clause forbids discrimination, whether forthright or ingenious").]   Moreover, as this Court noted in its January 26 Order, "the degree of a differential burden or charge on interstate commerce 'is of no relevance to the determination whether a State has discriminated against interstate commerce.'"  [January 26 order at 8 (citing *Oregon Waste Systems*, 511 U.S at 100 n.4).]

The Act and Regulations discriminate, on their face, against interstate commerce.[5]  Rather than regulating even-handedly, the Act and Regulations are specifically targeted at retailers with no physical presence in Colorado that "do[] not collect Colorado sales tax."  The Act and Regulations, however, do not apply to in-state retailers, who are required by law to collect Colorado sales tax.

---

[5] Because the Act is discriminatory, *Pike v. Bruce Church, Inc.,* 397 U.S. 137 (1970) does not apply, but the Act's burden on interstate commerce clearly exceeds the local benefit.

    a.  <u>The Act and Regulations Impose Different Burdens on Out-of-State</u>
<u>Retailers Than They Impose on In-State Retailers.</u>

The discrimination against out-of-state retailers that do not collect Colorado sales tax is manifest, both in the evidence of the Act's purpose, and in the practical effect of its requirements.  The title of the Act explicitly states that it applies solely to out-of-state companies:  "*An Act Concerning The Collection of Sales and Use Taxes <u>On</u>* *<u>Sales Made By Out-of-State Retailers</u>* . . ." [SOF, ¶ 1.]  The legislative history of the Act also makes clear that the intent of the law is to impose new requirements with respect to out-of-state retailers that are not obligated to report Colorado sales and use tax, because of the protections afforded them under the Commerce Clause and the *Quill* decision.  [SOF, ¶¶ 18-20.]  Furthermore, the Department's own "Statement of Basis and Purpose" for the Regulations shows that the Department interprets HB 10-1193 to apply only to out-of-state retailers.  [SOF, ¶ 21.]

The Act and Regulations impose new notice and reporting requirements on retailers that do "not collect Colorado sales or use tax." [COLO. CODE REGS. § 201-1:39-21-112.3.5(1)(a)(i).]  Because retailers doing business in Colorado are required, under Colorado law, to obtain a sales tax license from the Department and to collect the sales tax from the purchaser at the time of the sale, the Act is plainly targeted solely at out-of-state retailers.  [*See* COLO. REV. STAT. ANN. §§ 39-26-103(1)(a), 39-26-106(2)(a), 39-26-204(2).]  Indeed, it is unlawful, and a class 3 misdemeanor, for a retailer subject to the Colorado sales tax law to make sales at retail in Colorado without a license. [*Id.* §§ 39-26-103(1)(a), (4).]  In addition, a retailer that is obligated to collect Colorado sales tax but willfully fails to do so is guilty of a felony. [*Id.* §§ 39-21-118(2).]

17

Since in-state retailers must, under threat of criminal sanction, collect and remit Colorado sales tax, each retailer that does <u>not</u> collect Colorado sales tax is, by definition, located outside the state.  The Defendant, in opposing the DMA's request for a preliminary injunction, argued that, even though Colorado law makes it a crime for in-state retailers to fail to collect Colorado tax, the Act, nevertheless, "applies equally to all retailers that sell to Colorado purchasers and do not collect sales tax."   The Court properly rejected this argument, stating that:

> Under Colorado law, any retailer who is not subject to the statutory obligations to collect and remit Colorado sales tax necessarily is an out-of-state retailer.  The Act and Regulations impose a notice and reporting burden on these out-of-state retailers and that burden is not imposed on in-state retailers, except for a very few in-state retailers who defy their statutory sales tax obligations.

[January 26 Order at 7.]  There is nothing new or additional before the Court on summary judgment that can alter this conclusion.[6]

Furthermore, such differential burdens cannot be justified on the grounds that out-of-state retailers that volunteer to collect Colorado sales tax are not subject to the notice and reporting obligations of the Act and Regulations. The Commerce Clause does not permit a state to pick-and-choose which participants in interstate commerce it will select for discriminatory treatment.  [*E.g., Limbach,* 486 U.S. at 276 (1988) (Ohio statute, which offered tax credit to out-of-state companies from states with reciprocal tax credit for Ohio companies and, as a result, burdened only one out-of-state producer, nevertheless facially violated the Commerce Clause); *see also Faulkner Corp. v. Fulton,*

---

[6] It defies common sense to suggest that a statute "regulates even-handedly" on the grounds that it applies in the same manner to criminally–operated in-state retailers as it does to lawfully–operated out-of-state retailers.

