IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 10-cv-01546-REB-CBS

The Direct Marketing Association,

     Plaintiff,

v.

Roxy Huber, in her capacity as Executive Director,
Colorado Department of Revenue,

     Defendant.

---

## DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT-COUNTS I AND II (COMMERCE CLAUSE)

---

Defendant, Roxy Huber, Executive Director of the Colorado Department of Revenue ("DOR"), moves for partial summary judgment, pursuant to Federal Rule of Civil Procedure 56, on Counts I and II of Plaintiff, the Direct Marketing Association ("DMA"),'s First Amended Complaint ("Am.Compl."), filed July 23, 2010 [Dkt. #10].

### INTRODUCTION AND BACKGROUND

DMA alleges that a Colorado statute, Colo. Rev. Stat. § 39-21-112(3.5) (2010), and the implementing regulations, 1 Colo. Code Regs. § 201-1:39-21-112.3.5 (2010), (collectively, "the Law"), violate the Commerce Clause of the United States Constitution, Art. I, § 8, Cl. 3. First, DMA alleges that the Law discriminates against interstate commerce and imposes notice and reporting requirements that burden out-of-state retailers to the benefit of in-state retailers. Am.Compl., Count 1, pp.18-19. Second, DMA alleges the Law is an improper regulation of and imposes an undue burden upon interstate commerce because it imposes notice and reporting requirements upon

retailers with no physical presence in Colorado.  Am.Compl., Count 2, pp.20-22.

Because there is no genuine dispute as to any material fact and DMA cannot meet its

heavy burden to establish the unconstitutionality of the Law, summary judgment for

Defendant on Counts I and II is warranted.

**The Sales and Use Tax Scheme**

The Law does not exist in a vacuum.  Rather, it is a tool for DOR to enforce and

collect the long-existing sales and use tax.  Colorado enacted a sales tax in 1935 and a

complementary use tax in 1937.  Use tax is due on the storage, usage or consumption

of tangible property within Colorado when sales tax has not been paid. Colo. Rev. Stat.,

§ 39-26-202.  The use tax aims to capture loss of sales tax revenue when sales are

diverted out of state or are accomplished remotely, as through catalog purchases or via

the Internet.  The obligation to pay the sales or use tax is upon the consumer.  *J.A.*

*Tobin Construction Co. v. Weed*, 407 P.2d 350, 353 (Colo. 1965).

The purpose of a complementary sales and use tax scheme is to make all

tangible property used or consumed in the state subject to a uniform tax burden,

regardless of whether it is acquired within or without the state.  *Halliburton Oil Well*

*Cementing Co. v. Reily*, 373 U.S. 64, 66 (1963).  Another proper function of this scheme

is to "put local retailers subject to the sales tax on a competitive parity with out-of-state

retailers exempt from the sales tax."  *Nat'l Geographic Soc'y v. Cal. Bd. of Equalization*,

430 U.S. 551, 555 (1977) (noting the constitutionality of such schemes is settled).  The

constitutionality of Colorado's use tax is not at issue.  By its very nature, the use tax is a

facially discriminatory tax.  The Supreme Court, however, long ago determined that

when paired with the sales tax of the same rate, it does not run afoul of the dormant Commerce Clause.  *Henneford v. Silas Mason Co., Inc.*, 300 U.S. 577 (1937).

Also not in dispute is the ability of states, in certain circumstances, to require retailers to <u>collect</u> the sales and use tax from consumers and remit it to the state.  In Colorado, retailers doing business in the state must obtain a license, calculate the state and local sales tax due, including determining whether any exemptions apply, collect the tax at the time of the transaction, file a return, remit the tax collected to the state, and maintain records.  *See* Colo. Rev. Stat. §§ 39-26-101 through 39-26-127.  Only those retailers with a physical presence within the state, however, may be required to <u>collect</u> sales and use tax on behalf of the state.  *See infra* Part III (discussing the holdings in *Quill Corp. v. N.D.*, 504 U.S. 298 (1992) and *Nat'l Bellas Hess, Inc. v. Dept. of Revenue of Ill.*, 386 U.S. 753 (1967)).  The result is that national retailers with locations in Colorado, like Barnes & Noble or Target, and in-state companies must collect and remit sales tax.  Internet and mail-order companies with no physical presence in the State, like Amazon.com or L.L. Bean, are not required to do so.

**<u>The Tax Gap in the Age of the Internet</u>**

The challenge that states face is the growing gap between what is owed and what is paid in sales and use tax.  Consumers, whether unknowingly or willfully, often fail to pay the tax they owe if it is not collected at the point of sale.  This problem is compounded by the explosion in Internet sales ("E-commerce"), which reached $3 trillion nationwide in 2008.  Ex. 1, Decl. Professor William Fox, Ex. A thereto ("Fox Report"), p.2.  As consumers make more and more purchases via the Internet and

3

through other remote transactions from businesses that do not collect the sales and use tax, the tax gap widens.  *Id; see also*, *Fair Hous. Council v. Roomates.com LLC*, 521 F. 3d 1157, 1164 n.15 (9th Cir. 2008) (the Internet is the "dominant and perhaps the preeminent means in which commerce is conducted").  DMA does not dispute whether these taxes are <u>owed</u>; consumers' tax obligations are independent of the Law.  Rather, DMA challenges one method to enhance the State's ability to collect revenue due.

Although Congress has the expertise and authority to address a comprehensive national scheme to address the state sales and use tax gap, it has not yet done so. *See Quill*, 508 U.S. at 318.  In the absence of any action by Congress, the states, including Colorado, have approached this significant challenge in different ways.  *See, e.g., Amazon.com, LLC v. N.Y. State Dep't of Taxation & Fin.*, 913 N.Y.S.2d 129 (N.Y. App. Div. 2010) (discussing New York law requiring certain on-line retailers to collect sales tax on purchases by residents).  Such is the proper role of the States as laboratories for economic policy.  *See New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J. dissenting) ("It is the happy incidents of the federal system that a single courageous State may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country.").

