


United States of America

Department of the Treasury
Internal Revenue Service

Date: OCT 1 9 2010

## CERTIFICATE OF OFFICIAL RECORD

I certify that the annexed: is a true copy of the United States Department of the Treasury report titled, "Reducing the Federal Tax Gap, A Report on Improving Voluntary Compliance," dated August 2, 2007, as published on the Internal Revenue Service website www.irs.gov, consisting of one hundred (100) pages

under the custody of this office.



IN WITNESS WHEREOF, I have hereunto set my hand, and caused the seal of this office to be affixed, on the day and year first above written.

By the direction of the Secretary of the Treasury:

*Anna Marie Robles*

Anna Marie Robles
Senior Disclosure Specialist, Disclosure Office 11
Communications Liaison & Disclosure

Catalog Number 19002E

Form 2866 (Rev. 12-92)

D014
Exh.2

# Reducing the Federal Tax Gap

## A Report on Improving Voluntary Compliance

Internal Revenue Service

U.S. Department of the Treasury

August 2, 2007

D015
Exh.2

# Reducing the Federal Tax Gap

## A Report on Improving Voluntary Compliance

# Table of Contents

EXECUTIVE SUMMARY — 1

UNDERSTANDING THE TAX GAP — 6

VOLUNTARY COMPLIANCE — 17

COMPONENTS — 19

SUMMARY — 57

APPENDIX
Initiative Timeframes — 58

GLOSSARY — 97

# EXECUTIVE SUMMARY

## INTRODUCTION

In Fiscal Year (FY) 2006, federal receipts totaled over $2.4 trillion. More than 95 percent of the net receipts were collected by the Internal Revenue Service (IRS) through its administration of the income, employment, transfer, and excise tax provisions of the Internal Revenue Code. Virtually all of these receipts were collected through a tax system under which taxpayers voluntarily report and pay their taxes with no direct enforcement and minimal interaction with the government.

The overall compliance rate achieved under the United States revenue system is quite high. For the 2001 tax year, the IRS estimates that, after factoring in late payments and recoveries from IRS enforcement activities, over 86 percent of tax liabilities were collected. Nevertheless, an unacceptably large amount of the tax that should be paid every year is not, such that compliant taxpayers bear a disproportionate share of the revenue burden, and giving rise to the "tax gap." The gross tax gap was estimated to be $345 billion in 2001. After enforcement efforts and late payments, this amount was reduced to a net tax gap of approximately $290 billion.

The Treasury Department and IRS are committed to improving current compliance levels and continuing to address all forms of noncompliance. The IRS Oversight Board has adopted an 86 percent voluntary compliance goal by 2009 and Senate Finance Committee Chairman Max Baucus has asked for a 90 percent voluntary compliance goal by 2017. This report sets forth steps that will be taken to improve compliance and enhance the IRS' ability to measure compliance. Once implemented, these steps will improve the IRS' ability to gauge progress in achieving specific long-term compliance objectives.

This report outline steps that the IRS will take to increase voluntary compliance and reduce the tax gap. It builds on the Comprehensive Strategy for Reducing the Tax Gap (the Treasury Strategy) that was released in September 2006 by the Treasury Department's Office of Tax Policy and provides more detail for that strategy.

The IRS regularly addresses compliance improvement measures in its planning and budgeting processes. The Administration's annual budget request identifies the resources the IRS will need to meet specific performance goals to achieve its strategic priorities. This document combines and addresses current tax gap efforts. In addition, the IRS has long been conducting research in compliance and the tax gap, and resulting data is incorporated throughout this document.

The steps outlined in this report are, in many respects, only initial steps toward improving compliance. As described below, one of the primary challenges that the IRS faces in improving compliance is to get a better understanding of the current sources of noncompliance by improving research in this area. Until that understanding is clarified, efforts to improve compliance may be misdirected and progress may not be measurable. The IRS has taken significant steps in this direction, most importantly through the National Research Program (NRP), which is the source of updated estimates of compliance among individual taxpayers for 2001. The IRS is committed to furthering its work in this area through updated individual taxpayer NRP examinations and a current study focusing on compliance among Subchapter S corporations (S corporations).

