**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 10-CV-01546-REB-CBS

The Direct Marketing Association,

> Plaintiff,

> v.

Roxy Huber, in her capacity as Executive
   Director, Colorado Department of Revenue,

> Defendant.

---

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT — COUNTS I AND II (COMMERCE CLAUSE)**

---

     The Plaintiff, the Direct Marketing Association ("DMA"), opposes the

**Defendant's Motion for Partial Summary Judgment — Counts I and II (Commerce**

**Clause) [# 99]**, filed on May 6, 2011 ("Defendant's SJ Motion"), seeking judgment as a

matter of law on the DMA's claims that COLO. REV. STAT. ANN. § 39-21-112(3.5)(c)&(d)

("HB 10-1193" or "the Act") and the regulations promulgated by the Department of

Revenue to implement the Act  [1 COLO. CODE REGS. § 201-1: 39-21-112.3.5 (2010)

("the Regulations")], violate the Commerce Clause of the United States Constitution.

     The Defendant now acknowledges in her motion, as the Court concluded in its

**Order Granting Preliminary Injunction [# 79],** entered on January 26, 2011 ("January

26 Order") [at 7], that the Act and the Regulations impose notice and reporting

obligations that apply solely to out-of-state retailers who do not collect Colorado sales

and use tax, but do not apply to in-state retailers.  [*See* Defendant's SJ Motion at 7-8 (Statement of Undisputed Facts ("Def's SOF") ¶¶ 5-8.]   As a matter of law, the Act and Regulations are, therefore, discriminatory.  Furthermore, each of the justifications offered by the Defendant for imposing such differential burdens on out-of-state retailers is at odds with fundamental principles of Commerce Clause jurisprudence.  Because there are reasonable non-discriminatory alternatives to achieve the Act's objectives [*see* **Plaintiff's Motion for Summary Judgment [#98]**, filed on May 6, 2011("Plaintiff's SJ Motion") at 20-21 and incorporated Statement of Facts ("Plaintiff's SOF"), ¶¶ 16, 29, 34], the Defendant's motion for judgment on Court I of the DMA's **First Amended Complaint [#10]**, filed on July 23, 2010 ("Complaint") must be denied, and the DMA's cross-motion for summary judgment should be granted.

In fact, rather than applying established Commerce Clause doctrine to the facts of the case to defend the Act against the DMA's constitutional challenge, the Defendant's motion instead presents an extended policy argument criticizing the Supreme Court's holding in *Quill Corp. v. North Dakota*, 504 U.S 298 (1992) that retailers without a physical presence in a state may not be compelled to collect the state's sales and use tax.  The Defendant insists that the State of Colorado should be permitted, in reaction to *Quill*, to impose upon such out-of-state retailers the alternative, burdensome and discriminatory requirements of the Act, in order to offset, or compensate for, the sales and use tax obligations borne by in-state retailers.  As the Supreme Court has made clear, however, individual states and the courts are ill-suited to weigh the competing local and out-of-state interests.  Rather, the Supreme Court has

explained that it is the role of Congress, under the Commerce Clause, to balance the competing interests at play in the regulation of interstate commerce and to craft the details of any legislation that would expand (or limit) state taxing authority over such commerce.

Moreover, the Defendant's argument, that the notice and reporting obligations of the Act and Regulations are meant to substitute for the use tax collection obligation that the State cannot impose on out-of-state retailers under *Quill*, proves the DMA's case that the State lacks the power under the Commerce Clause to require retailers with no physical presence in the state to comply with the requirements of Act and Regulations. The Defendant offers no response to the DMA's contention, and the Court's well-reasoned conclusion in its January 26 Order [at 10], that the notice and reporting burdens imposed under the Act are at odds with the fundamental Commerce Clause principles. The Defendant's motion as to Count II should, therefore, be denied, as well, and the DMA awarded judgment as a matter of law on Count II.

## PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT OF UNDISPUTED FACTS

The DMA responds to each of the Defendant's enumerated factual assertions as follows:

1.      E-commerce in the United States has nearly tripled over the last decade, from $1.06 trillion in 2000 to $3.16 trillion in 2008. As a result, state and local governments and their economies experience increased evasion of sales and use taxes and the resulting lost revenue, lost sales by Main Street vendors who must collect sales tax, and the economically inefficient alteration of business practices to avoid collection responsibility. States collect taxes due on E-commerce much less effectively because vendors are often not required to collect and remit the tax and buyer compliance with the use tax is frequently very weak. Colorado state and local governments are estimated to fail to collect

hundreds of millions of dollars in sales or use tax due on E-commerce sales between 2010 and 2012.  Colorado also loses revenue that is uncollected on remote sales, such as from mail order firms.

Plaintiff's Response:  The DMA denies the first sentence of paragraph 1 on the grounds that the total amounts of e-commerce sales quoted by the Defendant are disputed by competing estimates.  [*See* Dep. Ex. 97, at 5-9 (attached to **Plaintiff's Reply to Defendant's Response in Opposition to Plaintiff Motion for a Preliminary Injunction [#56]** ("Plaintiff's Reply on PI") at Ex. H).]  The DMA denies the second sentence of paragraph 1 on the grounds that the statements made are not supported by the source cited, which is itself an unsupported expert opinion.  The DMA denies the third sentence of paragraph 1 on the grounds that it fails to state an objective fact, but, instead, posits a comparative relationship ("much less effectively") without identifying to what the comparison is made.  The DMA denies the fourth sentence of paragraph 1 on the grounds that the estimated amounts are disputed; indeed, the conclusions drawn in the "Fox Study" have been discredited by a competing analysis conducted in 2010. [*See* Dep. Ex. 97.]  The DMA denies the fifth sentence of paragraph 1 on the grounds that it fails to state an objective fact and is not supported by the source cited.  The DMA further responds that <u>none</u> of the assertions contained in paragraph 1 are material to the issue of whether the Act and Regulations violate the Commerce Clause.

      2.      Sales and use tax revenue historically account for approximately one third of the State of Colorado's General Fund.

Plaintiff's Response:  The DMA admits the statement set forth in paragraph 2, but states that it is immaterial to whether HB 10-1193 violates the Commerce Clause.

3.      The United States Department of the Treasury, Internal Revenue Service has conducted research on the income tax gap, the "aggregate amount of true tax liability imposed by law for a given tax year that is not paid voluntarily and timely."  This research indicates that compliance with tax laws dramatically increases when a third party reports taxable activity to the taxing authority.

