**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 10-cv-01546-REB-CBS

The Direct Marketing Association,

      Plaintiff,

v.

Roxy Huber, in her capacity as Executive Director,
Colorado Department of Revenue,

      Defendant.

---

**DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR**
**SUMMARY JUDGMENT AS TO COUNTS I AND II ALLEGING**
**VIOLATIONS OF THE COMMERCE CLAUSE**

---

Defendant, Roxy Huber, Executive Director of the Colorado Department of

Revenue ("DOR"), submits this Response in Opposition to Plaintiff's Motion for

Summary Judgment as to Counts I and II Alleging Violations of the Commerce Clause

[Dkt. #98] ("Pl. MSJ").

**INTRODUCTION AND BACKGROUND**

DMA alleges a Colorado law, Colo. Rev. Stat. § 39-21-112(3.5) (2010), and its

implementing regulations, 1 Colo. Code Regs. § 201-1:39-21-112.3.5 (2010),

(collectively, "the Law"), violate the Commerce Clause of the United States Constitution.

Count 1 alleges that the Law discriminates against interstate commerce and imposes

notice and reporting requirements that burden out-of-state retailers to the benefit of in-

state retailers.  First Amended Complaint ("Am.Compl."), [Dkt. #10], pp.18-19.  Count II

alleges the Law is an improper regulation of and imposes an undue burden upon

interstate commerce.  Am.Compl., pp.20-22.  In addition to a declaration that the Law is unconstitutional, DMA also seeks a permanent injunction preventing DOR from enforcing the Law.  The parties do not disagree about the essential facts or how the Law operates, only whether, as a matter of law, the Law violates the dormant Commerce Clause.  Pl. MSJ, p.14.  DMA is not entitled to summary judgment; rather, summary judgment for Defendant on Counts I and II is warranted.[1]

This case is about a thriving $3 trillion-a-year industry's attempt to expand its existing artificial competitive advantage and stake out a new regulatory-free zone through unsupported claims of discrimination, exaggerated and speculative burdens, and allegedly coercive state action.  DMA seeks an extension of the bright-line rule establishing a discrete safe harbor from the unique burdens of collecting and remitting use tax for retailers without a physical presence within the state.[2]  There is no legal or factual basis to support such an extension.  The alleged compliance burdens flowing from the Law are overstated and illusive, particularly given modern technology.  While the Law may have the eventual effect of leveling the playing field, in-state collecting retailers will not gain a competitive advantage as a result of the Law.  Non-collecting retailers will continue to enjoy the price advantage because they do not charge sales or use tax.  Any marginal effects of the Law upon the competitive status of out-of-state retailers do not amount to cognizable claims under the dormant Commerce Clause.

---

[1] Defendant respectfully refers the Court to her Motion for Partial Summary Judgment- Counts I and II (Commerce Clause), filed May 6, 2011 ("Def.'s MSJ") [Dkt. 99].

[2] *See infra* Part II.A (discussing the safe harbor for sales and use tax collection established by *Quill Corp. v. N.D.*, 504 U.S. 298 (1992) *and Nat'l Bellas Hess, Inc. v. Dep't Revenue of Ill.*, 386 U.S. 753 (1967)).

The Law is a wholly proper approach by the State of Colorado to address the swelling tax gap between what consumers owe in sales and use tax and what is paid.[3] Contrary to DMA's claims, the Law advances rather than offends the Commerce Clause objective to preserve a national common market of open competition by promoting tax-neutral decisions by consumers.  Because the Law is not protectionist and neither facially nor in effect discriminates against out-of-state retailers, it must be upheld because any burdens on interstate commerce and not clearly excessive in relation to the State's strong interests.  Further, the Law does not coerce out-of-state retailers to surrender their Commerce Clause protections or regulate commerce occurring wholly outside Colorado.  DMA simply cannot meet its burden to overcome the presumption of constitutionality afforded the Law and its claims fail as a matter of law.

## RESPONSE TO DMA'S STATEMENT OF FACTS

Defendant <u>disputes</u>[4] the following facts ("Disputed Facts"):

1.      Pl. MSJ, ¶ 17. Allegations supported solely by press reports are hearsay, and are not proper summary judgment evidence.  *Estate of Smith v. Silvas*, 414 F.Supp.2d 1015, 1020 (D. Colo. 2006).

---

[3]  For a detailed discussion of Colorado's sales and use tax scheme, the tax gap, and the notice and reporting requirements of the Law, *see* Def.'s MSJ, pp.2-6.

[4] Due to the unusual procedural posture of this case, Defendant did not have the opportunity to engage in discovery other than expert discovery.  *See* Scheduling Order [Dkt. #40], p. 7, ¶ 8.  As a result, she is without sufficient information to admit or deny certain facts asserted by DMA.  Solely for purposes of this Response, Defendant admits the following facts, none of which are material to DMA's Commerce Clause claims:  Pl. MSJ, ¶¶ 3, 5-10, 13.  Defendant reserves the right to seek discovery in accordance with a new scheduling order should the Court deny the parties' cross motions for summary judgment.

2.      Pl. MSJ, ¶¶ 22, 26.  Defendant's expert, Mr. Dieter Gable's estimates do not apply to all retailers.  Mr. Gable estimated that the onetime, non-recurring first year costs for the smallest affected retailers to comply with the Law, will be on average, between $2,500 and $6,000 in the first year (0.043% - 0.1% as a percent of sales), with an estimated additional cost of approximately $600 to $1,000 for the Annual Purchase Summary (0.01% - 0.017% as a percent of sales).  Def.'s MSJ, Ex. 5 [Dkt. #99-5], Decl. Dieter Gable, Ex. 1 thereto ("Gable Report"), p. 5.  Compliance costs for larger retailers, particularly when normalized on a percentage of sales basis, are expected to be even lower or even inconsequential.  *Id.* at p.2.  Even the smallest affected retailers' costs may be mitigated by reliance on third party packaged e-commerce solution providers and by incorporating the requirements of the Act into regular process improvements and annual tax preparation efforts.  *Id.* at pp. 9, 13.

