**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**February 22, 2016**

**FOR THE TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

_____

DIRECT MARKETING ASSOCIATION,
The

     Plaintiff - Appellee,

v.                                                             No. 12-1175

BARBARA BROHL, in her capacity as
Executive Director, Colorado Department
of Revenue,

     Defendant - Appellant,

and

MULTISTATE TAX COMMISSION;
INTERESTED LAW PROFESSORS; THE
RETAIL INDUSTRY LEADERS
ASSOCIATION; RETAIL LITIGATION
CENTER, INC.; COLORADO RETAIL
COUNCIL; NATIONAL GOVERNORS
ASSOCIATION; NATIONAL
CONFERENCE OF STATE
LEGISLATURES; COUNCIL OF STATE
GOVERNMENTS; NATIONAL
ASSOCIATION OF COUNTIES;
NATIONAL LEAGUE OF CITIES;
UNITED STATES CONFERENCE OF
MAYORS; INTERNATIONAL
CITY/COUNTY MANAGEMENT
ASSOCIATION; INTERNATIONAL
LAWYERS ASSOCIATION;
GOVERNMENT FINANCE OFFICERS
ASSOCIATION; TAX FOUNDATION,

     Amicus Curiae.

—————————————————————

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
(D.C. NO. 1:10-CV-01546-REB-CBS)**

—————————————————————

Frederick R. Yarger, Solicitor General (Cynthia H. Coffman, Attorney General, Stephanie Lindquist Scoville, Senior Assistant Attorney General, Grant T. Sullivan, Assistant Solicitor General, Claudia Brett Goldin, First Assistant Attorney General, Daniel D. Domenico, Solicitor General, and Melanie J. Snyder, Chief of Staff, with him on the briefs), Office of the Attorney General for the State of Colorado, Denver, Colorado, appearing for Defendant-Appellant.

George S. Isaacson (Matthew P. Schaefer, with him on the briefs), Brann & Isaacson, Lewiston, Maine, appearing for Plaintiff-Appellee.

Darien Shanske, University of California, Davis School of Law, Davis, California, Kirk J. Stark, University of California, Los Angeles, School of Law, Los Angeles, California, and Alan B. Morrison, George Washington University School of Law, Washington, DC, for *Amicus Curiae* Interested Law Professors.

Lisa Soronen, Executive Director, State & Local Legal Center, Washington, DC, and Ronald A. Parsons, Jr., Johnson, Abdallah, Bollweg & Parsons, LLP, Sioux Falls, South Dakota, for *Amicus Curiae* National Governors Association, National Conference of State Legislatures, Council of State Governments, National Association of Counties, National League of Cities, United States Conference of Mayors, International City/County Management Association, International Municipal Lawyers Association, and Government Finance Officers Association.

Helen Hecht, Lila Disque, and Sheldon Laskin, Multistate Tax Commission, Washington, DC, for *Amicus Curiae* Multistate Tax Commission.

Deborah White, Retail Industry Leaders Association and Retail Litigation Center, Arlington, Virginia; Tom Goldstein and Eric Citron, Goldstein & Russell, P.C., Bethesda Maryland, for *Amicus Curiae* Retail Industry Leaders Association, Retail Litigation Center, Inc. and Colorado Retail Council.

Joseph D. Henchman, Tax Foundation, Washington, DC, and Joseph P. Kennedy, Kennedy Kennedy & Ives, LLC, Albuquerque, New Mexico, for *Amicus Curiae* Tax Foundation.

—————————————————————

Before **BRISCOE**, **GORSUCH**, and **MATHESON**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

## I.  INTRODUCTION

When a neighborhood bookstore in Denver sells a book, it must collect sales tax from the buyer and remit that payment to the Colorado Department of Revenue ("Department").  When Barnes & Noble sells a book over the Internet to a Colorado buyer, it must collect sales tax from the buyer and remit.  But when Amazon sells a book over the Internet to a Colorado buyer, it has no obligation to collect sales tax.  This situation is largely the product of the Supreme Court's decision in *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992), which held that, under the dormant Commerce Clause doctrine, a state may not require a retailer having no physical presence in that state—e.g., Amazon as opposed to Barnes & Noble—to collect and remit sales tax on the sales it makes there.

Faced with *Quill*, many states, including Colorado, rely on purchasers themselves to calculate and pay a use tax on their purchases from out-of-state retailers that do not collect sales tax.  But few in Colorado or elsewhere pay the use tax despite their legal obligation to do so.[1]  With the explosive growth of e-commerce, the states' inability to

---

[1] The parties dispute the precise rate of non-compliance.  As the Department points out, the 75% compliance rate that DMA cites encompasses both sales and use taxes on all Internet sales, including those by retailers with a physical presence that must collect taxes.  It reports the compliance rate on remote retail sales with no collection

Continued . . .

compel out-of-state retailers to collect sales tax has cost state and local governments significant revenue and disadvantaged in-state retailers, who must collect sales tax at the point of sale.  Justice Kennedy recently said this "may well be a serious, continuing injustice faced by Colorado and many other States."  *Direct Mktg. Ass'n v. Brohl* ("*Brohl II*"), 135 S. Ct. 1124, 1134 (2015) (Kennedy, J., concurring).

In 2010, Colorado attempted to address use tax non-compliance by enacting a law ("Colorado Law") that imposes notice and reporting obligations on retailers that do not collect sales tax.  Plaintiff-Appellee Direct Marketing Association ("DMA")—a group of businesses and organizations that market products via catalogs, advertisements, broadcast media, and the Internet—has challenged this law as violating the dormant Commerce Clause.

DMA argues the Colorado Law unconstitutionally discriminates against and unduly burdens interstate commerce.  The district court agreed with both arguments, granted summary judgment to DMA, and permanently enjoined the Department from enforcing the Colorado Law.  *See Direct Mktg. Ass'n v. Huber*, No. 10-cv-01546-REB-

---

obligation is, as Justice Kennedy recently pointed out, only 4%.  *See Direct Mktg. Ass'n v. Brohl* ("*Brohl II*"), 135 S. Ct. 1124, 1135 (2015) (Kennedy, J., concurring); *see also* Brief of National Governors Ass'n et al. as Amici Curiae in Support of Defendant-Appellant Supporting Reversal at 10, *Direct Mktg. Ass'n v. Brohl*, No. 12-1175 (10th Cir. argued Sept. 29, 2015) (estimating household use-tax compliance at 0-5%, excluding motor vehicle purchases).  As the Department notes, any figure in the record would be significantly lower than the 98.3% compliance rate for sales taxes.

CBS, 2012 WL 1079175, at *10-11 (D. Colo. Mar. 30, 2012).  Defendant-Appellant

Barbara Brohl, Executive Director of the Department, appeals.[2]

We have jurisdiction under 28 U.S.C. § 1291.  We reverse because the Colorado

Law does not discriminate against nor does it unduly burden interstate commerce.

## II.  **BACKGROUND**

### A. *Factual History*

Colorado has imposed a sales tax since 1935 and a use tax since 1937.  The taxes

are complementary.  The sales tax is paid at the point of sale and the use tax is paid when

property is stored, used, or consumed within Colorado but sales tax was not paid to a

retailer.  *See* Colo. Rev. Stat. §§ 39-26-104, -202, -204(1).   In approving the sales-use

tax system under the dormant Commerce Clause, the Supreme Court described it as

follows:

> The practical effect of a system thus conditioned is readily perceived.  One
> of its effects must be that retail sellers in Washington will be helped to
> compete upon terms of equality with retail dealers in other states who are
> exempt from a sales tax or any corresponding burden. Another effect, or at
> least another tendency, must be to avoid the likelihood of a drain upon the
> revenues of the state, buyers being no longer tempted to place their orders
> in other states in the effort to escape payment of the tax on local sales.

*Henneford v. Silas Mason Co.*, 300 U.S. 577, 581 (1937).

The methods for collecting sales and use taxes vary.  In-state retailers subject to

sales tax collection are tasked with assorted requirements—for example, obtaining a

---

[2] When this lawsuit was filed in district court, the executive director was Roxy
Huber.  Ms. Brohl was later substituted as the defendant.

license, calculating state and local taxes, accounting for exemptions, collecting the tax, filing a return, remitting the tax to the state, and keeping certain records.  In-state retailers are also liable for any sales taxes they do not collect and may be subject to fines or criminal penalties for non-compliance.