516 U.S. 325, 333 n.3 (1996) (there is no "*de minimis*" defense to discrimination under the Commerce Clause.)]   Thus, the Act and Regulations, both in purpose and effect, impose discriminatory treatment against a specific segment of out-of-state retailers.

        b.     <u>The Defendant Cannot Carry Her Heavy Burden of Demonstrating that the Act Advances a Legitimate Local Purpose for which there is No Reasonable Non-Discriminatory Alternative.</u>

      Discriminatory laws such as the Act and Regulations are virtually *per se* invalid under the Commerce Clause.  [*Dorrance v. McCarthy,* 957 F.2d 761, 765 (10th Cir. 1992) (*citing City of Philadelphia v. New Jersey,* 437 U.S. 617, 624 (1978)).]  Indeed, even for a statute that has "facial neutrality" (which is not the case here), state laws having discriminatory *effects* are, likewise, subject to the same strict scrutiny.  [*See, e.g., Hunt,* 432 U.S. at 352-53.]  As a result, the burden falls on the Defendant to justify the Act and Regulations as: (1) having a legitimate local purpose; that (2) cannot be achieved through reasonable nondiscriminatory alternatives.  [*Dorrance*, 957 F.2d at 765 (*citing Hughes*, 441 U.S. at 336-37).]   The latter requirement means that the Defendant must affirmatively show that there are "*no other means*" to advance a legitimate local purpose for the law, an exceedingly difficult standard to meet.  [*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Auth.*, 550 U.S. 330, 338-39 (2007).]  Indeed, the Defendant's burden of justification is so heavy that "facial discrimination by itself may be a fatal defect." [*Hughes*, 441 U.S at 337.]

      The Defendant cannot carry her burden.  The Defendant has conceded that the Act has no purpose other than generating revenue.  [*See* Defendant's Opp. to Plaintiff's Motion for Preliminary Injunction, at 24-25.]  The Supreme Court has made clear,

however, that while revenue generation is an acceptable local purpose for state laws that regulate even-handedly, raising revenue, by itself is "not a local interest that can justify discrimination against interstate commerce."  [*C&A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 393 (1994).]  The reason for this rule is evident: blatantly discriminatory measures, including direct tariffs on out-of-state goods, would then be justified by states on the grounds that they generate revenue necessary to support important government programs, rendering meaningless the Court's requirement of a legitimate local purpose.  [*See id.* at 393-94.]  Thus, because the Defendant advances no other purpose in support of the law, and the record likewise supports no other legitimate interest of the State, the Defendant fails to satisfy the first prong of the test, *i.e.*, a showing that  the Act and Regulations advance a "legitimate local purpose" sufficient to sustain their discriminatory requirements.

Furthermore, as the Court concluded in its January 26 Order [at 8], there are demonstrable, non-discriminatory alternatives that would promote increased revenue through self-reporting of use tax by, and collection from, Colorado consumers.  The record indisputably supports a finding that several such alternatives exist.  Most obviously, Colorado could adopt the approach taken by more than 20 other states and include a line for reporting use tax on its individual income tax return. [SOF, ¶16.]  The State might also undertake its own consumer-awareness campaign, through notices and public service announcements, rather than subjecting out-of-state companies to burdensome obligations, including the forced disclosure to the Department of personal purchasing information regarding thousands of Colorado residents and non-residents.

[*See id.*, ¶ 29.] The Department could also pursue increased audits of businesses for under-reporting of use tax on their purchases, which the Defendant's expert, Bill Fox, estimates to comprise as much as half of all unreported use tax. [*Id.*, ¶¶ 29, 34.]

While there is incontestable evidence regarding alternative, non-discriminatory measures in the record, there is no evidence adequate to negate them, as the Defendant must do in order to carry her burden of justifying the discriminatory effect of the Act and Regulations.  Therefore, because the Act and Regulations discriminate against out-of-state retailers that do not collect Colorado sales tax, both on their face and in their effect, the DMA is entitled to judgment as a matter of law on Count I.