**<u>The Law</u>**

Just as the use tax supports enforcement of the sales tax, the notice and reporting requirements of the Law are additional enforcement tools to collect from consumers taxes owed on purchases from non-collecting retailers.  The Law is based on well-documented research which demonstrates that compliance dramatically

4

improves when a third party reports taxable activity to the taxing authority.  Ex. 2, "Reducing the Federal Tax Gap- A Report on Improving Voluntary Compliance" (the "Tax Gap Study"), p.6; *see also* Leandra Lederman, *Reducing Information Gaps to Reduce the Tax Gap: When is Information Reporting Warranted?*, 78 Fordham L. Rev. 1733, 1738-1739 (March, 2010) (comparing third party information reporting to red light cameras "spurring compliance in the first instance" because the taxpayer is aware the government is watching).[1]  The Law aims to improve compliance by requiring non-collecting retailers that sell to Colorado consumers to meet three requirements.[2]

Without these reporting provisions, the transactions on which use tax is due remain invisible to DOR.  The reporting provisions first require non-collecting retailers to notify purchasers that although sales tax is not collected, the purchase may be subject to Colorado's use tax (the "Transactional Notice").  Reg. 39-21-112.3.5(2).  Second, non-collecting retailers must send to customers who purchase more than $500 from the retailer in a year an annual summary listing the dates, general categories, and amounts of their purchases and reminding them of their use tax obligation (the "Annual Purchase Summary").  Reg. 39-21-112.3.5(3).  Third, non-collecting retailers must send an annual

---

[1] The Law is but one tool DOR may use in enforcing its lawful compensatory use tax.  *See also* Colo. Rev. Stat. § 39-21-112(3.5)(a) (providing for DOR's subpoena authority).   The Law is consistent with the flexibility allowed to states to regulate and tax through a variety of mechanisms.  *See, e.g., Gregg Dyeing Co. v. Query*, 286 U.S. 472, 480 (1932) (a state is not required to put all requirements in one statute, rather, it may distribute them as it sees fit as long as the totality of the result is not unconstitutional); *Assoc. Indus. of Mo. v. Lohman*, 511 U.S. 641, 655-656 (1994) (a state may "place provisions perfecting a compensatory tax scheme in two or more statutes").

[2] The Law exempts from these requirements non-collecting retailers with less than $100,000 in gross annual sales in Colorado.  Reg. 39-21-112.3.5(1)(a).

5

report to DOR listing only customer names, addresses, and total amounts spent (the "Customer Information Report").  Reg. 39-21-112.3.5(4).

The Law supports the State's strong interest in increasing compliance with its tax laws and collecting revenue for the public's benefit and promotes a level playing field for in-state and out-of-state retailers.  The Law also educates consumers about their sales and use tax obligations and provides them with the information to accurately report and pay the tax due.  Additionally, DOR can use the information reported to assess compliance and recover tax due from consumers who fail to pay use tax.  The Law imposes neither tax liability nor any obligation to collect and remit sales tax.[3]

## STATEMENT OF UNDISPUTED FACTS

The following facts are undisputed:

1.      E-commerce in the United States has nearly tripled over the last decade, from $1.06 trillion in 2000 to $3.16 trillion in 2008.  Ex. 1, Fox Report, p.2.  As a result, state and local governments and their economies experience increased evasion of sales and use taxes and the resulting lost revenue, lost sales by Main Street vendors who must collect sales tax, and the economically inefficient alteration of business practices to avoid collection responsibility.  *Id.*  States collect taxes due on E-commerce much less effectively because vendors are often not required to collect and remit the tax and buyer compliance with the use tax is frequently very weak.  *Id.*  Colorado state and local governments are estimated to fail to collect hundreds of millions of dollars in sales

---

[3] Because the Law is a tool to enforce the use tax, enjoining its enforcement could implicate the Tax Injunction Act, 28 U.S.C. § 1341, which provides that federal courts "shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State."

or use tax due on E-commerce sales between 2010 and 2012.  *Id.*  Colorado also loses revenue that is uncollected on remote sales, such as from mail order firms.  *Id.*

2.      Sales and use tax revenue historically account for approximately one third of the State of Colorado's General Fund.  Ex. 3, Decl. Todd Saliman, ¶ 8.

3.      The United States Department of the Treasury, Internal Revenue Service has conducted research on the income tax gap, the "aggregate amount of true tax liability imposed by law for a given tax year that is not paid voluntarily and timely."  Ex. 2, Tax Gap Study, p.6.  This research indicates that compliance with tax laws dramatically increases when a third party reports taxable activity to the taxing authority. *Id.*  (relevant portions highlighted, *see, e.g.,* pp. 12-16).

4.      Retailers utilizing direct marketing methods need not have facilities, employees, or property in a state to sell to consumers in the state.  Am.Compl., ¶ 9.

5.      Many direct marketers have no physical presence in Colorado, but sell products and services to Colorado consumers from outside the state using instrumentalities of interstate commerce.  *Id.* at ¶ 9.

6.      Retailers with a physical presence in Colorado are required under Colorado law to obtain a sales tax license from DOR and to collect and remit Colorado sales tax to DOR on all non-exempt, retail sales.  *Id.* at ¶ 16.

7.      Effective March 1, 2010, Colorado enacted House Bill 10-1193, codified at Colorado Revised Statutes Section 39-21-112(3.5), imposing new notice and reporting obligations upon "each retailer that does not collect Colorado sales tax." *Id.* at ¶¶ 1, 21.

8.      Under the Law, out-of-state retailers that agree to collect Colorado sales tax, even though they have no obligation to do so under Colorado law and the United States Constitution, are not required to comply with the requirements for the notice and reporting requirements of the Law.  *Id.* at ¶ 26.

9.      Of the Internet retailers listed in the publication *Top 500 Internet Retailers*, at least 39 do not have a physical presence in the State of Colorado but nevertheless collect Colorado sales tax.  Ex. 4, Decl. Elizabeth Corujo, ¶¶ 4, 6.

10.      Because the Law exempts retailers with less than $100,000 in gross annual sales in Colorado, the vast majority of retailers in the country are not subject to the Law.  Ex. 5, Decl. Dieter Gable, Ex. 1 thereto ("Gable Report"), pp.5-6.