1

In implementing the steps set forth in this document, it is important to have realistic expectations and perspectives. Based on the limited information available, compliance rates appear to have remained relatively stable at around 85 percent for decades. To make a meaningful improvement in this number without a fundamental change in the relationship between taxpayers and the government will require a long-term, focused effort. Implementation of the steps outlined in this document and in the Administration's Fiscal Year (FY) 2008 Budget request for the IRS will be subject to the uncertainties associated with the annual budget process. Moreover, it must be recognized that the causes of noncompliance are numerous and that only a portion of the tax gap results from intentional avoidance or evasion of the law. An equally or perhaps more important part of the problem lies in the growing complexity of the tax laws, which will continue to frustrate efforts to improve compliance.

The Administration is committed to working with Congress and other stakeholders to reduce the tax gap. The Administration's FY 2008 Budget request includes $11.1 billion for the IRS, a 4.7 percent increase over the budget enacted for FY 2007. A total of $410 million is for new enforcement initiatives as part of a strategy to improve compliance by:

- Increasing front-line enforcement resources;

- Increasing voluntary compliance through improved taxpayer service options and enhanced research;

- Investing in technology to reverse infrastructure deterioration, accelerate modernization, and improve the productivity of existing resources; and

- Implementing legislative and regulatory changes.

Since 2001 (the tax year studied by the NRP), IRS tax collections have increased significantly, audit rates have improved across all taxpayer segments, and measurements of taxpayer service have risen to historic levels. While specific data is not available, there is every reason to believe that these improvements have contributed to a general shift away from aggressive tax planning and an improvement in compliance levels over the past six years. In calling for a significant increase in IRS funding, the Administration's budget recognizes, however, that much work remains to be done. Based on historic experience, the IRS estimates that the overall return on new investments in compliance averages 4:1, with an additional indirect impact resulting from the improved overall compliance that comes from more targeted and effective enforcement of the tax law. However, direct spending on compliance improvements does not lend itself to traditional revenue-estimating analysis, given the difficulty in quantifying the effect that such improvements have on taxpayer behavior.

This report provides detail on how the additional funds requested in the Administration's FY 2008 Budget will build on improvements the IRS has made in recent years to taxpayer service, modernization, and enforcement, all of which are critical elements in the long-term strategy to improve compliance. In particular, this report describes six separate initiatives in the FY 2008 Budget request that are aimed at improving enforcement. The report also details how additional funds requested will be targeted to improving taxpayer service, including implementation of the recommendations made in the recently released Taxpayer Assistance Blueprint (TAB). In addition, the report outlines how additional funds will accelerate implementation of IRS modernization programs, to permit better document matching, faster and more accurate processing of returns, and more timely access to taxpayer account information. A detailed

2

timeline for implementing these various programs is included as an Appendix to this report.

The Treasury Department and IRS will continue to evaluate resource demands for improving taxpayer compliance. In addition, future budget requests will identify ways to utilize resources efficiently and effectively to target enforcement efforts to areas where they will have the greatest direct and indirect impact on compliance. The steps for improving compliance that are detailed in this report will continue to evolve over time as our understanding of the problem improves and as changes in the economy and changes in the tax law present new compliance challenges.

**The Treasury Department's Comprehensive Strategy for Reducing the Tax Gap**

Four key principles guided the development of the Treasury Strategy and continue to guide IRS efforts to improve compliance:

- First, both unintentional taxpayer errors and intentional taxpayer evasion should be addressed.

- Second, sources of noncompliance should be targeted with specificity.

- Third, enforcement activities should be combined with a commitment to taxpayer service.

- Fourth, policy positions and compliance proposals should be sensitive to taxpayer rights and maintain an appropriate balance between enforcement activity and imposition of taxpayer burden.