Plaintiff's Response:  The DMA admits that the United States Department of

Treasury has prepared a report relating to federal income taxes entitled "Update on

Reducing the Federal Tax Gap and Improving Voluntary Compliance," a copy of which

the Defendant has submitted to the Court.  The DMA denies that the Department of

Treasury report is material to the collection of state use taxes or the issue of whether

HB 10-1193 violates the Commerce Clause.  The DMA further denies that the language

quoted in the first sentence of paragraph 3 appears on page 6 of the report.  The DMA

also denies that pages 12-16 of the report support the statement contained in the

second sentence of paragraph 3.


4.      Retailers utilizing direct marketing methods need not have facilities, employees, or property in a state to sell to consumers in the state.

Plaintiff's Response:  The DMA admits the facts set forth in paragraph 4.


5.      Many direct marketers have no physical presence in Colorado, but sell products and services to Colorado consumers from outside the state using instrumentalities of interstate commerce.

Plaintiff's Response:  The DMA admits the facts set forth in paragraph 5.


6.      Retailers with a physical presence in Colorado are required under Colorado law to obtain a sales tax license from DOR and to collect and remit Colorado sales tax to DOR on all non-exempt, retail sales.

Plaintiff's Response:  The DMA admits the facts set forth in paragraph 6.

7.      Effective March 1, 2010, Colorado enacted House Bill 10-1193, codified at Colorado Revised Statutes Section 39-21-112(3.5), imposing new notice and reporting obligations upon "each retailer that does not collect Colorado sales tax."

Plaintiff's Response:  The DMA admits the facts set forth in paragraph 7.

8.      Under the Law, out-of-state retailers that agree to collect Colorado sales tax, even though they have no obligation to do so under Colorado law and the United States Constitution, are not required to comply with the requirements for the notice and reporting requirements of the Law.

Plaintiff's Response:  The DMA admits the facts set forth in paragraph 8.

9.      Of the Internet retailers listed in the publication *Top 500 Internet Retailers*, at least 39 do not have a physical presence in the State of Colorado but nevertheless collect Colorado sales tax.

Plaintiff's Response:  The DMA denies that the source cited establishes the facts asserted in paragraph 9.  The DMA also objects that the statement itself would not be admissible for the truth of the matter asserted, and therefore may not be relied upon pursuant to Fed. R. Civ. P. 56(c)(2).  The statement is also immaterial to whether the Act and Regulations violate the Commerce Clause.

10.      Because the Law exempts retailers with less than $100,000 in gross annual sales in Colorado, the vast majority of retailers in the country are not subject to the Law.

Plaintiff's Response:  The DMA denies that the "vast majority of retailers in the country" are not subject to the Act "because of" the exemption in the Regulations for retailers with gross sales under $100,000, since the vast majority of retailers in the country neither have a physical presence in Colorado nor sell to Colorado consumers

via direct marketing.  The statement is also immaterial to whether the Act and Regulations violate the Commerce Clause.  The DMA further notes that the Defendant's expert witness, Dieter Gable, estimates that as many as 10,000 small Internet retailers are subject to the law.  [*See* Plaintiff's Reply on PI, Ex. C, Deposition of Dieter Gable ("Gable Deposition"), at 96:25 – 102:15.]

> 11.     The Law provides leeway for variance in approaches to compliance, allowing affected retailers to comply with reasonable efforts.

Plaintiff's Response:  The DMA objects that the assertion in paragraph 11 reflects an opinion and a conclusion of law, not a statement of fact.  The assertion is therefore not admissible and may not be relied upon pursuant to Fed. R. Civ. P. 56(c)(2).  The assertion is also immaterial to whether the Act and Regulations violate the Commerce Clause.

> 12.     There are many ways a retailer can comply with the Transactional Notice requirement — from a linking notice or popup window at the time of the online purchase, to slipping the notice in as a packing slip for delivery, or other workarounds.  DMA's expert estimates a packing insert costs less than ten cents per package.

Plaintiff's Response:  The DMA objects to the assertion set forth in the first sentence of paragraph 12 on the grounds that it reflects an opinion and conclusion of law, rather than a statement of fact.  The assertion is therefore not admissible and may not be relied upon pursuant to Fed. R. Civ. P. 56(c)(2).  The DMA admits the assertion contained in the second sentence of paragraph 12.  The DMA further responds that the assertions contained in paragraph 12 are immaterial to whether the Act and Regulations violate the Commerce Clause.

13.     DOR has provided acceptable sample language for the Transactional Notice, which retailers may use.

<u>Plaintiff's Response</u>:  The DMA admits that the DOR has prepared sample language for the Transactional Notice that is acceptable to the DOR, but denies that such language is acceptable to affected DMA members.  The DMA further responds that the assertion set forth in paragraph 13 is immaterial to whether the Act and Regulations violate the Commerce Clause.

14.     Data for the Annual Purchase Summary and Customer Information Report already exists.  Retailers track customer data in very detailed ways and store that data.

<u>Plaintiff's Response</u>:  The DMA denies that "[d]ata for the Annual Purchase Summary and Customer Information Report already exists" and denies that the source cited supports this assertion.  It is self-evident that the data which affected retailers are required to include in Annual Purchase Summaries to customers and in the Customer Information Report submitted to the Department is newly created with each purchase transaction and, therefore, does not "already exist."  The DMA admits that retailers track and store some customer data, but denies that the sources cited support the assertions set forth in the second sentence of paragraph 14.  The DMA further responds that the assertions contained in paragraph 14 are immaterial to whether the Act and Regulations violate the Commerce Clause.

15.     Because the Law only requires the Annual Purchase Summary for customers who spend more than $500 annually, Mr. Barry estimates that retailers would have to create reports for fewer than 20% of Colorado purchasers, and it could be as low as 10%.

Plaintiff's Response:  The DMA admits that Mr. Barry estimates that retailers would need to create an Annual Purchase Summary for 10-20% of Colorado purchasers, although a report regarding every Colorado purchaser, regardless of purchase level, must be filed with the Department in the Customer Information Report of any retailer that is required to prepare at least one Annual Purchase Summary.

16.     DOR has provided instructions and templates to assist retailers with preparing and electronically filing the Annual Purchase Summary.

Plaintiff's Response:  The DMA admits the assertion set forth in paragraph 16.