3.      Pl. MSJ, ¶ 27.  Legislative Council Staff estimated the annual revenue associated with the reengrossed version of HB10-1193 to be $4.7 million per year.  This version of the bill required collection of sales and use tax by certain retailers and did not include the notice and reporting requirements of the Law as adopted.  *See* Ex. 1, HB10-1193, Reengrossed (available at:

http://www.leg.state.co.us/clics/clics2010a/csl.nsf/fsbillcont3/B30F574193882B4B87257 6A80026BE0C?open&file=1193_ren.pdf).

4.      Pl. MSJ, ¶ 29.  While Colorado has not previously included a line on its income tax returns for reporting use tax, between approximately 1966 and 1974, DOR included a consumer use tax return with the income tax return forms, but later

discontinued this practice because the amount of use tax collected did not justify the printing expense.  Ex. 2, Decl. Stanley Williams, ¶¶ 2-3 (previously filed as Ex. 13 to Defendant's Response in Opposition to Plaintiff's Motion for a Preliminary Injunction, [Dkt. #50-13]).

5.      Pl. MSJ, ¶31.  The methodology of the survey commissioned by DMA was fatally flawed and no conclusions may be drawn from its results.  *See* Def.'s Am. Pl. MSJ Exclude Test. of Pl.'s Expert Witnesses F. Curtis Barry, Thomas Adler, and Kevin Lane Keller ("Def.'s 702 Mot.") [Dkt. #71], pp.11-14; Def.'s MSJ, Ex. 9 [Dkt. #99-9], Decl. Prof. Donald Lichtenstein, Ex. A  thereto, pp.12-17.

6.      Pl. MSJ, ¶¶ 32, 33.  The Oklahoma and South Dakota requirements are substantively identical to the Law.  Oklahoma and South Dakota require that a transactional notice include the following information: 1) the non-collecting retailer is not required, and does not collect the state sales or use tax; 2) the purchase is subject to state use tax unless it is specifically exempt; 3) the purchase is not exempt merely because it is made over the Internet or by remote means; 4) the state requires purchasers to report untaxed purchases and pay tax due on those purchases; and 5) appropriate forms are available on the state's website.  The first four items are required by the Law and the fifth is optional in Colorado.  *See* 1 Colo. Code Regs. § 201-1:39-21-112.3.5(2)(c)(ii).  Further, Oklahoma and South Dakota both allow a consolidated transactional notice if similar notice is required for another state, provided it references the state and meets the placement requirements.  The Law similarly allows for

substantial compliance by retailers subject to other state requirements.  *See* Regs. 39-21-112.3.5(2)(e); 39-21-112.3.5(3)(b).

Defendant offers the following additional facts ("SOF") as undisputed:

1.      E-commerce in the United States has nearly tripled over the last decade, from $1.06 trillion in 2000 to $3.16 trillion in 2008.  Def.'s MSJ, Ex. 1 [Dkt. #99-1], Decl. Professor William Fox, Ex. A thereto, Fox Report, p.2.  As a result, state and local governments and their economies experience increased evasion of sales and use taxes and the resulting lost revenue; lost sales by Main Street vendors who must collect sales tax; and the economically inefficient alteration of business practices to avoid collection responsibility.  *Id.*  States collect taxes due on E-commerce much less effectively because vendors are often not required to collect and remit the tax and buyer compliance with the use tax is frequently very weak.  *Id.*  Colorado state and local governments are estimated to fail to collect hundreds of millions of dollars in sales or use tax due on E-commerce sales between 2010 and 2012.  *Id.*  Colorado also loses revenue that is uncollected on remote sales, such as from mail order firms.  *Id.* at 2-3.

2.      The estimated annual revenue associated with the Law as adopted was $12.5 million for fiscal year 2011-12.  *See* Ex. 3, Final Fiscal Note, dated August 18, 2010, p.2 (available at:

http://www.leg.state.co.us/clics/clics2010a/csl.nsf/fsbillcont3/B30F574193882B4B872576A80026BE0C?Open&file=HB1193_f1.pdf).  Estimated annual revenue will steadily increase over time with increased awareness of the Law and enforcement compliance.

3.      Sales and use tax revenue historically account for approximately one third of the State of Colorado's General Fund.  Def.'s MSJ, Ex. 3 [Dkt. #99-3], Decl. Todd Saliman, ¶ 8.

4.      The United States Department of the Treasury, Internal Revenue Service has conducted research on the tax gap, the "aggregate amount of true tax liability imposed by law for a given tax year that is not paid voluntarily and timely."  Def.'s MSJ, Ex. 2 [Dkt. #99-2], "Reducing the Federal Tax Gap— A Report on Improving Voluntary Compliance," p.6.  This research indicates that compliance with tax laws dramatically increases when a third party reports taxable activity to the taxing authority.  *Id.*  (relevant portions highlighted, *see, e.g.,* pp. 12-16).

5.      Of the Internet retailers in the *Top 500 Internet Retailers*, at least 39 do not have a physical presence in the State of Colorado but nevertheless collect Colorado sales tax.  Def.'s MSJ, Ex. 4 [Dkt. #99-4], Decl. Elizabeth Corujo, ¶¶ 4, 6.

6.      Because the Law exempts retailers with less than $100,000 in gross annual sales in Colorado, the vast majority of retailers in the country are not subject to the Law.  Gable Report, pp.5-6.

7.      The Law provides leeway for variance in approaches to compliance, allowing affected retailers to comply with reasonable, and in many cases, nominal efforts.  *Id.* at pp.6, 19-20.

8.      There are many ways a retailer can comply with the Transactional Notice requirement- from a linking notice or popup window at the time of the online purchase, to slipping the notice in as a packing slip for delivery, or other workarounds.  Def.'s MSJ,

Ex. 6 [Dkt. #99-6], Dep. Curtis Barry ("Barry Dep."), 93:9-94:6; 94:13-15; 95:10-20; 97:20-98:1.  DMA's expert estimates a packing insert costs less than ten cents per package. *Id.* at 226:3-5.