Because Colorado cannot compel out-of-state retailers without a physical presence in the state to collect taxes, the state requires purchasers themselves to calculate and remit use taxes on their purchases from out-of-state retailers.  The regimes differ greatly in effectiveness—compliance with the sales tax is extremely high, and compliance with the use tax is extremely low.

To assist the state in collecting use tax from in-state purchasers, most seemingly unaware of their tax responsibility,[3] the Colorado legislature passed a law in 2010 that imposes three obligations on retailers that do not collect sales taxes—"non-collecting retailers"[4]:  (1) to send a "transactional notice" to purchasers informing them that they may be subject to Colorado's use tax, *see* Colo. Rev. Stat. § 39-21-112(3.5)(c)(I); 1 Colo.

---

[3] *See* David Gamage & Devin J. Heckman, *A Better Way Forward for State Taxation of E-Commerce*, 92 B.U. L. Rev. 483, 489 (2012).

[4] A "non-collecting retailer" is defined as "a retailer that sells goods to Colorado purchasers and that does not collect Colorado sales or use tax."  1 Colo. Code Regs. § 201-1:39-21-112.3.5(1)(a)(i).  Retailers who made less than $100,000 in total gross sales in Colorado in the previous calendar year, and who reasonably expect gross sales in the current calendar year to be less than $100,000, are exempt from the notice and reporting obligations.  *Id.* § 201-1:39-21-112.3.5(1)(a)(iii).

Code Regs. § 201-1:39-21-112.3.5(2);[5] (2) to send Colorado purchasers who buy goods from the retailer totaling more than $500 an "annual purchase summary" with the dates, categories, and amounts of purchases, reminding them of their obligation to pay use taxes on those purchases, Colo. Rev. Stat. § 39-21-112(3.5)(d)(I); 1 Colo. Code Regs. § 201-1:39-21-112.3.5(3); and (3) to send the Department an annual "customer information report" listing their customers' names, addresses, and total amounts spent, Colo. Rev. Stat. § 39-21-112(3.5)(d)(II); 1 Colo. Code Regs. § 201-1:39-21-112.3.5(4). DMA objected to these requirements and brought suit against the Executive Director of the Department.

### B. *Procedural History*

DMA filed a facial challenge to the Colorado Law in federal district court in 2010. Among other claims,[6] it contended that the Colorado Law violates the dormant Commerce Clause because it discriminates against and unduly burdens interstate commerce.

On March 30, 2012, the district court granted summary judgment to DMA on both grounds. *Huber*, 2012 WL 1079175, at *10-11. The court permanently enjoined the Department from enforcing the Colorado Law. *Id.*

---

[5] The transactional notice requirement can be satisfied in various ways, including an online pop-up window, a packing slip, or other methods.

[6] DMA originally brought eight claims for relief, including First and Fourteenth Amendment challenges, but its motion for summary judgment included only the two dormant Commerce Clause challenges. We are presented only with those challenges on this appeal.

On August 20, 2013, this panel held that the district court lacked jurisdiction to hear DMA's challenge under the Tax Injunction Act ("TIA"). *See Direct Mktg. Ass'n v. Brohl* ("*Brohl I*"), 735 F.3d 904, 906 (10th Cir. 2013); 28 U.S.C. § 1341.  We remanded the case to the district court to dismiss DMA's claims and dissolve the permanent injunction. *Brohl I*, 735 F.3d at 921.  The Tenth Circuit rejected a request for en banc review. *Direct Mktg. Ass'n v. Brohl*, No. 12-1175 (10th Cir. Oct. 1, 2013) (unpublished).

On December 10, 2013, the district court dismissed DMA's claims and dissolved the permanent injunction.  Shortly thereafter, it dismissed the remainder of DMA's eight claims without prejudice.

DMA then sued the Department in state court.  It also petitioned for certiorari to the Supreme Court, seeking review of the Tenth Circuit's dismissal of its claims based on the TIA.

On February 18, 2014, the state district court preliminarily enjoined enforcement of the Colorado Law based on DMA's argument that it facially discriminated against interstate commerce in violation of the dormant Commerce Clause. *Direct Mktg. Ass'n v. Colo. Dep't of Revenue*, No. 13CV34855, at 1, 22-23 (Dist. Ct. Colo. Feb. 18, 2014) (unpublished).  It rejected DMA's argument that the Colorado Law placed an undue burden on interstate commerce, declining to extend *Quill*'s holding regarding tax collection to regulatory measures. *Id.* at 24-30.

On July 1, 2014, the Supreme Court granted DMA's petition for certiorari.  In response to this development, the Colorado state court stayed its proceedings and did not resolve the parties' cross-motions for summary judgment.  On March 3, 2015, the

- 8 -

Supreme Court held the TIA did not strip the federal courts of jurisdiction to hear DMA's challenge and reversed *Brohl I*. *Brohl II*, 135 S. Ct. at 1131. It remanded the case for further proceedings.

In the wake of *Brohl II*'s determination that the TIA's jurisdictional bar is inapplicable, we are now squarely presented with the two dormant Commerce Clause challenges decided by the federal district court before our decision in *Brohl I*. The parties have submitted supplemental briefs, and we heard oral argument on September 29, 2015.

## III. **DISCUSSION**

Our discussion proceeds in three parts. First, we present an overview of the dormant Commerce Clause doctrine. Second, we analyze the bright-line rule recognized in *Quill* and determine it is limited to tax collection. Third, we review DMA's dormant Commerce Clause claims and conclude the Colorado Law does not discriminate against or unduly burden interstate commerce.[7]

---

[7] In *Brohl II*, the Supreme Court noted this court's discussion of the "comity doctrine" in *Brohl I* and left "it to the Tenth Circuit to decide on remand whether the comity argument remains available to Colorado." 135 S. Ct. at 1134. The Department argues "this Court should not dismiss this case based on comity. Consistent with U.S. Supreme Court precedent, the Department has affirmatively waived reliance on the comity doctrine." Aplt. Supp. Br. at 23. DMA agrees. Aplee. Supp. Br. at 59. On this non-jurisdictional prudential matter, we do not dismiss this case on comity grounds.

A. ***Dormant Commerce Clause***

The Constitution does not contain a provision called the dormant Commerce Clause.[8]  The doctrine derives from Article I, Section 8, Clause 3—the Commerce Clause itself—which provides that "Congress shall have [the] power . . . [t]o regulate commerce . . . among the several States."  As to matters within the scope of the Commerce Clause power, Congress may choose to regulate, thereby preempting the states from doing so, *see Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 96-98 (1992); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947), or to authorize the states to regulate, *see In re Raher*, 140 U.S. 545, 555-56 (1891); *Prudential Ins. Co. v. Benjamin*, 328 U.S. 408, 429-31 (1946).

If Congress is silent—neither preempting nor consenting to state regulation—and a state attempts to regulate in the face of that silence, the Supreme Court, going back to *Gibbons v. Ogden*, 22 (9 Wheat) U.S. 1, 231-32, 238-39 (1824) (Johnson, J., concurring), and *Cooley v. Bd. of Port Wardens*, 53 U.S. (12 How.) 299, 318-19 (1851), has interpreted the Commerce Clause to limit state regulation of interstate commerce by applying the negative implications of the Commerce Clause—"these great silences of the Constitution," *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 535 (1949); *see White v. Mass. Council of Constr. Emp'rs, Inc.*, 460 U.S. 204, 213 (1983).  Accordingly, the Commerce Clause is both an express grant of power to Congress and an implicit limit on

---

[8] Nowhere does the Constitution explicitly limit state interference with interstate commerce except very specific limitations in Article I, Section 10, which prevent states from coining money or imposing duties on exports and imports.

the power of state and local government. *See Comptroller of the Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1794 (2015); *Kleinsmith v. Shurtleff*, 571 F.3d 1033, 1039 (10th Cir. 2009).

The focus of a dormant Commerce Clause challenge is whether a state law improperly interferes with interstate commerce. The primary concern is economic protectionism. *See W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 192 (1994) (quotations omitted) ("Th[e] 'negative' aspect of the Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978) ("The crucial inquiry, therefore, must be directed to determining whether [a state law] is basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental."); *Kleinsmith*, 571 F.3d at 1039 ("The Supreme Court's jurisprudence under the dormant Commerce Clause 'is driven by concern about economic protectionism.'" (quoting *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008)).