2.       **The Act and Regulations Impose Improper and Undue Burdens on Interstate Commerce.**

a.       The Commerce Clause Prohibits Imposing the Notice and Reporting Requirements of HB 10-1193 on Companies That Have No Physical Presence in the State.

The DMA is also entitled to summary judgment on Count II of its Complaint, asserting that Colorado lacks the power under the Commerce Clause to require retailers with no physical presence in the state to comply with the notice and reporting obligations of the Act and Regulations.  It is well-established that the Commerce Clause, in addition to prohibiting state laws that discriminate against interstate commerce, also restricts the authority of a state to impose undue burdens on interstate commerce.  [*Oregon Waste Sys.*, 511 U.S. at 98.]  This inherent limitation upon the power of a state to regulate interstate commerce further requires that "some aspects of trade generally must remain free from interference by the States."  [*Kassel v. Consolidated Freightways Corp.*, 450 U.S. 662, 669 (1981); *see also Quill*, 504 U.S at

314-15 (undue burdens on interstate commerce may be avoided in appropriate situations by the "demarcation of a discrete realm of commercial activity" that is free from interstate taxation or regulation).]

In *Quill*, the Supreme Court applied these fundamental principles of Commerce Clause jurisprudence to reaffirm that a state may not impose sales and use tax collection obligations on an out-of-state company that lacks a "substantial nexus" with the state. [*Quill*, 504 U.S. at 311-19.]  As the Court explained, the requirement that an out-of-state retailer must have a physical presence in the state to be subject to a tax collection obligation serves as "a means for limiting state burdens on interstate commerce."  [*Id.* at 313.]   Indeed, the nexus requirement derives from the core objectives of the dormant Commerce Clause and is informed "by structural concerns about the effects of state regulation on the national economy," rather than concerns about fairness to any individual retailer. [*Id.* at 312.]

The same principles relied upon by the Court in *Quill* prohibit the State of Colorado from subjecting remote sellers to the notice and reporting obligations of the Act and Regulations.  The Defendant correctly notes that the Act is not a tax law [*see* Defendant's Opp. To Plaintiff's Motion for Preliminary Injunction, at 25], but the parallel to *Quill* is otherwise direct.  The current case, like *Quill*, involves the imposition of onerous, and potentially conflicting, reporting burdens that are directed at the same kinds of direct marketers, engaged in the same kinds of sales transactions, as are the sales and use tax laws that the Supreme Court struck down under *Quill*.   As this Court noted in granting the DMA's request for a preliminary injunction, "the burdens imposed

by the Act and Regulations are inextricably related in kind and purpose to the burdens condemned in *Quill*."  [January 26 Order at 10.]

Indeed, the very same "structural concerns" that support the nexus requirement of *Quill* [*see* 504 U.S. at 313-15 and n.6 (*citing National Bellas Hess v. Department of Revenue*, 386 U.S. 753, 759-60 (1967))], apply with equal force to the notice and reporting requirements of the Act and Regulations. There are still thousands of different state and local taxing jurisdictions in the United States that can, if the Act is upheld, subject remote sellers that do not collect sales tax to a myriad of disparate notice and/or reporting laws, requiring them to provide customer notices with varying levels of detail about tax obligations and purchase histories, and to file extensive reports with tax officials concerning what or how much their customers purchased, whether it is taxable, where it was sent, and so on.  Indeed, if Colorado is free to impose such notice and reporting obligations on remote sellers, then "so can every other State, and so, indeed, can every municipality, every school district, and every other political subdivision throughout the Nation with power to impose sales and use taxes," resulting in precisely the kinds of "local entanglements" and burdens on interstate commerce that the Commerce Clause is designed to prevent. [*National Bellas Hess*, 386 U.S. at 759-60.][7]

The need to safeguard the national economic interests secured by the Commerce Clause and inherent to remote sales transactions has only increased in the 19 years since *Quill* was decided, with growth of electronic commerce conducted over

---

[7] The danger of conflicting state regulation posed by the notice and reporting requirements of the Act and Regulations is already evident.  Indeed, Oklahoma and South Dakota have each enacted conflicting Transactional Notice requirements imposed upon out-of-state sellers that do not collect sales tax in those states.  [SOF, ¶¶ 32-33.]