11.      The Law provides leeway for variance in approaches to compliance, allowing affected retailers to comply with reasonable efforts.  Ex. 5, Gable Report, p.6.

12.      There are many ways a retailer can comply with the Transactional Notice requirement- from a linking notice or popup window at the time of the online purchase, to slipping the notice in as a packing slip for delivery, or other workarounds.  Ex. 6, Deposition of Curtis Barry, 93:9-94:6; 94:13-15; 95:10-20; 97:20-98:1.  DMA's expert estimates a packing insert costs less than ten cents per package.  *Id.* at 226:3-5.

13.      DOR has provided acceptable sample language for the Transactional Notice, which retailers may use.  Ex. 7, Decl. Shirley Stevens, Ex. A thereto, "FYI Sales 79;" Ex. B thereto "Transactional Notice Template."

14.     Data for the Annual Purchase Summary and Customer Information Report already exists.  Ex. 6, Barry Dep., 157:5-6; 158:5-16.  Retailers track customer data in very detailed ways and store that data.  *Id;* Ex. 5, Gable Report, pp.8-9.

15.     Because the Law only requires the Annual Purchase Summary for customers who spend more the $500 annually, Mr. Barry estimates that retailers would have to create reports for fewer than 20% of Colorado purchasers, and it could be as low as 10%.  Ex. 6, Barry Dep. 169:11-20; 170:3-5.

16.     DOR has provided instructions and templates to assist retailers with preparing and electronically filing the Annual Purchase Summary.  Ex. 8, Decl. Edward Thompson, ¶¶ 5-6; Exs. A-D thereto.

### SUMMARY JUDGMENT STANDARDS AND BURDEN OF PROOF

Summary judgment is proper when there is no genuine dispute as to any material fact and a movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A dispute is "genuine" if the evidence is so contradictory that a judgment could enter for either party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it might reasonably affect the outcome of the case.  *Id.*  The moving party has the initial burden to show "that there is an absence of evidence to support the nonmoving party's case."  *Celotex*, 477 U.S. at 325.  When considering a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party.  *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

9

DMA bears a heavy burden in overcoming the "'venerable presumption' that an act of a state legislature is generally taken to be constitutional." *Hopkins v. Okla. Pub. Employees Retirement Sys.*, 150 F.3d 1155, 1160 (10th Cir. 1998). Facial challenges to statutes are generally disfavored as "strong medicine" applied "sparingly and only as a last resort." *Golan v. Holder*, 609 F.3d 1076, 1094 (10th Cir. 2010) (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). To demonstrate that the Law is facially unconstitutional, DMA must show "that no set of circumstances exists under which [the Law] would be valid," *United States v. Salerno*, 482 U.S. 739, 745 (1987), or that the Law "lacks any plainly legitimate sweep," *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997). *United States v. Stevens*, __U.S.__, 130 S.Ct 1577, 1587 (2010). To establish that the Law is unconstitutional as applied, DMA must establish beyond a reasonable doubt that the Law as applied to its particular situation is unconstitutional. *United States v. Platte*, 401 F.3d 1176, 1189 (10th Cir. 2005).

Because there is no genuine dispute as to any material fact and DMA cannot overcome the presumption of constitutionality of the Law, summary judgment for Defendant on Counts I and II is warranted.

## ARGUMENT

## I.   THE LAW FURTHERS RATHER THAN OFFENDS COMMERCE CLAUSE OBJECTIVES.

The Commerce Clause establishes both an affirmative power in Congress to regulate commerce amongst the states and also a dormant limitation on the power of the states to enact laws that impose substantial burdens on such commerce. *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1039 (10th Cir. 2009). The "fundamental

objective" of the dormant Commerce Clause is to preserve a "national market for competition undisturbed by preferential advantages conferred by a State upon its residents or resident competitors." *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997); *see also Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 351 (1977) (referring to "the Commerce Clause's overriding requirement of a national 'common market'"); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525 (1949) (Commerce Clause fosters a system of "free access to every market in the Nation" where consumers may "look to the free competition from every producing area in the Nation to protect him from exploitation by any."). The modern law of the dormant Commerce Clause is "driven by concern about economic protectionism-- that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-338 (2008).

The Law, part of Colorado's sales and use tax scheme, advances rather than offends the objectives of the Commerce Clause. This scheme is not protectionist but rather, encourages open competition and tax neutral decisions by consumers. National retailers with stores in Colorado as well as Colorado businesses are at a competitive disadvantage because they must collect sales tax on their in-store and online sales. *See Quill*, 504 U.S. at 328-329 (White, J. dissenting) (an out-of-state business can undercut in-state companies with its comparative price advantage in selling products free of use tax). The Supreme Court has recognized that a proper function of complementary sales and use tax schemes is to "put local retailers subject to the sales tax on a competitive parity with out-of-state retailers exempt from the sales tax." *Nat'l*

11

*Geographic Soc'y*, 430 U.S. at 555 (noting the constitutionality of such schemes is settled); *see also Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 332 (1977) (compensatory taxes leave a consumer free to make choices without regard to tax consequences).  The Law promotes such competitive parity by reducing the artificial competitive advantage currently enjoyed by non-collecting retailers due to the safe harbor created by *Nat'l Bellas Hess, Inc. v. Dep't of Revenue of the State of Ill.*, 386 U.S. 753 (1967) and *Quill Corp. v. N.D.*, 504 U.S. 298 (1992).  Further, by educating consumers about their use tax obligation, the Law promotes an open market where consumers are not mislead that no tax is due merely because it was not collected.