These principles point to the need for a comprehensive, integrated, multi-year strategy to reduce the tax gap. Guided by these key principles, the Treasury Strategy outlines seven components which form the basis for the detailed compliance improvement efforts set forth in this document:

**1. Reduce Opportunities for Evasion.** The Administration's FY 2008 Budget request contains 16 legislative proposals to reduce evasion opportunities and improve the efficiency of the IRS. Three of these proposals were recently enacted in modified form. The 16 provisions would result in an estimated $29.5 billion of additional revenues over the next ten years. The Treasury Department and the IRS also continue to use the regulatory guidance process to address both procedural and substantive issues to improve compliance and reduce the tax gap.

**2. Make a Multi-Year Commitment to Research.** Research is essential to identify sources of noncompliance so that IRS resources can be targeted properly. Regularly updating compliance research ensures that the IRS is aware of vulnerabilities as they emerge. New research is needed on the relationship between taxpayer burden and compliance and on the impact of customer service on voluntary compliance. Research also is essential to establish accurate benchmarks and metrics to assess the effectiveness of IRS efforts, including the effectiveness of the Treasury Strategy.

**3. Continue Improvements in Information Technology.** Continued improvements to technology, including continued development of and additions to Modernized e-File, will provide the IRS with better tools to improve compliance through early detection, better case selection, and better case management.

3

**4. Improve Compliance Activities.** IRS actions have produced a steady climb in enforcement revenues since 2001, and an increase in both the number of examinations and the coverage rate in virtually every major category. By further improving examination, collection, and document matching activities, the IRS will be better able to prevent, detect, and remedy noncompliance. These activities will increase compliance – not only among those directly contacted by the IRS, but also among those who will be deterred from noncompliant behavior as a consequence of a more visible IRS enforcement presence. Aided by results from the recent NRP study of individual taxpayers, the IRS continues to reengineer examination and collection procedures and invest in technology, resulting in efficiency gains and better targeting of examination efforts. These efficiency gains translate into expanded examination coverage, higher audit yields, and reduced burden on compliant taxpayers.

**5. Enhance Taxpayer Service.** Service is especially important to help taxpayers avoid unintentional errors. Given the increasing complexity of the tax code, providing taxpayers with assistance and clear and accurate information before they file their tax returns reduces unnecessary post-filing contacts, allowing the IRS to focus enforcement resources on taxpayers who intentionally evade their tax obligations. The IRS also is working to provide service more efficiently and effectively through new and existing tools, such as the IRS website. The Taxpayer Assistance Blueprint (TAB), which was completed in April 2007, outlines a five-year strategic plan for taxpayer service. The TAB includes a process for assessing the needs and preferences of taxpayers and partners and a decision model for prioritizing service initiatives and funding.

**6. Reform and Simplify the Tax Law.** Simplifying the tax law would reduce unintentional errors caused by a lack of understanding. Simplification would also reduce the opportunities for intentional evasion and make it easier for the IRS to administer the tax laws. For example, the Administration's FY 2008 Budget request includes proposals to simplify tax credits for families and tax treatment of savings by consolidating existing programs and clarifying eligibility requirements. These initiatives will continue to be supplemented by IRS efforts to reduce taxpayer burden by simplifying forms and procedures.

**7. Coordinate with Partners and Stakeholders.** Enhanced coordination is needed between the IRS and state and foreign governments to share information and compliance strategies. Expanded coordination also is needed with practitioner organizations, including bar and accounting associations, to maintain and improve mechanisms to ensure that advisors provide appropriate tax advice. Through contacts with practitioner organizations, the Treasury Department and IRS learn about recent developments in tax practice and hear directly from practitioners about taxpayer concerns and potentially abusive practices. Similarly, contacts with taxpayers and their representatives, including small business representatives and low-income taxpayer advocates, provide the Treasury Department and the IRS with needed insight on ways to protect taxpayer rights and minimize the potential burdens associated with compliance strategies.

### The IRS Strategic Planning Process

The more detailed steps outlined for improving compliance are, in part, contingent upon the budget process for FY 2008 and beyond. Accordingly, adoption of the Administration's proposed FY 2008 Budget for the IRS along with the enactment of the legislative recommendations included as part of that budget are critical components of the strategy to reduce the tax gap.