### PLAINTIFF'S STATEMENT OF RESPONSIVE UNDISPUTED FACTS

In response to the facts and arguments asserted by the Defendant in support of her motion for summary judgment, the DMA presents the following undisputed facts ("Plaintiff's RSOF"), in addition to those set forth in the Plaintiff's SJ Motion:

36.     In the 2011 legislative session, the Colorado General Assembly enacted, and the Colorado Governor signed into law, Colorado Senate Bill 11-223 ("SB 11-223"). SB 11-223 amends the Colorado sales and use tax law, COLO. REV. STAT. ANN. § 39-26-105, by adding a new paragraph (1)(g)(I), which provides: "Notwithstanding any other provision of this Section, the amount retained by a vendor to cover the vendor's expense in collecting and remitting tax pursuant to this section shall not exceed an amount equal to two and twenty-two one-hundredths percent of all sales tax reported on any return made on or after July 1, 2011, but prior to July 1, 2014."

37.     Under SB 11-223, in-state Colorado retailers registered as vendors to collect sales and use tax are entitled to retain a portion of the sales and use tax the

vendors collect from Colorado purchasers, in order to cover the expense of collecting and remitting Colorado sales tax.

38.     Out-of-state retailers that do not collect Colorado sales and use tax receive no compensation from the State of Colorado for the costs of compliance with the notice and reporting obligations of the Act and Regulations.

## ARGUMENT

**I.      THE DEFENDANT'S MOTION ON COUNT I OF THE PLAINTIFF'S COMPLAINT FOR DISCRIMINATION AGAINST INTERSTATE COMMERCE SHOULD BE DENIED.**

The test for determining whether a state law discriminates against interstate commerce is straightforward: if the law imposes "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter," either on its face, or in its effect, it is discriminatory.  [*Oregon Waste Sys., Inc. v. Department of Envtl. Quality*, 511 U.S. 93, 99 (1994*); Hughes v. Oklahoma*, 441 U.S. 332, 336 (1979).]  Once it is established that a law imposes such differential burdens on out-of-state companies, the burden shifts to the State to prove that the law has a legitimate local purpose that cannot be achieved through reasonable nondiscriminatory alternatives.  [*Hughes*, 441 U.S. at 336-37; *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Authority*, 550 U.S. 330, 338-39 (2007) (the Defendant must affirmatively show that there are "*no other means*" to advance a legitimate local purpose for the law) (emphasis added).]

**A. The Act and Regulations Impose Differential Burdens On Out-of-State Retailers That Are Not Imposed on In-State Retailers.**

There is no genuine dispute that HB 10-1193 imposes costs and burdens upon out-of-state retailers that are not imposed upon in-state retailers. [*See* Plaintiff's SJ Motion, at 16-19.]  Indeed, the Defendant acknowledges as much in her motion. [Defendant's SJ Motion at 5, 7-8; Def's SOF, ¶¶ 6-8.][1]  The Act and Regulations require retailers that do not collect Colorado sales and use tax to provide Colorado purchasers with the Transactional Notice and Annual Purchase Summaries, and to file with the Department an annual Customer Information Report.  [*Id.* at 5-6.]  Because retailers located within Colorado are required under Colorado law to collect Colorado sales and use tax – an obligation for which Colorado law provides compensation [Plaintiff's RSOF, ¶¶ 36-37] – all "non-collecting retailers" subject to the law are, by definition, located outside the state.  Each of the Act's notice and reporting obligations, as confirmed by the testimony of the Defendant's own expert, Dieter Gable, will require affected retailers to incur compliance costs that in-state retailers are not required to bear [Plaintiff's SOF,

---

[1]  In opposing the DMA's Motion for Preliminary Injunction, the Defendant previously argued that the Act and Regulations are non-discriminatory on the grounds that they apply equally to in-state retailers that fail to comply with their statutory obligation to collect sales tax, as well as to out-of-state retailers that do not collect use tax because they are protected from a collection obligation under the Supreme Court's decision in *Quill Corp. v. North Dakota*.  [See **Defendant's Response in Opposition to Plaintiff's Motion for a Preliminary Injunction [#50]** at 20-21.]  The DMA has demonstrated the fallacy of that argument, and the Court expressly rejected it in granting the DMA's motion for a preliminary injunction.  [January 26 Order at 7.]

In her motion for summary judgment, the Defendant now abandons the pretext that the Act and Regulations "regulate even-handedly" within the meaning of the Commerce Clause, and instead argues that the Court must evaluate the discriminatory burdens of HB 10-1193 as simply one facet of the State's overall sales and use tax system which serve to compensate for the obligation imposed on Colorado retailers to collect and report Colorado sales tax.  This new argument by the Defendant is equally unavailing under established Supreme Court precedent, as discussed herein.

¶¶ 22, 26], or face monetary penalties for failing to satisfy such obligations.   Thus, as the Court concluded in its January 26 Order [at 7], HB 10-1193 imposes differential burdens on out-of-state retailers.

### B.  The Defendant Offers No Evidence of Non-Discriminatory Alternatives.

In light of the admittedly disparate burdens imposed on out-of-state retailers by the Act and Regulations, in order to prevail on Count I the Defendant must show that there are no reasonable non-discriminatory alternatives to achieve the objectives of the law.   The Defendant, however, cites to no undisputed facts [*see generally* Def's SOF], and presents no argument that there are no such alternative measures the state could adopt.  As the facts cited by the DMA in its motion for summary judgment show, however [Plaintiff's SOF, ¶¶ 16, 29, 34] and as the Court concluded in its January 26 Order [at 8], such non-discriminatory alternatives are evident.   The Defendant's motion on Count I must, therefore, be denied.

### C.  The Defendant's Arguments That The Law Is Non-Discriminatory Because It Purportedly Advances The Objectives of the Commerce Clause Are Inconsistent With Basic Commerce Clause Doctrine.

Lacking any basis for defending the Act under the established Commerce Clause test for discriminatory state laws, the Defendant instead asserts that HB 10-1193 is non-discriminatory on the grounds that: (1) the law is not "protectionist" [Defendant's SJ Motion at 11]; (2) the Act purportedly gives retailers a "choice" between accepting the burdens of use tax collection or complying with the law [*id.* at 13-14]; and (3) the Act and Regulations do not favor in-state retailers over out-of-state retailers because Colorado sales and use tax law, viewed "holistically," imposes sales tax collection

obligations on in-state retailers that are comparable to the notice and reporting obligations imposed on out-of-state retailers under the Act and Regulations. [*Id.* at 15-16].  Each of the Defendant's contentions is, however, at odds with fundamental Commerce Clause principles.