9.       DOR has provided acceptable sample language for the Transactional Notice, so that retailers need not draft the notice themselves.  Def.'s MSJ, Ex. 7 [Dkt. #99-7], Decl. Shirley Stevens, Ex. A thereto, "FYI Sales 79;" Ex. B thereto "Transactional Notice Template."

10.     Data for the Annual Purchase Summary and Customer Information Report already exists.  Barry Dep., 157:5-6; 158:5-16.  Retailers track customer data in very detailed ways and store that data.  *Id;* Ex. 5, Gable Report, pp.8-9.

11.     Because the Law only requires the Annual Purchase Summary for customers who spend more the $500 annually, Mr. Barry estimates that retailers would have to create reports for fewer than 20% of Colorado purchasers, and it could be as low as 10%.  Barry Dep. 169:11-20; 170:3-5.

12.     DOR has provided instructions and templates to assist retailers with preparing and electronically filing the Annual Purchase Summary.  Def.'s MSJ, Ex. 8 [Dkt. #99-8], Decl. Edward Thompson, ¶¶ 5-6; Exs. A-D thereto.

13.     There is no evidence in the record of any actual compliance costs incurred by DMA members prior to entry of the Court's Order granting the preliminary injunction.

14.     There is no evidence in the record of any actual losses of sales or customers sustained by DMA members from the Transactional Notice, effective March 1, 2010, until the Court's Order granting the preliminary injunction.

**SUMMARY JUDGMENT STANDARDS AND BURDEN OF PROOF**

Summary judgment is proper when there is no genuine dispute as to any material fact and a movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A dispute is "genuine" if the evidence is so contradictory that a judgment could enter for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it might reasonably affect the outcome of the case. *Id.* The moving party has the initial burden to show "that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. If the motion is properly supported, the burden shifts to the nonmovant to show that summary judgment is not proper. *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994). When considering a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party. *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

DMA bears a heavy burden in overcoming the "'venerable presumption' that an act of a state legislature is generally taken to be constitutional." *Hopkins v. Okla. Pub. Employees Retirement Sys.*, 150 F.3d 1155, 1160 (10th Cir. 1998). Facial challenges to statutes are generally disfavored as "strong medicine" applied "sparingly and only as a last resort." *Golan v. Holder*, 609 F.3d 1076, 1094 (10th Cir. 2010) (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). To demonstrate that the Law is facially unconstitutional, DMA must show "that no set of circumstances exists under which [the Law] would be valid," *United States v. Salerno*, 482 U.S. 739, 745

(1987), or that the Law "lacks any plainly legitimate sweep," *Washington v. Glucksberg*, 521 U.S. 702, 740 n.7 (1997).  *United States v. Stevens*, 130 S.Ct 1577, 1587 (2010).

DMA has the burden to establish that the Law violates the dormant Commerce Clause.  The Supreme Court's dormant Commerce Clause jurisprudence is "driven by concern about economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."  *Kleinsmith v. Shurtleff*, 751 F.3d 1033, 1039 (10th Cir. 2009).  The Tenth Circuit has identified a two-tiered approach to examining challenges to state economic regulations under the dormant Commerce Clause.  *Id.*  The first tier involves a determination of whether the law directly regulates or discriminates against interstate commerce or has the effect of favoring in-state economic interests over out-of-state interests.  *Id.*  If the challenging party meets its burden to establish such discrimination, the burden falls to the state to justify its law in terms of the local benefits and unavailability of nondiscriminatory alternatives.  *Id.* at 1040.  State laws that regulate even-handedly with only indirect effects on interstate commerce must be upheld under the second tier inquiry which employs the balancing test of *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970).  *Id.* at 1040.  Under that test, the law must be upheld unless the challenging party shows the burden on interstate commerce "is clearly excessive in relation to the putative local benefits."  *Pike*, 397 at 142.

**ARGUMENT**

I.     **THE LAW DOES NOT DISCRIMINATE AGAINST OUT-OF-STATE RETAILERS OR INTERSTATE COMMERCE.**

DMA cannot meet its heavy burden to establish that the Law discriminates against interstate commerce or favors in-state retailers by burdening out-of-state retailers.  A discrimination claim under the dormant Commerce Clause necessarily entails a comparative showing that in-state interests are <u>favored</u> over out-of-state interests or <u>put at a competitive disadvantage</u> as a result of the challenged law.  *See Or. Waste Sys., Inc. v. Dep't of Env. Quality of State of Or.*, 511 U.S. 93, 99 (1994) (a law discriminates if it imposes "differential treatment of in-state and out-of-state economic interests <u>that benefits the former and burdens the latter</u>.") (emphasis added)).  DMA's exclusive focus on the <u>differential treatment</u> of collecting and non-collecting retailers is fatal to its claim.  Although the Law begins to level the playing field, non-collecting out-of-state retailers will continue to enjoy a competitive advantage over in-state retailers who are subject to the unique burdens of collecting and remitting sales and use tax.  Absent discrimination, the dormant Commerce Clause does not protect against this type of market effect.  *See CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 93-94 (1987) (rejecting the notion that the Commerce Clause protects particular market structures or methods of operation).

A.     **The Law Does Not Target Out-of State Retailers for Discrimination.**

DMA's contention that the Law singles out out-of-state retailers for discrimination is incorrect.  Pl. MSJ, pp.16-17.  Discrimination for purposes of the dormant Commerce

11

Clause focuses on whether a law is motivated by economic protectionism, defined by laws that burden out-of-state businesses in order to give a competitive advantage to in-state businesses, *Granholm v. Heald*, 544 U.S. 460, 472 (2005), or shield in-state interests from out-of-state competition. *Maine v. Taylor*, 477 U.S. 131, 148 (1986). The Framers' purpose was to "preven[t] a State from retreating into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Fulton Corp. v. Faulkner*, 516 U.S. 325, 330-331 (1996) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 180 (1995)).