As to the state regulation at issue in this case, up to now Congress has been silent—it has not preempted or consented to the Colorado Law.[9] The question then is

---

[9] As DMA has noted in its supplemental brief, "since the parties first filed their briefs in this case in 2012, Congress has increased its already active scrutiny of the issue." Aplee. Supp. Br. at 50.

whether the Constitution's affirmative grant of the commerce power to Congress should be interpreted to circumscribe the Colorado Law.  The judiciary's answer to this question need not be final.  If we uphold the law, Congress can pass its own law and preempt the Colorado Law.  Or if we decide the law is unconstitutional under the dormant Commerce Clause doctrine, Congress can enact legislation authorizing Colorado to do what we have struck down.  In that sense, the judicial decision determines which party would need to go to Congress to seek a different result.

The Supreme Court has produced an extensive body of dormant Commerce Clause case law.[10]  As a general matter, state regulation that discriminates against interstate commerce will survive constitutional challenge only if the state shows "it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives."  *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 581 (1997) (quotations omitted).  The Court has "required that justifications for discriminatory restrictions on commerce pass the 'strictest scrutiny.'" *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 101 (1994) (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 337 (1979)).

Nondiscriminatory state laws also can be invalidated when they impose an undue burden on interstate commerce.  *See Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 529 (1959).  "Where the statute regulates even-handedly to effectuate a legitimate local

---

[10] A WestLawNext search of "Dormant Commerce Clause" on February 9, 2016, produced a list of 56 United States Supreme Court decisions.

public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). "State laws frequently survive this *Pike* scrutiny . . . ." *Davis*, 553 U.S. at 339.[11]

Finally, the Supreme Court has adapted its dormant Commerce Clause jurisprudence to review state taxes on interstate commerce. In *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977), the Court stated that a tax on interstate commercial activity is constitutional if it "[1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." *Id.* at 279. As discussed more fully below, *Complete Auto* does not apply here because this case involves a reporting requirement and not a tax.

### B. *Scope of* Quill

The outcome of this case turns largely on the scope of *Quill*. We conclude it applies narrowly to sales and use tax collection. The following discussion explains how we arrive at this conclusion, which affects both DMA's claim for discrimination and for undue burden.

---

[11] In *Energy & Env't Legal Inst. v. Epel*, 793 F.3d 1169, 1172 (10th Cir. 2015), *cert. denied*, 136 S. Ct. 595 (2015), this court recently acknowledged a third type of dormant Commerce Clause cases: those involving "certain price control and price affirmation laws that control 'extraterritorial' conduct." This category does not apply to this appeal.

In *National Bellas Hess, Inc. v. Department of Revenue*, 386 U.S. 753 (1967), the Supreme Court addressed whether Illinois could require a Delaware-based mail-order business with no physical presence in Illinois to pay use taxes on sales to Illinois customers. *Id.* at 753-54. The seller's only connection with Illinois was through common carrier and U.S. mail. *Id.* at 754. The Court concluded that such a requirement violated the Commerce Clause.

In *Quill*, the Supreme Court revisited the holding of *Bellas Hess*. The Court addressed whether North Dakota could "require an out-of-state mail-order house that has neither outlets nor sales representatives in the State to collect and pay a use tax on goods purchased for use within the State." 504 U.S. at 301. Quill sold office supplies "through catalogs and flyers, advertisements in national periodicals, and telephone calls." *Id.* at 302. The Supreme Court of North Dakota had determined that this requirement was constitutional because "the tremendous social, economic, commercial, and legal innovations of the past quarter-century have rendered" the holding of *Bellas Hess* "obsolete." *Id.* (quotations omitted). The Supreme Court disagreed.[12]

In *Quill*, the Supreme Court applied the four-part test from *Complete Auto Transit*, 430 U.S. at 279. The test focuses on a statute's "practical effect" rather than its "formal

---

[12] The Court did overrule *Bellas Hess* on a separate issue. *Bellas Hess* had held that the Illinois use tax requirement had violated due process principles. The *Quill* court held that, "to the extent that our decisions have indicated that the Due Process Clause requires physical presence in a State for the imposition of duty to collect a use tax, we overrule those holdings as superseded by developments in the law of due process." 504 U.S. at 308.

language," and, as noted above, sustains a tax under the dormant Commerce Clause when the tax:  (1) "is applied to an activity with a substantial nexus with the taxing State," (2) "is fairly apportioned," (3) "does not discriminate against interstate commerce," and (4) "is fairly related to the services provided by the State."  *Id*.  The Court decided *Quill* based on the first step of the *Complete Auto* test.  504 U.S. at 311-15.[13]  It determined the dormant Commerce Clause and *Bellas Hess* create a safe harbor wherein "vendors whose only connection with customers in the taxing State is by common carrier or the United States mail . . . are free from state-imposed duties to collect sales and use taxes."  *Id.* at 315 (quotations and brackets omitted).  The *Quill* Court relied on *Bellas Hess* to make a stare decisis decision that recognized the physical presence rule as a "bright-line" test.  *Id.* at 314-18.

In *Brohl II*, the Supreme Court characterized *Quill* as establishing the principle that a state "may not require retailers who lack a physical presence in the State to *collect* these taxes on behalf of the [state]."  135 S. Ct. at 1127 (emphasis added).  Justice Kennedy's concurrence in *Brohl II*, 135 S. Ct. at 1135, echoed the numerous commentators who have criticized *Quill*'s bright-line physical presence test.[14]  Even

---

[13] The Court did not address whether the North Dakota use tax violated the third step of the *Complete Auto* test, which asks whether a state tax discriminates against interstate commerce.

[14] *See, e.g.*, H. Beau Baez III, *The Rush to the Goblin Market:  The Blurring of* Quill*'s Two Nexus Tests*, 29 Seattle U. L. Rev. 581, 581-82 (2006); Walter Hellerstein, *Deconstructing the Debate Over State Taxation of Electronic Commerce*, 13 Harv. J.L. & Tech. 549, 549-50 (2000).

though the Supreme Court has not overruled *Quill*, it has not extended the physical

presence rule beyond the realm of sales and use tax collection.

This court's discussion in *American Target Advertising, Inc. v. Giani* is instructive

on this point:

> Both *Bellas Hess* and *Quill* concern the levy of *taxes* upon out-of-state
> entities.  The Supreme Court in *Quill* repeatedly stressed that it was
> preserving *Bellas Hess*' bright-line rule 'in the area of sales and use taxes.'
> The Utah Act imposes licensing and registration requirements, not tax
> burdens.  The *Bellas Hess/Quill* bright-line rule is therefore inapposite.

199 F.3d 1241, 1255 (10th Cir. 2000) (quoting *Quill*, 504 U.S. at 316) (citations

omitted).[15]

---

[15] Other circuits have recognized that *Quill* is limited to state taxes.  *See Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1324 (9th Cir. 2015); *Ferndale Labs., Inc. v. Cavendish*, 79 F.3d 488, 490, 494 (6th Cir. 1996).

Moreover, the weight of state authority limits *Quill*'s physical presence requirement to sales and use taxes, as opposed to other kinds of taxes.  *See, e.g., Lamtec Corp. v. Dep't of Revenue*, 246 P.3d 788, 794 (Wash. 2011) (en banc) (stating in dicta "[t]here is also extensive language in *Quill* that suggests the physical presence requirement should be restricted to sales and use taxes" as opposed to business and occupation taxes); *KFC Corp. v. Iowa Dep't of Revenue*, 792 N.W.2d 308, 328 (Iowa 2010) ("[W]e hold that a physical presence is not required under the dormant Commerce Clause of the United States Constitution in order for the Iowa legislature to impose an income tax on revenue earned by an out-of-state corporation arising from the use of its intangibles by franchisees located within the State of Iowa."); *Geoffrey, Inc. v. Comm'r of Revenue*, 899 N.E.2d 87, 94-95 (Mass. 2009) (explaining "[t]he Supreme Court's decision in *Quill* discussed a 'physical-presence' requirement under the commerce clause only in the context of sales and use taxes," not taxes on royalty income); *Tax Comm'r v. MBNA Am. Bank, N.A.*, 640 S.E.2d 226, 232 (W. Va. 2006) ("[W]e conclude that *Quill*'s physical-presence requirement for showing a substantial Commerce Clause nexus applies only to use and sales taxes and not to business franchise and corporation net income taxes."); *Lanco, Inc. v. Dir., Div. of Taxation*, 908 A.2d 176, 176-77 (N.J. 2006) (concluding *Quill* does not prohibit a state from imposing a corporation business tax on physically non-present businesses); *Geoffrey, Inc. v. S.C. Tax Comm'n*, 437 S.E.2d 13, 18

Continued . . .