the Internet. The nexus requirement of *Bellas Hess and Quill* was based in part on the Supreme Court's conclusion that "it is difficult to conceive of commercial transactions more exclusively interstate in character than the mail order transactions here involved." [*National Bellas Hess*, 386 U.S. at 759.]  Today, the majority of remote sales are conducted online, an even more intensely interstate environment.  As the Tenth Circuit has found, the nature of the Internet as an inherently borderless medium raises a host of additional and enhanced Commerce Clause concerns that weigh heavily in favor of enjoining state laws that seek to regulate commercial activity transacted over the Internet.  [*See ACLU v. Johnson,* 194 F.3d 1149, 1160-63 (10th Cir. 1999).]  Echoing and amplifying the kinds of "structural concerns" that supported the Court's decision in *Quill*, the Tenth Circuit has concluded that the Internet "requires a cohesive scheme of national regulation" and cannot be subjected to the risk of inconsistent state regulations under the Commerce Clause.  [*Id.* at 1163 (*citing Pataki*, 969 F.Supp. at 182).]

The need for a cohesive national marketplace is precisely why the framers reserved for Congress the power to regulate commerce "among the several States." [U.S. CONST., art. 1, § 8, cl. 3.]  As *Quill* makes clear, Congress, rather than individual states or the courts, is "better qualified to resolve" the underlying tension between the state interest in tax collection and burdens imposed on interstate commerce.  504 U.S. at 316.  Indeed, in its most recent session, ending in 2010, Congress once again considered legislation addressing this issue.  [*See* SOF, ¶ 30.]  As recognized in *Quill*, "it may be that 'the better part of both wisdom and valor is to respect the judgment of [Congress]'" on the perceived problem of uncollected use tax.  [*Id.* at 318-19.]

24

Congress, and not the courts, is equipped to handle the delicate task of writing legislation that balances the interests of interstate commerce (such as mandating simplification and uniformity of state taxation of interstate commerce) with any expansion of state tax authority.

      b.     <u>The State May Not Devise Alternative Burdens On Interstate Commerce In Order to Circumvent its Lack of Authority to Require Sales and Use Tax Collection Under *Quill*.</u>

Even if the notice and reporting obligations of the Act did not implicate the same, fundamental "structural concerns" that underlie the Court's holding in *Quill*, the Act and Regulations represent an impermissible attempt by Colorado to compel out-of-state retailers with no physical presence in the state to surrender the constitutional protections afforded to them under the *Quill* decision.   Indeed, the thinly-veiled objective of HB 10-1193 is to coerce out-of-state retailers that are protected, by *Quill,* from the obligation of collecting Colorado sales/use tax to surrender such protection voluntarily, rather than confront the more onerous choice of either complying with the Act's burdensome requirements, or incurring substantial penalties for non-compliance.[8]

The Commerce Clause, however, prohibits Colorado from devising such alternative burdens for out-of-state sellers*,* and then conditioning relief from such burdens on the waiver of the affected retailers' constitutional rights.  [*See Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 893 (1988) (a state may not condition the availability of other important rights on the relinquishment of a party's

---

[8]  Press reports indicate that the Department's Tax Policy Director has publicly-stated that he believes that out-of-state retailers would rather voluntarily collect Colorado use tax than face the more unpleasant task of complying with the Act.  [SOF, ¶ 17.]

constitutional rights under the Commerce Clause).][9]   Indeed, the Supreme Court recently commented, with disfavor, on an effort by the City of New York to "end-run its lack of authority" under *Quill* to compel sales and use tax collection by out-of-state companies by bringing a claim against a remote seller of cigarettes under federal racketeering law.  *Hemi Group LLC v. City of New* York, 130 S.Ct. 983, 994-95 (2010) (Roberts, J., for the majority, and Ginsburg, J. concurring).   The Court emphasized that the City sought to impose obligations (indeed, liability) upon an out-of-state company with respect to "lost taxes that [the company] had no obligation to collect, remit, or pay" under *Quill,* in order to "substitute for or complement [the] governing body's uncertain ability or desire to collect taxes directly from those who owe them.*"*  [*Id.* at 994.]  In short, Colorado may not, consistent with the Commerce Clause, craft more onerous and discriminatory notice and reporting obligations as a substitute for the tax collection obligations it is prohibited from imposing under *Quill.*

         c.     <u>The Act and Regulations Impermissibly Regulate Commerce Occurring Entirely Outside of Colorado.</u>