## II.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I.

DMA cannot meet its heavy burden to establish that the Law discriminates against interstate commerce or favors in-state retailers by burdening out-of-state retailers.[4]  State laws that discriminate against interstate commerce or have the effect of favoring in-state economic interests over out-of-state interests are virtually per se invalid.  *Kleinsmith*, 571 F.3d at 1039-1040.  When, however, a law regulates even-handedly with only incidental effects on interstate commerce, it will be upheld unless the burden on interstate commerce clearly exceeds the local benefits.  *Id.*

Defendant is entitled to summary judgment on Count I for three reasons.  First, the Law is not a protectionist measure and does not discriminate because it gives non-

---

[4] While discrimination and burdens are two separate components of dormant Commerce Clause analysis, both Counts I and II allege the Law unduly burdens out-of-state retailers and interstate commerce.  *See* Am.Comp., ¶¶ 58-61; 68.  Consequently, Part II.B. *infra* will address the burdens that allegedly put out-of-state retailers at a competitive disadvantage to in-state retailers.  Part III.B. *infra* will focus on the unique burdens identified by *Quill* as allegedly applicable to out-of-state retailers due to the Law.

collecting retailers the choice to be subject to the same burden imposed on their in-state competitors who have no such choice.  Second, even absent this ability to choose, the Law does not favor in-state retailers over out-of-state retailers.  Third, any effect on out-of-state retailers as a result of the Law is incidental and does not outweigh the strong State interest in enforcing and collecting the sales and use taxes.

A.   **DMA Cannot Prove That the Law Discriminates Against Out-of-State Retailers or Interstate Commerce.**

The Law is not a protectionist measure and does not discriminate against interstate commerce because it allows non-collecting retailers the ability to choose to be subject to the same burden imposed on their in-state competitors who have no such choice- that is, in-state retailers cannot elect to comply with the Law rather than collect and remit the sales tax.  Discrimination for purposes of the dormant Commerce Clause focuses on whether a law is motivated by economic protectionism, defined by laws that burden out-of-state businesses simply to give a competitive advantage to in-state businesses, *Granholm v. Heald*, 544 U.S. 460, 472 (2005), or shield in-state industries from out-of-state competition.  *Maine v. Taylor*, 477 U.S. 131, 148 (1986).  The Framers' purpose was to "preven[t] a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear."  *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330-331 (1996) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995)).

Nothing in the Law, part of Colorado's sales and use tax scheme, suggests it discriminates or is aimed at protectionism or market manipulation to favor in-state interests.  DMA's discrimination claim is based on the limited applicability of the Law to out-of-state retailers.  *See* Am.Compl., ¶¶ 1,57-58 (alleging the Law targets such retailers and does not apply to Colorado retailers).[5]  The Law, however, is indifferent to a retailer's <u>location</u> and focuses solely upon whether a retailer <u>collects</u> the sales tax.  *See, e.g.* Colo. Rev. Stat. § 39-21-112(3.5)(c) (referring to "each retailer that does not collect Colorado sales tax.").  These two classes of collecting retailers and non-collecting retailers are a function of the Supreme Court's holdings in *Quill* and *Bellas Hess*, not the Law's alleged targeting of out-of-state retailers.  *See infra* Part III.A.

More importantly, the Law does not discriminate because non-collecting retailers may <u>choose</u> between two alternatives: either collecting and remitting sales tax or complying with the notice and reporting requirements of the Law.   In fact, many large retailers without physical presence in Colorado <u>voluntarily choose</u> to collect.  *See* Ex. 4, Decl. E. Corujo, ¶¶ 4,6 (39 of the companies listed in the publication Top 500 Internet Retailers are without physical presence but elect  to collect sales tax).  Retailers with a physical presence within the State do not have a choice-- they <u>must</u> collect sales tax or face civil and criminal penalties.  *Id.* at §§ 39-26-103(4); 39-21-118(2).  DMA, therefore,

---

[5] DMA's facial challenge based upon the title of the bill, referring to "out-of-state retailers," is a red herring. *See* Am.Compl., ¶ 1.  HB10-1193 as originally introduced required certain retailers to <u>collect</u> sales and use tax while the challenged Law as adopted imposes no such duty to collect.  The bill was substantially amended to its current form; however, the title did not change.

cannot prove that the Law discriminates against non-collecting retailers by providing them with a choice when their competitors have no such choice.

**B.**   **Even Absent an Ability to Choose, DMA Cannot Prove the Law Favors In-State Retailers Over Out-of State Retailers.**

Even assuming out-of-state retailers had no choice and were required to abide by the Law without the option of collecting the sales tax, DMA cannot meet its heavy burden to prove the Law favors in-state collecting retailers.  Differential treatment alone does not suffice to establish a Commerce Clause violation.  Rather, a law discriminates if it imposes "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *Or. Waste Sys., Inc. v. Dep't of Env. Quality of State of Or.*, 511 U.S. 93, 99 (1994) (emphasis added); *see also Boston Stock Exch*, 429 U.S. at 329 (Commerce Clause precludes discrimination that creates a "direct commercial advantage to local business") (emphasis added); *Am. Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005) (same).

Because discrimination may not be apparent from the face of a law but may lie in its effects, the Supreme Court has taken a holistic approach to evaluate the challenged components of regulatory and tax schemes.  *See, e.g., West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994).  Dormant Commerce Clause analysis thus requires consideration of the challenged law in the context of other related laws.  For example, in *West Lynn Creamery,* the Court struck down a seemingly non-discriminatory Massachusetts pricing order that imposed an assessment on all milk dealers selling to state residents.  *Id.* at 198-202.  The assessments were paid to a state fund which

made distributions only to in-state dairy farmers.  The Court rejected the argument that since the pricing order and subsidy program each was constitutional, the combination of the two was equally valid.  *Id.*  Similarly, in striking down the franchise tax in *S. Cent. Bell Telephone Co. v. Ala.*, 526 U.S. 160, 169 (1999), the Court examined not only the challenged franchise tax but other provisions of state law allowing in-state corporations flexibility in setting their tax base while out-of-state corporations were denied that ability.

The Law does not exist in a vacuum.  It is one method to enforce the State's sales and use taxes and must be evaluated within this scheme.  *See Matthews*, 562 P.2d at 417 (use tax is not a separate tax from the sales tax and should not be viewed in isolation).  Any challenge to the Law on dormant Commerce Clause grounds must weigh the relative burdens of Colorado's sales and use tax scheme on non-collecting retailers as compared to collecting retailers, rather than viewing in isolation the Law's application to out-of-state retailers.