The IRS has an extensive annual strategic planning process through which each of its operating divisions develop and estimate resource requirements needed to achieve functional priorities and performance targets based on budget allocations. Detailed action plans, which are part of the IRS' strategic planning process and are coordinated with this report, identify specific sub-goals and measures as well as accountable parties. Progress toward these plans is monitored internally and reported to the Treasury Department and the Office of Management and Budget (OMB) throughout the year.

Return to Table of Contents

D021
Exh.2

# UNDERSTANDING THE TAX GAP

The Internal Revenue Code places three primary obligations on taxpayers: (1) to file timely returns; (2) to make accurate reports on those returns; and (3) to pay the required tax voluntarily and timely. Taxpayers are compliant when they meet these obligations. Noncompliance – and the tax gap – results when taxpayers do not meet these obligations.

The tax gap is defined as the aggregate amount of **true tax liability** imposed by law for a given tax year that is **not paid voluntarily and timely**. **True tax liability** for any given taxpayer means the amount of tax that would be determined for the tax year in question if all relevant aspects of the tax law were correctly applied to all of the relevant facts of that taxpayer's situation. For a variety of reasons, this amount often differs from the amount of tax that a taxpayer reports on a return. The taxpayer might not understand the law, might make inadvertent mistakes, or might misreport intentionally.

To be **paid voluntarily**, a tax liability must be paid without direct IRS intervention. Taxpayers have the responsibility to determine and report their correct tax liability, and to make sure that amount is paid (whether through withholding, estimated tax payments, payments with a filed return, etc.). The IRS focuses its enforcement where it is needed most, but the overall rate of tax compliance in the United States is as high as it is because the vast majority of taxpayers meet their obligations with little or no involvement from the IRS. To be **paid timely**, a tax liability must be paid in full on or before the date on which all payments for the given tax year were legally due.

It is important to emphasize that IRS estimates of the tax gap are associated with the **legal sector** of the economy only. Although tax is due on income from whatever source derived, legal or illegal, the tax attributable to income earned from illegal activities is extremely difficult to estimate. Moreover, the government's interest in pursuing this type of noncompliance is, ultimately, to stop the illegal activity, not merely to tax it.

Although they are related, the tax gap is not synonymous with the **"underground economy."** Definitions of the "underground economy" vary widely. However, most people characterize it in terms of the value of goods and services that elude official measurement. Furthermore, there are some items in the "underground economy" that are not included in the tax gap (such as tax due on illegal-source income), and there are contributors to the tax gap that no one would include in the "underground economy" (such as the tax associated with overstated exemptions, adjustments, deductions, or credits, or with claiming the wrong filing status). The greatest area of overlap between these two concepts is sometimes called the "cash economy," in which income (usually of a business nature) is received in cash, which helps to hide it from taxation.

Equally important, the tax gap does not arise solely from tax evasion or cheating. It includes a significant amount of noncompliance due to tax law complexity that results in errors of ignorance, confusion, and carelessness. This distinction is important even though, at this point, the IRS does not have sufficient data to distinguish clearly the amount of noncompliance that arises from willful, as opposed to unintentional, mistakes. Moreover, the line between intentional and unintentional mistakes is often a grey one, particularly in areas such as basis reporting, where a taxpayer may know that his or her reporting is inaccurate but does not have ready access to accurate information. This is an area where additional research is needed to improve understanding.

6

## MEASURING THE TAX GAP

Historically, estimates of federal tax compliance were based on special studies, including the Taxpayer Compliance Measurement Program (TCMP), which covered income and self-employment taxes and groups of taxpayers, and consisted of line-by-line audits of random samples of returns. These studies provided the IRS with information on compliance trends and allowed the IRS to update audit selection formulas regularly. However, this method of data gathering was extremely burdensome on the taxpayers whose returns were selected. As a result of concerns raised by taxpayers, Congress, and other stakeholders, the last TCMP audits were done in 1988.

The IRS conducted several much narrower compliance studies between 1988 and 2001, but nothing that would provide a comprehensive perspective on the overall tax gap. Until recently, all of these subsequent estimates of the tax gap have been rough projections that basically assume no change in compliance rates among the major tax gap components even though the magnitude of these projections reflects growth in tax receipts in these major tax gap categories.