1. **The Supreme Court Has Made Clear that State Laws that Impose Increased Burdens on Out-of-State Companies Are, by Definition, Discriminatory and "Protectionist" for Purposes of the Commerce Clause.**

The Defendant argues that  Act and Regulations do not run afoul of the Commerce Clause because they are not "protectionist."   It is a bedrock principle of the dormant Commerce Clause, however, that a state law may not discriminate against interstate commerce either facially or in effect.  [*New Energy Co. v. Limbach*, 486 U.S 269, 280 (1988) (striking down law that discriminated against out-of-state companies on its face); *Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 350, 354 (1977).]  (striking down law that had the practical effect of discriminating against out-of-state producers).]  Requiring a "protectionist" intent to discriminate by the State "would mean that the Commerce Clause of itself imposes no limitations on state action . . . save for the rare instance where a state artlessly discloses an avowed purpose to discriminate against interstate goods." [*Hunt,* 432 U.S. at 350.]  Indeed, the Defendant's argument that HB 10-1193 must be upheld because it lacks a "protectionist" motive has been repeatedly rejected as a basis for defending a law as non-discriminatory.  [*See, e.g., City of Philadelphia v. New Jersey*, 437 U.S. 617, 626 (1978) (state effort to "deny that [a law] was motivated by financial concerns or economic protectionism" fails because "whatever [the state's] ultimate purpose, it may not be accomplished by

13

discriminating against articles of commerce coming from outside the State"); *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 205 (rejecting argument that a state law that imposed additional burdens on out-of-state businesses was constitutionally-permissible because it was not protectionist); *American Trucking Ass'n, Inc. v. Whitman*, 437 F.3d 313, 321 (3rd Cir. 2006) (purpose of a law is not relevant to whether a statute is discriminatory); *McNeilus Truck and Mfg., Inc. v. Ohio Ex Rel. Montgomery*, 226 F.3d 429, 443 (6th Cir. 2000) ("we need not ascribe an economic protection motive" to invalidate the law under the Commerce Clause).

State laws that impose differential, and greater, burdens on out-of-state companies than they impose on in-state companies are, by their very nature, "protectionist" for purposes of the Commerce Clause.  Indeed, laws that raise the cost of doing business for out-of-state businesses, while leaving the costs of in-state business unaffected, impose the "most obvious" form of discrimination against interstate commerce, because the "increased costs imposed by the statute would tend to shield [in-state interests]" from the competition of out-of-state businesses.  *Hunt*, 432 U.S. at 350-51.   For that reason, laws that "explicitly impose costs on the citizens and businesses of other states while exempting [the state's] own citizens from those same costs" are facially discriminatory under the Commerce Clause.  *American Trucking Ass'n*, 437 F.3d at 321, 322; *Used Tire Int'l., Inc. v. Diaz-Saldana*, 155 F.3d 1, 3 (1st Cir. 1998) (a law that "imposes burdens, costs and risks" on out-of-state interests that are not borne by in-state companies, discriminates against interstate commerce, "no matter how laudatory its purpose.")   The Defendant's contention that the Act and Regulations

are somehow consistent with Commerce Clause principles despite imposing disparate, and increased, burdens on out-of-state retailers, fails.

> **2. The Defendant's Argument that the Act Gives Out-of-State Retailers The "Choice" Of Avoiding HB 3659's Notice and Reporting Requirements by Surrendering Their Constitutional Rights Turns Commerce Clause Doctrine On Its Head.**

The Defendant next asserts that the Act and Regulations are non-discriminatory because "non-collecting retailers may choose between two alternatives: either collecting and remitting sales tax or complying with the notice and reporting requirements of the Law." [Defendant's SJ Motion at 14.]   The Defendant's "choice" argument would convert one of the Act's central constitutional flaws into its greatest virtue.  The purported "choice" offered to out-of-state retailers with no physical presence in Colorado is the option of either surrendering their rights guaranteed under the Commerce Clause not to be subject to the obligation to collect state and local use taxes (the *Quill* doctrine) or, instead, complying with the even more onerous notice and reporting requirements of the Act and Regulations.  As the DMA demonstrated in its motion for summary judgment, the Constitution forbids a state from requiring a business to surrender important rights in order to be free from discrimination under the Commerce Clause. [*Bendix Autolite Corp. v. Midwesco Enters. Inc.*, 486 U.S. 888, 893 (1988).]   Likewise, a state may not, consistent with the Commerce Clause, demand that a company accept regulatory burdens as if it were a resident of the state as a condition of receiving equal-treatment under state law.  [*Granholm v. Heald*, 544 U.S. 460, 475 (2005); *Fulton Corp. v. Faulkner,* 516 U.S. 325, 333 n.3 (1996).]

Far from creating a choice for out-of-state retailers of whether to collect and remit Colorado sales and use taxes (indeed, out-of-sate retailers already had that option before HB 10-1193 was enacted), by adopting the Act and Regulations, the State of Colorado seeks to *compel* retailers who have declined to collect Colorado sales tax voluntarily, to give-up their constitutional rights not to collect such taxes.  Although the Defendant argues that the retailer's decision in the face of such coercion is a "choice," the Constitution precludes such oppressive and discriminatory measures against interstate commerce.[2]

The ability of a member of a group targeted by discriminatory state requirements to "opt-out" of the group and thereby avoid discrimination, does not make the law non-discriminatory.  [*See, e.g., American Trucking Ass'n,* 437 F.3d at 321 (the creation of a limited exception for certain out-of-state entities does nothing to cure the discriminatory nature of a law).]  Moreover, the argument that out-of-state retailers "could avoid the strictures" of the Act and Regulations, if only they would agree to behave like in-state retailers, and collect Colorado use tax "turn[s] the 'availability of nondiscriminatory alternatives' test on its head."   [*McNeilus,* 226 F.3d at 444.]  In response to a charge of discrimination,  the Defendant  cannot argue that the best alternative is for out-of-state companies to change their lawful business practices.  [*Id.* ("[T]he existence of

---

[2] Nor can the state justify imposing such onerous burdens on out-of-state retailers on the grounds that in-state retailers purportedly have no choice whether to comply with their statutory obligation to collect and remit sales taxes under state law.  By locating their businesses in the state, Colorado retailers necessarily subject themselves to the regulatory authority of the state. Retailers with no physical presence in Colorado must likewise comply with the tax laws of their home states, while Colorado businesses are neither required to collect sales and use taxes, nor to comply with notice and reporting obligations of the kind imposed under Colorado HB 10-1193, in states where they lack a physical presence.

alternatives is a burden [of proof] for the state that precludes using the discriminatory method that it has chosen, not a way to shift blame to the [out-of-state seller] for the manner in which it runs its business.").]