Nothing in the Law suggests it facially or in effect favors in-state interests or is aimed at protecting such interests from out-of-state competition.[5] As part of the sales and use tax scheme, the Law is a wholly proper approach by the State to address the swelling tax gap created by the explosion in sales by non-collecting retailers. SOF, ¶ 1. The Law is indifferent to a retailer's <u>location</u> or contacts with Colorado but rather focuses solely upon a retailer's status as a <u>collecting or non-collecting</u> retailer. Colo. Rev. Stat. § 39-21-112(3.5)(c) (referring to "each retailer that does not collect Colorado sales tax."). Thus the Law regulates even-handedly without regard to interstate or intrastate commerce. *See Minn. v. Clover Leaf Creamery Co.*, 449 U.S. 456, 471-72 (1981); *Commonwealth Edison Co. v. Mont.*, 453 U.S. 609, 619 (1981).

---

[5] Because the Law does not discriminate against out-of-state retailers or interstate commerce, Defendant need not demonstrate reasonable nondiscriminatory alternatives. Although DOR has found alternatives ineffective. Disputed Fact, ¶ 4.

DMA's discrimination claim is based on the applicability of the Law to out-of-state retailers.  Pl. MSJ, pp.15-17.  The fact that state regulation falls primarily upon interstate interests, however, does not by itself, establish discrimination.  *See Exxon Corp. v. Md.*, 437 U.S. 117, 125 (1978).  The non-collecting retailer status is a function of the Supreme Court's holdings in *Quill* and *Bellas Hess*, not the Law's alleged targeting of out-of-state retailers.  *See, e.g. Ford Motor Co. v. Tex. Dep't Transp.*, 264 F.3d 493, 502 (5th Cir. 2001) (no discrimination where law did not create classifications based on Ford's contacts with the state but rather on the basis of its status as an automobile manufacturer).  Further, the Supreme Court has recognized that a proper function of complementary sales and use tax schemes is to "put local retailers subject to the sales tax on a competitive parity with out-of-state retailers exempt from the sales tax."  *Nat'l Geographic Soc'y v. Cal. Bd. of Equalization*, 430 U.S. 551, 555 (1977) (noting the constitutionality of such schemes is settled); *see also Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 332 (1977) (compensatory taxes leave a consumer free to make choices without regard to tax consequences); *Exxon*, 437 U.S. at 122 (upholding a law designed to correct the inequities of past preferential treatment).

Finally, DMA's facial challenge based upon the title of the bill and first fiscal note, referring to "out-of-state retailers," is a red herring.  Pl. MSJ, p. 17.  As originally introduced, HB10 1193 required certain retailers to <u>collect</u> sales and use tax.  The bill was substantially amended to its current form; however, the title did not change.  The title of the bill is not part of the Law itself and does not affect the plain meaning of the statute.  *See Johnston v. Comm'r of Internal Revenue*, 114 F.3d 145, 150 (10th Cir.

13

1997).  Moreover, any alleged improper motives to which DMA may refer do not invalidate the Law.  *See Henneford v. Silas Mason Co., Inc.*, 300 U.S. 577, 586 (1937). ("motives alone will seldom invalidate an otherwise lawful tax…[l]east of all … when equality and not preference is the end to be achieved").

### B.    Differential Treatment Alone Is Not Discrimination.

DMA's expansive interpretation of discrimination is inconsistent with the Supreme Court's dormant Commerce Clause jurisprudence.  Pl. MSJ, pp. 15-17.  DMA cites the proper test for discrimination set forth in *Oregon Waste*, 511 U.S. at 99 ("differential treatment of in-state and out-of-state economic interests <u>that benefits the former and burdens the latter</u>.") (emphasis added)), but then proceeds to apply only the first half of that test.  Differential treatment alone does not suffice to establish a Commerce Clause violation.  Discrimination <u>against</u> interstate commerce necessarily entails preferential treatment of in-state interests or punitive treatment of out-of-state interests.  *See, e.g., id.* (striking down a law imposing a $0.85 per ton fee upon the disposal of waste generated in-state when a fee of $2.50 was imposed on that generated outside the state); *see also Boston Stock Exch.*, 429 U.S. at 329 (Commerce Clause precludes discrimination that creates a "<u>direct commercial advantage</u> to local business") (emphasis added); *Am. Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005) (same).  "Not every benefit or burden will suffice- only one that alters the competitive balance between in-state and out-of-state firms." *Kleinsmith*, 571 F.3d at 1041 (internal quotations omitted).

DMA's incomplete application of the discrimination standard would lead to absurd results.  For example, if the fees in *Oregon Waste* were reversed so that a <u>higher</u> fee was applied to in-state waste, the result would be <u>differential</u> treatment but would hardly amount to a cognizable discrimination claim.  Further, the fact that the Law was adopted after the existing sales and use tax scheme does not mean that it should be viewed in isolation.  Had the fee on out-of-state waste in *Oregon Waste* been adopted after an existing fee on in-state waste, it would be nonsensical for the Court to view the new fee in isolation as applying solely to out-of-state interests.

The Law does not exist in a vacuum.  It is one method to enforce the State's sales and use taxes and must be evaluated within this scheme.  *See Matthews*, 562 P.2d at 417 (use tax is not a separate tax from the sales tax and should not be viewed in isolation).  Any challenge to the Law on dormant Commerce Clause grounds must examine the relative burdens of Colorado's sales and use tax scheme on non-collecting out-of-state retailers as compared to collecting in-state retailers, rather than viewing in isolation the Law's application to the former.  *Kleinsmith*, 571 F.3d at 1041 (party claiming discrimination "must show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened").

## C.   The Law Neither Favors In-State Retailers Nor Puts Out-of-State Retailers at a Competitive Disadvantage.

While it is true the dormant Commerce Clause does not permit discrimination against any segment of interstate commerce or "*de minimis"* discrimination, DMA cannot prove any segment of non-collecting out-of-state retailers is competitively

disadvantaged in relation to collecting in-state retailers as a result of the Law.  Because out-of-state retailers are not subject to the administrative costs and burdens of collecting sales and use tax, they currently enjoy a significant competitive advantage as a result of the safe harbor created by *Quill* and *Bellas Hess*.  This competitive advantage is in addition to the price advantage they enjoy by not charging sales tax.  Any incremental leveling of the playing field that may occur as a result of the regulatory requirements of the Law still leaves out-of-state non-collecting retailers with a competitive advantage over in-state collecting retailers.