DMA argues the Supreme Court has cited *Quill* in three cases reviewing state laws that did not impose a tax collection obligation, but these decisions merely describe points of law in *Quill* and do not actually extend its holding to other contexts. *See Polar Tankers, Inc. v. City of Valdez*, 557 U.S. 1, 11 (2009) (invoking *Quill*'s due process analysis in a Tonnage Clause case to support the assertion that "a nondomiciliary jurisdiction may constitutionally tax property when that property has a substantial nexus with that jurisdiction, and such a nexus is established when the taxpayer avails itself of the substantial privilege of carrying on business in that jurisdiction" (quotations omitted)); *MeadWestvaco Corp. v. Ill. Dep't of Revenue*, 553 U.S. 16, 24-25 (2008) (invoking *Quill* to support the proposition that "[t]he Commerce Clause and the Due Process Clause impose distinct but parallel limitations on a State's power to tax out-of-state activities," then relying on *Quill*'s due process holding); *Camps Newfound/Owatonna, Inc.*, 520 U.S. at 572 n.8 (citing *Quill* in a string-cite for the

---

& n.4 (S.C. 1993) (concluding the physical-presence requirement of *Bellas Hess* and *Quill* applies only to sales and use taxes). *But see J.C. Penney Nat'l Bank v. Johnson*, 19 S.W.3d 831, 839 (Tenn. Ct. App. 1999) ("Any constitutional distinctions between the franchise and excise taxes presented here and the use taxes contemplated in *Bellas Hess* and *Quill* are not within the purview of this court to discern.").

These cases generally interpret *Quill* to apply exclusively to sales and use taxes for two reasons relevant here. First, they emphasize the language in *Quill* itself, which stated "we have not, in our review of other types of taxes, articulated the same physical-presence requirement that *Bellas Hess* established for sales and use taxes." 504 U.S. at 314. Second, they highlight *Quill*'s stare decisis rationale rooted in the mail order industry's reliance on *Bellas Hess*—a reliance interest absent in the context of other taxes. *See KFC Corp.*, 792 N.W.2d at 324.

proposition that Congress may "repudiate or substantially modify" Commerce Clause jurisprudence).

None of the foregoing cases actually invokes *Quill*'s dormant Commerce Clause analysis—only its due process analysis and discussion of congressional authority—and they do not demonstrate that *Quill* extends beyond the actual collection of taxes by out-of-state retailers.  Indeed, the cases cited by DMA suggest that *Quill* has not been extended beyond that context.

In sum, we conclude *Quill* applies narrowly to and has not been extended beyond tax collection.  The district court erred in holding otherwise.  In the following section, we address how this conclusion affects DMA's claims.

## C. *DMA's Claims*

The district court granted summary judgment on two grounds:  the Colorado Law (1) impermissibly discriminates against and (2) unduly burdens interstate commerce.  As to both grounds, we review a district court's grant of summary judgment de novo, evaluating the evidence "in the light most favorable to the non-moving party."  *Sabourin v. Univ. of Utah*, 676 F.3d 950, 957 (10th Cir. 2012) (quotations omitted).  We also review challenges to the constitutionality of a statute de novo.  *Shivwits Band of Paiute Indians v. Utah*, 428 F.3d 966, 972 (10th Cir. 2005).

When, as here, the target of state regulation alleges discrimination and undue burden, the analysis proceeds as follows:

> When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without

> further inquiry.  When, however, a statute has only indirect effects on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits. . . . In either situation the critical consideration is the overall effect of the statute on both local and interstate activity.

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986) (citations omitted).

1. **Discrimination**

We turn first to DMA's discrimination claim.  A state law generally violates the dormant Commerce Clause if it discriminates—either on its face or in its practical effects—against interstate commerce.  *Hughes*, 441 U.S. at 336.

a.  *District court order*

The district court determined the Colorado Law discriminates against interstate commerce in violation of the Commerce Clause.  It determined that "the Act and the Regulations directly regulate and discriminate against out-of-state retailers and, therefore, interstate commerce."  *Huber*, 2012 WL 1079175, at *4.[16]  It noted that under state law,

---

[16] The district court stopped short of saying the law was facially discriminatory, noting:

> On their face the Act and the Regulations do not distinguish between in-state retailers (those with a physical presence—a brick and mortar presence—in the state) and out-of-state retailers (those with no physical presence in the state who make sales to customers in the state).  Rather, the Act focuses on the distinction between retailers who collect Colorado sales tax and those who do not collect Colorado sales tax.

*Id.*

"all retailers doing business in Colorado and selling to Colorado purchasers must obtain a sales tax license and must collect and remit the sales tax applicable to each sale," *id.* (citing Colo. Rev. Stat. §§ 39-26-103, -104, -106, -204), and face civil and criminal penalties for non-compliance, *id.* (citing Colo. Rev. Stat. §§ 39-21-118(2), 39-26-103(1)(a), (4)).  It further noted that *Quill* precludes the state from imposing these requirements and penalties on out-of-state retailers without a physical presence in Colorado.  *Id.* (citing *Quill*, 504 U.S. at 315).

The district court recognized that, although the Colorado Law refers only to "any retailer that does not collect Colorado sales tax," Colo. Rev. Stat. § 39-21-112, the combination of state law and *Quill* guarantees that this provision applies only to out-of-state retailers.  *Huber*, 2012 WL 1079175, at *4-5.  The court concluded, "the veil provided by the words of the Act and the Regulations is too thin to support the conclusion that the Act and the Regulations regulate in-state and out-of-state retailers even-handedly."  *Id.* at *4.

Although the Department pointed out that some out-of-state retailers voluntarily collect and remit Colorado sales tax and therefore are not subject to the Colorado Law, the district court determined the Department "may not condition an out-of-state retailer's reliance on its rights on a requirement that the retailer accept a different burden, particularly when that burden is unique to out-of-state retailers."  *Id.* (citing *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 893 (1988)).

The district court therefore subjected the law to strict scrutiny, at which stage "the burden falls on the State to justify [the statute] both in terms of the local benefits flowing

from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Id.* at *6 (quoting *Hughes*, 441 U.S. at 336). The court briefly canvassed the interests identified by the Department and the proposed non-discriminatory alternatives identified by DMA, and ultimately concluded "[t]he record contains essentially no evidence to show that the legitimate interests advanced by the defendant cannot be served adequately by reasonable nondiscriminatory alternatives." *Id.* The court concluded the Department failed to carry its burden on the discrimination analysis and granted summary judgment to DMA. *Id.* at *7.

b. *Analysis*

A statute may discriminate against interstate commerce on its face or in practical effect. *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 402 (1994). "The burden to show discrimination rests on the party challenging the validity of the statute . . . ." *Hughes*, 441 U.S. at 336. If the party challenging the state law meets its burden to show that the statute is discriminatory, the law "is virtually *per se* invalid." *Or. Waste*, 511 U.S. at 99. When the Colorado Law is properly viewed in its factual and legal context, DMA has not carried its burden of showing discrimination against interstate commerce.

We consider: (1) whether the Colorado Law facially discriminates against interstate commerce, and (2) whether the Colorado Law's direct effect is to favor in-state economic interests over out-of-state interests.

   i.  <u>The Colorado Law Does Not Facially Discriminate Against Interstate Commerce</u>

The Colorado Law is not facially discriminatory.  It applies to certain retailers that sell goods to Colorado purchasers but do not collect Colorado sales or use taxes.  Colo. Rev. Stat. § 39-21-112(3.5)(c)(I); 1 Colo. Code Regs. § 201-1:39-21-112.3.5(1)(a)(i).  On its face, the law does not distinguish between in-state and out-of-state economic interests. It instead imposes differential treatment based on whether the retailer collects Colorado sales or use taxes.  Some out-of-state retailers are collecting retailers, some are not.