The Act and Regulations also impermissibly burden interstate commerce by regulating transactions that occur entirely outside the state. The Defendant admits that the Regulations include within the definition of "Colorado purchaser" those customers of a retailer located outside Colorado who request that goods be shipped into the state. [*See* SOF, ¶ 24; 1 COLO. CODE REGS. § 201-1:39-21-112.3.5(1)(b)(i).]  As a result, the

_____

[9] Moreover, the Commerce Clause clearly forbids a state from requiring an out-of-state company to accept additional regulatory burdens as if it were a resident, in order to stand on equal footing with in-state companies. [*Granholm*, 544 U.S. at 475 (*citing Halliburton Oil Well Cementing Co. v. Reilly*, 373 U.S. 64, 72 (1963)).]  Such laws promote the very "economic Balkanization" the Commerce Clause seeks to prevent.  [*Fulton Corp.*, 516 U.S. at 333 n.3.]

notice and reporting obligations of the Act and Regulations are imposed on out-of-state retailers not only with respect to sales to Colorado residents, but also with respect to sales by non-residents to non-residents, where the only connection to Colorado is the fact that the donee of the out-of-state purchaser receives the package via mail or common carrier in Colorado.

The Supreme Court has made clear that states may not regulate commerce occurring outside their borders. [*See, e.g., Edgar v. MITE Corp.*, 457 U.S. 624, 642-43 (1982).]  Indeed, state laws having such an "extraterritorial effect" constitute a "per se violation" of the Commerce Clause. [*ACLU v. Johnson*, 194 F.3d at 1161; *see Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 665-66 (7th Cir. 2010) (collecting cases).]  In determining if the law violates the Commerce Clause, "[t]he critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the state." [*Healy v. Beer Institute*, 491 U.S. 324, 336 (1989); *see also Edgar*, 457 U.S. at 642-43 (the Commerce Clause prohibits the application of a state statute to commerce occurring outside the state's borders, even if such commerce has effects within the state).]  Here again, a principle concern, against which the Commerce Clause protects, is the danger of "inconsistent legislation arising from the projection of one state's regulatory regime into the jurisdiction of another State."  [*Healy,* 491 U.S. at 336-37.]

## C.  THE DMA SATISFIES THE REQUIREMENTS FOR A PERMANENT INJUNCTION PREVENTING ENFORCEMENT OF THE ACT.

In addition to a declaration that the Act and Regulations are unconstitutional and unenforceable, the DMA seeks a permanent injunction preventing the Defendant from enforcing them.  "A party is entitled to a permanent injunction if it proves: A) actual

success on the merits; B) irreparable harm unless the injunction is issued; C) the threatened injury outweighs the harm that the injunction may cause the opposing party; and D) the injunction, if issued, will not adversely affect the public interest." [*Rocky Mountain Christian Church v. Board of County Comm'rs of Boulder County*, 612 F. Supp. 2d 1157, 1160 (D. Colo. 2009), aff'd, 335 F.3d 1229 (10th Cir. 2010).]

Because the Act and Regulations, as demonstrated above, are "per se invalid" under the Commerce Clause, it is evident that a permanent injunction against their enforcement is appropriate. [*See, e.g., Pete's Brewing Co. v. Whitehead*, 19 F. Supp. 2d 1004, 1021 (W.D. Mo. 1998) ("To the extent that the Plaintiffs seek a permanent injunction . . . such a request has been granted by the Court's declaratory judgment that [the statute] violates the Commerce Clause"); *Hillside Dairy, Inc. v. Kawamura*, 317 F. Supp. 2d 1194, 1199 (E.D. Cal. 2004) (because a statute discriminates on its face against interstate commerce, "[t]herefore, Defendants are permanently enjoined from enforcing [it]").] The DMA, in addition to succeeding on the merits of its claims, clearly satisfies the basic requirements for a permanent injunction.