DMA cannot prove that non-collecting retailers are put at a competitive disadvantage as a result of the Law.  In Colorado, retailers that are required to collect sales tax must take extensive steps to comply with state tax laws, including, obtain a license, calculate the state and local sales tax owed, including determining whether any exemptions apply, collect the tax at the time of the transaction, provide a receipt, file a return and remit tax collected to the State on a monthly or quarterly basis, and maintain records.  Colo. Rev. Stat. §§ 39-26-101 through 39-26-127.  Collecting retailers are ultimately liable for paying the tax, whether or not they collect it.  *See id.* at § 39-26-105.

DMA cannot prove that burdens upon out-of-state non-collecting retailers as a result of the Law outweigh burdens upon collecting retailers.

DMA alleges two burdens upon non-collecting retailers as a result of the Law: compliance costs and loss of sales and customers.  Am.Compl. ¶¶ 59-60.  DMA relies upon three experts to establish these alleged burdens.  All three experts, however, utilized flawed methodology resulting in opinions that amount to no more than speculation.  *See Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) ("Evidence, including testimony must be based on more than mere speculation, conjecture, or surmise.  Unsubstantiated allegations carry no probative weight in summary judgment proceedings.")*; see also* Def.'s Am. Mot. Exclude Test. of Pl.'s Expert Witnesses F. Curtis Barry, Thomas Adler, and Kevin Lane Keller, filed December 20, 2010 [Dkt. #71] ("Def.'s 702 Mot.").[6]

With respect to the alleged compliance costs, there are two important things to note.  First, the Law exempts retailers with less than $100,000 in annual gross sales in CO.  Reg. 29-31-112.3.5(1)(1).  A relatively small number of retailers are thus actually subject to the Law.  Ex. 5, Gable Report, pp.5-6.  DOR's expert, Mr. Gable, concluded that of those retailers subject to the Law, larger retailers can comply with the law with minimal effort as part of regular technical enhancements.  *Id.* at p.11.  The associated costs are so inconsequential, particularly when viewed as a percentage of sales, that

---

[6] In the Order dated January 26, 2011 [Dkt. #78], the Court deferred resolution of this Motion "pending further developments in this case."  Given the parties are moving toward final judgment, it is appropriate for the Court to consider the Motion.

they cannot be quantified.  *Id.*  According to Mr. Gable, smaller retailers may have some

initial costs but those will likely be tied to software upgrades and may be absorbed by

the software vendors on whom they currently rely for their E-commerce platforms.  *Id.* at

pp.7-10.  Second, DMA relies solely upon the estimates of its expert Mr. Barry rather

than upon any actual costs its members have or expect to incur.  Notably, DMA

presented no data showing actual losses sustained by its members from the

Transactional Notice, effective March 1, 2010.

When viewed in the context of retailers operations, the burdens the Law places

on retailers are insubstantial.  There are many ways a retailer can meet the

<u>Transactional Notice</u> requirement-- from a linking notice or popup window at the time of

the online purchase, to slipping the notice in as a packing slip for delivery, or other

workarounds.  Ex.6, Barry Dep. 93:9-94:6; 94:13-15; 95:10-20; 97:20-98:1.  DOR has

provided sample language for the notice and DMA's expert, Mr. Barry, estimates that a

simple packing insert costs less than ten cents per package.  Ex 7, Decl. S. Stevens,

Ex. B thereto, Transactional Notice Template; Ex. 6, Barry Dep. 226:3-5.

Regarding the <u>Annual Purchase Summary and Customer Information Report</u>, it is

undisputed that the data used to create these reports already exists because retailers

track customer data in very detailed ways.  *Id.* at 157:5-6; 158:5-16.  Given the existing

tracking and manipulation of this information, Mr. Gable concluded that the additional

incremental effort to create these reports is minimal.  Ex. 5, Gable Report, pp.13-14.

DOR has also provided instructions and templates to assist retailers with preparing and

electronically filing the Annual Purchase Summary.  Ex. 8, Decl. E. Thompson, ¶¶ 5-6;

18

Exs. A-D thereto.  Further, because the Law only requires the Annual Purchase

Summary for customers who spend more the $500 annually, DMA's expert, Mr. Barry,

estimates that retailers would have to create reports for fewer than 20% of Colorado

purchasers, and it could be as low as 10%.  Ex. 6, Barry Dep. 169:11-20; 170:3-5.

Lastly, DMA alleges its members will suffer lost sales and customers due to

consumers' perceived invasion of privacy by the Law.  Am.Compl. ¶ 60.  DMA, however,

cannot establish beyond speculation that its members will sustain such losses.  DMA

presented no actual numbers of lost sales or customers, but instead relies on

projections by two experts, Drs. Adler and Keller.  Their projections are wholly based on

a survey, the methodology of which was fatally flawed in at least four respects.  *See*

Def.'s 702 Mot., pp.11-14 (the methodology contained a fatal confound, contained false

information, suggested a response, and did not follow survey standards).  Most

significantly, the survey confounded consumer privacy concerns with consumer tax

aversion and resistance to having information turned over to DOR for tax collection.  Ex.

9, Decl. Prof. Donald Lichtenstein, Ex. A  thereto ("Lichtenstein Report"), pp.12-17.  Dr.

Adler admitted that the survey should be designed to determine whether a seller's

reporting of information to the Department would cause consumers not to make future

purchase or whether this result would be caused by a resistance to paying taxes and

thus higher prices on purchases.  As he explained:

```
15   Q      Okay.  Next is May 19th.  Can you tell me what
16          that note is?
17   A      So this looks like kind of a repeat of the
18          specific objectives, what we wanted to find out.
19   Q      So you wanted to find out whether turning over the
```

20          information will cause people to not purchase?

21     A     Right, versus not paying taxes.  We wanted to

22          avoid getting into the issue of people not liking

23          to pay taxes because we know nobody does.