The NRP, which the IRS has used to estimate the most recent tax gap updates, arose out of a desire to find a less intrusive means of measuring tax compliance. The IRS used a focused statistical selection process that resulted in the selection of approximately 46,000 individual income tax returns for Tax Year (TY) 2001 – somewhat fewer than previous compliance studies, even though the population of individual tax returns had grown over time.

Like the compliance studies of the past, the NRP was designed to allow the IRS to meet certain objectives – to estimate the overall extent of reporting compliance among individual income tax filers and to update the audit-selection formulas. It also introduced several innovations designed to reduce the burden imposed on taxpayers whose returns were selected for the study.

The first NRP innovation was to compile a comprehensive set of data to supplement what was reported on the selected returns. The sources of the "case building" data included third-party information returns from payers of income (e.g., Form W-2 and Form 1099) and prior-year returns filed by taxpayers. Also, for the first time, the IRS added data on dependents obtained from various government sources, as well as data obtained from public records (e.g., current and prior addresses, real estate holdings, business registrations, and involvement with corporations). Together, these data reduced the amount of information requested from taxpayers, with some of the selected taxpayers not requiring any contact from the IRS. In effect, these data allowed the IRS to focus its efforts on return information that could not otherwise be verified. This pioneering approach was so successful it is being expanded in regular operational audit programs.

A second major NRP innovation was to introduce a "classification" process, whereby the randomly selected returns and associated case-building data were first reviewed by experienced auditors (referred to as classifiers) who identified not only which issues needed to be examined, but also the best way to handle each return in the sample. In this way, each return was either: (1) accepted as filed, without contacting the taxpayer at all (although, sometimes, minor adjustments were noted for research purposes); (2) selected for correspondence audit of up to three focused issues; or (3) selected for an in-person audit where there were numerous items that needed to be verified. In addition, the classifiers identified compliance issues that the auditor was required to evaluate, although the examiners had the ability to expand the audit to investigate other issues as warranted.

7

Other NRP innovations included streamlining the collection of data, providing auditors with new tools to detect noncompliance, and involving stakeholders (including representatives of tax professional associations) in the design and implementation of the study. Clearly, the NRP approach was much less burdensome on taxpayers than the old TCMP audits, which examined every line item on every return.

## TAX GAP ESTIMATES

As noted above, for the 2001 tax year, the overall gross tax gap was estimated to be approximately $345 billion, corresponding to a noncompliance rate of 16.3 percent. After accounting for enforcement efforts and late payments, the amount was reduced to $290 billion, corresponding to a net noncompliance rate of 13.7 percent.

Noncompliance takes three forms:

- not filing required returns on time (nonfiling);
- not reporting one's full tax liability on a timely filed return (underreporting); and
- not timely paying the full amount of tax reported on a timely return (underpayment).

The IRS has separate tax gap estimates for each of these three types of noncompliance. **Underreporting** (in the form of unreported receipts and overstated expenses) constitutes over 82 percent of the gross tax gap, up slightly from earlier estimates. **Underpayment** constitutes nearly 10 percent and **nonfiling** almost 8 percent of the gross tax gap.

### Nonfiling

The nonfiling gap is defined as the amount of true tax liability that is not paid on time by taxpayers who do not file a required return on time (or at all). It is reduced by amounts paid on time, such as through withholding, estimated payments, and other credits. The nonfiler population does not include *legitimate* nonfilers (i.e., those who have no obligation to file).

### Underreporting

The underreporting gap is defined as the amount of tax liability not voluntarily reported by taxpayers who file required returns on time. For income taxes, the underreporting gap arises from three errors: underreporting taxable income, overstating offsets to income or to tax, and net math errors. Taxable income includes such items as wages and salaries, rents and royalties, and net business income. Offsets to income include income exclusions, exemptions, statutory adjustments, and deductions. Offsets to tax are tax credits. Net math errors involve arithmetic mistakes or transcription errors made by taxpayers that are corrected at the time the return is processed. In addition to developing an estimate of the aggregate underreporting gap, it is possible to break aspects of this estimate down into measures of the underreporting gap attributable to specific line items on the tax return.