### 3. The Supreme Court Has Made Clear that Laws that Impose Additional Burdens Solely on Out-of-State Companies Inherently Favor In-State Companies.

The Defendant next argues that the notice and reporting obligations imposed under the Act and Regulations are not discriminatory on the grounds that they do not, when viewed in the context of Colorado's overall sales and use tax system, actually favor in-state retailers.  Here again, the Defendant misconstrues fundamental Commerce Clause jurisprudence.  It has been understood for more than 150 years that "the imposition of a differential burden on any part of the stream of commerce . . . is invalid, *because . . . it will result in a disadvantage to the out-of-state producer.*"  [*West Lynn Creamery v. Healy*,  512 U.S. 186, 202 (1994) (emphasis added).]  As the Court noted in granting the DMA's request for a preliminary injunction, "the degree of a differential burden or charge on interstate commerce 'is of no relevance to the determination whether a State has discriminated against interstate commerce.'" [January 26 Order at 6, citing *Oregon Waste Systems*, 511 U.S. at 100 n. 4.]  Laws which impose additional obligations on out-of-state businesses that are not imposed on in-state businesses have the effect, by the very fact of such differential burdens, of favoring in-state interests over out-of-state interests.  [*Hunt*, 432 U.S. at 350.][3]

---

[3] The Commerce Clause, of course, imposes no limitation on a state's power to impose regulatory obligations on *in-state* companies, and therefore does not prevent a state from imposing greater burdens on in-state interests than on out-of-state interests.  Of necessity, a

To support her argument that a discriminatory law may pass constitutional muster even when it imposes demonstrably disparate burdens on out-of-state companies that are not imposed on in-state companies, the Defendant argues that the Commerce Clause "requires consideration of the challenged law in the context of other related laws."  [Defendant's SJ Motion at 15.]  The authorities cited by the Defendant do not, however, support her "holistic approach" to Commerce Clause jurisprudence.   In *West Lynn Creamery*, the plaintiffs challenged the combined effect of two components of a Massachusetts scheme for regulating the dairy industry.  The State argued that because each of two components of the law, viewed separately, were within the regulatory power of the State under existing Commerce Clause doctrine, then the two components, taken together, could not violate the Commerce Clause.  The Supreme Court rejected this argument, finding that the combined effect of the two components clearly discriminated against interstate commerce.  [512 U.S. at 201.]

In this case, the Act and Regulations are not, considered independently of other provisions of Colorado law, constitutionally valid; rather, they plainly impose disparate burdens solely on out-of-state retailers. Nothing in *West Lynn Creamery* supports the Defendants contention that the discriminatory effects of the Act and Regulations may be excused by searching out competing burdens imposed on in-state interests under other provisions of Colorado's sales and use tax code.

---

state only contravenes the Commerce Clause by subjecting out-of-state interests to requirements not borne by in-state interests, as the test for discrimination set forth by the Supreme Court in *Oregon Waste Systems* makes clear.  The State may not, however, justify imposing additional burdens solely on out-of-state businesses on the grounds that those differential obligations do not, in fact, have *the effect* of "favoring" in-state interests.  A state law could never, under the Defendant's theory, discriminate against interstate commerce on its face.

Similarly, in *South Central Bell Telephone Co. v. Alabama*, 526 U.S. 160 (1999), also cited by the Defendant, the Supreme Court *rejected* the argument advanced by the State of Alabama that provisions of its franchise tax that applied solely to out-of-state companies were not, in fact, discriminatory, because other provisions of the Alabama Tax Code imposed different and (the state argued) offsetting tax burdens on in-state businesses.   526 U.S. at 169.  Thus, *South Central Bell*, like *West Lynn Creamery,* shows that a facially *non-discriminatory* state law may, nevertheless, be shown to have discriminatory effects when understood as part of a larger statutory scheme.  The cases cited by the Defendant do not show that a demonstrably discriminatory law, like the Act, which imposes obligations solely upon out-of-state business, will only run afoul of the Commerce Clause if no offsetting burdens on in-state interests can be located elsewhere in the State's law.[4]

D.     **The Defendant's Thinly-Veiled Attempt to Invoke The Compensatory Tax Doctrine Fails.**

All of the Defendant's arguments in support of her claim for summary judgment on Count I of the DMA's complaint alleging discrimination against interstate commerce rely, to varying degree, on the Defendant's contention that the Act and Regulations are permissible because they impose burdens on affected out-of-state retailers that compensate for the for the obligation imposed upon in-state retailers to collect and remit

---

[4] The Defendant's reliance on *Matthews v. Department of Revenue*, 562 P.2d 415 (Colo. 1977) is also misplaced.  In *Matthews*, a provision of Colorado use tax law that was not discriminatory on its face was found to violate the Commerce Clause when considered together with a contrasting provision in Colorado's sales tax law.  Once again, while facially constitutional provisions may be shown to be discriminatory when understood in light of other laws, it is not the case not that a demonstrably discriminatory law may be excused by taking a more "holistic view" of state laws.

19

Colorado sales taxes.[5]  Indeed, the core of the Defendant's entire defense of the Act is that "[a]ny challenge to the Law on dormant Commerce Clause grounds must weigh the relative burdens of Colorado's sales and use tax scheme on non-collecting retailers  as compared to collecting retailers, rather than viewing in isolation the Law's application to out-of-state retailers."  [Defendant's SJ Motion at 16.]  The Defendant offers no citation for this proposition, because it is simply incorrect as a matter of law: a state may not defend a law that imposes increased burdens on out-of-state retailers as being non-discriminatory under the Commerce Clause on the grounds that the state also imposes other, different burdens upon their in-state competitors under different laws.

Indeed, the only narrow, and utterly inapplicable, caveat to this fundamental principle is the so-called "complementary" or "compensatory" tax doctrine, most recently addressed (and rejected) by the Supreme Court in *South Central Bell.*  [S*ee* 526 U.S. at 169-70.]  Indeed, the Defendant's reliance upon *South Central Bell,* and her citation to several other cases discussing the compensatory tax theory,[6]  belies the fact that the Defendant's entire case is grounded in the doctrine.