Retailers that are required to collect sales tax must undertake extensive efforts to comply with state tax laws, including, obtaining a license; calculating the state and local sales tax owed, including determining whether any exemptions apply; collecting the tax at the time of the transaction; providing a tax receipt; filing a return; remitting tax collected to the State on a monthly or quarterly basis; maintaining records; and being subject to regular audit.  Colo. Rev. Stat. §§ 39-26-101 through 39-26-127.  Collecting retailers are ultimately <u>liable</u> for paying the tax, whether or not they collect it.  *See id.* at § 39-26-105.  DMA cannot prove that the modest notice and reporting requirements of the Law outweigh the significant administrative requirements and tax liability to which collecting retailers are subject.

Moreover, the Law does not discriminate against interstate commerce because it allows non-collecting retailers the ability to <u>choose</u> to be subject to the same burden imposed on their in-state competitors who have <u>no such choice</u>.  In-state retailers cannot elect to comply with the Law rather than collect and remit the sales and use tax.

16

In fact, many large retailers without physical presence in Colorado already <u>voluntarily choose</u> to collect.  SOF, ¶ 5.   Logically, there can be no discrimination against non-collecting out-of-state retailers who have a choice to be subject to precisely the same burdens as in-state retailers who do not enjoy the benefit of that choice.  *See infra* Part II.C. (dispelling DMA's contention that such choice is coercive).

## II.       THE LAW DOES NOT UNDULY BURDEN OR IMPROPERLY REGULATE INTERSTATE COMMERCE

DMA cannot prove the Law's modest notice and reporting requirements in the post technology-boom age of the Internet unduly burden interstate commerce.  The carefully-limited physical presence requirement of *Quill* does not change this result. *Quill's* holding and policy considerations do not apply to the Law since it does not impose a duty to collect the sales and use tax.  DMA argues for an extension of the bright-line rule of *Quill*, essentially seeking the recognition of a regulatory-free zone to which its members are not entitled under existing Commerce Clause precedent. Because the Law does not discriminate and has only incidental effects on interstate commerce, it must be upheld.  *See Pike*, 397 U.S. at 142.  Further, because the Law is a wholly permissible approach by the State to enforce its sales and use taxes, DMA members are not forced to choose between two impermissible burdens.  Rather, the very fact that out-of-state retailers have a choice to comply with the Law or collect sales and use tax when their competitors do not is dispositive.

### A. Neither *Quill* Nor the Commerce Clause Bars the Imposition of Notice and Reporting Requirements upon Non-Collecting Retailers with No Physical Presence in Colorado.

Contrary to DMA's suggestion that the physical presence nexus rule of *Quill* derives from "core" Commerce Clause objectives, Pl. MSJ, p.22., it is not at all clear that this is so.  In fact, the *Quill* Court specifically suggested that had the issue been presented as a matter of first impression, contemporary Commerce Clause jurisprudence might not dictate the same result.  504 U.S. at 311.  DMA members without a physical presence in Colorado are not protected from the reach of the Law by the carefully-limited bright-line rule of *Bellas Hess* and *Quill*,[6] which applies only to sales and use <u>tax collection and remittance obligations</u>.  DMA attempts to dismiss this fundamental aspect of *Quill*.  The main rationale in *Quill* for adhering to the physical presence requirement of *Bellas Hess* was the principle of *stare decisis* and the perceived "substantial reliance" by the industry upon the bright-line rule.  *Id.* at 317.  Because the duty to collect actually creates <u>tax liability</u>, the *Quill* Court was primarily concerned about the retrospective consequences of overruling *Bellas Hess* and creating unanticipated tax liability for the mail-order industry.  504 U.S. at 318 n.10.  Such concerns are not implicated by simple notice and reporting requirements.

---

[6] *Quill* is consistently and explicitly limited to the imposition of the sales and use taxes and the imposition of the duty to collect those taxes.  *See, e.g.,* 504 U.S. at 308 ("Comparable reasoning justifies the <u>imposition of the collection duty</u> on a mail-order house that is engaged in continuous and widespread solicitation of business within a State."); *id.* ("the Due Process Clause does not bar <u>enforcement of …the use tax</u> against Quill."); *id.* at 315 ("Under *Bellas Hess,* [vendors lacking physical presence] are free from <u>state-imposed duties to collect sales and use taxes.</u>"); *id.* ("Such a rule firmly establishes the boundaries of legitimate state authority to impose a <u>duty to collect sales and use taxes</u> and reduces litigation concerning those taxes."); *id.* at 318 ("Congress is now free to decide whether, when, and to what extent the States may burden interstate mail-order concerns with a <u>duty to collect use taxes.</u>") (emphasis added).

The Tenth Circuit and several state appellate courts have accordingly limited *Quill's* physical presence rule for Commerce Clause nexus to when a state may require a business to <u>collect and remit</u> sales and use taxes.  In *American Target Adver., Inc. v. Giani*, 199 F.3d 1241, 1254-55 (2000), the Court declined to extend *Bellas Hess* and *Quill* beyond the <u>levy of taxes</u> upon out-of-state entities to a state regulatory law. Similarly, in a corporate income tax case, the Iowa Supreme Court recently concluded *Quill's* physical presence nexus standard does not extend beyond sales and use tax. *KFC Corp. v. Iowa. Dept. of Rev.*, 792 N.W.2d 308, 324-328 (Iowa 2010); *see also Capital One Bank, v. Comm'r of Revenue*, 899 N.E.2d 76, 84 (Mass. 2009) (noting the *Quill* Court "explicitly emphasized on more than one occasion, a narrow focus on sales and use taxes" and declining to extend physical presence rule to financial institution excises); *Tax Comm'r of the State of W. Va. v. MBNA America Bank, N.A.*, 640 S.E.2d 226, 232-233 (2007) (same result for business franchise and corporate income tax).