Although the title of the statute—An Act Concerning the Collection of Sales and Use Taxes on Sales Made by Out-Of-State Retailers—mentions out-of-state retailers, the Supreme Court has cautioned that "[t]he title of a statute cannot limit the plain meaning of the text.  For interpretive purposes, it is of use only when it sheds light on some ambiguous word or phrase."  *Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) (quotations and alterations omitted).  Here, the words of the statute are not ambiguous. The text refers to "[e]ach retailer that does not collect Colorado sales tax," which distinguishes between those entities that collect Colorado sales tax and those that do not. *See* Colo. Rev. Stat. §§ 39-21-112(c)(I), (d)(I)(A), (II)(A).  We will not rely on the statute's title to limit the plain meaning of the text.

Moreover, when the Supreme Court has concluded a law facially discriminates against interstate commerce, it has done so based on statutory language explicitly identifying geographical distinctions.  *See, e.g.*, *General Motors Corp. v. Tracy*, 519 U.S. 278, 307 n.15 (1997) ("[I]f a State discriminates against out-of-state interests by drawing

geographical distinctions between entities that are otherwise similarly situated, such facial discrimination will be subject to a high level of judicial scrutiny even if it is directed toward a legitimate health and safety goal.").  For example, the Court said the statute at issue in *Oregon Waste* was facially discriminatory because it imposed a higher surcharge on disposal of solid waste "generated out-of-state" than solid waste generated in-state.  511 U.S. at 96, 99-100.  The Colorado Law makes no such geographic distinction.  *See, e.g.*, *Exxon Corp. v. Governor of Md.*, 437 U.S. 117 (1978) (concluding a statute did not facially discriminate by prohibiting producers or refiners of petroleum products from operating retail service stations in Maryland, even though no producers or refiners were located in the state); *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 352 (1977) (finding facially neutral a law requiring "all closed containers of apples sold, offered for sale, or shipped into the State bear no grade other than the applicable U.S. grade or standard" (quotations omitted)).  As explained above, the Colorado Law distinguishes between those retailers that collect Colorado sales and use tax and those that do not.[17]

---

[17] DMA contends the Colorado Law fails the internal consistency test.  The test "looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate."  *Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1802 (2015) (quotations omitted).  The test has been confined to dormant Commerce Clause review of state taxes.  It is therefore inapplicable here because, again, the Colorado Law imposes a reporting requirement, not a tax.

In the absence of facial discrimination, a state law may nonetheless discriminate against interstate commerce in its direct effects. *See Kleinsmith*, 571 F.3d at 1040 (noting a law "may be neutral in its terms and still discriminate against interstate commerce"); *Hunt*, 432 U.S. at 350-52. We therefore next consider the direct effects of the Colorado Law.

### ii.  The Colorado Law Is Not Discriminatory In Its Direct Effects

A state law may violate the dormant Commerce Clause "when its effect is to favor in-state economic interests over out-of-state interests." *Brown-Forman*, 476 U.S. at 579. In this inquiry, "the critical consideration is the overall effect of the statute on both local and interstate activity." *Id.* We conclude the Colorado Law does not favor in-state economic interests and is not discriminatory in its effects.

We have previously said, "'The Supreme Court has not directly spoken to the question of what showing is required to prove discriminatory effect where, as here, a statute is evenhanded on its face," *Kleinsmith*, 571 F.3d at 1040 (quoting *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 36 (1st Cir. 2007)). But we have held "the party claiming discrimination has the burden to put on evidence of a discriminatory effect on commerce that is 'significantly probative, not merely colorable.'" *Id.* at 1040-41 (quoting *All. of Auto Mfrs. v. Gwadosky*, 430 F.3d 30, 40 (1st Cir. 2005)). The party claiming discrimination must show that the state law benefits local actors and burdens

out-of-state actors, and the result must "alter[] the competitive balance between in-state and out-of-state firms." *Id.* at 1041 (quotations omitted).[18]

### 1) DMA's arguments on differential treatment

As a preliminary matter, DMA is incorrect that (a) "any differential treatment" between in-state and out-of-state entities establishes a violation of the dormant Commerce Clause, and (b) the Colorado Law should be viewed in isolation. Three principles are instructive.

<u>First</u>, the Supreme Court has repeatedly indicated that differential treatment must adversely affect interstate commerce to the benefit of intrastate commerce to trigger dormant Commerce Clause concerns. In that regard, "'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste*, 511 U.S. at 99; *Kleinsmith*, 571 F.3d at 1040 ("Discriminatory laws are those that 'mandate differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter.'" (quoting *Granholm v. Heald*, 544 U.S. 460, 472 (2005)). For that reason, differential treatment that benefits or does not affect out-of-state interests is not a violation of the dormant Commerce Clause. *North Dakota v. United States*, 495 U.S. 423, 439 (1990) ("A

---

[18] In *Kleinsmith*, we determined the plaintiff had not presented evidence sufficient to establish a discriminatory effect because he had failed to show how the state law at issue "alters the competitive balance between resident and nonresident attorneys." *Id.* at 1042. "In light of *Exxon*, Mr. Kleinsmith should at least have produced evidence that the work he had performed was now being done by attorneys who are residents of Utah." *Id.* at 1043. DMA bears a similar burden here.

regulatory regime which so favors the Federal Government cannot be considered to discriminate against it.").

In light of the Colorado consumers' preexisting obligations to pay sales or use taxes whether they purchase goods from a collecting or non-collecting retailer, the reporting obligation itself does not give in-state retailers a competitive advantage. We further note the Supreme Court has upheld differential tax reporting obligations and apportionment formulas for non-resident corporations, *see, e.g.*, *Underwood Typewriter Co. v. Chamberlain*, 254 U.S. 113, 118-20 (1920); *Container Corp. of Am. v. Franchise Tax Bd.*, 463 U.S. 159, 169-70 (1983), and administrative mechanisms to facilitate tax collection, *see, e.g.*, *Travis v. Yale & Towne Mfg. Co.*, 252 U.S. 60 (1920).[19]

Second, equal treatment requires that those similarly situated be treated alike. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (stating that under the Equal Protection Clause, "all persons similarly situated should be treated alike"). Conversely, disparate treatment is not unequal treatment or discrimination if the subjects of the treatment are not similarly situated. This basic principle of equal protection law applies to whether a state law discriminates against out-of-state actors relative to in-state actors. In *General Motors Corp. v. Tracy*, 519 U.S. 278 (1997), the Supreme Court upheld an Ohio statute that exempted local natural gas distribution companies ("LDCs")

---

[19] Although *Travis* involved a claim under the Privileges and Immunities Clause, the Supreme Court in *Wynne* recently relied on *Travis* to resolve a claim under the Commerce Clause. *See Wynne*, 135 S. Ct. at 1799-1800 (citing *Travis*, 252 U.S. at 75, 79-80).

from sales and use tax while out-of-state producers and marketers had to collect it. *Id.* at 281-82.  The Court said the in-state and out-of-state companies were not similarly situated and did not have to be treated the same. *Id.* at 298-99, 310.  Here, the non-collecting out-of-state retailers are not similarly situated to the in-state retailers, who must comply with tax collection and reporting requirements that are not imposed on the out-of-state non-collecting retailers.

<u>Third</u>, despite DMA's myopic view to the contrary, the Supreme Court has repeatedly stressed that laws are not to be understood in isolation, but in their broader context.  In *West Lynn Creamery*, the Court expressly declined to "analyze separately two parts of an integrated regulation," and said it is "the entire program . . . that simultaneously burdens interstate commerce and discriminates in favor of local producers."  512 U.S. at 201; *see also Ala. Dep't of Revenue v. CSX Transp., Inc.* ("*CSX II*"), 135 S. Ct. 1136, 1143 (2015) ("It is undoubtedly correct that the 'tax' (singular) must discriminate—but it does not discriminate unless it treats railroads differently from other *similarly situated* taxpayers *without sufficient justification*.");[20] *North Dakota*, 495 U.S. at 435 ("[T]he question whether a state regulation discriminates against the Federal Government cannot be viewed in isolation.  Rather, the entire regulatory system should be analyzed to determine whether it is discriminatory with regard to the economic

---

[20] *CSX II* was not a dormant Commerce Clause case, but in analyzing the 4-R Act, the Court borrowed from dormant Commerce Clause precedent to explain a law should be assessed in context to determine whether it discriminates. *Id.* at 1143 (citing *Gregg Dyeing Co. v. Query*, 286 U.S. 472, 479-80 (1932)).

burdens that result." (quotations omitted)); *Gregg Dyeing Co. v. Query*, 286 U.S. 472,

479-80 (1932) ("What is required is that state action, whether through one agency or

another, or through one enactment or more than one, shall be consistent with the

restrictions of the Federal Constitution.  There is no demand in that Constitution that the

state shall put its requirements in any one statute.  It may distribute them as it sees fit, if

the result, taken in its totality, is within the state's constitutional power.").