### 1.  DMA Members Will Suffer Irreparable Harm Absent an Injunction.

The DMA clearly satisfies the requirement of irreparable harm. In general, "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable harm is necessary." [*Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (citing 11A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995).] Moreover, as the Court noted in granting the DMA's request for a preliminary injunction [January 26 Order at

28

11], the Tenth Circuit has indicated that violation of the rights protected under the Commerce Clause is alone sufficient harm to warrant a permanent injunction. [*ACLU v. Johnson*, 194 F.3d at 1163 (citing *American Libraries Ass'n v. Pataki,* 969 F. Supp. 160, 168 (S.D.N.Y. 1991).]  Numerous other courts have reached the same conclusion. [*E.g., Midwest Title Loans, Inc. v. Ripley*, 616 F.Supp.2d 897, 908 (S.D. Ind. 2009), aff'd sub nom. *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir.), and cert. denied, 131 S.Ct. 83 (2010); *American Booksellers Found. for Free Expression v. Dean,* 202 F. Supp. 2d 300, 321-22 (D. Vt. 2002), aff'd in pertinent part, 342 F.3d 96 (2nd Cir. 2003); *Kendall Jackson Winery v. Branson*, 82 F. Supp. 2d 844, 878 (N.D.Ill.) (collecting cases), appeal dismissed, 212 F.3d 995 (7th Cir. 2000).]

Furthermore, each of the different notice and reporting obligations requires affected remote sellers to incur compliance costs [SOF, ¶¶ 22, 26] (or face penalties for non-compliance) that they will be unable to recover due to the Defendant's immunity from suit under the Eleventh Amendment.  The Tenth Circuit in *Edmondson* stated:

> The imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury… <u>If forced to comply with the Oklahoma Act, the Chambers' members will face a significant risk of suffering financial harm</u> as described in Part II.[10]  Yet, because Oklahoma and its officers are immune from suit for retrospective relief, *Edelman*, 415 U.S. at 667-68 . . .these financial injuries cannot be remedied. ... <u>These consequences, in and of themselves, demonstrate a likelihood of irreparable harm</u>.

594 F.3d at 770-71 (emphasis and ellipses added).

---

[10] In Part II of the opinion, the Court stated:

<u>Both compliance and non-compliance with Section 7(B) injure the Chambers' members</u>. As noted above, Section 7(B) effectively forces members to use Basic Pilot. . . <u>Adopting Basic Pilot imposes significant economic injuries in the form of implementation and training expenses, which the Chambers allege may total well more than a thousand dollar per year.</u>  594 F.3d at 756 (emphasis added).

**3.   The Balance of Equities Favors the DMA and a Permanent Injunction Preventing Enforcement of the Act Serves the Public Interest.**

Balancing the harm to the parties and evaluating whether an injunction serves the public interest "largely overlap when a Plaintiff sues a government entity to enjoin enforcement of a statute." [*Midwest Title Loans*, 616 F. Supp. 2d at 908.]  While DMA members face irreparable harm if the Act and Regulations are enforced, Colorado "has no interest in enforcing a law that is likely constitutionally infirm."   [*Edmondson*, 594 F.3d at 771.]  Indeed, the public interest is best served by enjoining a law that violates the Commerce Clause.  [*Id.*; *Midwest Title Loans*, 616 F.Supp.2d at 908; *see also Rocky Mountain Church*, 612 F. Supp. 2d at 1161 (vindicating constitutional rights serves the public interest).]  Moreover, granting a permanent injunction against the law will not prevent Colorado consumers from self-reporting use tax, or bar the Department from pursuing constitutionally-proper initiatives to promote self-reporting by consumers.

## V.   Conclusion

For the foregoing reasons, the DMA's motion for summary judgment should be granted.

Dated: May 6, 2011

s/ George S. Isaacson
George S. Isaacson
Matthew P. Schaefer
BRANN & ISAACSON
184 Main Street, P. O. Box 3070
Lewiston, ME 04243−3070
Tel.: (207) 786−3566
Fax:  (207) 783-9325
E-mail: gisaacson@brannlaw.com
          mschaefer@brannlaw.com
*Attorneys for The Direct Marketing Association*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 6, 2011, I electronically filed the foregoing, Plaintiff's

Motion for Summary Judgment, using the CM/ECF system, which will send notification

of such filing to counsel of record:

> Jack Wesoky
>   Senior Assistant Attorney General
>   Jack.Wesoky@state.co.us
> Stephanie Lindquist Scoville
>   Senior Assistant Attorney General
>   stephanie.scoville@state.co.us
> Melanie J. Snyder
>   Assistant Attorney General
>   melanie.snyder@state.co.us
>
> State of Colorado
> 1525 Sherman Street, 7th Floor
> Denver, CO 80203
>
> Attorneys for Defendant

s/ George S. Isaacson
George S. Isaacson