Ex. 10, Adler Dep. 137:15 - 23.  Nevertheless, Dr. Adler made no effort to factor tax avoidance or higher prices out of his survey methodology.  Ex. 9, Lichtenstein Report, pp.15-17.  The survey did not follow established methodologies for factoring out this confound.  *Id.* at pp. 16-17.  With price/tax being a potential cause for consumer behavior, it should have been measured and "covaried" out.  *Id.* at p.16.  Because the privacy concern cannot be disentangled from a price/tax concern, no conclusions may be drawn from the survey results.  *Id.* at 13.  Due to this serious confound alone, the survey methodology is "fatally flawed".  *Id.* at 14.

DOR's expert, Professor Lichtenstein, concluded that to the extent consumers change behavior, if at all, as a result of the Law, it is in reaction to a higher price/tax liability (because they now understand tax is owed although not collected).  *Id.* at pp.6, 13-16.  This type of loss does not fall within the protections of the dormant Commerce Clause.  *See, e.g., Gen. Motors. Corp.*, 519 U.S. at 300 (dormant Commerce Clause protects markets and market participants, not individuals).  Regulations designed to protect in-state interests from out-of-state competition by eliminating a competitive advantage <u>earned</u> by an out-of-state interest have been struck down.  *See, e.g., Hunt*, 432 U.S. at 351 (law had effect of "stripping away" the competitive and economic advantages the out-of-state apple industry had "earned for itself" through an expensive inspection and grading system).  Here, out-of-state retailers have not "earned for

20

themselves" the artificial market advantage created by the *Bellas Hess/Quill* safe

harbor.  *See* Scott W. Gaylor & Andrew Haile, *Constitutional Threats in the E-*

*Commerce Jungle: First Amendment and Dormant Commerce Clause Limits on*

*Amazon Laws and Use Tax Reporting Statutes*, N.C. Law Rev. (forthcoming), *available*

*at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1773685, p.77.  The dormant

Commerce Clause does not entitle DMA members to protection of their market share of

customers who seek to evade tax liability.  DMA cannot meet its heavy burden to prove

the Law favors in-state retailers over out-of-state retailers.

### C.    DMA Cannot Prove the Incidental Effects of the Law on Out-of-State Retailers Are Clearly Excessive in Relation to Colorado's Interest in Enforcing its Sales and Use Tax Laws.

Because the Law regulates even-handedly and any incidental effects on out-of-

state retailers are not clearly excessive in relation to the strong state interest in

enforcing its tax laws it must be upheld.  *See Pike v. Bruce*, 397 U.S. 137, 142 (1970);

*see also Quik Payday, Inc. v. Stork*, 549 F.3d 1302 (1309 (10th Cir. 2008) ("The states

can, of course, pass Acts which affect commerce unless the burden so imposed greatly

exceeds the extent of the local benefits.").  The Supreme Court has long recognized

that even interstate commerce must be made to pay its fair share of the state tax

burden, even if it increases the cost of doing business.  *W. Live Stock v. Bureau of*

*Revenue*, 303 U.S. 250, 254 (1938).  Further, "the modes adopted [by the states] to

enforce the taxes levied should be interfered with as little as possible."  *Dows v. City of*

*Chicago*, 78 U.S. 108, 110 (1871) (emphasis added).

The Law advances three strong state taxing authority interests.  First, the Law enhances DOR's ability to recover sales and use tax revenue due to the State, a vital component of the State budget.  *See* Ex. 3, Decl. T. Saliman, ¶¶ 7-8.    In *United Haulers Assoc., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 346 (2007), the Court applied a truncated analysis under *Pike* and determined that "[w]hile revenue generation is a not a local interest that can justify discrimination against interstate commerce…it is a cognizable benefit for purposes of the *Pike* test."  *Id.* at 346; *see also C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 429 (1994) (protection of the public fisc is a legitimate non-protectionist benefit); Donald H. Regan*, The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause,* 84 Mich. L. Rev. 1091, 1120 (May, 1986) ("[R]aising revenue for the state treasury is . . . a federally cognizable benefit.").

Second, the Law, an enforcement mechanism of the sales and use taxes, promotes the fair distribution of the cost of government.  The levying of taxes is a proper means of distributing the burden of the cost of government and is a fundamental principle of government existing primarily to provide for the common good. *Commonwealth Edison Co. v. Mont.*, 453 U.S. 609, 622-623 (1981) (citing *Carmichael v. S. Coal & Coke Co.*, 301 U.S. 494, 521-533 (1937); *see also Quill*, 504 U.S. at 328 (White, J. dissenting) (an out-of-state business derives numerous commercial benefits from the state in which it does business, such as sound local banking institutions to support credit transactions and courts to ensure collection of the purchase price).

Third, the Law promotes respect for and compliance with the tax laws.  *See St. German of Alaska E. Orthodox Catholic Church v. United States*, 840 F. 2d 1087, 1094 (2d Cir. 1988) (enforcement of tax laws is a compelling governmental interest); *United States v. Richey*, 924 F.2d 857, 862 (9th Cir. 1990) (maintaining a workable tax system is a compelling governmental interest); *Schehl v. Comm'r of Internal Revenue*, 855 F.2d 364, 367 (6th Cir. 1988) (promoting public compliance with the tax laws is a legitimate governmental interest).  Any differential burden upon DMA members due to the Law is incidental and does not clearly outweigh these strong State interests.

## III.   DEFENDANT IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II.

DMA cannot prove that the Law is an improper regulation of and imposes an undue burden upon interstate commerce because it imposes notice and reporting requirements upon retailers with no physical presence in Colorado.  DMA argues for an extension of the bright-line rule of *Quill* beyond the area of sales and use tax <u>collection and remittance</u>, essentially seeking the recognition of a regulatory-free zone to which its members are not entitled under existing Commerce Clause precedent.  *Quill's* carefully-limited physical presence requirement and the policy considerations underlying the burdens analysis do not apply to the notice and reporting requirements of the Law which do not impose a duty to collect the sales and use tax.  As a result, DMA's claim fails as a matter of law, and summary judgment for Defendant on Count II is appropriate.