8

## Underpayment

The underpayment gap is the portion of the total tax liability that taxpayers report on their timely filed returns but do not pay on time. This arises primarily from insufficient remittances from taxpayers themselves. However, it also includes employer under-deposits of withheld income tax. In the case of withheld income tax, it is the responsibility of the employees to report the corresponding tax liability on timely filed returns, and it is the responsibility of their employers to deposit those withholdings with the government on time.

## THE TAX GAP MAP

Figure 1 summarizes the key components of the tax gap and how they relate to one another. It has come to be known as the "Tax Gap Map." As the Tax Gap Map indicates, the IRS estimates that, for 2001, approximately $55 billion of the gross tax gap will eventually be paid through enforcement or other late payments, leaving a net tax gap of about $290 billion. This projection of what will eventually be paid is based on fiscal year tabulations of past enforcement revenue and on prior studies of amounts that are paid late without enforcement efforts. Obviously, this projection depends directly on actions that both the IRS and taxpayers will take in the future, and the past is not likely to be a perfect predictor of that. Moreover, the IRS does not have good data on the amounts that are paid late without enforcement efforts. Consequently, this estimate of enforcement revenues and other late payments is necessarily subject to some uncertainty.

The Tax Gap Map distinguishes between "good" and "weak" estimates. For example, the corporation income tax estimates are acknowledged as weak because compliance behavior may have changed since the mid-1980s, which is the last time the IRS collected data on corporate compliance. Moreover, the underreporting tax gap is estimated as the difference between true tax liability and reported amounts. Determining true tax liability for large multi-national corporations can be difficult, given the complexity of the tax law, economic activities undertaken by these taxpayers, and the difficulty of making any kind of statistically valid assumptions based on a limited population of taxpayers. Weaknesses in general arise from two causes: using old data and using data and methods that do not adequately reflect the full extent of noncompliance.

Figure 2 organizes these estimates by type of tax and by type of noncompliance. As with tax gap estimates for prior tax years, the overall tax gap is dominated by the underreporting of individual income tax, which results in part from the dominant role that the individual income tax plays in overall federal tax receipts.

The individual income tax accounted for about half of all tax receipts in 2001. Individual income tax underreporting, however, was approximately $197 billion, or about 57 percent of the overall tax gap. While a comparison with 1988 data would suggest a slight decrease in individual income tax reporting compliance, it is important to remember that the data tell nothing about the years just before or just after TY 2001 and, as such, cannot show whether compliance trends today are improving or getting worse. Moreover, many aspects of the data and estimating methodologies used now are not comparable to earlier studies. In addition, broader changes in the economy over the past 20 years have made comparisons between the data difficult.

*Figure 1*

*Figure 2*

**Tax Year 2001 Gross Tax Gap by Type of Tax and Type of Noncompliance (in $ billions)**

| Type of Tax | Type of Noncompliance | | | TOTAL | |
|---|---|---|---|---|---|
| | Nonfiling Gap | Underreporting Gap | Underpayment Gap* | Amount | Percent Distribution |
| Individual Income Tax | 25 | 197 | 23.4 | 245 | 71.1% |
| Corporation Income Tax | # | 30 | 2.3 | 32 | 9.3% |
| Employment Tax | # | 54 | 5.0 | 59 | 17.0% |
| Estate & Gift Tax | 2 | 4 | 2.1 | 8 | 2.4% |
| Excise Tax | # | # | 0.5 | 1 | 0.1% |
| TOTAL<br>Percent Distribution | 27<br>7.8% | 285<br>82.5% | 33.3<br>9.7% | 345 | 100.0% |

* Since the underpayment gap figures are generally actual amounts rather than estimates, they are presented here to the closest $0.1 billion.

# No estimates are available for these components.

Amounts may not add to totals due to rounding. See Figure 1 regarding the reliability of estimates.

D026
Exh.2