---

[5]  *See* Defendant's SJ Motion at 6 (the Act "promotes a level playing field for in-state and out-of-state retailers'); 11 ("Colorado businesses are at a competitive disadvantage because they must collect sales tax on their in-store and online sales"); 11-12 (the "function of complementary sales and use taxes schemes is 'to put local retailers subject to the sales tax on a competitive parity with out-of-state retailers exempt from the sales tax . . . by reducing the artificial competitive advantage currently enjoyed by non-collecting retailers due to the safe harbor created by [*National Bellas Hess* and *Quill*]"); 13 (the Act "allows non-collecting retailers the ability to choose to be subject to the same burden imposed on their in-state competitors") (underline in original); 16 ("the DMA cannot prove that burdens upon out-of-state non-collecting retailers as a result of the Law outweigh burdens upon collecting retailers").

[6]  *See, e.g.,* Defendant's SJ Motion at 3 (citing *Henneford v. Silas Mason Co.,* 300 U.S. 577 (1937)); 5 n.1 (citing *Associated Industries of Missouri v. Lohman,* 511 U.S. 641 (1994)); and 12 (citing *Boston Stock Exchange v. State Tax Comm'n,* 429 U.S. 318 (1977)).

As explained by the Supreme Court in *Oregon Waste Systems*, the concept of a "compensatory tax" is "merely a specific way of justifying a facially discriminatory tax as achieving a legitimate local purpose that cannot be achieved through nondiscriminatory means."  [511 U.S. at 102 (citation omitted).]   Under the compensatory tax doctrine, "a facially discriminatory tax that imposes on interstate commerce the rough equivalent of an identifiable and 'substantially similar' tax on intrastate commerce does not offend the negative Commerce Clause."  *Id.* at 102-03.[7]   As with any purported justification for a discriminatory tax, the state bears the burden of proving that the exception applies. *Id.* at 103.  The compensatory tax doctrine, however, is utterly unavailing to the Defendant, for several reasons:

- First and foremost, the Act and Regulations do not impose a tax, as the Defendant herself emphasizes.  [*See* Defendant's SJ Motion at 6 ("The Law imposes neither tax liability nor any obligation to collect and remit sales tax").] Therefore, the doctrine simply does not apply.

-  Moreover, the compensatory tax doctrine, as the Supreme Court has made clear, is simply one way for the State to carry its burden of proving that there are no reasonable non-discriminatory alternatives to a discriminatory tax.  Since there are demonstrable non-discriminatory alternatives to the Act and

---

[7] Although dating back over 100 years, the only viable example of a properly "compensatory" tax is a state or local use tax which, although facially discriminatory because its applies only to purchases made outside the state (and therefore not subject to state sales tax), does not run afoul of the Commerce Clause because it so closely tracks, and directly complements, the state sales tax. [*Oregon Waste Systems,* 511 U.S. at 105 (*citing Henneford v. Silas Mason Co.*, 300 U.S. 577 (1937)).]

Regulations, the Defendant cannot use the "compensatory" tax argument, even by analogy, to show that there are no such alternatives.

- As with any justification for a discriminatory law, the State has the burden of proof under the doctrine.  The failure of the State to carry its burden on any element of the test is "fatal" to the State's effort to justify a discriminatory tax law. *Oregon Waste Systems*, 511 U.S at 104; *Fulton Corp.,* 561 U.S. at 344.  For example, the State is required to indentify the intrastate tax burden for which it seeks to compensate, and to show that the tax burden imposed on interstate commerce is roughly equivalent.  The Defendant has done neither in arguing that the requirements of the Act are non-discriminatory when weighed against the sales tax obligations of in-state retailers.  The Defendant has offered no evidence (and the record is devoid of information) as to the nature and amount of the burdens borne by in-state retailers.  Thus, there would be no way of determining whether the non-tax notice and reporting obligations imposed upon out-of-state retailers approximate the sales tax obligations imposed on in-state retailers, assuming any comparison between such different burdens was possible at all.[8]

---

[8] The burdens imposed on out-of-state retailers by the Act and Regulations are established by the undisputed facts.  Those burdens include compliance costs [Plaintiff's SOF ¶¶ 22, 26], penalties for non-compliance, and lost business [Plaintiff's SOF ¶ 31.]  With regard to the decline in sales faced by out of state retailers who are required by the Act to report their customers' purchasing information to the Department, the Defendant critiques the Plaintiff's survey of Colorado consumers, but she offers no competing survey evidence or other facts to refute the results of the DMA's survey. It is well-established that the results of a survey are admissible if the survey was conducted according to generally accepted survey methodology. [*Brunswick Corp. v. Sprinit Reel Co.*, 832 F.2d 513, 522 (10th Cir. 1987); *see also Hodgdon Power Co. v. Alliant Techsystems, Inc.*, 512 F.Supp.2d 1178, 1181 (D. Kan. 2007) (listing factors). The Plaintiff's expert, Dr. Adler, affirmed in his original declaration ([#19] ¶¶ 4, 6-10),

- Furthermore, the Defendant ignores the fact that Colorado retailers are (or soon will be) compensated for the burden of collecting and remitting Colorado sales and use taxes through the vendor allowance enacted in HB 11-223.  [Plaintiff's RSOF ¶¶ 36, 37.]  Any comparison of the burdens between in-state retailers required to collect Colorado sales and use tax and out-of-state retailers who are required to comply with the discriminatory notice and reporting obligations imposed by the Act and Regulations would also have to take account of the collection allowance for in-state retailers.  Moreover, if one goal of the Act and Regulations is "competitive parity"  between in-state and out-of-state retailers who do not collect sales tax, the collection allowance represents yet another demonstrable, non-discriminatory alternative to the discriminatory notice and reporting obligations imposed on out-of-state retailers under the Act.

- Finally, the Defendant again fails to recognize that the protection of interstate commerce from unduly burdensome regulation secured by the physical presence requirement of *Quill* is a "two-way street" that benefits Colorado retailers, as well, with reference to the tax laws of other states. In supposedly seeking to reduce the "artificial competitive advantage currently enjoyed by non-collecting retailers due to the safe harbor created by" *Bellas Hess* and *Quill* [Defendant's SJ Motion at 12], Colorado imposes on out-of-state retailers a set of notice and reporting obligations that its own, in-state retailers are not required to bear when

---

and again during his deposition (*e.g.,* Adler Dep. at 94:3 – 97:17), that the DMA's survey was conducted in accordance with accepted survey methodology.

transacting business in other states.  Thus, far from competitive parity, the State

seeks an advantage for Colorado retailers over their out-of-state competitors.[9]

## II.   WEIGHING THE COMPETING INTERESTS AT STAKE IN THE REGULATION OF INTERSTATE COMMERCE IS THE ROLE OF CONGRESS, NOT COLORADO, OR THE COURTS.