DMA's suggestion that the nature of the Internet weighs in favor of enjoining state regulations of commercial activity transacted over the Internet is unavailing.  Pl. MSJ., p. 24.  It is true that the Supreme Court has recognized that some aspects of trade, such as the railways, must remain free from excessive state interference under the dormant Commerce Clause.  *See Kassel v. Consol. Freightways Corp. of Del.*, 450 U.S. 662, 669-671 (1981).  The Tenth Circuit, however, has rejected attempts to define new industries and areas that must remain free from lawful state regulation.  In *Quik Payday, Inc. v. Stork*, the Tenth Circuit upheld a Kansas law regulating Internet payday loans against a Commerce Clause challenge. 549 F.3d 1302 (2008).  Quik Payday, an

Internet-based lender, was headquartered in Utah and had no offices, employees, or other physical presence in Kansas.  Nevertheless, the Court upheld the law and refused to interpret its holding in *Johnson* to bar regulation of commercial exchanges just because parties use the Internet to communicate.  *Id.* at 1312 ("[W]hen an entity intentionally reaches beyond its boundaries to conduct business with foreign residents, the exercise of specific jurisdiction by the foreign jurisdiction over that entity is proper." (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F.Supp.1119, 1124 (W.D. Pa. 1997)).  The Law does not attempt to regulate the Internet and its use as a medium to conduct transactions with Colorado residents should not be used as a shield against a state's legitimate regulatory and taxing authority.

DMA cites the "structural concerns" discussed in *Quill* regarding the potential effects of regulation by multiple taxing jurisdictions on the national economy.  *See Quill*, 504 U.S. at 313-15. The dormant Commerce Clause is concerned with <u>inconsistent</u> regulation by the states, that is, conflicting laws affecting the same transaction or occurrence.  *See, e.g.*, *Kassel*, 460 U.S. at 679.  In the Tenth Circuit, challenges based on the alleged need for "national uniformity" are not independent claims but are rather reviewed as part of the *Pike* balancing analysis.  *Quik Payday*, 549 F.3d at 1307.

Contrary to DMA's contention, the transactional notice laws recently passed in Oklahoma and South Dakota do not <u>conflict</u> with the Law.  Disputed Facts, ¶ 6.  Further, there is no reason to assume beyond speculation that multiple laws would cover the same transaction or that every local jurisdiction with taxing authority will adopt similar requirements.  If anything, it appears such requirements will be set at the state level.

Moreover, the Law allows for substantial compliance by non-collecting retailers subject to other state requirements.  Disputed Facts, ¶ 6.  Businesses are often subject to regulation by the various states in which they do business.  *See, e.g., American Trucking Ass'n, Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 438 (2005) (concluding that businesses operating in multiple states <u>expect</u> to pay local fees in each of those states).  Further, state regulations are still evaluated by considering what <u>unduly</u> burdens interstate commerce.  *See, e.g., Kassel*, 450 U.S. at 669-671 (weighing the nature of the regulation in light of the burden imposed).  The dormant Commerce Clause does not seek "to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing business." *Commonwealth Edison*, 453 U.S. at 623-624.

The world of E-commerce and remote sales looks vastly different from the mail-order world of *Quill* nearly twenty years ago and the burdens of the Law upon out-of-state retailers must be viewed through a contemporary lens.  Even in 1967, Justice Fortas recognized the advances of modern technology and criticized the majority for exempting the direct-mail industry from collection burdens as follows:

> The burden is no greater than that placed upon local retailers by comparable sales tax obligations; and the Court's response that these administrative and record keeping requirements could 'entangle' appellant's interstate business in a welter of complicated obligations <u>vastly underestimates the skill of contemporary man and his machines</u>.  There is no doubt that the collection of taxes from consumers is a burden; but it is no more of a burden on a mail order house…located in another State than on an enterprise in the same State which accepts orders by mail; and it is, indeed, hardly more of a burden than it is on any ordinary retail store in the taxing State.

*Bellas Hess,* 386 U.S. at 766 (dissenting) (emphasis added).

The development of the Internet and the explosion in E-Commerce since *Bellas Hess* and *Quill* counsel against the expansion of the special bright-line rule created to address the unique history and burdens associated with sales and use <u>tax collection</u> as applied to the direct-mail industry.  At the time of *Bellas Hess*, the mail order sales industry was $2.4 billion annually.  386 U.S. at 763 (Fortas, J., dissenting and predicting that the "haven of immunity," resulting from the favored position and exemption from bearing the fair burden of state taxes, will increase in size and importance).  When the Court decided *Quill* 25 years later, that industry had grown to $180 billion annually.  *See* 504 U.S. at 329, White, J., dissenting:

> Also very questionable is the rationality of perpetuating a rule that creates an interstate tax shelter for one form of business…but no countervailing advantage for its competitors.  If the Commerce Clause was intended to put businesses on an even playing field, the majority's rule is hardly a way to achieve that goal…I would think that protectionist rules favoring a $180-billion-a-a-year industry might come within the scope of such "structural concerns.

Reaching $3 trillion in 2008, E-Commerce is no infant industry and expansion of a rule that already affords a substantial artificial advantage cuts against the objective of the dormant Commerce Clause.  SOF, ¶ 1.

### B. The Incidental Effects of the Law Do Not Clearly Exceed Colorado's Interest in Enforcing its Sales and Use Taxes.

Because any effects on interstate commerce are incidental and not clearly excessive in relation to the strong state interest in enforcing its tax laws, the Law must be upheld.  *See Pike*, 397 U.S. at 142.  The Supreme Court has long recognized that even interstate commerce must be made to pay its fair share of the state tax burden, even if it increases the cost of doing business.  *W. Live Stock v. Bureau of Revenue*,

303 U.S. 250, 254 (1938).  Out-of-state businesses without physical presence can be subjected to a wide range of obligations by a state in which they deliberately avail themselves of economic opportunities.  *See, e.g., Quill*, 504 U.S. at 319 (Scalia, J. concurring) (discussing state regulatory jurisdiction including Blue Sky laws); *Granholm*, 544 U.S. 460 (state liquor licensing scheme).  Further, "the <u>modes</u> adopted [by the states] to enforce the taxes levied should be interfered with as little as possible."  *Dows v. City of Chicago*, 78 U.S. 108, 110 (1871) (emphasis added).