The broader context helps determine whether a law "alters the competitive balance

between in-state and out-of-state firms."  *Kleinsmith*, 571 F.3d at 1041 (quotations

omitted).  Here, the reporting requirements are designed to increase compliance with

preexisting tax obligations, and apply only to retailers that are not otherwise required to

comply with the greater burden of tax collection and reporting.  DMA has not shown the

Colorado Law imposes a discriminatory economic burden on out-of-state vendors when

viewed against the backdrop of the collecting retailers' tax collection and reporting

obligations.  And as discussed more fully below, even if we limit our comparative

analysis to the notice and reporting obligations imposed on collecting and non-collecting

vendors, DMA has failed to show the Colorado Law unconstitutionally discriminates

against interstate commerce.

### 2)  *Quill* and discriminatory effect

Whether the Colorado Law works a discriminatory effect on interstate commerce

turns on the reach of *Quill*.  The Department contends the law is not discriminatory

because out-of-state retailers can either (a) comply with the notice and reporting

requirements or (b) collect and remit taxes like in-state retailers.  DMA contends this

argument fails because *Quill* protects out-of-state retailers from having to collect and remit taxes, making the Colorado Law's only function to impose new notice and reporting responsibilities on out-of-state retailers that in-state retailers need not perform.

As an initial matter, we disagree with the Department that out-of-state retailers' having the option to collect and remit sales taxes makes the Colorado Law non-discriminatory. *Quill* unequivocally holds that out-of-state retailers without a physical presence in the state need not collect sales tax. *See Quill*, 504 U.S. at 301-02. *Quill* privileges out-of-state retailers in that regard, and the possibility that they might choose to give up that privilege rather than comply with the challenged Colorado Law does not make the Colorado Law constitutional. *Bendix*, 486 U.S. at 893.

But *Quill* applies only to the collection of sales and use taxes, and the Colorado Law does not require the collection or remittance of sales and use taxes. Instead, it imposes notice and reporting obligations. Those notice and reporting obligations are discriminatory only if they constitute "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter," *Or. Waste*, 511 U.S. at 99, and thereby "alter[] the competitive balance between in-state and out-of-state firms," *Kleinsmith*, 571 F.3d at 1041 (quotations omitted). DMA has not produced significant probative evidence establishing such discriminatory treatment.

3) Comparative regulation and DMA's burden

Even if we limit our comparative analysis to the regulatory requirements imposed on in-state retailers and out-of-state retailers, DMA has not demonstrated the Colorado Law unconstitutionally discriminates against interstate commerce.

In addition to collecting sales taxes, holding them in trust, and remaining liable for any sales and use tax due on a transaction, *see* Colo. Rev. Stat. §§ 39-26-105, -118(1), in-state retailers must comply with numerous requirements, including obtaining a license; calculating the state and local tax due while accounting for any tax exemptions; filing a return; remitting the tax to the State; and maintaining various records. *See* Colo. Rev. Stat. §§ 39-26-101 to -129.

Of these notice and reporting requirements, in-state retailers can be compelled to collect and remit sales taxes while non-collecting out-of-state retailers cannot. *Quill*, 504 U.S. at 301-02. But *Quill* does not establish that out-of-state retailers are free from all regulatory requirements—only tax collection and liability. *See id.* at 315 ("Under *Bellas Hess*, . . . vendors [without a physical presence in the state] are free from state-imposed duties to *collect* sales and use taxes." (emphasis added)).

As the Supreme Court recently explained in *CSX II*:

> It does not accord with ordinary English usage to say that a tax discriminates against a rail carrier if a rival who is exempt from that tax must pay *another* comparable tax from which the rail carrier is exempt. If that were true, *both* competitors could claim to be disfavored—discriminated against—relative to each other. Our negative Commerce Clause cases endorse the proposition that an additional tax on third parties may justify an otherwise discriminatory tax. We think that an alternative, roughly equivalent tax is one possible justification that renders a tax disparity nondiscriminatory.

135 S. Ct. at 1143 (citations omitted)); *see also Travis*, 252 U.S. at 76 ("The contention

that an unconstitutional discrimination against noncitizens arises out of the provision of

section 366 confining the withholding at source to the income of nonresidents is

unsubstantial.  That provision does not in any wise increase the burden of the tax upon

nonresidents, but merely recognizes the fact that as to them the state imposes no personal

liability, and hence adopts a convenient substitute for it.").

DMA does not point to any evidence establishing that the notice and reporting

requirements for non-collecting out-of-state retailers are more burdensome than the

regulatory requirements in-state retailers already face.  Because DMA has not carried its

burden and identified significant probative evidence of discrimination, *see Kleinsmith*,

571 F.3d at 1040, it has not established that the Colorado Law discriminates in its direct

effects.

\* \* \*

Because we conclude the Colorado Law is not discriminatory, "it is [not] virtually

per se invalid," and it need not survive strict scrutiny.  *Or. Waste*, 511 U.S. at 99.  State

laws that are not discriminatory must nevertheless not unduly burden interstate

commerce.  *See Davis*, 553 U.S. at 353.

### D. *Undue Burden*

Whether a state law unduly burdens interstate commerce is a separate inquiry from

whether a state law discriminates against interstate commerce.  In *Quill*, the Supreme

Court explained that the first step of the *Complete Auto* test—whether a tax "is applied to

an activity with a substantial nexus with the taxing State"—the step on which the *Quill*

decision was based, "limit[s] the reach of state taxing authority so as to ensure that state

taxation does not unduly burden interstate commerce."  504 U.S. at 311, 313.

The district court decided the undue burden issue on the basis that *Quill*'s bright-

line rule applied.  DMA limits its undue burden argument to *Quill* and also states that

"[b]ecause the Act is discriminatory, the test generally applied to even-handed

regulations plainly does not apply in this case," Aplee. Supp. Br. at 23 n.8 (citing *Pike*,

397 U.S. at 142).[21]  We therefore address undue burden based on *Quill* and do not reach a

balancing analysis under *Pike*, 397 U.S. at 142.

1. **District Court Order**

The district court determined the Colorado Law unduly burdens interstate

commerce in violation of the dormant Commerce Clause.  It noted *Quill* counsels looking

beyond the formal language of a statute and considering its practical effect.  *See Quill*,

504 U.S. at 310.  Although *Quill* itself narrowly focused on sales and use taxes, the

---

[21] In the same footnote, DMA argues Colorado's expert testimony shows the burdens imposed on non-collecting retailers—"an estimated $25 million to $60 million in the first year, and $10 million annually thereafter"—are "grossly excessive" compared to the initial annual revenue of $12.5 million estimated to result from the Colorado Law. Aplee. Supp. Br. at 23 n.8.  The district court did not analyze DMA's claims under the *Pike* balancing test, and DMA's single sentence is inadequate to present a *Pike* balancing argument on appeal.  DMA also "refers the Court" to DMA's argument section of its brief filed in 2012, *id.* at 2 n.1, but when we granted DMA's motion to file supplemental briefs after the case was remanded by the Supreme Court, we "direct[ed] the parties to provide *full briefing* on the Commerce Clause claims . . . and any other issues the parties consider pertinent to this appeal on remand."  *Direct Mktg. Ass'n v. Brohl*, No. 12-1173, at *1 (10th Cir. Apr. 13, 2015) (unpublished) (emphasis added).

district court noted that the Colorado Law "require[s] out-of-state retailers to gather, maintain, and report information, and to provide notices to their Colorado customers and to the [Department]," and "[t]he sole purpose of these requirements is to enhance the collection of use taxes by the State of Colorado." *Huber*, 2012 WL 1079175, at *8. As a result, the district court concluded "that the burdens imposed by the Act and the Regulations are inextricably related in kind and purpose to the burdens condemned in *Quill*." *Id.* On that basis, the court determined the Colorado Law imposed an undue burden on interstate commerce. *Id.* at *9.