### A.   <u>DMA Cannot Prove the Law Improperly Regulates Interstate Commerce or Runs Afoul of *Quill*.</u>

DMA members without a physical presence in Colorado are not protected from the reach of the Law by the carefully limited bright-line rule of *Bellas Hess* and *Quill*, which applies only to sales and use tax collection and remittance obligations. In *Bellas Hess*, the Court held that a state could not, consistent with due process requirements and the dormant Commerce Clause, impose a use tax collection obligation on a mail-order company whose only connection with customers in the state was by common carrier or the United States mail. 386 U.S. at 758. Twenty-five years later in *Quill*, the Court revisited the same issue. 504 U.S. 298. Noting that claims under the Due Process and Commerce Clauses are "closely related," the Court determined that they nevertheless impose distinct limits on state taxing powers. *Id.* at 305. Under the former, only a "minimum connection" between the state and the person, property, or transaction subject to the tax is required. *Id.* at 306. The Court thus overruled *Bellas Hess* to the extent it required physical presence for the imposition of the duty to collect use tax on due process grounds. *Id.* at 308 ("In 'modern commercial life' it matters little that such solicitation is accomplished by a deluge of catalogs rather than a phalanx of drummers: The requirements of due process are met irrespective of a corporation's lack of physical presence in the taxing state."). Under the Commerce Clause, however, the Court affirmed the physical presence rule of *Bellas Hess* in the specific context of the duty to collect use taxes. *Id.* at 317-318.

The main rationale for adhering to the physical presence requirement for imposition of the duty to collect sales and use tax was the principle of *stare decisis* and the perceived "substantial reliance" by the industry upon the bright-line *Bellas Hess* rule.

*Id.* at 317.  In particular, the *Quill* Court was very concerned about the retroactive consequences of overruling *Bellas Hess* and creating an unanticipated tax liability that could result if the mail-order industry was subjected to a collection duty.  504 U.S. at 318 n.10.  Acknowledging the "artificiality" of this rule, the Court noted the benefit of encouraging settled expectations, which foster investment in the industry.  *Id.* at 315-316.  Recognizing that it had not adopted a similar bright-line rule in other types of tax cases, the Court noted that "[t]his aspect of our decision is made easier by the fact that the underlying issue is not only one that Congress may be better qualified to resolve, but also one that Congress has the ultimate power to resolve."  *Id.* at 318; *see also* John A. Swain, *State Income Tax Jurisdiction: A Jurisprudential and Policy Perspective*, 45 Wm. & Mary L. Rev. 319, pp.343-344 (2003).

     *Quill* is explicitly and consistently limited to the imposition of the sales and use taxes and the imposition of the duty to collect those taxes.  *See, e.g.,* 504 U.S. at 308 ("Comparable reasoning justifies the <u>imposition of the collection duty </u>on a mail-order house that is engaged in continuous and widespread solicitation of business within a State."); *id.* ("the Due Process Clause does not bar <u>enforcement of …the use tax</u> against Quill."); *id.* at 315 ("Under *Bellas Hess,* [vendors lacking physical presence] are free from <u>state-imposed duties to collect sales and use taxes</u>."); *id.* ("Such a rule firmly establishes the boundaries of legitimate state authority to impose a <u>duty to collect sales and use taxes</u> and reduces litigation concerning those taxes."); *id.* at 318 ("Congress is now free to decide whether, when, and to what extent the States may burden interstate mail-order concerns with a <u>duty to collect use taxes</u>.") (emphasis added).

The Tenth Circuit and several state appellate courts have followed this analysis and held that *Quill's* physical presence requirement for Commerce Clause nexus is limited to when a state may require a business to collect and remit sales and use taxes. In *American Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1254-55 (2000), the Tenth Circuit declined to extend *Bellas Hess* and *Quill* beyond the levy of taxes upon out-of-state entities to a state regulatory law.  Similarly, in a corporate income tax case, the Supreme Court of Iowa recently determined that *Quill's* physical presence nexus standard does not extend beyond sales and use tax.  *KFC Corp. v. Iowa. Dept. of Rev.*, 792 N.W.2d 308, 324-328 (Iowa 2010); *see also Capital One Bank, v. Comm'r of Revenue*, 899 N.E.2d 76, 84 (Mass. 2009) (noting the *Quill* Court "explicitly emphasized on more than one occasion, a narrow focus on sales and use taxes" and declining to extend physical presence rule to financial institution excises); *Tax Comm'r of the State of W. Va. v. MBNA America Bank, N.A.*, 640 S.E.2d 226, 232-233 (2007) (same result in business franchise and corporate income tax case).

The Law's reporting requirements are more properly characterized as traditional regulatory requirements as they do not impose or require the collection of a tax, and thus the extension of *Quill's* physical presence rule is not appropriate.  Because *Quill* applied specifically to the collection and remittance of sales and use tax, *stare decisis* is not triggered.  Additionally, because the Law does not impose a tax, the retroactivity considerations that weighed heavily upon the *Quill* Court are not present here.  Out-of-state businesses without physical presence can be subjected to a wide range of obligations by a state in which they deliberately avail themselves of economic

opportunities.  *See, e.g., Quill*, 504 U.S. at 319 (Scalia, J. concurring) (discussing state

regulatory jurisdiction including Blue Sky laws); *Granholm*, 544 U.S. 460 (state liquor

licensing scheme).  Further, the development of the Internet and the explosion in E-

Commerce since *Bellas Hess* and *Quill* counsel against the expansion of the special

bright-line rule created to address the unique history and burdens associated with sales

and use tax <u>collection</u> as applied to the direct-mail industry.  At the time of *Bellas Hess*,

the mail order sales industry was $2.4 billion annually.  386 U.S. at 763 (Fortas, J.,

dissenting and predicting that the "haven of immunity," resulting from the favored

position and exemption from bearing the fair burden of state taxes, will increase in size

and importance).  When the Court decided *Quill* 25 years later, that industry had grown

to $180 billion annually.  *See* 504 U.S. at 329, White, J., dissenting:

> Also very questionable is the rationality of perpetuating a rule that creates an
> interstate tax shelter for one form of business…but no countervailing advantage
> for its competitors.  If the Commerce Clause was intended to put businesses on
> an even playing field, the majority's rule is hardly a way to achieve that goal…I
> would think that protectionist rules favoring a $180-billion-a-a-year industry might
> come within the scope of such "structural concerns.