The complexities inherent in balancing the relative burdens imposed on local and

interstate interests demonstrates why the Commerce Clause reserves to Congress, and

not the States, or the Courts, the role of regulating interstate commerce.  Indeed,

individual states have no interest in balancing the competing interests of interstate

commerce and out-of-state businesses against the interests of in-state companies, nor

is it their domain.  States will be inclined, through the natural workings of the local

political process, to favor in-state companies over out-of-state businesses.

Congress, by contrast, can properly balance all of the competing interests, and

can fine-tailor laws regulating interstate commerce in a way that even federal courts

cannot.  As the Supreme Court has recognized,

> Congress has the capacity to investigate and analyze facts beyond anything the Judiciary could match, joined with the authority of the commerce power to run economic risks that the Judiciary should confront only when the constitutional or statutory mandate for judicial choice is clear.

---

[9] Because the Act is discriminatory, there is no need for the Court to consider the Defendant's additional argument under the test of *Pike v. Bruce Church, Inc.*, 397 U.S 137 (1970), that the "incidental effects" of the Act on interstate commerce are not clearly excessive in relation to the local benefits achieved by the law.  In fact, the burdens imposed on interstate commerce – at least an additional $2,500 to $6,000 in compliance costs per company in the first year, and an additional roughly $1,000 per company per year thereafter, incurred by an estimated 10,0000 companies, according to the Defendant's own expert, for a total cost in the tens of millions of dollars – are grossly excessive in comparison to the $4.7 million annual revenue estimate for the law.  [Plaintiff's SOF ¶¶ 25-28.]

*General Motors Corp. v. Tracy*, 519 U.S. 278, 309 (1997); *see also Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 589-90 (1983) ("courts as institutions are poorly equipped to evaluate with precision the relative burdens of various methods of taxation"). Indeed, the Court has cautioned, specifically with regard to weighing the comparative burdens of state tax laws on in-state and out-of-state businesses, that courts are ill-suited, and should generally decline to "engage in elaborate analysis of real-world economic effects . . . or to consider subtle compensatory tax defenses."  [*General Motors,* 519 U.S. at 308-09 (citing *Fulton Corp.*, 516 U.S. at 341-42 and *Oregon Waste Systems*, 511 U.S. at 105); *see also American Trucking Ass'n v. Scheiner*, 483 U.S. 266, 289 (1987) (declining to "plunge . . . into the morass of weighing comparative tax burdens").]

Balancing the competing interests of the free flow of interstate commerce against state and local taxing prerogatives in the area of direct marketing sales requires such careful analysis.   As the Court recognized in *Quill*, the danger of inconsistent state laws across the thousands of state and local taxing jurisdictions in the United States[10] implicates core principles of the Commerce Clause and justifies the "bright line" physical presence standard to prevent undue burdens on interstate commerce.  Potentially daunting complexities for interstate businesses arise with regard to both the proper tax treatment of transactions, and the burdens of tax reporting and administration across

---

[10] The number of state and local taxing jurisdictions in the United States has grown dramatically since the Supreme Court first recognized the physical presence requirement in *Bellas Hess* in 1967.  The Court noted then that there were over 2,300 such jurisdictions [386 U.S. at 759 n.12]; at the time *Quill* was decided in 1992 there were over 6,000. [*Quill*, 504 U.S at 313 n.6]  Today it is widely-acknowledged that there are over 7,500 state and local jurisdictions in the United States that impose some form of sales or use tax. [*See, e.g.*, WALTER HELLERSTEIN & JOHN A. SWAIN, STREAMLINED SALES AND USE TAX 2-4 (2005).]

multiple jurisdictions.  In Colorado, for example, there are dozens of "home rule" municipalities that administer their own sales tax systems and can tax at varying rates different products and services than the state.  States and localities often have wildly differing requirements with regard to not only tax rates, taxable products, and exemptions, but also such matters as the tax treatment of shipping and handling charges imposed by remote sellers for the delivery of products.[11]  By viewing the issue on national scale, Congress can properly determine whether, and in what manner, to require a more uniform tax base, single-form reporting, etc.

Likewise, in the area of tax administration, expanded state tax jurisdiction could subject direct marketers to audits by numerous different state and local taxing authorities each year.  Whether to impose, as a condition of expanded state and local taxing power, a system of consolidated tax audits conducted by a company's home-state, similar to the system adopted under the International Fuel Tax Agreement, is the kind of determination that is properly reserved to Congress under the Commerce Clause.  Congress, and not the individual States, is best-suited to evaluate the degree of uniformity and simplification to be required of state tax laws, consistent with the interests of interstate commerce secured by the Commerce Clause.

---

[11] Recognizing the inconsistency of state and local sales and use tax systems in the United States, 44 states have agreed to participate in a project whose objective is to simplify and make more uniform state sales and use taxes.  Colorado is the only state with a sales/use tax that has declined to participate in the Streamlined Sales and Use Tax Project.  (Five states do not have a state level sales/use tax.)  [*See* the "Quick Links" state map appearing at http://www.streamlinedsalestax.org/index.php?page=About-Us.] A bill that would provide for Congressional endorsement of the Streamlined Sales and Use Tax Agreement, which has been adopted by 24 of the 44 participating states, was introduced in Congress in 2010. [*See* Plaintiff's SOF ¶ 30.]  Colorado has not adopted the simplification measures proposed in the SSUTA.

**III.    THE DEFENDANT'S OWN ARGUMENTS DEMONSTRATE THAT THE STATE OF COLORADO LACKS THE AUTHORITY TO IMPOSE THE ACT'S NOTICE AND REPORTING OBLIGATIONS ON RETAILERS WITH NO PHYSICAL PRESENCE IN THE STATE.**

In Count II of the Complaint, the DMA asserts that the State of Colorado lacks the authority under the Commerce Clause to require retailers with no physical presence in the state to comply with the notice and reporting obligations of the Act and Regulations.  In seeking summary judgment on Count II, the Defendant argues that the DMA seeks a "regulatory-free zone to which its members are not entitled under existing Commerce Clause precedent."  [Defendant's SJ Motion at 23.] The Defendant is wrong.