The starting place for consideration of a dormant Commerce Clause challenge is the interest of the state in the subject matter regulated and how fundamental this local interest is.  *Aldens, Inc. v. Ryan,* 571 F.2d 1159, 1161 (10th Cir. 1978).   It is against the backdrop of the State's complementary sales and use tax scheme that the Law advances several significant state interests.  Contrary to DMA's assertion that the sole justification for the Law is revenue generation, the Law advances three strong state taxing authority interests.

First, the Law enhances DOR's ability to recover sales and use tax revenue due to the State, a vital component of the State budget.  SOF, ¶ 3.    In *United Haulers Ass'n., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth*., 550 U.S. 330, 346 (2007), the Court applied a truncated analysis under *Pike* and determined that "[w]hile revenue generation is a not a local interest that can justify discrimination against interstate commerce…it is a cognizable benefit for purposes of the *Pike* test."  *Id*. at 346; *see also C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 429 (1994) (protection of the public fisc is a legitimate non-protectionist benefit).  DMA attempts to discredit this

interest by utilizing a revenue estimate from an inapplicable fiscal note, *see* Disputed Facts*, ¶ 3,* to suggest an insignificant fiscal impact.  Pl. MSJ, ¶ 28.  The State has estimated that annual revenue will steadily increase over time with increased awareness of the Law and enforcement compliance.  SOF*, ¶ 2.*  Further, the Commerce Clause does not require states to adopt any particular economic theory and it is not the role of the courts "to second-guess the empirical judgments of lawmakers concerning the utility of legislation."  *CTS Corp.*, 481 U.S. at 92 (quoting *Kassel*, 460 U.S. at 679 (Brennan, J., concurring)).

Second, the Law, an enforcement mechanism of the sales and use taxes, promotes the fair distribution of the cost of government.  The levying of taxes is a proper means of distributing the burden of the cost of government and is a fundamental principle of government existing primarily to provide for the common good. *Commonwealth Edison Co. v. Mont.*, 453 U.S. 609, 622-623 (1981) (citing *Carmichael v. S. Coal & Coke Co.*, 301 U.S. 494, 521-533 (1937); *see also Quill*, 504 U.S. at 328 (White, J. dissenting) (an out-of-state business derives numerous commercial benefits from the state in which it does business, such as sound local banking institutions to support credit transactions and courts to ensure collection of the purchase price).

Third, the Law promotes respect for and compliance with the tax laws.  *See St. German of Alaska E. Orthodox Catholic Church v. United States*, 840 F. 2d 1087, 1094 (2d Cir. 1988) (enforcement of tax laws is a compelling governmental interest); *United States v. Richey*, 924 F.2d 857, 862 (9th Cir. 1990) (maintaining a workable tax system is a compelling governmental interest); *Schehl v. Comm'r of Internal Revenue*, 855 F.2d

24

364, 367 (6th Cir. 1988) (promoting public compliance with the tax laws is a legitimate governmental interest).

Any burden upon DMA members due to the Law is incidental and does not clearly outweigh these strong State interests.  DMA alleges two burdens upon non-collecting retailers as a result of the Law: compliance costs and loss of sales and customers.  Am.Compl. ¶¶ 59-60.  DMA relies upon three experts to establish these alleged burdens.  All three experts, however, utilized flawed methodology resulting in opinions that amount to no more than speculation.  *See Cardoso v. Calbone*, 490 F.3d 1194, 1197 (10th Cir. 2007) ("Evidence, including testimony must be based on more than mere speculation, conjecture, or surmise.  Unsubstantiated allegations carry no probative weight in summary judgment proceedings.")*; see also* Def.'s 702 Mot.[7]

Nevertheless, it is true that the smallest affected retailers may incur some one-time costs of up to $6,000.00 in complying with the Law.  Disputed Facts, ¶ 2.  Such nominal costs, however, do not constitute an undue burden.  For example, in *Aldens, Inc*, 571 F.2d 1159, a mail-order business without physical presence in Oklahoma challenged the state's interest rate caps on goods sold to residents.  The parties stipulated that costs to comply with the law would exceed $160,000.00 annually.  *Id*. at 1161.  Aldens further alleged significant burdens associated with sorting out and according different treatment to Oklahoma credit transactions.  *Id*. at 1162.  The Tenth

---

[7] In the Order dated January 26, 2011 [Dkt. #78], the Court deferred resolution of this Motion "pending further developments in this case."  Given that the parties' cross motions on summary judgment will likely lead to a final, appealable j judgment, it is appropriate for the Court to consider the Motion at this time.

Circuit nevertheless concluded the compliance costs and burdens did not unduly burden interstate commerce and specifically noted that "in the era of computers," such burdens were not unreasonable compared to the local interest in consumer protection.  *Id.*

The reality is that in the areas of Internet and remote sales, non-collecting retailers have benefitted from a windfall of customers who either unknowingly or deliberately avoid paying the sales or use tax due on their transactions.  Any reliance non-collecting retailers have based on the "haven of immunity" *Bellas Hess* and *Quill* created cannot reasonably entitle them to a zone entirely free from any state regulation, particularly when such retailers have substantial economic presence and profit handsomely from transactions with Colorado consumers.  Finally, any costs to DMA members are nominal, largely one-time costs that will decrease over time; costs to the State from uncollected revenue due are substantial, recurring, and increasing over time.

### C.   The Law Does Not Coerce Out-of-State Retailers to Surrender Commerce Clause Protections Afforded by *Quill*.

DMA's suggestion that the Law improperly coerces out-of-state retailers to surrender their Commerce Clause protections is wrong.  Pl. MSJ, p.25-26 (citing *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888 (1988)).  In *Bendix Autolite Corporation*, the two choices available to out-of-state companies were both deemed to be undue burdens upon interstate commerce.  *Id.* at 893-895 (discussing the choice between submitting to the general jurisdiction of Ohio courts by appointing an agent within the state for service of process or forfeiture of the limitations defense).