2. **Analysis**

DMA relies solely on *Quill* for its undue burden claim, and the district court limited its analysis of undue burden to *Quill*. We conclude that the Colorado Law does not impose an undue burden on interstate commerce.[22] *Quill* is not binding in light of Supreme Court and Tenth Circuit decisions construing it narrowly to apply only to the duty to collect and remit taxes.

As explained earlier, *Quill* is limited to the narrow context of tax collection. In *Brohl II*, the Supreme Court not only characterized *Quill* as establishing the principle that a state "may not require retailers who lack a physical presence in the State to *collect* these taxes on behalf of the Department," 135 S. Ct. at 1127 (emphasis added), it also

_____

[22] We note that the Colorado state district court that addressed whether the Colorado Law imposes an undue burden under *Quill* came to the same conclusion. *Direct Mktg. Ass'n*, No. 13CV34855, at 28-30.

concluded that the notice and reporting requirements of the Colorado Law do not constitute a form of tax collection, *id.* at 1130-31.  As the Court repeatedly stated in its TIA analysis, the Colorado Law does not require out-of-state retailers to assess, levy, or collect use tax on behalf of Colorado.  *Id.* at 1131 ("The TIA is keyed to the acts of assessment, levy, and collection themselves, and enforcement of the notice and reporting requirements is none of these.").  The Court determined "the notice and reporting requirements precede the steps of 'assessment' and 'collection,'" in part because "[a]fter each of these notices or reports is filed, the State still needs to take further action to assess the taxpayer's use-tax liability and to collect payment from him." *Id.*[23]

As a result, *Quill*—confined to the sphere of sales and use tax collection—is not controlling.  The *Brohl II* Court's logic for reversing *Brohl I* precludes any other result.  It reversed the panel's TIA determination precisely because it determined the relief sought in this litigation—invalidating the Colorado Law—would not "enjoin, suspend or restrain the assessment, levy or collection of any tax under State law."  *Id.* at 1127 (quoting 28 U.S.C. § 1341).  The holding in *Brohl II* cannot be squared with the district court's determination that the Colorado Law functionally compels the collection of taxes, *see Huber*, 2012 WL 1079175, at *8.  The Court's conclusion in *Brohl II* controls.  DMA's success in *Brohl II* leads to the demise of its undue burden argument here.

---

[23] The Department did not "seriously contend" the notice and reporting requirements constituted a levy.  *Id.*

Having determined *Quill* is not controlling in the instant case, we cannot identify

any good reason to sua sponte extend the bright-line rule of *Quill* to the notice and

reporting requirements of the Colorado Law.  Because the Colorado Law's notice and

reporting requirements are regulatory and are not subject to the bright-line rule of *Quill*,

this ends the undue burden inquiry.[24]

## IV. **CONCLUSION**

Applying the law to the record, we hold the Colorado Law does not violate the

dormant Commerce Clause because it does not discriminate against or unduly burden

interstate commerce.  We therefore reverse the district court's order granting summary

judgment and remand for further proceedings consistent with this opinion.  We conclude

by noting the Supreme Court's observation in *Quill* that Congress holds the "ultimate

power" and is "better qualified to resolve" the issue of "whether, when, and to what

extent the States may burden interstate [retailers] with a duty to collect [sales and] use

taxes."  504 U.S. at 318.[25]

---

[24] At this point, the regulatory requirements must only satisfy due process requirements, and DMA has not made a due process challenge in its motion for summary judgment or its arguments on appeal.

[25] We grant the motions for leave to file amici briefs and the motion for leave to file a joint reply in support of the motions for leave to file amici briefs.

No. 12-1175, *Direct Marketing Association v. Brohl*

**GORSUCH**, Circuit Judge, concurring.

I agree with everything the court has said and write only to acknowledge a few additional points that have influenced my thinking in this case.

In our legal order past decisions often control the outcome of present disputes. Some criticize this feature of our law, suggesting that respect for judicial precedent invests dead judges with too much authority over living citizens. They contend, too, that it invites current judges to avoid thinking for themselves and to succumb instead in "judicial somnambulism." Jerome Frank, Law and the Modern Mind 171 (1930). But in our legal order judges distinguish themselves from politicians by the oath they take to apply the law as it is, not to reshape the law as they wish it to be. And in taking the judicial oath judges do not necessarily profess a conviction that every precedent is rightly decided, but they must and do profess a conviction that a justice system that failed to attach power to precedent, one that surrendered similarly situated persons to wildly different fates at the hands of unconstrained judges, would hardly be of the name.

At the center of this appeal is a claim about the power of precedent. In fact, the whole field in which we are asked to operate today — dormant commerce clause doctrine — might be said to be an artifact of judicial precedent. After all, the Commerce Clause is found in Article I of the Constitution and it grants Congress the authority to adopt laws regulating interstate commerce. Meanwhile, in dormant commerce clause cases Article III courts have claimed the

(anything but dormant) power to strike down some state laws even in the absence of congressional direction. *See, e.g.*, *Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1808 (2015) (Scalia, J., dissenting); *Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 614-17 (1997) (Thomas, J., dissenting). And the plaintiffs' attempt in this case to topple Colorado's statutory scheme depends almost entirely on a claim about the power of a single dormant commerce clause decision: *Quill Corp. v. North Dakota*, 504 U.S. 298 (1992).

Everyone before us acknowledges that *Quill* is among the most contentious of all dormant commerce clause cases. Everyone before us acknowledges that it's been the target of criticism over many years from many quarters, including from many members of the Supreme Court. *See* Maj. Op. at 15 n.14 (citing scholarly literature); *Quill*, 504 U.S. at 319-20 (Scalia, J., concurring in part and concurring in the judgment); *id.* at 321-33 (White, J., concurring in part and dissenting in part); *Direct Mktg. Ass'n v. Brohl*, 135 S. Ct. 1124, 1134-35 (2015) (Kennedy, J., concurring). But, the plaintiffs remind us, *Quill* remains on the books and we are duty-bound to follow it. And about that much the plaintiffs are surely right: we are obliged to follow *Quill* out of fidelity to our system of precedent whether or not we profess confidence in the decision itself. For while a court may in rare circumstances overrule a decision of its own devise, or one of a lower court, this

court may of course never usurp the power to overrule a decision of the Supreme Court.

With that much plain enough, the question remains what exactly *Quill* requires of us.  Later (reading) courts faced with guidance from earlier (writing) courts sometimes face questions how best to interpret that guidance.  And the parties before us today offer wildly different accounts of *Quill*.  Most narrowly, everyone agrees that *Quill*'s holding forbids states from imposing sales and use tax collection duties on firms that lack a physical presence in-state.  And everyone agrees that Colorado's law doesn't quite go that far.  While Colorado requires in-state brick-and-mortar firms to collect sales and use taxes, it asks out-of-state mail order and internet firms only to supply reports designed to enable the state itself to collect the taxes in question.  Indeed, Colorado suggests that its statutory scheme carefully and consciously stops (just) short of doing what *Quill*'s holding forbids.

But as the plaintiffs note, that is hardly the end of it.  Our obligation to precedent obliges us to abide not only a prior case's holding but also to afford careful consideration to the reasoning (the "ratio decidendi") on which it rests.  And surely our respect for a prior decision's reasoning must be at its zenith when the decision emanates from the Supreme Court.  Indeed, our court has said that it will usually defer even to the dicta (not just the ratio) found in Supreme Court decisions.  *See, e.g.*, *Tokoph v. United States*, 774 F.3d 1300, 1303-04 (10th Cir.

-3-

2014).  And building on this insight the plaintiffs argue that respect for *Quill*'s ratio, if not its holding, requires us to strike down Colorado's law.  After all, the plaintiffs note, Colorado's regulatory scheme seeks to facilitate the collection of sales and use taxes by requiring out-of-state firms to satisfy various notice and reporting obligations — burdens comparable in their severity to those associated with collecting the underlying taxes themselves.