Reaching $3 trillion in 2008, the E-Commerce is no infant industry and expansion of a

rule that already affords a substantial artificial advantage cuts against the objective of

the dormant Commerce Clause.  *See* Ex. 1, Fox Report, p.2.

Finally, DMA's claim that the Law seeks to regulate commerce that occurs wholly

outside Colorado is without merit.  Am.Compl. ¶ 71.  Because the Law is triggered only

when there is a sale to a customer located in Colorado or the goods are shipped to a

Colorado address, there is no concern for regulation of commerce that occurs entirely

outside Colorado.  *See* Reg. 39-21-112.3.5(1)(b) and (c) (defining Colorado Purchaser

and Colorado Purchase, respectively).

### B.   DMA Cannot Prove the Law Unduly Burdens Interstate Commerce.

The *Quill* Court acknowledged the limitations of its decision, and even suggested

that had the issue been presented as a matter of first impression, contemporary

Commerce Clause jurisprudence might not dictate the same result.  504 U.S. at 311.

Contemporary Commerce Clause jurisprudence is what applies to DMA's claims, and

under these cases, DMA cannot prove the Law's notice and reporting requirements in

the post-technology boom age of the Internet unduly burden interstate commerce.

In *Quill,* the Court explained that the Commerce Clause nexus requirement is

informed by the "structural concerns" about the effects of regulation by multiple states

on the national economy."  *Id.* at 312.  Businesses, however, are often subject to

regulation by the various states in which they do business.   *See, e.g., American*

*Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 438 (2005) (concluding

that businesses operating in multiple states <u>expect</u> to pay local fees in each of those

states).  Further, State regulations are still evaluated by considering what <u>unduly</u>

burdens interstate commerce.  *See, e.g., Kassel v. Consol. Freightways Corp. of Del.*,

450 U.S. 662, 669-671 (1981) (weighing the nature of the regulation in light of the

burden imposed).  The dormant Commerce Clause does not seek "to relieve those

engaged in interstate commerce from their just share of state tax burden even though it

increases the cost of doing business."  *Commonwealth Edison*, 453 U.S. at 623-624.

The world of E-commerce and remote sales looks vastly different from the mail-order world of *Quill* nearly twenty years ago and the burdens of the Law upon out-of-state retailers must be viewed through a contemporary lens.  Even in 1967, Justice Fortas recognized the advances of modern technology and criticized the majority for exempting the direct-mail industry from collection burdens as follows:

> The burden is no greater than that placed upon local retailers by comparable sales tax obligations; and the Court's response that these administrative and record keeping requirements could 'entangle' appellant's interstate business in a welter of complicated obligations <u>vastly underestimates the skill of contemporary man and his machines</u>.  There is no doubt that the collection of taxes from consumers is a burden; but it is no more of a burden on a mail order house…located in another State than on an enterprise in the same State which accepts orders by mail; and it is, indeed, hardly more of a burden than it is on any ordinary retail store in the taxing State.

*Bellas Hess,* 386 U.S. at 766 (dissenting) (emphasis added).

While there are some costs associated with compliance with the Law, these are nominal, particularly when viewed as a percentage of sales revenue.  Ex. 5, Gable Report, p. 2.   Further, the Law allows for substantial compliance by non-collecting retailers subject to other state requirements.  *See* Regs. 39-21-112.3.5(2)(e); 39-21-112.3.5(3)(b) (allowing the Transactional Notice and Annual Purchase Summary to be in a form generalized to any state if they substantially contain the required information).

The reality is that in the areas of Internet and remote sales, non-collecting retailers have benefitted from a windfall of customers who either unknowingly or deliberately avoid paying the sales or use tax due on their transactions.   Any reliance non-collecting retailers have based on the "haven of immunity" *Bellas Hess* and *Quill* created cannot reasonably entitle them to a zone entirely free from any state regulation,

29

particularly when such retailers have substantial economic presence and profit

handsomely from transactions with Colorado consumers.  As the Iowa Supreme

recently noted, it simply does not make sense to require Barnes & Noble to collect and

remit sales tax in connection with its online sales but not impose the same burden on

Amazon.com when the difference is in the manner in which those retailers have chosen

to do business and not the degree to which they benefit from the provision of

government services in the taxing state.  *KFC Corp.*, 792 N.W.2d at 326 ("physical

presence is not a meaningful surrogate for economic presence").

## IV.    CONCLUSION

WHEREFORE, Defendant respectfully requests the Court enter an order granting

partial summary judgment in favor of Defendant on Plaintiff's Counts I and II.

Respectfully submitted this 6th day of May, 2011.

JOHN W. SUTHERS
Attorney General

*s/ Melanie J. Snyder*

MELANIE J. SNYDER, 35835*
Assistant Attorney General
STEPHANIE LINDQUIST SCOVILLE, 31182*
JACK M. WESOKY, 6001*
Senior Assistants Attorney General
1525 Sherman Street, 7th Floor
Denver, Colorado  80203
Telephone:  (303) 866-5273 (Snyder)
Telephone:  (303) 866-5241 (Scoville)
Telephone:  (303) 866-5512 (Wesoky)
FAX:  (303) 866-5395
E-Mail:  melanie.snyder@state.co.us
E-Mail:  stephanie.scoville@state.co.us
E-Mail:  jack.wesoky@state.co.us

*Counsel of Record
*Attorneys for Defendant*

30

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 6, 2011, I electronically filed the foregoing **Defendant's Motion for Partial Summary Judgment- Counts I and II (Commerce Clause)** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

gisaacson@branlaw.com
mschaefer@branlaw.com

*Attorneys for Plaintiff*


s/  Melanie J. Snyder
_____


<u>*cc: Via interoffice mail*</u>
Ms. Roxy Huber
Executive Director
Colorado Department of Revenue
1375 Sherman Street
Denver, Colorado  80261