As set forth in the DMA's cross-motion for summary judgment, the DMA asserts that out-of-state retailers with no physical presence in Colorado have the right, under the Commerce Clause, to be free, not from all forms of state regulation, but from discriminatory and unduly burdensome regulation of the kind imposed under the Act.[12] The question of whether the Act and Regulations impose such undue burdens on interstate commerce is determined with reference to well-established principles of Commerce Clause jurisprudence which underlie and inform numerous Supreme Court and lower federal court decisions, relied upon by the DMA in support of both its motion for preliminary injunction, and its motion for summary judgment. [*See* Plaintiff's SJ Motion at 21-25; Plaintiff's Motion for Preliminary Injunction at 23-27.]

As those principles relate to direct marketers engaged in the sale of goods delivered via common carrier and U.S. mail (or digitally over the Internet), the Supreme

---

[12] The DMA does not dispute that out-of-state retailers may be required to comply with a wide variety of non-discriminatory state laws, *so long as those laws do not run afoul of constitutional protections.*

Court's decisions in *Quill* and *National Bellas Hess v. Department of Revenue*, 386 U.S. 753, 759 (1967)*,* as well as the Tenth Circuit's decision in *ACLU v. Johnson*, 194 F.3d 1149 (1999), have particular relevance, because they embody the proper application of core "structural" concerns of the Commerce Clause to a segment of commerce that is "inherently interstate."  *National Bellas Hess,* 386 U.S. at 759.  Indeed, this case, like *Quill*, involves the imposition of onerous, and potentially conflicting, reporting burdens that attach to every sales transaction.  As this Court noted in granting the DMA's request for a preliminary injunction, "the burdens imposed by the Act and Regulations are inextricably related in kind and purpose to the burdens condemned in *Quill.*" [January 26 Order at 10.][13]

The Defendant acknowledges that the classification of "non-collecting retailers" targeted by the Act and Regulations is expressly "a function of the Supreme Court's holdings in *Quill* and *Bellas Hess.*" [Defendant's SJ Motion at 14.]  Furthermore, she contends, the Act "promotes competitive parity by reducing the artificial competitive advantage" for such retailers purportedly created by the *Quill* and *Bellas Hess* decisions.  [*Id.* at 12.]  By conceding that the Act is both designed to, and functions as, a set of substitute obligations for the use tax collection obligations expressly held unconstitutional under *Quill*, the Defendant proves why the Act and Regulations

---

[13] The Defendant's argument that the "main rationale" for the holding in *Quill* was *stare decisis* is simply wrong, and demonstrates the Defendant's continued misunderstanding of the true significance of *Quill.*  Rather, the Court in *Quill* detailed the core Commerce Clause principles that underlie the "substantial nexus" requirement of *Complete Auto Transit, Inc. v. Brady*, concluding that the "bright line" rule of physical presence "furthers the ends of the dormant Commerce Clause."  [504 U.S. at  314.] The Court went on to find *stare decisis* to be an important additional factor [*id.* at 316-17], but it was not, as the Defendant contends, the primary basis for the Court's ruling.

similarly unduly burden the same transactions in interstate commerce (*i.e.*, sales by out-of-state retailers delivered via mail and common carrier to in-state residents.)

The Defendant's citations to state court decisions holding that the "bright line" rule of *Quill* does not apply in the context of state corporate income taxes are simply irrelevant.  [*See* Defendant's SJ Motion at 26.]  The Act and Regulations do not impose annual corporate income tax filing obligations on out-of-state retailers; they impose notice and reporting obligations associated with each and every sales transaction made by a retailer.  The Tenth Circuit's decision in  *American Target Advertising, Inc. v. Giani* likewise is not controlling, or even relevant, because it involved scrutiny of a Utah statute that bears no similarity, either in terms of subject matter or degree of potentially inconsistent and burdensome regulation of interstate commerce, to the onerous and extensive notice and reporting obligations imposed by the Act.  [*See* 199 F.3d 1241, 1246 (10th Cir. 2000) (upholding a Utah law  requiring "all professional fundraising consultants to register with the state and obtain a permit.")]

The Defendant's further argument that *Quill*  is at odds with "contemporary Commerce Clause jurisprudence" is also wrong.  [Defendant's SJ Motion at 28.]  The "structural concerns" of the Commerce Clause embodied by the *Quill*  decision are timeless and lie at the very heart of Commerce Clause doctrine.  Indeed, the unconstitutionality of the Colorado law in light of the core Commerce Clause principles set forth in *Quill* has been described in an article in a leading tax journal as "compelling." [Prof. Edward A. Zelinsky, *The Siren Song of "Amazon" Laws: The Colorado Example*, STATE TAX NOTES (March 7, 2011) at 695-700 (commenting on this Court's January 26

Order).]  Moreover, the continuing vitality of *Quill* in limiting state efforts to regulate interstate commerce is highlighted by the Supreme Court's recent decision *Hemi Group LLC v. City of New* York, 130 S.Ct. 983 (2010), in which the Court rejected an effort by the City to find a creative way to "end-run its lack of authority" under *Quill.*  [*Id.* at 994, 995 (Roberts, J., majority; Ginsburg, J. concurring).]   Because the State of Colorado lacks the authority under the Commerce Clause to accomplish its own end-run around *Quill*  by imposing burdensome notice and reporting obligations on out-of-state retailers with no physical presence in the state, the Defendant's motion for summary judgment on Count II should be denied.

## CONCLUSION

For the foregoing reasons, the DMA respectfully requests that the Court deny the Defendant's motion for summary judgment, and grant the DMA's motion.


Dated:  May 27, 2011

s/ George S. Isaacson
George S. Isaacson
Matthew P. Schaefer
BRANN & ISAACSON
184 Main Street, P. O. Box 3070
Lewiston, ME 04243−3070
Tel.: (207) 786−3566
Fax:  (207) 783-9325
E-mail: gisaacson@brannlaw.com
      mschaefer@brannlaw.com
*Attorneys for The Direct Marketing Association*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 27, 2011, I electronically filed the foregoing, Plaintiff's Response in Opposition to Defendant's Partial Motion for Summary Judgment — Counts I and II (Commerce Clause), using the CM/ECF system, which will send notification of such filing to counsel of record:

> Jack Wesoky
>   Senior Assistant Attorney General
>   Jack.Wesoky@state.co.us
> Stephanie Lindquist Scoville
>   Senior Assistant Attorney General
>   stephanie.scoville@state.co.us
> Melanie J. Snyder
>   Assistant Attorney General
>   melanie.snyder@state.co.us
>
> State of Colorado
> 1525 Sherman Street, 7th Floor
> Denver, CO 80203
>
> Attorneys for Defendant

> s/ George S. Isaacson
> George S. Isaacson