DMA's characterization of the Law as coercive does not make it so.  *See McLeod v. J.E. Dilworth*, Co*,* 322 U.S. 327, 331 (1944) (court could not "render unconstitutional a tax, that in its actual effect violates no constitutional provision, by inaccurately defining it." (quoting *Wagner v. City of Covington*, 251 U.S. 95, 102, 104 (1919)).  The Law simply represents a constitutionally permissible way for DOR to gather information needed to collect taxes due to the state.  DMA cites the "onerous choice" between complying with the Law and incurring penalties.  Pl. MSJ., p.25.  Many laws, however, might be deemed "coercive" in the sense that failure to comply with them results in penalties or even criminal consequences.

*Bendix* does not support DMA's claims because out-of-state retailers are not forced to choose between unlawful burdens as a result of the Law.  As discussed above, DMA's members are not shielded from compliance with the Law by the *Quill* physical presence rule because the notice and reporting requirements do not impose a collection duty.  Because the Law does not impose an undue burden upon interstate commerce and because out-of-state retailers may choose whether to comply with the Law or collect sales and use tax when in-state retailers have no such choice, *Bendix* is inapposite.  Likewise, DMA's reliance upon *Hemi Group LLC v. City of New York*, a case not even addressing dormant Commerce Clause claims, is misplaced.  130 S.Ct. 983 (2010).  In *Hemi Group LLC*, the Court upheld the dismissal of the city's claims under the Racketeer Influenced and Corrupt Organizations Act (RICO) based upon lost cigarette tax revenues where causation was too attenuated.  *Id.* at 989.  DMA's

coercion argument is not bolstered by a passing remark in the lone concurrence.  *Id.* at 994-95 (Ginsburg, J. concurring).

### III.        The Law Does Not Regulate Commerce Entirely Outside Colorado.

DMA's claim that the Law seeks to regulate commerce that occurs wholly outside Colorado is also wrong.  Pl. MSJ, pp. 26-27.  While the dormant Commerce Clause precludes direct regulation by a state of interstate commerce that occurs wholly outside the state, *Edgar v. MITE Corp.*, 457 U.S. 624, 640-643 (1982), such is not the case here.  In *Edgar*, the Court struck down an Illinois law that reached beyond the state and purported to determine whether tender offers could proceed anywhere in the nation.  *Id.* at 643.  The Court distinguished the law from other permissible state regulations of in-state activity with only incidental effects upon interstate commerce.  *Id.* at 641 (discussing state "blue-sky" laws regulating securities transactions where the disposition of securities occurs within the state).  *Id.* at 641.

Because the Law is triggered only when there is a sale to a customer located in Colorado or the goods are shipped to a Colorado address, there is no concern for regulation of commerce that occurs entirely outside Colorado.  *See* Reg. 39-21-112.3.5(1)(b) and (c) (defining Colorado Purchaser and Colorado Purchase, respectively).  In both cases, the transaction ends with the use or enjoyment of the goods within the state, long-recognized as a permissible basis for state regulation.  *See Henneford*, 300 U.S. at 583.

IV.     **DMA CANNOT PROVE THE ELEMENTS REQUIRED FOR A PERMANENT INJUNCTION**

DMA accurately describes the elements it must prove for a permanent injunction: 1) actual success on the merits of its claim; 2) irreparable harm if injunctive relief is not granted; 3) that its threatened injury outweighs the harm that an injunction would cause DOR; and 4) that the injunction, if issued, would not adversely affect the public interest. *Fisher v. Okla. Health Care Auth.*, 335 F.3d 375, 380 (10th Cir. 2003).

DMA cannot prove these elements.  As demonstrated herein and in DOR's cross-motion for summary judgment, the Law does not violate the Commerce Clause, and therefore, DMA does not succeed on the merits of its claim.  Further, unless DMA proves the Law is unconstitutional, the DMA cannot demonstrate irreparable harm, as there can be no irreparable harm in complying with a valid law.  For the same reason, the DMA cannot demonstrate that any threatened injury to its members outweighs the harm an injunction would cause DOR.  Finally, DMA cannot show that an injunction would adversely affect the public interest.  Colorado has an interest in enforcing valid laws.  Thus, the converse of DMA's argument that the public is best served by enjoining a law that violates the Commerce Clause is equally true -- the public is best served by the enforcement of a law that does not violate the Commerce Clause.  *See United States v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).  This principle is particularly true in this case because the public has an interest in enforcing a statute designed to enhance collection of revenue due to the state, *United Haulers Ass'n, Inc*, 550 U.S. at 346; fairly distributing the costs of government; and seeing that tax laws are enforced

and those subject to the laws obey them.  *St. German of Alaska E. Orthodox Catholic Church*, 840 F.2d at 1094; *Richey*, 924 F.2d at 862.

## V.      CONCLUSION

For the foregoing reasons, DMA's Motion should be denied and summary judgment on Counts I and II should entered in favor of DOR.

Respectfully submitted this 27th day of May, 2011.

JOHN W. SUTHERS
Attorney General

*s/  Melanie J. Snyder*
MELANIE J. SNYDER, 35835*
Assistant Attorney General
STEPHANIE LINDQUIST SCOVILLE, 31182*
JACK M. WESOKY, 6001*
Senior Assistants Attorney General
1525 Sherman Street, 7th Floor
Denver, Colorado  80203
Telephone:  (303) 866-5273 (Snyder)
Telephone:  (303) 866-5241 (Scoville)
Telephone:  (303) 866-5512 (Wesoky)
FAX:  (303) 866-5395
E-Mail:  melanie.snyder@state.co.us
E-Mail:  stephanie.scoville@state.co.us
E-Mail:  jack.wesoky@state.co.us

*Counsel of Record
*Attorneys for Defendant*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 27, 2011, I electronically filed the foregoing **Defendant's Response in Opposition to Plaintiff's Motion for Summary Judgment as to Counts I and II Alleging Violations of the Commerce Clause** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following e-mail addresses:

gisaacson@branlaw.com
mschaefer@branlaw.com

*Attorneys for Plaintiff*

*s/  Melanie J. Snyder*

<u>*cc: Via interoffice mail*</u>
Ms. Roxy Huber
Executive Director
Colorado Department of Revenue
1375 Sherman Street
Denver, Colorado  80261