It's a reasonable argument, but like my colleagues I believe there's a reason it's wrong.  The reason lies in the exceptional narrowness of *Quill*'s ratio.  If the Court in *Quill* had suggested that state laws commanding out-of-state firms to collect sales and use taxes violated dormant commerce clause doctrine because they are too burdensome, then I would agree that we would be obliged to ask whether Colorado's law imposes a comparable burden.  But *Quill*'s ratio doesn't sound in the comparability of burdens — it is instead and itself all about the respect due precedent, about the doctrine of *stare decisis* and the respect due a still earlier decision.  *See Quill*, 504 U.S. at 317; *id.* at 320 (Scalia, J., concurring in part and concurring in the judgment); *Brohl*, 135 S. Ct. at 1134 (Kennedy, J., concurring).

This distinction proves decisive.  Some years before *Quill*, in *National Bellas Hess, Inc. v. Department of Revenue of Illinois*, 386 U.S. 753 (1967), the Supreme Court held that states could not impose use tax collection duties on out-of-state firms.  In *Quill*, the Court openly reconsidered that decision and

-4-

ultimately chose to retain its rule — but did so only to protect the reliance interests that had grown up around it.  Indeed, the Court expressly acknowledged that *Bellas Hess* very well might have been decided differently under "contemporary Commerce Clause jurisprudence" and cases like *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274 (1977).  *Quill, 504 U.S.* at 311; *cf.* Billy Hamilton, *Remembrance of Things Not So Past: The Story Behind the Quill Decision*, 59 St. Tax Notes Mag. 807 (2011).  The Court also expressly acknowledged that states can constitutionally impose tax and regulatory burdens on out-of-state firms that are more or less comparable to sales and use tax collection duties.  *See Quill*, 504 U.S. at 311-12, 314-15.  And the Court expressly acknowledged that this dichotomy — between (impermissible) sales and use tax collection obligations and (permissible) comparable tax and regulatory burdens — is pretty "artificial" and "formalistic."  *Id.*  Given all this, respect for *Quill*'s reasoning surely means we must respect the *Bellas Hess* rule it retained.  But just as surely it means we are under no obligation to extend that rule to comparable tax and regulatory obligations.

In fact, this much is itself a matter of precedent for this court and many others have already held *Quill* does nothing to forbid states from imposing regulatory and tax duties of comparable severity to sales and use tax collection duties.  *See, e.g.*, *Am. Target Advert., Inc. v. Giani*, 199 F.3d 1241, 1255 (10th Cir. 2000), *cert. denied*, 531 U.S. 811 (2000); *KFC Corp. v. Iowa Dep't of*

*Revenue*, 792 N.W.2d 308, 324-28 (Iowa 2010), *cert. denied*, 132 S. Ct. 97 (2011) (mem.); *Capital One Bank v. Comm'r of Revenue*, 899 N.E.2d 76, 84-86 (Mass. 2009), *cert. denied*, 557 U.S. 919 (2009); *Tax Comm'r v. MBNA Am. Bank, N.A.*, 640 S.E.2d 226, 232-34 (W. Va. 2006), *cert. denied sub nom FIA Card Servs., N.A. v. Tax Comm'r*, 551 U.S. 1141 (2007).

It may be rare for Supreme Court precedents to suffer as highly a "distinguished" fate as *Bellas Hess* — but it isn't unprecedented.  Take baseball. Years ago and speaking through Justice Holmes, the Supreme Court held baseball effectively immune from the federal antitrust laws and did so reasoning that the "exhibition[] of base ball" by professional teams crossing state lines didn't involve "commerce among the States."  *Federal Baseball Club of Balt., Inc. v. Nat'l League of Prof'l Baseball Clubs*, 259 U.S. 200, 208-09 (1922).  Since then the Supreme Court has recognized that other organizations offering "exhibitions" in various states *do* engage in interstate commerce and *are* subject to antitrust scrutiny.  *E.g.*, *United States v. Shubert*, 348 U.S. 222, 230-31 (1955).  But though it has long since rejected the reasoning of *Federal Baseball*, the Supreme Court has still chosen to retain the holding itself — continuing to rule baseball effectively immune from the antitrust laws, if now only out of respect for the reliance interests the *Federal Baseball* decision engendered in that particular industry.  *Toolson v. N.Y. Yankees, Inc.*, 346 U.S. 356, 357 (1953) (per curiam). And, of course, Congress has since codified baseball's special exemption.  *See* 15

U.S.C. § 26b.  So it is that the baseball rule now applies only to baseball itself, having lost every away game it has played.

Accepting at this point that *Quill* doesn't require us to declare Colorado's law unconstitutional, the question remains whether some other principle in dormant commerce clause doctrine might.  For their part the plaintiffs identify (only) one other potential candidate, suggesting that Colorado's law runs afoul of the principle that states may not discriminate against out-of-state firms, a principle often associated with *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186 (1994).  And to the extent that there's anything that's uncontroversial about dormant commerce clause jurisprudence it may be this anti-discrimination principle, for even critics of dormant commerce clause doctrine often endorse it even as they suggest it might find a more textually comfortable home in other constitutional provisions.  *E.g.*, *Camps Newfound*, 520 U.S. at 610 (Thomas, J., dissenting).

But any claim of discrimination in this case is easily rejected.  The plaintiffs haven't come close to showing that the notice and reporting burdens Colorado places on out-of-state mail order and internet retailers compare unfavorably to the administrative burdens the state imposes on in-state brick-and-mortar retailers who must collect sales and use taxes.  If anything, by asking us to strike down Colorado's law, out-of-state mail order and internet retailers don't seek comparable treatment to their in-state brick-and-mortar rivals, they seek

-7-

more favorable treatment, a competitive advantage, a sort of judicially sponsored arbitrage opportunity or "tax shelter." *Quill*, 504 U.S. at 329 (White, J., concurring in part and dissenting in part).

Of course, the mail order and internet retailer plaintiffs might respond that, whatever its propriety, they are entitled to a competitive advantage over their brick-and-mortar competitors thanks to *Bellas Hess* and *Quill*.  And about that much (again) I cannot disagree.  It is a fact — if an analytical oddity — that the *Bellas Hess* branch of dormant commerce clause jurisprudence guarantees a competitive benefit to certain firms simply because of the organizational form they choose to assume while the mainstream of dormant commerce clause jurisprudence associated with *West Lynn Creamery* is all about preventing discrimination between firms.[1]  And the plaintiffs might well complain that the competitive advantage they enjoy will be diluted by our decision in this case. Indeed, if my colleagues and I are correct that states may impose notice and reporting burdens on mail order and internet retailers comparable to the sales and

---

[1]  An oddity that, if anything, seems to grow by the day, for if it were ever thought that mail-order retailers were small businesses meriting (constitutionalized, no less) protection from behemoth brick-and-mortar enterprises, that thought must have evaporated long ago.  Anecdotal evidence to be sure but consider:  today's e-commerce retail leader, Amazon, recorded nearly ninety billion dollars in sales in 2014 while the vast majority of small businesses recorded no online sales at all.  *See* Amazon.com, Inc., Annual Report on SEC Form 10-K at 17 (2014); Ryan Lunka, *Retail Data: 100 Stats About Retail, eCommerce & Digital Marketing* (July 9, 2015), https://www.nchannel.com/blog/retail-data-ecommerce-statistics/.

use tax collection obligations they impose on brick-and-mortar firms, many (all?) states can be expected to follow Colorado's lead and enact statutes like the one now before us.

But this result too seems to me, as it does to my colleagues, entirely consistent with the demands of precedent. After all, by reinforcing an admittedly "formalistic" and "artificial" distinction between sales and use tax collection obligations and other comparable regulatory and tax duties, *Quill* invited states to impose comparable duties. In this way, *Quill* might be said to have attached a sort of expiration date for mail order and internet vendors' reliance interests on *Bellas Hess*'s rule by perpetuating its rule for the time being while also encouraging states over time to find ways of achieving comparable results through different means. In this way too *Quill* is perhaps unusual but hardly unprecedented, for while some precedential islands manage to survive indefinitely even when surrounded by a sea of contrary law (*e.g.*, *Federal Baseball*), a good many others disappear when reliance interests never form around them or erode over time (*e.g.*, *Montejo v. Louisiana*, 556 U.S. 778, 792-93 (2009)). And *Quill*'s very reasoning — its *ratio decidendi* — seems deliberately designed to ensure that *Bellas Hess*'s precedential island would never expand but would, if anything, wash away with the tides of time.

I respectfully concur.